THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MARK C. KRAUSE (SBN 198142)
Assistant United States Attorney
Deputy Chief, Cyber and Intellectual
Property Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3493
     Facsimile: (213) 894-8601
     Email: mark.krause@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO. 08-582-GW |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF THE DEATH OF M.T.M. |
| v. | ) | |
| | ) | |
| LORI DREW, | ) | |
| | ) | Hearing Date: November 10, 2008 |
| Defendant. | ) | Hearing Time: 8:30 a.m. |
| | ) | Trial Date: November 18, 2008 |
| | ) | Trial Time: 8:00 a.m. |
| | ) | Place: Courtroom of the |
| | ) | Hon. George H. Wu |

    Plaintiff United States of America, by and through its

counsel of record, United States Attorney Thomas P. O'Brien and

Assistant United States Attorney Mark C. Krause, hereby files

this opposition to defendant's motion in limine to exclude

evidence of the death of victim M.T.M..

\\\

\\\

\\\

This opposition is based on the attached memorandum of points and authorities, the files and records in this case, and whatever evidence or argument this Court may consider.

Dated: November ⟋ , 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

MARK C. KRAUSE
Assistant United States Attorneys

Attorneys for Plaintiff
United States of America

TABLE OF CONTENTS

Page

I       INTRODUCTION . . . . . . . . . . . . . . . . . . .   1

II      STATEMENT OF FACTS . . . . . . . . . . . . . . . .   2

        A.    DEFENDANT EMBARKS ON SCHEME TO OBTAIN INFORMATION
              ABOUT M.T.M. . . . . . . . . . . . . . . . .   3

        B.    DEFENDANT AND HER CO-CONSPIRATORS USE THE FAKE
              MYSPACE ACCOUNT . . . . . . . . . . . . . . .   4

        C.    DEFENDANT ACKNOWLEDGES INVOLVEMENT IN SCHEME   . . . .   6

        D.    DEFENDANT'S STORY CHANGES FOLLOWING M.T.M.'s DEATH   .   6

              1.    Defendant's Hairdresser   . . . . . . . . . .   7

              2.    Defendant's Friend . . . . . . . . . . .   7

              3.    Defendant's Colleague . . . . . . . . .   8

III     ARGUMENT . . . . . . . . . . . . . . . . . . . .   8

        A.    THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE
              BECAUSE EVIDENCE RELATED TO THE DEATH OF VICTIM M.T.M.
              IS HIGHLY PROBATIVE ON THE ISSUE OF DEFENDANT'S INTENT
              AND PROVIDES CONTEXT FOR DEFENDANT'S CONDUCT AND
              STATEMENTS . . . . . . . . . . . . . . . . .   8

        B.    THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE
              BECAUSE THE SUBSTANTIAL PROBATIVE VALUE WOULD NOT BE
              SUBSTANTIALLY OUTWEIGHED BY THE LIMITED PREJUDICIAL
              EFFECT . . . . . . . . . . . . . . . . . . . .   12

IV      CONCLUSION . . . . . . . . . . . . . . . . . . .   20

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                Page(s)

Huddleston v. United States,
    485 U.S. 681 (1988) . . . . . . . . . . . . . . . . . . .   13

Jenkins v. Associated Transport, Inc.,
    330 F.2d 706 (6th Cir. 1964) . . . . . . . . . . . . . .   15

Old Chief v. United States,
    519 U.S. 172 (1997) . . . . . . . . . . . . . . . . . .   19

United States v. Allen,
    341 F.3d 870 (9th Cir. 2003) . . . . . . . . . . . . . .   16

United States v. Bailleaux,
    685 F.2d 1105 (9th Cir. 1982) . . . . . . . . . . . 13, 14

United States v. Bland,
    908 F.2d 471 (9th Cir. 1990) . . . . . . . . . . 17, 18, 19

United States v. Boise,
    916 F.2d 497 (9th Cir. 1990) . . . . . . . . . . . . . .   15

United States v. Bradley,
    5 F.3d 1317 (9th Cir. 1994) . . . . . . . . . . . . . .   18

United States v. Ellis,
    147 F.3d 1131 (9th Cir. 1998) . . . . . . . . . . . . .   18

United States v. Ganoe,
    538 F.3d 1117 (9th Cir. 2008) . . . . . . . . . . . 15, 16

United States v. Gartmon,
    146 F.3d 1015 (D.C. Cir. 1998) . . . . . . . . . . . . .   13

United States v. Layton,
    767 F.2d 549 (9th Cir. 1985) . . . . . . . . . . . . . .   16

United States v. LeMay,
    260 F.3d 1018 (9th Cir. 2001) . . . . . . . . . . . 16, 17

ii

**TABLE OF AUTHORITIES (cont'd)**

**FEDERAL CASES**                                                    **Page(s)**

United States v. Lewis,
    837 F.2d 415 (9th Cir. 1988) . . . . . . . . . . . . . .   16

United States v. McDonald,
    576 F.2d 1350 (9th Cir. 1978) . . . . . . . . . . . 9, 11

United States v. Mende,
    43 F.3d 1298 (9th Cir. 1995) . . . . . . . . . . . .   16

United States v. Merriweather,
    78 F.3d 1070 (6th Cir. 1996) . . . . . . . . . . . .   19

United States v. Mitchell,
    502 F.3d 931 (9th Cir. 2007) . . . . . . . . . . . .   16

United States v. Morales-Aldahondo,
    524 F.3d 115 (1st Cir. 2008) . . . . . . . . . . . .   15

United States v. Parker,
    549 F.2d 1217 (9th Cir. 1977) . . . . . . . . . . .   12

United States v. Ramirez-Jiminez,
    967 F.2d 1321 (9th Cir. 1992) . . . . . . . . . . .   18

United States v. Ripinsky,
    109 F.3d 1442 (9th Cir. 1997) . . . . . . . . . . .   11

United States v. Rincon,
    28 F.3d 921 (9th Cir. 1994) . . . . . . . . . . . .   18

United States v. Skillman,
    922 F.2d 1370 (9th Cir. 1991) . . . . . . . . . . .   13

United States v. Vicarra-Martinez,
    66 F.3d 1006 (9th Cir. 1995) . . . . . . . . . . . .   10

United States v. Wecker,
    620 F. Supp. 1002 (D. Del. 1985) . . . . . . . . . .   12

# TABLE OF AUTHORITIES (cont'd)

**STATE CASES**                                                    **Page(s)**

Hailey v. California Physicians Services,
    2007 WL 4472790 (Cal. App. Dec. 4, 2007) . . . . . . . . .   10

People v. Dyer,
    45 Cal. 3d 26 (1988) . . . . . . . . . . . . . . . . .   15

Rodriguez v. McDonnell Douglas Corp.,
    87 Cal. App. 3d 626 (1978) . . . . . . . . . . . . . .   15

**FEDERAL STATUTES**

18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . .  1, 9, 10

**FEDERAL RULES**

Fed. R. Crim. P. 7 . . . . . . . . . . . . . . . . . .   12

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . .   9

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## INTRODUCTION

Defendant Lori Drew has been charged in the four count indictment with (1) conspiring to access protected computers without authorization in violation of 18 U.S.C. § 1030(a)(2) (Count One); and (2) accessing protected computers without authorization to obtain information to further a tortious act (Counts Two through Four).  Trial in this matter has been scheduled for November 18, 2008.

On November 2, 2008, defendant filed a motion in limine to exclude evidence related to the death of victim M.T.M.  Defendant contends the evidence should be excluded as irrelevant under Rules 401 and 402 of the Federal Rules of Evidence or, in the alternative, unduly prejudicial under Rule 403.  Defendant's arguments are unavailing.

First, evidence of M.T.M.'s death is relevant under Rule 401.  The evidence is plainly probative on the issue of defendant's motive and intent.  Defendant is charged with engaging in a scheme to obtain information to further a tortious act, namely, intentional infliction of emotional distress. Evidence that defendant did, in fact, cause emotional distress is therefore probative to show that she acted with that purpose. Such evidence is also probative to show that the conduct in which she was involved was "outrageous" within the meaning of the law governing intentional infliction of emotional distress.  On a

more fundamental level, the evidence is also necessary to allow the government to provide a logical narrative to the jury.  The government anticipates calling a series of witnesses who will testify about conduct defendant took in response to the death. The government also anticipates calling witnesses to describe defendant's statements regarding the incident, including the death.  The government also expects to elicit testimony showing that defendant's description of her conduct changed after the death.  Depriving the government of evidence regarding the death would take defendant's conduct and statements out of context and, therefore, deprive both of their meaning and comprehensibility.

Second, and relatedly, because the evidence of M.T.M.'s death is highly probative, it should not be excluded under Rule 403.  M.T.M's death is central to the case.  Courts routinely admit evidence that is both less probative and more inflammatory than that found here.  Finally, even if that evidence has the risk of causing undue prejudice, that risk can be mitigated with careful voir dire and cautionary instructions to the jury.

Defendant concludes by saying "this case is not about what happened to M.T.M."  (Def's Mot. at 5.)  As laid out below, because defendant is mistaken, her motion in limine should be denied.

II

STATEMENT OF FACTS

Although the facts of this case have been detailed before in

2

prior pleadings, several facts related to the death of victim
M.T.M. are extremely relevant to the instant motion.

A.   DEFENDANT EMBARKS ON SCHEME TO OBTAIN INFORMATION ABOUT
     M.T.M.

For several years, defendant's family and another local
neighborhood family, the Meiers, were friendly.  Each family had
a daughter the same age.  The two attended school together and
were friends; however, their relationship was, at times, rocky.
M.T.M. spent a great deal of time at defendant's residence and
even traveled with defendant's family.  During one such trip,
defendant administered M.T.M. her prescription medication.  On
other occasions, M.T.M. feuded with defendant's daughter.  In
addition, at times M.T.M. would act out and defendant would send
her home, telling M.T.M. that she needed to take her medication.

Over time, the two girls drifted apart and, in 2005, the
Meiers decided to transfer M.T.M. from the local public school to
a local Catholic school.  Christina Meier, M.T.M.'s mother
confided in defendant that she was concerned about M.T.M.'s
mental health and believed M.T.M. was particularly vulnerable.
Specifically, Meier told defendant that M.T.M. was suffering from
depression -- so much so that Meier expressed concern that the
Meiers would need to reverse the locks on the door to M.T.M.'s
bedroom so that she could not lock herself in and harm herself.
Meier also told defendant that M.T.M. would become distraught
when defendant would speak harshly to her and send her home.

Over the summer of 2006, defendant and her family became
concerned that M.T.M. was spreading malicious rumors about

3

defendant's daughter.  Defendant discussed the matter with her

daughter and her eighteen year old employee, Ashley Grills.  The

three conceived of a scheme where they would pretend to be an

attractive male teenager on Myspace.com ("MySpace") and approach

M.T.M. through MySpace using that false identity to obtain

M.T.M.'s confidence.  Once they had gained M.T.M.'s confidence,

the co-conspirators planned to find out what M.T.M. was saying on

MySpace, including what M.T.M. was saying about defendant's

daughter.  Grills pointed out that there was a risk they would

get in trouble if the scheme were uncovered; however, defendant

assured Grills that they would not and, in any event, many people

created fake identities on the Internet.

B.    DEFENDANT AND HER CO-CONSPIRATORS USE THE FAKE MYSPACE
      ACCOUNT

On September 20, 2008, defendant and her co-schemers created

a MySpace profile under the fake name "Josh Evans."  "Evans" was

supposedly a teenager who was new to the area and was home-

schooled.  "Evans" was supposedly lonely because he did not know

anyone in the area and "his" father had abandoned the family.

The co-schemers also posted a photograph of an attractive boy on

the profile to further the fraud.[1]  On that same date, defendant

and her co-schemers contacted M.T.M. through the MySpace

communication services.[2]  Smitten with the attractive "boy's"

---

[1] The co-conspirators did not ask anyone's permission before
posting the photograph.

[2] Because M.T.M. registered for a juvenile account, that is,
an account for members under the age of sixteen, her account was
designated "private."  As a result, the content on her page was

4

1  invitation to communicate, M.T.M. agreed to communicate with

2  "him."

3      Although the initial communications were innocent enough,

4  within days, defendant encouraged her co-schemers to flirt with

5  M.T.M.  Defendant also discussed using the information obtained

6  during the scheme to humiliate M.T.M. in the real world.

7  Specifically, when it became clear frm the communications that

8  M.T.M. was attracted to "Josh Evans," defendant proposed that the

9  co-conspirators lure M.T.M. to a mall where they would reveal

10 that there was no "Josh Evans" and taunt M.T.M. with the contents

11 of her MySpace page and information learned during the scheme.

12      On October 15, 2006, another girl in the neighborhood

13 obtained the username and password for the "Josh Evans" account

14 from defendant's daughter and sent M.T.M. a message suggesting

15 that "Evans" did not want to be friends with M.T.M. anymore

16 because M.T.M. was not nice to M.T.M.'s friends.  When the co-

17 schemers resumed the on-line conversation the following day, the

18 dispute escalated until Grills told M.T.M. that the world would

19 be a better place without M.T.M. in it.  Distraught, M.T.M. hung

20 herself in her bedroom closet.

21      When emergency crews responded to the Meier residence,

22 defendant instructed her co-conspirators to find out what had

23 happened.  Upon learning that M.T.M. had attempted to commit

24 suicide, defendant and her husband directed the co-schemers to

25

26

27 not available to the public at large and could only be viewed if
   M.T.M. agreed to let the member contact her.

28                                    5

1  delete the MySpace account.

2      Later that evening, defendant called the neighborhood girl

3  who had sent M.T.M. the message on October 15.   Defendant

4  instructed her to "keep her mouth shut," to "stay off the

5  MySpace," and to avoid accessing the Josh Evans account.   Sensing

6  something was amiss because defendant never called her daughter

7  directly, the mother of the neighborhood girl, Michelle Mulford,

8  asked her daughter what had happened.   After speaking with her

9  daughter, Mulford subsequently confronted defendant.   Defendant

10 told Mulford that she (defendant), her daughter, and Grills had

11 created the account to play a prank on M.T.M. and that she

12 (defendant) caused the account to be deleted.   In a subsequent

13 phone conversation, defendant tried to disclaim responsibility,

14 telling Mulford that M.T.M. previously tried to commit suicide.

15 C.   DEFENDANT ACKNOWLEDGES INVOLVEMENT IN SCHEME TO LAW
        ENFORCEMENT
16

17      On November 25, 2006, defendant contacted the St. Charles

18 Sheriff's Department to notify them about a neighborhood dispute.

   Defendant told the responding deputy that she needed to confront
19
   her neighbors, the Meiers, regarding their daughter's suicide.
20
   She went on to explain that she wanted to "just tell them" what
21
   she did to contribute to M.T.M.'s suicide.   In particular,
22
   defendant stated that she instigated and monitored a MySpace
23
   account belonging to a "good looking" male for the sole purpose
24
   of communicating with M.T.M. to find out what M.T.M. was saying
25
   on-line.   Defendant stated that the communications with M.T.M.
26
   were aimed at gaining her confidence to find out what she was
27

28                                    6

saying about defendant's daughter and other people.   Defendant
stated that she, her daughter and Grills typed, read and
monitored the communication between fake male profile and M.T.M.
and that the conversation became sexual for a 13-year old.   She
also pointed out that she did not feel as guilty as she felt
before once she found out M.T.M. had previously tried to commit
suicide.   She explained that she wanted the tension in the
neighborhood documented in case their property was damaged in the
future.

D.   DEFENDANT'S STORY CHANGES FOLLOWING M.T.M.'s DEATH

Defendant's description of her role in the scheme changed
following the revelation of defendant's role in the scheme.
Defendant became less boastful and more defensive.   She also
began to distance herself from the scheme.

1.   Defendant's Hairdresser

For example, before M.T.M.'s death, defendant confided in
her hairdresser.   Defendant told her hairdresser that defendant
and others had made up a profile for a fake internet guy and
started talking to M.T.M. using that profile.   She added that
M.T.M. may have had the "hots" for the fake guy.   Defendant
appeared to enjoy describing the scheme.   After M.T.M's death,
however, defendant's story changed.   Defendant began blaming
Grills for the scheme and denied that the scheme was designed to
get back at M.T.M.

2.   Defendant's Friend

Similarly, during the scheme, defendant told an old friend

7

1  about the scheme, characterizing it as a joke that they were all

2  playing on M.T.M. to obtain information from her.  Later, on the

3  Wednesday after M.T.M. passed away, however, defendant told her

4  friend that she was afraid that the death had something to do

5  with the MySpace profile they created and that, as a result, she

6  deleted the evidence from her computer and just wanted it all

7  gone.  She nonetheless acknowledged that she still was simply

8  trying to get information from M.T.M.  Still later after M.T.M.'s

9  death, defendant began to deny involvement in the scheme,

10  claiming only that she had knowledge of it.

11      3.  Defendant's Colleague

12      Defendant also complained to others about the backlash that

13  followed the revelation of defendant's involvement in the scheme

14  and the death of M.T.M.  For example, defendant would go to a

15  business colleague's office to complain about the Meiers and how

16  they blamed defendant for the death of their daughter.  Defendant

17  told her colleague that she and her daughter came up with the

18  idea to see what M.T.M. was saying about defendant's daughter but

19  that it was simply for fun.

20                            III

21                       ARGUMENT

22  A.    THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE BECAUSE
          EVIDENCE RELATED TO THE DEATH OF VICTIM M.T.M. IS HIGHLY
23          PROBATIVE ON THE ISSUE OF DEFENDANT'S INTENT AND PROVIDES
          CONTEXT FOR DEFENDANT'S CONDUCT AND STATEMENTS
24

25      Defendant first contends that evidence related to M.T.M.'s

26  death is "irrelevant" to the instant prosecution.  (Def's Mot. at

27  3).  Defendant appears to contend that notwithstanding the fact

28                      8

that she is charged with the unauthorized access of a protected computer to obtain information to further a tortious act, to wit, intentional infliction of emotional distress, evidence of a death is never relevant in a Section 1030 prosecution.  (Id.).  In doing so, defendant ignores that M.T.M.'s death is relevant to demonstrate defendant's scienter and to provide context for defendant's conduct and statements.

"Fed. R. Evid. 401 recites an expansive definition of relevance and Fed. R. Evid. 402 provides that all relevant evidence is admissible as a general rule."  United States v. McDonald, 576 F.2d 1350, 1356 n.10 (9th Cir. 1978).  Rule 401 provides that evidence is "relevant" if it enhances the probability "of any fact that is of consequence to the determination of the action."  Fed. R. Evid. 401.  Relevance is established by any showing, however slight, which makes it more likely than it was before the admission of the evidence that the defendant committed the crime in question.  See Generally Fed. R. Evid. 401, Notes of Advisory Committee on Proposed Rules.

Defendant's conclusory statement that evidence of M.T.M.'s death is "irrelevant" to any element under Section 1030 is misplaced.  First, proof of the suicide is material evidence related to proving defendant's intent to further a tortious act. The indictment alleges, after all, that defendant engaged in the scheme to cause extreme emotional distress.  Facts showing that defendant, in fact, caused extreme emotional distress are, therefore, relevant to prove that tortious purpose.  1A O'Malley,

9

1  Grenig & Lee, Federal Jury Practice and Instructions, p. 622,

2  § 17.07 (5th ed. 2000) ("You may infer, but you are certainly not

3  required to infer, that a person intends the natural and probable

4  consequences of acts knowingly done or knowingly omitted.").  The

5  government expects the evidence at trial will show that defendant

6  concocted a scheme with others to gain M.T.M.'s confidence by

7  flirting with her.  They further planned to use the information

8  to humiliate her.  Evidence that victim M.T.M. became so attached

9  to "Josh Evans" that, later, she became distraught when "he"

10  spurned her, so much so that she committed suicide, is therefore

11  highly probative because her distress was precisely the goal

12  defendant sought.  If nothing else, the death is probative on the

13  issue of whether conduct in tormenting M.T.M. was truly

14  "outrageous" within the meaning of intentional infliction of

15  emotional distress.  Hailey v. California Physicians Servs., 2007

16  WL 4472790 (Cal. App. Dec. 4, 2007) (explaining that one of

17  elements is "[e]xtreme or outrageous conduct by the defendant

18  with the intention of causing or reckless disregard of the

19  probability of causing emotional distress").[3]

20      Second, evidence of M.T.M.'s death is necessary to allow the

21  jury to understand the chronology of the case and defendant's

22  role in it.  United States v. Vicarra-Martinez, 66 F.3d 1006,

23  1012-13 (9th Cir. 1995) (discussing admissibility of evidence to

24

25      [3] The fact that Section 1030 has other provisions related to
    "physical injur[ies]" and threats to "public safety" further
26  underscores that defendant is mistaken when she suggests that
    deaths are never relevant under Section 1030. Compare 18 U.S.C.
27  § 1030(c)(4)(i)(III) & (IV) with Def's Mot. at 3.

28                                  10

1  "permit the prosecutor to offer a coherent and comprehensible

2  story regarding the commission of the crime").  Absent that

3  context, the jury will not be able to "make sense of the

4  testimony in its proper context."  <u>United States v. Ripinsky</u>, 109

5  F.3d 1436, 1442 (9th Cir. 1997) (quoting <u>United States v.</u>

6  <u>Ramirez-Jiminez</u>, 967 F.2d 1321, 1327 (9th Cir. 1992)).  For

7  example, the indictment alleges that after defendant learned of

8  M.T.M.'s death, she directed her co-schemers to destroy evidence

9  of the Josh Evans MySpace account.  (Indictment ¶ 11).  The

10  indictment likewise alleges that defendant instructed a juvenile

11  to "keep her mouth shut" to avoid detection by law enforcement.

12  (Indictment ¶ 12).  Without the context of M.T.M.'s death, those

13  acts make little sense because defendant's actions were

14  undertaken in response to M.T.M.'s death.

15      Finally, and similarly, evidence related to the suicide is

16  necessary to provide context for the statements defendant made to

17  other witnesses.  <u>McDonald</u>, 576 F.2d at 1356 n.10 ("The timing of

18  the statements and conduct attributed to appellant was a factor

19  to be considered by the court in weighing probative value against

20  the danger of unfair prejudice.")  For example, the government

21  expects the evidence will show that immediately after learning of

22  M.T.M.'s attempt on her life, defendant called a neighborhood

23  girl, advised that M.T.M. had lost her breath, and instructed her

24  to keep her mouth shut and to stay off of the MySpace.  The

25  government also expects the evidence at trial will show that

26  defendant told witnesses that she only felt partially responsible

27

28                              11

1  for M.T.M.'s death.  Likewise, defendant's statements to her

2  business colleague that she was being blamed by the Meiers for

3  their daughter's death make little sense if the witnesses are

4  barred from referring to the death.  Excluding evidence of the

5  death would render those admissions incomprehensible.[4] Without

6  the context of M.T.M.'s death, the changes in defendant's story

7  likewise make no sense.  The jury should not be deprived of this

8  valuable context.

9  B.   THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE BECAUSE
        THE SUBSTANTIAL PROBATIVE VALUE WOULD NOT BE SUBSTANTIALLY
10       OUTWEIGHED BY THE LIMITED PREJUDICIAL EFFECT

11       Defendant alternatively contends that the evidence of

12  M.T.M's suicide is inadmissible under Rule 403 because of the

13  risk of prejudice.  (Def's Mot. at 8-9).  The test under that

14  rule is not whether the evidence would simply be prejudicial —

15  "[t]he best evidence often is."  United States v. Parker, 549

16

17  _____

18       [4] Notably, notwithstanding the fact that M.T.M.'s death was
     alleged in the indictment, defendant did not seek to strike those
19   allegations.  The purpose of a motion to strike under Fed. R.
     Crim. P. 7(d) is to protect against 'prejudicial or inflammatory
20   allegations that are neither relevant nor material to the
     charges.'" United States v. Terrigno, 838 F.2d 371, 373 (9th Cir.
21   1988) United States v. Ramirez, 710 F.2d 535, 544-45 (9th Cir.
     1983).  "It is an exacting standard which is met only in rare
22   cases."  United States v. Giampa, 904 F. Supp. 235, 271 (D.N.J.
     1995).  Generally, if a matter relates to allegations that the
23   government intends to prove at trial, it should not be stricken
     as surplusage.  United States v. Fahey, 769 F.2d 829, 842 (1st
24   Cir. 1985); see also United States v. Hill, 799 F. Supp. 86, 89
     (D. Kan. 1992) ("if the government intends to properly prove a
25   matter at trial, then it is proper for the indictment to include
     those matters, even if they are not 'essential elements' of the
26   crime charged.").  Even where a matter is not essential to the
     charge, it should not be stricken if it is relevant in a general
27   sense to the overall scheme charged in the indictment.  United
     States v. Wecker, 620 F. Supp. 1002, 1006 (D. Del. 1985).

28                                 12

F.2d 1217, 1222 (9th Cir. 1977).   Rather, the evidence must be
unfairly prejudicial.   See United States v. Skillman, 922 F.2d
1370, 1374 (9th Cir. 1991) (evidence that "has an undue tendency
to suggest decision on an improper basis, commonly, though not
necessarily, an emotional one" is considered "unfairly"
prejudicial) (quoting Advisory Committee Notes to Rule 403);
United States v. Bailleaux, 685 F.2d 1105, 1111 n.2 (9th Cir.
1982) ("As used in Rule 403, 'unfair prejudice' means that the
evidence not only has a significant impact on the defendant's
case but that its admission results in some unfairness to the
defendant from its non-probative aspect"), modified on other
grounds, Huddleston v. United States, 485 U.S. 681 (1988).   As
one court has explained:

> Rule 403 does not provide a shield for defendants who
> engage in outrageous acts, permitting only the crimes
> of Caspar Milquetoasts to be described fully to a jury.
> It does not generally require the government to
> sanitize its case, to deflate its witness' testimony,
> or to tell its story in a monotone.   It does not bar
> powerful, or even "prejudicial" evidence.   Instead, the
> rule focuses on the "danger of unfair prejudice," and
> gives the court discretion to exclude evidence only if
> that danger "subsatntially outweigh[s]" the evidence's
> probative value.

United States v. Gartmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998).

The evidence at issue here is highly probative.   Defendant
is charged with unauthorized access to a protected computer to
obtain information to further a tortious act, namely, intentional
infliction of emotional distress.   The government expects the
evidence will show that defendant embarked on a scheme to
humiliate victim M.T.M. and cause a troubled, depressed young

girl emotional distress.   Put simply, evidence of M.T.M.'s death
demonstrates defendant's scheme succeeded.   Having built up
M.T.M.'s romantic hopes through careful manipulation, M.T.M. was
crushed when the "relationship" soured.   Defendant cannot now be
heard to complain that the facts of the case are too outrageous
to be heard by a jury.   Further underscoring the need for the
evidence of M.T.M.'s death is that such evidence places
defendant's statements and conduct in context.   Id. at 1021
(noting that evidence not offered for improper purpose, on an
ancillary issue or to inflame the jury but "as evidence of
defendant's intent and controlling role"); Old Chief v. United
States, 519 U.S. 172, 192 (1997) ("That the prosecutor's choice
will generally survive a Rule 403 analysis when a defendant seeks
to force the substitution of an admission for evidence creating a
coherent narrative of his thoughts and actions in perpetrating
the offense for which he is being tried.").   Without testimony
and evidence regarding M.T.M.'s death and suicide, defendant's
words and actions will be without context and will be rendered
meaningless.

   Given the highly probative nature of the evidence,
defendant's showing of prejudice must be even greater than in the
ordinary case.   See, e.g., Bailleaux, 685 F.2d at 1111 (greater
prejudice required to exclude the highly probative evidence).
Defendant presumes that evidence and testimony regarding the
death of a child will be so emotional that the jurors cannot be
trusted to fulfill their sworn duty.   That presumption is

14

unfounded.   See <u>Jenkins v. Associated Transport, Inc.</u>, 330 F.2d 706, 711 (6th Cir. 1964) (district court did not err in introducing color photographs of injuries in personal injury action); <u>People v. Dyer</u>, 45 Cal.3d 26, 74 (1988) (admission of photographs of murder victims and one victim's blood stained shirt not unfairly prejudicial because relevant to supporting inference that victim struggled and relevant to malice); <u>Rodriguez v. McDonnell Douglas Corp.</u>, 87 Cal. App.3d 626, 663 (1978) (in action for injuries sustained when pipe fell on him on a construction site, photographs of employee's scars, pressure sores, opening in his stomach, and useless legs, were admissible, even though they were claimed to be "gory" and "gruesome"). After all, courts routinely allow even more emotionally charged evidence in other trials.   For example, courts routinely admit movies depicting child rape over Rule 403 objection.   <u>See, e.g.,</u> <u>United States v. Ganoe</u>, 538 F.3d 1117, 1124 (9th Cir. 2008); <u>United States v. Morales-Aldahondo</u>, 524 F.3d 115, 120 (1st Cir. 2008) ("The trial judge's job is to avoid unfair prejudice.   The court is not required to scrub the trial clean of all evidence that may have an emotional impact").   Likewise, courts have allowed detailed testimony regarding prior incidents of child abuse as "other acts" evidence notwithstanding its emotional valence and the fact that it relates to collateral matters.   <u>See,</u> <u>e.g.,</u> <u>United States v. Boise</u>, 916 F.2d 497, 502-03 (9th Cir. 1990); <u>United States v. Lewis</u>, 837 F.2d 415, 419 (9th Cir. 1988); <u>United States v. LeMay</u>, 260 F.3d 1018, 1023 (9th Cir. 2001).

15

1  Courts have also admitted gruesome photographs in homicide cases,

2  including graphic pictures of mutilations and beheadings.  See,

3  e.g., United States v. Mitchell, 502 F.3d 931, 968 (9th Cir.

4  2007).   Courts even allow outrageous racist propaganda

5  notwithstanding Rule 403.  United States v. Allen, 341 F.3d 870,

6  885-86 (9th Cir. 2003).  Put simply, if jurors can be expected to

7  carefully evaluate graphic, visceral images on collateral issues,

8  they can certainly evaluate the facts regarding M.T.M.'s suicide

9  where such testimony is central to the case.

10      Even if some "unfair" prejudice might be caused by the

11  admission of such evidence, that prejudice can be eliminated or

12  mitigated through a limiting instruction to the jury.

13  See Huddleston, 485 U.S. at 691-92; United States v. Boise, 916

14  F.2d 497, 501 (9th Cir. 1991).  Jurors are, after all, presumed

15  to follow such instructions.  See United States v. Mende, 43 F.3d

16  1298, 1302 (9th Cir. 1995).  The Court could further insulate

17  defendant from improper prejudice through questioning during voir

18  dire.  Ganoe, 538 F.3d at 1124 (noting that "careful voir dire"

19  eliminated risk of undue prejudice from showing child pornography

20  in child pornography trial).

21      The cases cited by defendant are not to the contrary.  In

22  United States v. Layton, 767 F.2d 549 (9th Cir. 1985), the Ninth

23  Circuit affirmed the district court's pretrial exclusion of a

24  tape on which children were heard crying.  Id. at 555.  The

25  defendant in Layton was charged with the murder of a congressman

26  and the attempted murder of a diplomat in the Jonestown Massacre.

27

28                              16

Id. at 550. The government sought to introduce a rambling tape recording of Jim Jones, the cult leader who led the massacre. Id. at 551-53. The district court held the tape was not probative and the Ninth Circuit gave that finding deference. In particular, the Ninth Circuit explained that Jones' statements on the tape did not show that defendant was a member of any conspiracy or that he had a role in shooting the Congressman -- the theory of relevance proffered by the government. In addition, the recording, which contained sounds of infants crying and presumably dying, was highly inflammatory. The risk of undue prejudice was also maximized because the murder of the children was not at issue in the case, which charged the defendant simply with the murder of the Congressman and attempted murder of the diplomat.

Unlike the tape in Layton which was both not probative and contained inflammatory evidence of uncharged murders of children, the death of M.T.M. is highly relevant to this case. As explained previously, M.T.M.'s emotional distress was the object of defendant's scheme and the death serves to provide context for defendant's words and actions. Consequently, unlike in Layton where the deaths of the children were unrelated to the charged offenses, the evidence of M.T.M.'s death is central to the charged offenses in this case and the scheme cannot be understood here without such evidence. Accordingly, Layton is inapt.

Nor is United States v. Bland, 908 F.2d 471 (9th Cir. 1990), any more helpful. In Bland, the Ninth Circuit held that the

17

district court abused its discretion when it allowed the

government to introduce evidence of an alleged murder unrelated

to the charge of conviction, felon in possession of a firearm.

Law enforcement officers had a warrant for defendant's arrest

related to the murder of a girl.  Id. at 472.  When officers

attempted to arrest defendant, he tried to flee and was shot.

Id.  While in the hospital, defendant was interviewed by his

parole officer and, during that interview, acknowledged

possession of the gun.  Id.  Before trial, the defendant

indicated that he sought to argue the gun was planted by the

officer who shot him to "justify" the officer's use of force.

When in response the government sought to introduce evidence

related to his underlying arrest, the defendant offered to

stipulate the officer was entitled to shoot him.  The government

rejected the stipulation and the court itself told the jury about

the murder in its voir dire.  The Ninth Circuit held that

although it was not error to introduce evidence showing that the

shooting was proper, it was error to introduce the facts related

to the unrelated crime when the defendant offered to stipulate.[5]

---

[5]The remainder of the cases cited by defendant dealt with completely different issues.  United States v. Ellis, 147 F.3d 1131 (9th Cir. 1998), addressed whether the district court abused its discretion when it allowed the government to introduce evidence of the destructive power of certain explosives – which had no relevance to the case and only drew parallels to the then recent Oklahoma City bombing.  Here, by contrast, the evidence related to M.T.M.'s death is directly relevant to elements of the offense and is necessary for understanding both the scheme and defendant's admissions.  United States v. Rincon, 28 F.3d 921 (9th Cir. 1994), dealt with expert testimony and therefore is irrelevant.  United States v. Bradley, 5 F.3d 1317 (9th Cir. 1994), addressed the introduction of evidence related to an

18

Once again, <u>Bland</u> is distinguishable.  Whereas the detailed facts of the murder in <u>Bland</u> were on a collateral issue and were immaterial to rebut the defense that the evidence was planted, M.T.M.'s death is crucial to the understanding of the evidence in this case.  In addition, whereas the defendant in <u>Bland</u> offered to stipulate to the evidentiary equivalent of the probative value of the inflammatory evidence in <u>Bland</u>, defendant has made no offer here.  Defendant simply seeks to strip the government of its proof and of the narrative power of its case.  Under <u>Old Chief</u>, defendant is not entitled to do so.[6]

---

uncharged murder under Rule 404(b).  Here, by contrast, defendant has been charged with intending to cause victim M.T.M. extreme emotional distress and the indictment explains how her death lay at the center of her scheme and coverup.  Likewise, <u>United States v. Merriweather</u>, 78 F.3d 1070 (6th Cir. 1996), addressed the admissibility of uncharged drug deals.  Here, the victimization of M.T.M., and her death, stand at the heart of the indictment.

[6] In her conclusion, defendant appears to suggest that the Court should grant her motion in limine because the government's legal theory is unusual.  (Def's Mot. at 5).  As a preliminary matter, the government disputes defendant's characterization and stands on the briefing already provided to the Court.  In any event, defendant's legal challenge to the indictment bears no relationship to the merits of the instant evidentiary motion.

19

IV.

CONCLUSION

For the foregoing reasons, defendant's motion in limine to exclude evidence of the death of M.T.M. should be denied.

Dated: November ⌒, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

_____
MARK C. KRAUSE
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

20