THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MARK C. KRAUSE (SBN 198142)
Assistant United States Attorney
Deputy Chief, Cyber and
Intellectual Property Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3493
    Facsimile: (213) 894-8601
    Email: mark.krause@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>          v.<br><br>LORI DREW,<br><br>        Defendant. | CR NO. 08-582-GW<br><br>GOVERNMENT'S TRIAL MEMORANDUM<br><br>Trial Date: November 18, 2008<br>Time: 8:30 a.m.<br>Honorable George Wu |

     Plaintiff United States of America, by and through its counsel of record, United States Attorney Thomas P. O'Brien and Assistant United States Attorney Mark C. Krause, respectfully files its trial memorandum in the above-entitled matter.

///

///

///

1    The United States seeks leave to file any additional

2  memoranda that may become necessary during the course of the

3  trial.

4  Dated: November __, 2008

5                              Respectfully submitted,

6                              THOMAS P. O'BRIEN
                               United States Attorney
7
                               CHRISTINE C. EWELL
8                              Assistant United States Attorney
                               Chief, Criminal Division
9

10
                               _____
11                             MARK C. KRAUSE
                               Assistant United States Attorney
12
                                   Attorneys for Plaintiff
13                                 UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Page

I.   FACTUAL SUMMARY OF GOVERNMENT'S CASE . . . . . . . . . .  1

     A.   BACKGROUND ON MYSPACE.COM . . . . . . . . . . . .  1

     B.   DEFENDANT EMBARKS ON SCHEME TO OBTAIN INFORMATION
          ABOUT M.T.M. . . . . . . . . . . . . . . . . . .  2

     C.   DEFENDANT AND HER CO-CONSPIRATORS USE THE FAKE
          MYSPACE ACCOUNT . . . . . . . . . . . . . . . . .  4

     D.   DEFENDANT ACKNOWLEDGES INVOLVEMENT IN SCHEME  . . . .  6

II.  LEGAL AND EVIDENTIARY ISSUES . . . . . . . . . . . . .  7

     A.   CONSPIRACY: 18 U.S.C. § 371 . . . . . . . . . . .  7

          1.   Elements . . . . . . . . . . . . . . . . . .  7

          2.   The Agreement  . . . . . . . . . . . . . . .  7

          3.   Overt Acts . . . . . . . . . . . . . . . . .  8

          4.   Proof of Conspiracy  . . . . . . . . . . . .  8

     B.   UNAUTHORIZED ACCESS TO A PROTECTED COMPUTER . . . . .  9

          1.   Elements . . . . . . . . . . . . . . . . . .  9

          2.   Unauthorized Access  . . . . . . . . . . . .  9

          3.   Access in Excess of Authorization  . . . . .  10

          4.   Intent . . . . . . . . . . . . . . . . . . .  10

          5.   Conduct Done in Furtherance of a
               Tortious Act . . . . . . . . . . . . . . . .  10

          6.   Intentional Infliction of
               Emotional Distress . . . . . . . . . . . . .  12

     C.   LIABILITY OF A PRINCIPAL  . . . . . . . . . . . . .  14

III. EVIDENTIARY ISSUES . . . . . . . . . . . . . . . . . .  15

     A.   IDENTIFICATION OF DEFENDANT . . . . . . . . . . .  15

     B.   DEFENDANT'S PRIOR STATEMENTS  . . . . . . . . . .  15

TABLE OF CONTENTS (cont'd)

Page

C.   ADMISSIBILITY OF BUSINESS RECORDS UNDER FEDERAL
     RULE OF EVIDENCE 902(11)  . . . . . . . . . . . .  16

D.   STATEMENTS BY CO-CONSPIRATORS NOT HEARSAY . . . . .  16

     1.   Foundation . . . . . . . . . . . . . . . . .  16

     2.   "In Furtherance of the Conspiracy" . . . . .  17

     3.   Connection of Statement to Defendant . . . .  18

     4.   Laying the Foundation  . . . . . . . . . . .  18

E.   CO-CONSPIRATOR STATEMENTS ARE NOT TESTIMONIAL . . .  19

F.   CHAIN OF CUSTODY  . . . . . . . . . . . . . . . .  19

G.   Expert Testimony  . . . . . . . . . . . . . . . .  20

     1.   Computer Forensics . . . . . . . . . . . . .  21

     2.   Psychiatric Testimony  . . . . . . . . . . .  21

H.   Character Witnesses . . . . . . . . . . . . . . .  21

1

## TABLE OF AUTHORITIES

2    **FEDERAL CASES**                                              Page(s)

3    Bourjaily v. United States,
4        483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . 17, 18

     Crawford v. Washington,
5        541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . 16, 19

6    Doe v. Smith,
7        429 F.3d 706 (7th Cir. 2005) . . . . . . . . . . . . . 12

     In re Doubleclick Inc. Privacy Litigation,
8        154 F. Supp. 2d 497 (S.D.N.Y. 2001) . . . . . . . . . . 12

9    Gallegos v. United States,
10       276 F.2d 914 (9th Cir. 1960) . . . . . . . . . . . . . 20

     Garlington v. O'Leary,
11       879 F.2d 277 (1989) . . . . . . . . . . . . . . . . . . 17

12   Medical Laboratory Managment Consultants v. ABC,
13       1997 WL 405908 (D. Ar. Mar. 27, 1997) . . . . . . . . . 12

     Michelson v. United States,
14       335 U.S. 469 (1948) . . . . . . . . . . . . . . . . . 21, 22

15   Nealon v. California Stevedore & Ballast Co.,
16       996 F.2d 966 (9th Cir. 1993) . . . . . . . . . . . . . 11

     Reyes v. United States,
17       383 F.2d 734 (9th Cir. 1967) . . . . . . . . . . . . . 20

18   Salinas v. United States,
19       522 U.S. 52 (1977) . . . . . . . . . . . . . . . . . . . 8

     Sattazahn v. Pennsylvania,
20       537 U.S. 101 (2003) . . . . . . . . . . . . . . . . . . 11

21   Sendejas v. United States,
22       428 F.2d 1040 (9th Cir. 1970) . . . . . . . . . . . . . 18

     Sussman v. ABC,
23       186 F.3d 1200 (9th Cir. 1999) . . . . . . . . . . . . . 12

24   United States v. Aviles,
25       623 F.2d 1192 (7th Cir. 1980) . . . . . . . . . . . . . 20

     United States v. Baker,
26       63 F.3d 1478 (9th Cir. 1995) . . . . . . . . . . . . . 10

27

28                                -iii-

1

## TABLE OF AUTHORITIES (cont'd)

2

Page(s)

3
United States v. Bright,
    588 F.2d 504 (5th Cir. 1979) . . . . . . . . . . . . . 23

4

United States v. Burreson,
5      643 F.2d 1344 (9th Cir. 1981) . . . . . . . . . . . 15

6
United States v. Butcher,
    557 F.2d 666 (9th Cir. 1977) . . . . . . . . . . . . 15

7

United States v. Camejo,
8      929 F.2d 610 (11th Cir. 1991) . . . . . . . . . . . 22

9
United States v. Castro,
    972 F.2d 1107 (9th Cir. 1992) . . . . . . . . . . . . 8

10

United States v. Cervantes-Flores,
11      421 F.3d 825 (9th Cir. 2005) . . . . . . . . . . . . 18

12
United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991) . . . . . . . . . . . . 20

13

United States v. Cloud,
14      872 F.2d 846 (9th Cir. 1989) . . . . . . . . . . . . 8

15
United States v. Collicott,
    92 F.3d 973 (9th Cir. 1996) . . . . . . . . . . . . . 16

16

United States v. Crespo De Llano,
17      838 F.2d 1006 (9th Cir. 1987) . . . . . . . . . . . 18

18
United States v. Dale,
    991 F.2d 819 (D.C. Cir. 1993) . . . . . . . . . . . 11

19

United States v. Gay,
20      967 F.2d 322 (9th Cir. 1992) . . . . . . . . . . . . 10

21
United States v. Gleason,
    616 F.2d 2 (2d Cir. 1979) . . . . . . . . . . . . . 15

22

United States v. Hancock,
23      231 F.3d 557 (9th Cir. 2000) . . . . . . . . . . . . 10

24
United States v. Hernandez-Urista,
    9 F.3d 82 (10th Cir. 1993) . . . . . . . . . . . . . 10

25

United States v. Holmes,
26      406 F.3d 337 (9th Cir. 2005) . . . . . . . . . . . . 19

27

28

1

**TABLE OF AUTHORITIES (cont'd)**

Page

2   United States v. Hubbard,
      96 F.3d 1223 (9th Cir. 1996) . . . . . . . . . . . 8

3

    United States v. Huddleston,
4     485 U.S. 681 (1988) . . . . . . . . . . . . . .    14

5   United States v. Kenny,
      645 F.2d 1323 (9th Cir. 1981) . . . . . . . . .    20

6

    United States v. Loya,
7     807 F.2d 1483 (9th Cir. 1987) . . . . . . . . .    20

8   United States v. Marsh,
      894 F.2d 1035 (9th Cir. 1990) . . . . . . . . .    12

9

    United States v. Matta-Ballesteros,
10    71 F.3d 754 (9th Cir. 1995) . . . . . . . . .      22

11  United States v. McCollom,
      664 F.2d 56 (5th Cir. 1981) . . . . . . . . . .    25

12

    United States v. Megna,
13    450 F.2d 511 (5th Cir. 1971) . . . . . . . . .     16

14  United States v.  Melchor-Lopez,
      627 F.2d 886 (9th Cir. 1980) . . . . . . . . . .    9

15

    United States v. Ortega,
16    203 F.3d 675 (9th Cir. 2000) . . . . . . . . .     17

17  United States v. Rabinowich,
      238 U.S. 78 (1915) . . . . . . . . . . . .         10

18

    United States v. Rashid,
19    383 F.3d 769 (8th Cir. 2004) . . . . . . . . .     21

20  United States v. Schmidt,
      881 F.2d 608 (9th Cir. 1989) . . . . . . . . . 19, 20

21

    United States v. Vaccaro,
22    816 F.2d 443 (9th Cir. 1987) . . . . . . . . .     16

23  United States v. Vaughn,
      797 F.2d 1485 (9th Cir. 1986) . . . . . . . . .    16

24

    United States v. Vest,
25    639 F. Supp. 899 (D. Mass. 1986) . . . . . . .     14

26  United States v. Weiland,
      420 F.3d 1062 (9th Cir. 2005) . . . . . . . . .    18

27

28                              -v-

1

**TABLE OF AUTHORITIES (cont'd)**

2

Page

3  United States v. Williams,
      989 F.2d 1061 (9th Cir. 1993) . . . . . . . . . . . . .   19

4  United States v. Yarbrough,
      852 F.2d 1522 (9th Cir. 1988) . . . . . . . . . . . . .   19

5

6  United States v. Zavala-Serra,
      853 F.2d 1512 (9th Cir. 1988) . . . . . . . . . . . 19, 20

7  United v. Smith,
      893 F.2d 1573 (9th Cir. 1990) . . . . . . . . . . . . .   19

8

9  **STATE CASES**

10  Alcorn v. Anbro Engineering, Inc.,
      2 Cal. 3d 493 (1970) . . . . . . . . . . . . . . . . .   13

11

12  Bundren v. Superior Court,
      145 Cal. App. 3d 784 (1983) . . . . . . . . . . . . .   13

13  Cole v. Fair Oaks Fire Protection District,
      43 Cal. 3d 148 (1987) . . . . . . . . . . . . . . . .   13

14

15  Davidson v. City of Westminster,
      32 Cal.3d 197 (1982) . . . . . . . . . . . . . . . 13, 14

16  Delia S. v. Torres,
      134 Cal. App. 3d 471 (1982) . . . . . . . . . . . . .   15

17

18  Fletcher v. W. National Life Insurance Co.,
      10 Cal. App. 3d 376 (1970) . . . . . . . . . . . . . .   13

19  Hailey v. California Physicians Servs.,
      2007 WL 4472790 (Cal. App. Dec. 4, 2007) . . . . . . .   13

20

21  KOVR-TV, v. Super. Ct.,
      31 Cal. App. 4th 1023 (1995) . . . . . . . . . . . . .   13

22  Melorich Builders, Inc. v. Superior Court,
      160 Cal. App. 3d 931 (1984) . . . . . . . . . . . . .   13

23

24  Robinson v. Hewlett-Packard Corp.,
      183 Cal. App. 3d 1108 (1986) . . . . . . . . . . . . .   13

25

26

27

28                          -vi-

**TABLE OF AUTHORITIES (cont'd)**

Page

**FEDERAL STATUTES**

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . 14, 15

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 2511 . . . . . . . . . . . . . . . . . . 11, 12

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . 10

**FEDERAL RULES**

Fed. R. Evid. 405 . . . . . . . . . . . . . . . . . . 22

Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . 15, 16

Fed. R. Evid. 901 . . . . . . . . . . . . . . . . . . 21

1    I.    FACTUAL SUMMARY OF GOVERNMENT'S CASE

2    A.    BACKGROUND ON MYSPACE.COM

3        MySpace is a social networking website; that is, MySpace is

4    a website that focuses on building online communities of people

5    who share interests and activities, or who are interested in

6    exploring the interests and activities of others.   MySpace

7    accounts are free.   There are two types of users of the website:

8    visitors and members.   Visitors can navigate to the website and

9    view certain content that is publically available.   Members have

10   greater rights of access.   Not only can members view the

11   publically available content, they also can view some content

12   that is not available to nonmembers.   They also are permitted to

13   create unique personal profiles online.   These profiles can

14   include text, pictures, and audio files.   Members also can find

15   and communicate with old and new friends using MySpace

16   communication services, including email and instant messaging

17   services.   Some content on MySpace is only available to MySpace

18   members and only MySpace members have access to MySpace

19   communication services.

20       Although MySpace membership is free, prospective members are

21   required to agree to certain Terms of Service ("TOS") before they

22   can become members.   Prospective members are "authorized" to use

23   MySpace's services only if they agree to abide by all applicable

24   laws and the TOS.   ("You are only authorized to use the Services

25   . . . if you agree to abide by all applicable laws and to this

26   Agreement").   The TOS also enumerate certain conduct that is not

27

28                                -1-

permitted on the website, is unauthorized, and can lead to
termination of the member's account.  Among other things, the
rules prohibit:

    1.  "criminal or tortious activity, including child
        pornography, fraud, trafficking in obscene
        material, drug dealing, gambling, harassment,
        stalking, spamming, spimming, sending of viruses
        or other harmful files, copyright infringement,
        patent infringement or theft of trade secrets"

    2.  "using any information obtained from [MySpace
        services] in order to harass, abuse, or harm
        another person"

    3.  "soliciting personal information from anyone under
        18"

    4.  "harass[ing] or advocat[ing] harassment of another
        person.

    5.  promot[ing] information that the member knows is
        false or misleading; and

    6.  using a photograph with out a person's consent.

The registration process and TOS also require prospective members
to promise that their registration information is truthful and
accurate.

B.  DEFENDANT EMBARKS ON SCHEME TO OBTAIN INFORMATION ABOUT
    M.T.M.

    For several years, defendant's family and another local
neighborhood family, the Meiers, were friendly.  Each family had
a daughter the same age.  The two attended school together and
were friends; however, their relationship was, at times, rocky.
M.T.M. spent a great deal of time at defendant's residence and
even traveled with defendant's family.  During one such trip,
defendant administered M.T.M. her prescription medications.  On
other occasions, M.T.M. feuded with defendant's daughter.  In

-2-

1  addition, at times M.T.M. would act out and defendant would send

2  her home, telling M.T.M. that she needed to take her medication.

3       Over time, the two girls drifted apart and, in 2005, the

4  Meiers decided to transfer M.T.M. from the local public school to

5  a local Catholic school.  Christina Meier, M.T.M.'s mother

6  confided in defendant that she was concerned about M.T.M.'s

7  mental health and believed M.T.M. was particularly vulnerable.

8  Specifically, Meier told defendant that M.T.M. was suffering from

9  depression -- so much so that Meier expressed concern that the

10 Meiers would need to reverse the locks on the door to M.T.M.'s

11 bedroom so that she could not lock herself in and harm herself.

12 Meier also told defendant that M.T.M. would become distraught

13 when defendant would speak harshly to her and send her home.

14      Over the summer of 2006, defendant and her family became

15 concerned that M.T.M. was spreading malicious rumors about

16 defendant's daughter.  Defendant discussed the matter with her

17 daughter and her eighteen year old employee, Ashley Grills.  The

18 three conceived of a scheme where they would pretend to be an

19 attractive male teenager on MySpace and approach M.T.M. through

20 MySpace using that false identity to obtain M.T.M.'s confidence.

21 Once they had gained M.T.M.'s confidence, the co-conspirators

22 planned to find out what M.T.M. was saying on MySpace, including

23 what M.T.M. was saying about defendant's daughter.  Grills

24 pointed out that there was a risk they would get in trouble if

25 the scheme were uncovered; however, defendant assured Grills that

26 they would not and, in any event, many people created fake

27

28                              -3-

1  identities on the Internet.

2  C.   DEFENDANT AND HER CO-CONSPIRATORS USE THE FAKE MYSPACE
       ACCOUNT
3

4       On September 20, 2008, defendant and her co-schemers created

5  a MySpace profile under the fake name "Josh Evans."  "Evans" was

6  supposedly a teenager who was new to the area and was home-

   schooled.  "Evans" was supposedly lonely because he did not know
7
   anyone in the area and "his" father had abandoned the family.
8
   The co-schemers also posted a photograph of an attractive boy on
9
   the profile to further the fraud.[1]  On that same date, defendant
10
   and her co-schemers contacted M.T.M. through the MySpace
11
   communication services.[2]  Smitten with the attractive "boy's"
12
   invitation to communicate, M.T.M. agreed to communicate with
13
   "him."
14
        Although the initial communications were innocent enough,
15
   within days, defendant encouraged her co-schemers to flirt with
16
   M.T.M.  Defendant also discussed using the information obtained
17
   during the scheme to humiliate M.T.M. in the real world.
18
   Specifically, when it became clear from the communications that
19
   M.T.M. was attracted to "Josh Evans," defendant proposed that the
20
   co-conspirators lure M.T.M. to a mall where they would reveal
21
   that there was no "Josh Evans" and taunt M.T.M. with the contents
22

23       [1] The co-conspirators did not ask anyone's permission before

24  posting the photograph.

25       [2] Because M.T.M. registered for a juvenile account, that is,
    an account for members under the age of sixteen, her account was
26  designated "private."  As a result, the content on her page was
    not available to the public at large and could only be viewed if
27  M.T.M. agreed to let the member contact her.

28                                    -4-

1    of her MySpace page and information learned during the scheme.

2        During this time, defendant told friends and colleagues

3    about the scheme.  For example, defendant told her hairdresser

4    that defendant and others had made up a profile for a fake

5    internet guy and started talking to M.T.M. using that profile.

6    She added that M.T.M. may have had the "hots" for the fake guy.

7    Defendant appeared to enjoy describing the scheme.  Similarly,

8    defendant told an old friend about the scheme, characterizing it

9    as a joke that they were all playing on M.T.M. to obtain

10   information from her.

11       On October 15, 2006, another girl in the neighborhood

12   obtained the username and password for the "Josh Evans" account

13   from defendant's daughter and sent M.T.M. a message suggesting

14   that "Evans" did not want to be friends with M.T.M. anymore

15   because M.T.M. was not nice to M.T.M.'s friends.  When the co-

16   schemers resumed the on-line conversation the following day, the

17   dispute escalated until Grills told M.T.M. that the world would

18   be a better place without M.T.M. in it.  Distraught, M.T.M. hung

19   herself in her bedroom closet.

20       When emergency crews responded to the Meier residence,

21   defendant instructed her co-conspirators to find out what had

22   happened.  Upon learning that M.T.M. had attempted to commit

23   suicide, defendant and her husband directed the co-schemers to

24   delete the MySpace account.

25       Later that evening, defendant called the neighborhood girl

26   who had sent M.T.M. the message on October 15.  Defendant

27

28                                -5-

1  instructed her to "keep her mouth shut," to "stay off the

2  MySpace," and to avoid accessing the Josh Evans account.  Sensing

3  something was amiss because defendant never called her daughter

4  directly, the mother of the neighborhood girl, Michelle Mulford,

5  asked her daughter what had happened.  After speaking with her

6  daughter, Mulford subsequently confronted defendant.  Defendant

7  told Mulford that she (defendant), her daughter, and Grills had

8  created the account to play a prank on M.T.M. and that she

9  (defendant) caused the account to be deleted.  In a subsequent

10  phone conversation, defendant tried to disclaim responsibility,

11  telling Mulford that M.T.M. previously tried to commit suicide.

12       Likewise, a few days after the death, defendant told a

13  friend that that she was afraid that the death had something to

14  do with the MySpace profile they created and that, as a result,

15  she deleted the evidence from her computer and just wanted it all

16  gone.  She nonetheless acknowledged that she was trying to get

17  information from M.T.M.

18  D.   DEFENDANT ACKNOWLEDGES INVOLVEMENT IN SCHEME TO LAW
          ENFORCEMENT
19

20       On November 25, 2006, defendant contacted the St. Charles

21  Sheriff's Department to notify them about a neighborhood dispute.

22  Defendant told the responding deputy that she needed to confront

23  her neighbors, the Meiers, regarding their daughter's suicide.

24  She went on to explain that she wanted to "just tell them" what

25  she did to contribute to M.T.M.'s suicide.  In particular,

26  defendant stated that she instigated and monitored a MySpace

27  account belonging to a "good looking" male for the sole purpose

28                              -6-

1  of communicating with M.T.M. to find out what M.T.M. was saying

2  on-line.  Defendant stated that the communications with M.T.M.

3  were aimed at gaining her confidence to find out what she was

4  saying about defendant's daughter and other people.  Defendant

5  stated that she, her daughter and Grills typed, read and

6  monitored the communication between fake male profile and M.T.M.

7  and that the conversation became sexual for a 13-year old.  She

8  also pointed out that she did not feel as guilty as she felt

9  before once she found out M.T.M. had previously tried to commit

10 suicide.  She explained that she wanted the tension in the

11 neighborhood documented in case their property was damaged in the

12 future.

13 II.  LEGAL AND EVIDENTIARY ISSUES

14 A.   CONSPIRACY: 18 U.S.C. § 371

15      1.   Elements

16      In order for a defendant to be found guilty of conspiracy,

17 in violation of 18 U.S.C. § 371, the government must prove:

18 (1) there was an agreement between two or more persons to commit

19 at least one crime as charged in the indictment; (2) the

20 defendant became a member of the conspiracy knowing of at least

21 one of its objects and intending to help accomplish it; and

22 (3) one of the members of the conspiracy performed at least one

23 overt act for the purpose of carrying out the conspiracy.

24      2.   The Agreement

25      "[T]he evidentiary requirement for establishment of an

26 agreement in the conspiracy context is considerably more lax than

27

28                              -7-

1  in the case of an enforceable contract." United States v.

2  Melchor-Lopez, 627 F.2d 886, 890 (9th Cir. 1980).    To support a

3  conspiracy conviction, "[t]he agreement need not be explicit; it

4  may be inferred from the defendant's acts pursuant to a

5  fraudulent scheme or from other circumstantial evidence." United

6  States v. Cloud, 872 F.2d 846, 852 (9th Cir. 1989).    Its

7  existence may be inferred from evidence of a "concert of action,

8  all the parties working together understandingly, with a single

9  design for the accomplishment of a common purpose." United

10  States v. Hubbard, 96 F.3d 1223, 1226 (9th Cir. 1996).    "A

11  conspiracy may exist even if a conspirator does not agree to

12  commit each and every part of the substantive offense." Salinas

13  v. United States, 522 U.S. 52, 63 (1977).

14      3.    Overt Acts

15      The overt act "need not be of itself a criminal act; still

16  less need it constitute the very crime that is the object of the

17  conspiracy." United States v. Rabinowich, 238 U.S. 78, 86

18  (1915).    "Nor need it appear that all the coconspirators joined

19  in the overt act." Id.    The government need prove only one of

20  the overt acts charged in the indictment.

21      4.    Proof of Conspiracy

22      "The government does not have to present direct evidence.

23  Circumstantial evidence and the inferences drawn from that

24  evidence will sustain a conspiracy conviction." United States v.

25  Castro, 972 F.2d 1107, 1110 (9th Cir. 1992) (original emphasis),

26  overruled on other grounds, United States v. Jimenez-Recio, 537

27

28                                -8-

1  U.S. 270 (2003).

2  B.   UNAUTHORIZED ACCESS TO A PROTECTED COMPUTER

3       1.   Elements

4       In order for a defendant to be found guilty of unauthorized

5  access to a protected computer, in violation of 18 U.S.C.

6  § 1030(a)(2)(C), (b)(2)(C), the government must prove the

7  following beyond a reasonable doubt: (1) the defendant

8  intentionally accessed without authorization or exceeded

9  authorized access to a computer; (2) the defendant's access of

10 that computer involved an interstate or foreign communication;

11 (3) by accessing without authorization or exceeding authorized

12 access to that computer, the defendant obtained information from

13 a computer used in interstate or foreign commerce or

14 communication; and (4) the defendant obtained the information to

15 further a tortious act.

16      2.   Unauthorized Access

17      Unauthorized access is access that is "unapproved," "not

18 permitted," and "not sanctioned" by the computer's owner.  See

19 Black's Law Dictionary 1559, 143 8th ed. (defining "unauthorized"

20 as "done without authority" and "authorize" as "to give legal

21 authority; to empower", "to formally approve"); Webster's New

22 World Dictionary, 3d Collegiate Ed. 98 (1988) (defining

23 "authorize" as "to give official approval to or permission for");

24 http://dictionary.reference.com /browse/authorized (defining

25 "authorized" as "1. given or endowed with authority; 2. duly

26 sanctioned").

27

28                              -9-

1    3.   <u>Access in Excess of Authorization</u>

2        Section 1030(e)(6) defines "[t]he term 'exceeds authorized

3    access' [as] to access a computer with authorization and to use

4    such access to obtain or alter information in the computer that

5    the accesser is not entitled so to obtain or alter."

6    4.   <u>Intent</u>

7        The general rule in criminal prosecutions is that ignorance

8    of the law is no excuse.  <u>See</u> <u>United States v. Baker</u>, 63 F.3d

9    1478, 1491 (9th Cir. 1995); <u>see also</u> <u>United States v. Marsh</u>, 894

10   F.2d 1035, 40-41 (9th Cir. 1990) (approving jury instruction that

11   "ignorance of the law is not defense" in controlled substance

12   conspiracy where jury sent note regarding whether the government

13   had to prove defendants knew manufacture of drug "euphoria" was

14   illegal).  Willfulness is not an element of the crimes charged in

15   the indictment.  <u>See</u>, <u>e.g.</u>, <u>United States v. Hancock</u>, 231 F.3d

16   557, 562 (9th Cir. 2000) (affirming district court's refusal to

17   give instruction that defendant "knew that it was illegal for him

18   to possess firearms" because prosecution under 18 U.S.C. § 922(g)

19   does not require proof of willful violation); <u>United States v.</u>

20   <u>Gay</u>, 967 F.2d 322, 327 (9th Cir. 1992) (no good faith exception

21   in mail fraud cases); <u>United States v. Hernandez-Urista</u>, 9 F.3d

22   82, 84 (10th Cir. 1993)(declining to extend good faith exception

23   to drug cases).

24   5.   <u>Conduct Done in Furtherance of a Tortious Act</u>

25       The government is required to prove that "the offense was

26   committed in furtherance of . . . a tortious act in violation of

27

28                              -10-

1  . . . laws . . . of any state" under 18 U.S.C.

2  § 1030(c)(2)(B)(ii).  <u>Sattazahn v. Pennsylvania</u>, 537 U.S. 101,

3  111 (2003) ("Put simply, if the existence of any fact (other than

4  a prior conviction) increases the maximum punishment that may be

5  imposed on a defendant, that fact -- no matter how the State

6  labels it --constitutes an element, and must be found by a jury

7  beyond a reasonable doubt.").  In enacting the provision,

8  Congress explained that Section 1030(c)(2)(B)(ii) had the same

9  meaning as identical language in 18 U.S.C. § 2511(1)(d) under the

10  Wiretap Act.  S. Rep. 104-357, 1996 WL 492169 at *8 ("The terms .

11  . . 'for the purpose of committing any criminal or tortious act'

12  are taken from . . . the wiretap statute (18 U.S.C.

13  § 2511(1)(d), . . . and are intended to have the same meaning as

14  in th[at] statute[]").  Because the language under 18 U.S.C.

15  § 2511 is identical, Section 1030(c)(2)(B)(iii) should be

16  construed in the same way.  <u>Nealon v. California Stevedore &</u>

17  <u>Ballast Co.</u>, 996 F.2d 966, 970 (9th Cir. 1993) ("We would be

18  frustrating the intent of Congress were we to interpret the

19  provision in the Black Lung Act in a way that fulfills that

20  purpose while, at the same time, interpreting the same language

21  in the Longshore Act in exactly the opposite way.").

22  Accordingly, the government must show "either (1) that the

23  primary motivation, or (2) that a determinative factor in the

24  actor's motivation for [the unauthorized access] was to commit a

25  criminal [or] tortious act . . ." <u>United States v. Dale</u>, 991 F.2d

26  819, 841-42 (D.C. Cir. 1993) (quoting <u>United States v. Vest</u>, 639

27

28                                  -11-

F. Supp. 899, 904 (D. Mass. 1986), aff'd 913 F.F.2d 477 (1st Cir. 1987).  The tort at issue may be intentional infliction of emotional distress.  See Doe v. Smith, 429 F.3d 706, 710 (7th Cir. 2005); Medical Laboratory Managment Consultants v. ABC, 1997 WL 405908 (D. Ar. Mar. 27, 1997) .

The mere existence of a lawful purpose alone will not "sanitize" a defendant's conduct.  Sussman v. ABC, 186 F.3d 1200, 1202 (9th Cir. 1999) (lawful purpose cannot sanitize unlawful). The critical issue is the defendant's state of mind at the time of the unauthorized access.  In re Doubleclick Inc. Privacy Litigation, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ("Section 2511(2)(d)'s legislative history and caselaw make clear that the "criminal" or "tortious" purpose requirement is to be construed narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort.").  Proof of M.T.M.'s death is evidence of defendant's intent. 1A O'Malley, Grenig & Lee, Federal Jury Practice and Instructions, p. 622, § 17.07 (5th ed. 2000) ("You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.").

6.    Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress requires: "(1) Extreme or outrageous conduct by the defendant with the intention of causing or reckless disregard of the probability of causing emotional distress; (2) The victim's suffering severe or extreme emotional distress; and (3) actual and proximate

1   causation of the emotional distress by the defendant's outrageous

2   conduct.  <u>Hailey v. California Physicians Servs.</u>, 2007 WL 4472790

3   (Cal. App. Dec. 4, 2007).

4       The conduct must be "so extreme as to exceed all bounds of

5   that usually tolerated in a civilized society."  <u>Davidson v. City</u>

6   <u>of Westminster</u>, 32 Cal.3d 197, 209 (1982); <u>see also</u> <u>Melorich</u>

7   <u>Builders, Inc. v. Superior Court</u>, 160 Cal. App. 3d 931, 935

8   (1984).  Mere "insults, indignities, threats, annoyances, petty

9   oppressions, or other trivialities" are not "outrageous conduct"

10  where the case is lacking in other circumstances of aggravation.

11  <u>Cole v. Fair Oaks Fire Protection Dist.</u>, 43 Cal. 3d 148, 155

12  (1987).  Conduct not objectively "extreme and outrageous" may

13  become so where the defendant proceeds in the face of knowledge

14  that plaintiff is peculiarly susceptible to emotional distress by

15  reason of age or some physical or mental condition or

16  idiosyncrasy.  <u>KOVR-TV, v. Super. Ct.</u>, 31 Cal. App.4th 1023,

17  1031-32 (1995).  For example, a defendant's conduct can be

18  extreme or outrageous where the victim is a child, <u>id.</u>, or the

19  defendant knows the victim suffers from a medical condition that

20  makes them more vulnerable, <u>Bundren v. Superior Court</u>, 145 Cal.

21  App. 3d 784, 791 (1983) (defendant knew victim feeling effects of

22  surgery and had been attacked with machete).  <u>See also</u> <u>Alcorn v.</u>

23  <u>Anbro Eng'g, Inc.</u>, 2 Cal.3d 493, 498 n.3 (1970) (special

24  susceptibility to racial epithets); <u>Fletcher v. W. Nat'l Life</u>

25  <u>Ins. Co.</u>, 10 Cal. App. 3d 376, 404 (1970); <u>Robinson v. Hewlett-</u>

26  <u>Packard Corp.</u>, 183 Cal. App. 3d 1108, 1129-30 (1986).  Likewise,

27

28                              -13-

1   a defendant's conduct can be extreme or outrageous where the
2   defendant is in a position or a relationship with the victim that
3   would cause her conduct to have a particularly severe impact on
4   the victim.  <u>Delia v. Torres</u>, 134 Cal. App. 3d 471, 482 (1982)
5   ("The jury reasonably could have found the abuse and manipulation
6   a position of friendship, trust and influence in order to place
7   the wife of a friend in a sufficiently vulnerable position to
8   accomplish her rape was so extreme and outrageous as to caus
9   severe emotional distress beyond that resulting from the rape
10  itself.").  Conduct that is intended to inflict emotional
11  distress is more likely to be outrageous than conduct that is
12  merely reckless.  <u>Davidson</u>, 32 Cal.3d at 210.
13  C.   LIABILITY OF A PRINCIPAL
14       Under 18 U.S.C. § 2, a person is punishable as a principal
15  if that person aids and abets another person in the commission of
16  an offense, or causes another person to commit an offense.  A
17  theory of aiding and abetting is implicit in every substantive
18  count of an indictment.  <u>See</u> <u>United States v. Megna</u>, 450 F.2d
19  511, 512 (5th Cir. 1971).  To establish guilt as an aider and
20  abettor, the government must prove that: (1) the defendant
21  knowingly associated with a criminal venture and (2) by his or
22  her participation in that venture sought to make it succeed.  <u>See</u>
23  <u>United States v. Vaccaro</u>, 816 F.2d 443, 455 (9th Cir. 1987),
24  disapproved on other grounds by <u>United States v. Huddleston</u>, 485
25  U.S. 681 (1988); <u>United States v. Vaughn</u>, 797 F.2d 1485, 1492
26  (9th Cir. 1986).
27
28                              -14-

1    Alternatively, under 18 U.S.C. § 2(b), a person who, with

2  the requisite intent, "causes" another to commit a criminal act

3  is liable for that act as if he had committed it personally.  See

4  United States v. Gleason, 616 F.2d 2, 20 (2d Cir. 1979).

5  III.   EVIDENTIARY ISSUES

6  A.    IDENTIFICATION OF DEFENDANT

7    Opinion testimony as to the identification of a defendant is

8  admissible when the testimony is based on contacts between the

9  defendant and witness over a period of time, even if the contacts

10 are of limited duration.  The amount of time that a witness has

11 to observe the defendant goes to the weight of the evidence, not

12 admissibility.  United States v. Butcher, 557 F.2d 666, 669 (9th

13 Cir. 1977).

14 B.    DEFENDANT'S PRIOR STATEMENTS

15    The government will elicit testimony regarding statements by

16 defendant.  A statement is not hearsay if the statement is

17 offered against a party and is the party's own statement in

18 either an individual or representative capacity.  Fed. R. Evid.

19 801(d)(2)(A); United States v. Burreson, 643 F.2d 1344, 1349 (9th

20 Cir. 1981).  When the government admits some of a defendant's

21 prior statements, the door is not thereby opened to the defendant

22 to put in all of his or her out-of-court statements, because when

23 offered by the defendant, the statements are hearsay.  Fed. R.

24 Evid. 801(d)(2); United States v. Ortega, 203 F.3d 675, 682 (9th

25 Cir. 2000) (district court properly granted the government's

26 motion in limine to exclude defendant's post arrest statements

27

28                              -15-

through cross examination of INS agent); <u>United States v. Collicott</u>, 92 F.3d 973, 983 (9th Cir. 1996)(hearsay not admitted regardless of Rule 106).

C.    ADMISSIBILITY OF BUSINESS RECORDS UNDER FEDERAL RULE OF EVIDENCE 902(11)

Amended Rule 902 of the Federal Rules of Evidence provides that "extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person." The government has notified defendant of the government's intent to introduce evidence by way of Federal Rule of Evidence 902(11). The Ninth Circuit has stated that the use of declarations to establish foundational facts does not violate <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).   <u>United States v. Cervantes-Flores</u>, 421 F.3d 825, 834 (9th Cir. 2005); <u>United States v. Weiland</u>, 420 F.3d 1062, 1077 (9th Cir. 2005).

D.    STATEMENTS BY CO-CONSPIRATORS NOT HEARSAY

A statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).

1.    Foundation

For a statement to be admissible under Rule 801(d)(2)(E), the offering party must establish that: (a) the statement was in furtherance of the conspiracy; (b) it was made during the life of the conspiracy; and (c) the defendant and declarant were members

-16-

of the conspiracy.  <u>Bourjaily v. United States</u>, 483 U.S. 171, 175

(1987); <u>United v. Smith</u>, 893 F.2d 1573, 1578 (9th Cir. 1990).

The offering party has the burden of proving these foundational

facts by a preponderance of the evidence.  <u>Bourjaily</u>, 483 U.S. at

176; <u>United States v. Schmidt</u>, 881 F.2d 608, 610 (9th Cir. 1989).

Whether the offering party has met its burden is to be determined

by the trial judge, and not the jury.  <u>United States v. Zavala-</u>

<u>Serra</u>, 853 F.2d 1512, 1514 (9th Cir. 1988).  The contents of the

declaration, together with independent evidence, may constitute

sufficient proof of the existence of the conspiracy and the

involvement of the defendant and declarant in it.  <u>Boujaily</u>, 483

U.S. at 181.

    2.    "In Furtherance of the Conspiracy"

    The term "in furtherance of the conspiracy" is construed

broadly to include statements made to "induce enlistment or

further participation in the group's activities," to "prompt

further action on the part of conspirators," to "reassure members

of a conspiracy's continued existence," to "allay a co-

conspirator's fears," or to "keep co-conspirators abreast of an

ongoing conspiracy's activities."  <u>United States v. Yarbrough</u>,

852 F.2d 1522, 1535-36 (9th Cir. 1988).

    A co-conspirator declaration need not have been made

exclusively, or even primarily, to further the conspiracy.

<u>Garlington v. O'Leary</u>, 879 F.2d 277, 284 (1989).  Likewise,

statements made with the intent of furthering the conspiracy are

admissible whether or not they actually result in any benefit to

-17-

the conspiracy.  <u>United States v. Williams</u>, 989 F.2d 1061, 1068

(9th Cir. 1993); <u>United States v. Schmidt</u>, 881 F.2d 608, 612 (9th

Cir. 1989).  Nor is it necessary that the defendant was present

at the time the statement was made.  <u>Sendejas v. United States</u>,

428 F.2d 1040, 1045 (9th Cir. 1970).  Finally, co-conspirator

declarations need not be made to a member of the conspiracy to be

admissible under Rule 810(d)(2)(E).  <u>United States v. Zavala-</u>

<u>Serra</u>, 853 F.2d 1512, 1516 (9th Cir. 1988).

    3.    <u>Connection of Statement to Defendant</u>

    Once the existence of the conspiracy is established, only

"slight evidence" is needed to connect the defendant and the

declarant to it.  <u>United States v. Crespo De Llano</u>, 838 F.2d

1006, 1017 (9th Cir. 1987).  The declaration itself, together

with independent evidence, may constitute sufficient proof of the

existence of the conspiracy and the involvement of the defendant

and declarant in it.  <u>Bourjaily</u>, 483 U.S. at 181; <u>Zavala-Serra</u>,

8563 F.2d at 1515.

    4.    <u>Laying the Foundation</u>

    The foundation for the admission of a co-conspirator

statement may be established before or after the admission of the

statement.  <u>See United States v. Loya</u>, 807 F.2d 1483, 1490 (9th

Cir. 1987).  If a proper foundation has not yet been laid, the

court may nevertheless admit the statement, but with an

admonition that the testimony will be stricken should the

conspiracy not be proved.  <u>See United States v. Kenny</u>, 645 F.2d

1323, 1333-34 (9th Cir. 1981).

-18-

E.    CO-CONSPIRATOR STATEMENTS ARE NOT TESTIMONIAL

Co-conspirator statements are not "testimonial" and therefore are admissible under Crawford.    See United States v. Rashid, 383 F.3d 769, 776 (8th Cir. 2004) ("co-conspirator statements are not testimonial for purpose of Crawford analysis); United States v. Saget, 377 F.3d 223, 224-25 (2d Cir. 2004) ("we hold that the introduction of Beckham's co-conspirators statements against Saget did not violate the Confrontation Clause because the statements were not testimonial, and therefore did not implicate the per se bar on the introduction of out-of-court testimonial statements, absent a prior opportunity for cross examination"); see also United States v. Holmes, 406 F.3d 337, 349 (9th Cir. 2005) (even if statements are testimonial they do not violate Crawford if not offered for their truth).

F.    CHAIN OF CUSTODY

The test of admissibility of physical objects connected with the commission of a crime requires a showing that the object is in substantially the same condition as when the crime was committed (or the object seized).    Fed. R. Evid. 901(a).    Rule 901(a) of the Federal Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a

-19-

1  reasonable juror could find in favor of authenticity or

2  identification." United States v. Chu Kong Yin, 935 F.2d 990,

3  996 (9th Cir. 1991). Factors to be considered in the Court's

4  determination include the nature of the article, the

5  circumstances surrounding the preservation and custody of it, and

6  the likelihood of intermeddlers tampering with it. Gallegos v.

7  United States, 276 F.2d 914, 917 (9th Cir. 1960). The government

8  is not required, in establishing chain of custody, to call all

9  persons who may have come into contact with the piece of

10  evidence. Reyes v. United States, 383 F.2d 734 (9th Cir. 1967);

11  Gallegos, 276 F.2d at 917. Alleged gaps in a chain of custody go

12  to the weight of the evidence, rather than its admissibility.

13  See United States v. Matta-Ballesteros, 71 F.3d 754, 768-769 (9th

14  Cir. 1995). To avoid defects in chain of custody, there must be

15  a showing that the evidence is in substantially the same

16  condition as when it was seized. See id.

17      When exhibits are at all times in official custody, a

18  presumption of regularity attends the discharge of official

19  duties. See United States v. Aviles, 623 F.2d 1192, 1198 (7th

20  Cir. 1980). In short, the district court may admit physical

21  evidence so long as there is a "reasonable probability the

22  article has not been changed in important respects." Id.

23  (citation omitted).

24  G.   Expert Testimony

25      The government intends to call three expert witnesses at

26  trial and has disclosed all reports, qualifications, and

27

28                              -20-

summaries to defense.

1.  Computer Forensics

The first expert witness, Det. Brian Mize, is an expert in computer forensics and performed an examination of defendant's computer as well as the computer belonging to the Meiers.  The government also expects to call Special Agent Justin Kempf, an expert in computer forensics to testify about additional materials that he identified.  Agent Kempf also may rebut claims made by Tami Loehrs, proffered by the defendant.

2.  Psychiatric Testimony

The government also expects to call Dr. Saiid Khojesteh, a expert in psychiatry, to testify about M.T.M.'s mental state and her medical condition prior to and during defendant's scheme.

H.  Character Witnesses

The government anticipates defendant may call character witnesses.  The Supreme Court has recognized that character evidence — particularly cumulative character evidence — has weak probative value and great potential to confuse the issues and prejudice the jury.  Michelson v. United States, 335 U.S. 469, 480, 486 (1948).  The Court has thus given trial courts wide discretion to limit the presentation of character evidence.  Id. at 486.

Rule 404(a) of the Federal Rules of Evidence governs the admissibility of character evidence.  Rule 404(a) permits a defendant to introduce evidence of a "pertinent" trait of character.  Because the charges here do not have a character

-21-

trait as an element, the only "pertinent" traits of character in this case are defendant's status as a law-abiding citizen.  <u>See</u> <u>United States v. Camejo</u>, 929 F.2d 610, 612-13 (11th Cir. 1991) (evidence of defendant's prior lawful conduct excluded as "inadmissible character evidence").

Moreover, the form of the proffered evidence must be proper. Federal Rule of Evidence 405(a) sets forth the sole methods by which character evidence may be introduced.  It specifically states that where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation; and (2) by testimony as to opinion.  Thus, a defendant may not introduce specific instances of his good conduct through the testimony of others.  <u>Michelson</u>, 335 U.S. at 477 ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental or moral traits"); <u>Camejo</u>, 929 F.2d at 612-13 (evidence of specific acts of good conduct inadmissible in narcotics case under Rule 405(a)).

On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue.  Fed. R. Evid. 405(a).  The only prerequisite is that there be a good faith basis that the incidents inquired about are relevant to the character trait at issue.  <u>See United States v.</u>

-22-

McCollom, 664 F.2d 56, 58 (5th Cir. 1981); United States v.

Bright, 588 F.2d 504 (5th Cir. 1979).

Dated: November ___, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


MARK C. KRAUSE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

-23-