THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MARK C. KRAUSE (SBN 198142)
Assistant United States Attorney
Deputy Chief, Cyber and Intellectual
Property Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3493
     Facsimile: (213) 894-8601
     Email: mark.krause@usdoj.gov
Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,           )    CR NO. 08-582-GW
                                    )
          Plaintiff,                )    GOVERNMENT'S SUPPLEMENT TO
                                    )    OPPOSITION TO DEFENDANT'S
          v.                        )    MOTION IN LIMINE TO EXCLUDE
                                    )    EVIDENCE OF THE DEATH OF M.T.M.
LORI DREW,                          )
                                    )
          Defendant.                )
                                    )
                                    )
_____ )

          Plaintiff United States of America, by and through its

counsel of record, United States Attorney Thomas P. O'Brien and

Assistant United States Attorney Mark C. Krause, hereby files

this supplement to its previously-filed opposition to defendant's

motion in limine to exclude evidence of the death of victim

M.T.M.

\\\

\\\

\\\

The government's opposition to defendant's motion is based on the attached supplemental memorandum of points and authorities, the previously-filed opposition to defendant's motion, the files and records in this case, and whatever other evidence or argument this Court may consider.

Dated: November 13, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


  George S. Cardona /S/ for
MARK C. KRAUSE
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

2

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . .  ii

I   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

II  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.   EVIDENCE OF M.T.M.'S SUICIDE IS DIRECTLY RELEVANT
           TO FACTS THE GOVERNMENT MUST PROVE BEYOND A
           REASONABLE DOUBT TO ESTABLISH THE CRIMES WITH
           WHICH DEFENDANT IS CHARGED  . . . . . . . . . . . . . . 4

           1.   Evidence of M.T.M.'s Suicide is Relevant to
               Prove that Defendant's MySpace Communications
               Were In Furtherance of the California Tort of
               Intentional Infliction of Emotional Distress . . 4

           2.   Evidence of M.T.M.'s Suicide is Also Relevant
               to Prove Defendant's Knowledge that Her
               Communications with M.T.M. Over the MySpace
               Computer Network Exceeded Her "Authorized
               Access"  . . . . . . . . . . . . . . . . . . . . . 9

      B.   EVIDENCE OF M.T.M.'S SUICIDE SHOULD NOT BE EXCLUDED
           UNDER FEDERAL RULE OF EVIDENCE 403  . . . . . . . . 11

III CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 18

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                            **Page(s)**

<u>Old Chief v. United States</u>,
    519 U.S. 172 (1997) . . . . . . . . . . . . . . . 2, 11, 13-14

<u>United States v. Allen</u>,
    341 F.3d 870 (9th Cir. 2003) . . . . . . . . . . . . . . 12, 13

<u>United States v. Curtin</u>,
    489 F.3d 935 (9th Cir. 2007) (en banc) . . . . . . 4, 7-9, 11

<u>United States v. Ganoe</u>,
    538 F.3d 1117 (9th Cir. 2008) . . . . . . . . . . . . . . 13

<u>United States v. Hiland</u>,
    909 F.2d 1114 (8th Cir. 1990) . . . . . . . . . . . . . . 12

<u>United States v. McDonald</u>,
    576 F.2d 1350 (9th Cir. 1978) . . . . . . . . . . . . . . 4

**STATE CASES**                                             **Page(s)**

<u>Hailey v. California Physicians Services</u>,
    158 Cal. App. 4th 452 (2008) . . . . . . . . . . . . . 1, 5

<u>Hernandez v. General Adjustment Bureau</u>,
    199 Cal. App. 3d 999 (1988) . . . . . . . . . . . . . . 6

<u>Tate v. Canonica</u>,
    180 Cal. App. 2d 898 (1960) . . . . . . . . . . . . . . 5

<u>Rodriquez v. McDonnell Douglas Corp.</u>,
    87 Cal. App. 3d 626 (1978) . . . . . . . . . . . . . . 15

**FEDERAL STATUTES**

18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . 1, 5, 9-10

**FEDERAL RULES**

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Evid. 402 . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . 11, 13, 17

ii

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**

I

INTRODUCTION

Defendant Lori Drew has filed a motion _in limine_ to exclude evidence related to the death of victim M.T.M.  This motion should be denied for two reasons.

First, evidence that M.T.M. committed suicide is directly relevant to facts the government must prove beyond a reasonable doubt to establish the crimes with which defendant is charged.

To render defendant's conduct as charged a felony, the government must prove that defendant's unauthorized communications with M.T.M. were "committed in furtherance of" the California tort of intentional infliction of emotional distress, a tort that requires showings of both "extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress" and the victim's "suffering severe or extreme emotional distress,"  18 U.S.C. § 1030(c)(2)(B)(ii); <u>Hailey v. California Physician's Service</u>, 158 Cal. App. 4th 452, 474 (2008).  M.T.M.'s suicide is directly relevant to both these required showings.

To establish an element of the charged crime, the government must prove that defendant knew that her communications with M.T.M. over the MySpace computer network exceeded her "authorized access" to that network, that is, that she knew she was not supposed to be using MySpace to engage in the communications she did.  18 U.S.C. § 1030(a)(2).  As a result of defendant's own

1

conduct in response to M.T.M.'s suicide, evidence of that suicide is directly relevant to establish this element of the charged crime.   In particular, the government will introduce evidence that after learning of M.T.M.'s suicide, defendant directed her co-schemers to destroy evidence of the MySpace account that had been used to communicate with M.T.M., and instructed a neighbor who had used that MySpace account to "keep her mouth shut" and stay off MySpace.   This evidence supports an inference that defendant's post-suicide actions were motivated by her knowledge that she had been using MySpace in ways she should not and her concern that investigation of M.T.M.'s suicide would reveal this to law enforcement.   Evidence of M.T.M.'s suicide is relevant because it provides the basis for this valid inference.

Second, evidence that M.T.M. committed suicide should not be excluded under Federal Rule of Evidence 403.   For the reasons discussed above, this evidence is highly probative.   Because it is not evidence of defendant's own prior conduct or legal status, in determining whether despite its probative value it should be excluded under Rule 403, the court should consider the "evidentiary alternatives," bearing in mind the Supreme Court's admonition that the prosecution should be allowed to "place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." Old Chief v. United States, 519 U.S. 172, 184, 188 (1997).   This

2

admonition comes into play here precisely because there is no viable "evidentiary alternative" to evidence of M.T.M.'s suicide. That suicide is central to the case, and to the memories and testimony of the witnesses who will be called at trial. Presenting a sanitized version of the facts in an attempt to prevent the jury from learning that M.T.M. killed herself will gut the prosecution's case of facts necessary both to establish the commission of the charged crimes and to convince the jurors that a guilty verdict is morally reasonable; will force witnesses to alter their testimony in ways that may cause the jury unfairly to doubt their credibility; and, in the absence of the careful voir dire and limiting instructions that would be directed to eliminating unfair prejudice were evidence of the suicide admitted, will pose the risk of greater unfair prejudice to defendant because of jury speculation occasioned by the gaping hole in the evidence resulting from omission of any reference to M.T.M.'s suicide.  In contrast, if the evidence is admitted, any risk of unfair prejudice can be addressed head-on and avoided through voir dire and limiting instructions.  For all these reasons, Rule 403 provides no basis for excluding evidence of M.T.M.'s suicide.

///

///

///

///

///

3

1

II

2

ARGUMENT

3   A.   EVIDENCE OF M.T.M.'S SUICIDE IS DIRECTLY RELEVANT TO FACTS
         THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT TO
4        ESTABLISH THE CRIMES WITH WHICH DEFENDANT IS CHARGED

5        "Fed. R. Evid. 401 recites an expansive definition of

6   relevance and Fed. R. Evid. 402 provides that all relevant

7   evidence is admissible as a general rule."  United States v.

8   McDonald, 576 F.2d 1350, 1356 n.10 (9th Cir. 1978).  Rule 401

9   provides that evidence is "relevant" if it enhances the

10  probability "of any fact that is of consequence to the

11  determination of the action."  Fed. R. Evid. 401. "To be

12  'relevant,' evidence need not be conclusive proof of a fact

13  sought to be proved, or even strong evidence of the same.  All

14  that is required is a 'tendency' to establish the fact at issue."

15  United States v. Curtin, 489 F.3d 935, 943 (9th Cir. 2007) (en

16  banc).  Moreover, "[t]he fact to be proved may be ultimate,

17  intermediate, or evidentiary; it matters not, so long as it is of

18  consequence in the determination of the action."  Id. (quoting

19  Advisory Committee Notes to the 1972 Proposed Rules).  Here,

20  evidence of M.T.M.'s suicide satisfies these standards for

21  relevancy with respect to two facts the government must prove to

22  establish the crimes with which defendant is charged.

23       1.   Evidence of M.T.M.'s Suicide is Relevant to Prove that
              Defendant's MySpace Communications Were In Furtherance
24            of the California Tort of Intentional Infliction of
              Emotional Distress
25
26       To render defendant's conduct as charged a felony, the

27  government must prove that defendant's unauthorized

28                                  4

communications with M.T.M. were "committed in furtherance of" the California tort of intentional infliction of emotional distress. 18 U.S.C. § 1030(c)(2)(B)(ii).  Under California law, this tort has three elements: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct." <u>Hailey</u>, 158 Cal. App. 4th at 474 (quoting <u>Cervantez v. J.C. Penney Co.</u>, 24 Cal. 3d 579, 593 (1979)).  As to the first element, "[b]ehavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress."  <u>Id.</u> (citations omitted).

Here, evidence of M.T.M.'s suicide is, of course, directly relevant to the second element of the tort – that M.T.M. committed suicide is directly probative of the "severe or extreme emotional distress" she was suffering at the time she committed the suicide.  <u>See</u> <u>Tate v. Canonica</u>, 180 Cal. App. 2d 898, 909 (1960) (wrongful death action may proceed based on intentional infliction of emotional distress where evidence shows that "defendant intended, by his conduct, to cause serious mental distress . . . and does so, and such mental distress is shown by

1  the evidence to be a 'substantial factor in bringing about' the

2  suicide").

3       Evidence of M.T.M.'s suicide is also directly relevant to

4  the first element of the tort.  To establish that defendant's

5  conduct was "outrageous" the government will introduce evidence

6  that defendant knew that M.T.M. was suffering from depression,

7  that M.T.M. was taking prescribed anti-anxiety medication, and

8  that M.T.M.'s mother had expressed concern that M.T.M. would harm

9  herself.  All of these facts are relevant to establish that

10  defendant's conduct was "outrageous" because she was aware of

11  facts rendering M.T.M. "susceptible to injuries through mental

12  distress."  See Hernandez v. General Adjustment Bureau, 199 Cal.

13  App. 3d 999 (1988) (in light of defendants' knowledge of victim's

14  psychiatric problems and repeated attempts at suicide,

15  defendants' intentional delay of benefit payments vital to

16  support of victim's children sufficient to sustain action for

17  intentional infliction of emotional distress).  Even after proof

18  that defendant's conduct was "outrageous," however, the first

19  element of the tort also requires proof that the conduct was

20  engaged in "intentionally or unreasonably with the recognition

21  that the acts are likely to result in illness through mental

22  distress."  That defendant's conduct in fact resulted in such

23  "illness through mental distress," namely, M.T.M.'s suicide, is

24  relevant to, that is, has a "tendency" to, establish the required

25  intent and recognition by defendant that her conduct was "likely"

26  to do so.  Moreover, the government intends to introduce evidence

27

28                                    6

of statements by defendant referencing M.T.M.'s suicide that further demonstrate defendant's awareness of the causal connection between her conduct and M.T.M.'s "illness through mental distress."  In particular, the government will introduce evidence that shortly after the ambulance arrived at M.T.M.'s house and defendant learned that M.T.M. had killed herself, defendant stated, "Maybe it is our fault because [M.T.M.] was depressed and suicidal."  In addition, the government will introduce evidence that at a later time, after admitting that she had caused the MySpace account to be shut down, defendant stated, "It's not like I pulled the trigger."[1]

The Ninth Circuit's en banc decision in Curtin provides a method of analysis that demonstrates why the evidence of M.T.M.'s suicide, particularly when coupled with defendant's post-suicide statements referencing that suicide, is relevant to establish defendant's intent and recogniton of the "likely" outcome of her acts.  In Curtin, defendant was charged with traveling with the intent to have sex with an individual he believed to be a minor, "christy13" (who was actually an undercover agent posing as a minor), with whom he had repeated chats over the internet. Defendant claimed that his intent was not to have sex with a minor, but rather to have sex with an adult masquerading as a minor.  To prove that defendant had the required intent and to rebut this defense, the government sought to introduce stories

---

[1] The government only recently learned of these two statements by defendant while interviewing witnesses in preparation for trial.

contained on defendant's PDA that were "about a father having sex with his young daughter and the daughter's enjoyment of the offense."  489 F.3d at 939-41.  The court recognized that "circumstances surrounding an alleged crime become <u>more</u> relevant when the defendant makes his intent a disputed issue."  <u>Id.</u> at 952.  And in analyzing relevance, the court reasoned as follows:

> To further illustrate the relevancy of Curtin's recent PDA downloads, what would we certainly hold if the evidence in question was Curtin's possession of stories in his PDA consisting of role playing daddy/daughter incest with female adults – not minors – and the district court had excluded the stories as "irrelevant"?  Curtin would have attempted to admit the stories into evidence to demonstrate that he had intended to meet an adult.  Without a doubt, a convicted Curtin would assert on appeal that the content of the stories shed light on his subjective intent and – as counsel put it to the jurors – his "thoughts" as he communicated with "christy13," and as he traveled interstate with the stories in his pocket to meet her; and there is no doubt that we would agree.  Why?  Because the stories would have a "tendency to make the existence of any fact that is of consequence to the determination of the acton more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Such stories would corroborate his claim of adult incest fantasy. How else could he do that without evidence of "other acts," as they are called?  Conversely, the absence of such adult stories, coupled with the presence of stories wherein children are the objects of the sexual appetites of adults, is equally relevant to prove the government's case and to confront Curtin's defense.

<u>Id.</u> at 951 (footnote omitted).

Similar reasoning demonstrates the relevance of M.T.M.'s suicide to proof of defendant's intent in this case.  If M.T.M. had not committed suicide and had instead laughed off the "Josh Evans" brush off, defendant would certainly be seeking to admit these facts as evidence that defendant did not intend or recognize that her conduct was "likely to result in illness through mental distress."  And the court would certainly admit

8

evidence of these facts because they would "shed light" on defendant's intent and recognition.  As in <u>Curtin</u>, the converse is also true.  In conjunction with the evidence of defendant's knowledge of facts rendering M.T.M. "susceptible to injuries through mental distress," as well as defendant's own post-suicide statements referencing M.T.M.'s suicide, that M.T.M. did commit suicide is relevant because it tends to make more probable that defendant intended and recognized that her conduct was "likely to result in illness through mental distress," a fact at issue given the charges in this case.

    2.   <u>Evidence of M.T.M.'s Suicide Is Also Relevant to Prove Defendant's Knowledge That Her Communications With M.T.M. Over The MySpace Computer Network Exceeded her "Authorized Access"</u>

Defendant is charged with conspiring to violate and violating 18 U.S.C. § 1030(a)(2)(C), which requires the government to prove, among other things, that defendant "intentionally access[ed] a computer without authorization or exceed[ed] authorized access."  Defendant has made clear that this required element lies at the core of her defense, and that she will contend that she did not know that her use of the "Josh Evans" MySpace account violated any MySpace rules.  To assist in proving the required element and rebutting defendant's assertions, the government will introduce evidence that after learning of M.T.M.'s suicide, which occurred shortly after "Josh Evans" told M.T.M. that the world would be a better place without her, defendant took the following two actions: defendant directed her co-schemers to destroy evidence of the "Josh Evans" MySpace

account; and defendant instructed a neighborhood girl who had previously used the "Josh Evans" MySpace account to "keep her mouth shut," to "stay off the MySpace," and to avoid accessing the "Josh Evans" account.

Both of these actions are alleged in the indictment as overt acts in the charged conspiracy to violate § 1030(a)(2)(C). (Indictment, ¶ 16, Overt Acts 11 & 12). The two overt acts specifically allege that these actions were taken after defendant learned "that M.T.M. had killed herself." (Id.). The reason this is alleged is that M.T.M.'s suicide, and defendant's knowledge of that suicide, are key pieces of evidence that render these subsequent acts relevant to support an inference that defendant knew that her conduct in using the "Josh Evans" account violated MySpace's rules. In particular, M.T.M.'s suicide is an act that would permit a jury properly to infer that anyone who learned of it (i.e., defendant) would realize that: (a) it would be the subject of an investigation that would focus on the circumstances that caused it; and (b) in the course of such an investigation, the "Josh Evans" MySpace communications would be uncovered. These inferences, which rest on the inherently unusual nature of M.T.M.'s suicide (it is not often that a 13-year old kills herself), provide the basis for the jury to infer that defendant's actions in seeking to cover up the MySpace communications, the acts alleged in Overt Acts 11 & 12, were committed in furtherance of the conspiracy, and were driven by defendant's knowledge that covering up the MySpace communications

was necessary because the MySpace communications violated MySpace rules.

Again, the methodology of <u>Curtin</u> confirms the relevance of M.T.M.'s suicide to these points.  If, after learning of M.T.M.'s suicide defendant had not taken the actions she did and had instead continued to blithely use the "Josh Evans" account as if nothing had happened, defendant would certainly be seeking to introduce evidence of M.T.M.'s suicide, and the court would surely hold that evidence relevant, to permit a jury inference that because defendant did not engage in a coverup once she learned that her actions might have contributed to an outcome as horrible as M.T.M.'s suicide that would surely result in an investigation, she must have believed that she was breaking no rules when she used the "Josh Evans" account.  <u>Curtin</u> compels the conclusion that the converse must be true, and that evidence of M.T.M.'s suicide is "equally relevant" to prove the government's case by demonstrating that defendant's post-suicide actions reflected her knowledge that she was breaking MySpace rules when she used the "Josh Evans" account.

B.   EVIDENCE OF M.T.M.'S SUICIDE SHOULD NOT BE EXCLUDED UNDER
     FEDERAL RULE OF EVIDENCE 403

Under Federal Rule of Evidence 403, relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice. . . ."  For these purposes, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  <u>Old Chief</u>, 519 U.S. at 180 (quoting Advisory

11

Committee Notes to Fed. R. Evid. 403); see also United States v. Allen, 341 F.3d 870, 886 (9th Cir. 2003) (same; holding that "although prejudicial, the skinhead and other white supremacy evidence was not unfairly so and properly was admitted to prove racial animus"). As discussed in the government's original opposition, application of these standards has led to numbers of cases permitting, subject to mitigating measures such as voir dire and limiting instructions, the presentation of evidence far more likely to elicit an emotional reaction than the simple fact of M.T.M.'s suicide: prior acts of child molestation, movies depicting child rape, Nazi-related literature and skinhead paraphernalia, and graphic pictures of mutilations and beatings.

The discussion of these cases will not be repeated here, but there are two points that bear emphasis in considering their application. First, the government is not seeking to overemphasize the facts relating to M.T.M.'s suicide, and does not intend to introduce any gruesome photos, coroner's reports, or other similar evidence that would be most likely to elicit an emotional effect. All the government seeks to introduce is the fact of M.T.M.'s suicide for the reasons it is relevant as discussed above. See United States v. Hiland, 909 F.2d 1114, 1135 (8th Cir. 1990) (in trial for manufacture of non-FDA approved drug, appropriate to admit medical testimony regarding infant deaths where "medical testimony was carefully controlled and not presented in an inflammatory manner"). Second, the government has no objection, and would join in recommending, both

12

careful voir dire and thorough limiting instructions to ensure
that the fact of M.T.M.'s suicide is considered only for its
proper relevance, and not as an emotional basis for decision.
Given the nature of the evidence, there is no reason to believe
that a properly voir-dired jury will be unable to abide by such
limiting instructions.  Indeed, as discussed in more detail
below, proceeding in this way is more likely to avoid any
potential for unfair prejudice than the alternative, attempting
to avoid any mention of M.T.M.'s suicide while running the risk
that jurors have either been exposed to publicity referencing
that suicide or deduce for themselves that it occurred.

Old Chief makes clear that when assessing whether to exclude
relevant evidence under Rule 403, courts may consider the
availability of "evidentiary alternatives."  514 U.S. at 184.
But Old Chief continues to recognize that where, as here, the
evidence at issue under Rule 403 is not "proof of felon status,"
deference must be given to the prosecutor's decision as to how to
present its case, and the prosecutor ordinarily will be free to
reject a proffered evidentiary alternative in favor of "evidence
creating a coherent narrative of [defendant's] thoughts and
actions in perpetrating the offense for which he is being tried."
Id. at 186-92 & n.7; see also United States v. Ganoe, 538 F.3d
1117, 1123-24 (9th Cir. 2008) (upholding admission of child
pornography images despite defendant's proffered stipulation that
images were child pornography); Allen, 341 F.3d at 888 (upholding
admission of Nazi-related literature and skinhead paraphernalia

13

despite defendants' admissions that they were racists and skinheads).  The Court summarized its reasoning on this point as follows:

> In sum, the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense.  A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it.  People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibilty knowing that more could be said than they have heard.  A convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best.

519 U.S. at 189.

Old Chief's reasoning is applicable here and mandates admission of the fact of M.T.M.'s suicide.

First, defendant has proposed no viable evidentiary alternative that could substitute for the relevant fact of M.T.M.'s suicide.  Nor can she.  For all the reasons discussed above, that M.T.M. actually took the extreme step of killing herself is crucial to establishing both that defendant's use of the "Josh Evans" account was in furtherance of tortious conduct, namely, intentional infliction of emotional distress, and that defendant's post-suicide conduct evidenced her knowledge that her use of the "Josh Evans" account violated MySpace rules.  There is no way to sanitize the evidence to prevent the jury from learning of M.T.M.'s suicide while preserving the probative value of that fact.

14

Second, M.T.M.'s suicide is central to this case.  It is the reason a number of witnesses remember certain statements and events, and it is the reference point around which the acts, including defendant's post-suicide conduct and statements, relevant to this case occurred.  Removing the ability of the witnesses to refer in any way to M.T.M.'s suicide will drastically alter the natural narrative of their testimony, resulting in gaps and breaks that will be unexplainable.  This will unfairly affect the jury's assessment of the weight of their testimony, and may lead a jury unfairly to conclude that the gaps and breaks indicate a lack of credibility justifying rejection of their testimony as a whole.  The court will be unable to correct this by instruction, for such an instruction (e.g., "In assessing credibility, you should disregard the breaks, gaps, and clearly altered nature of the witnesses' testimony because I have instructed the witnesses not to reference a particular event."), would both improperly remove from the jury much of its role in assessing credibility while at the same time encouraging speculation as to the unreferenced event.

Third, and relatedly, precisely because of the centrality of M.T.M.'s suicide to the narrative in this case, complete omission of any reference to that suicide will leave a gaping hole in the evidence that could result in more unfair prejudice to defendant than if the simple fact of M.T.M.'s suicide were admitted and dealt with head on.

15

As an initial matter, this case has been the subject of extensive publicity, all of which has referenced M.T.M.'s suicide.  In the ordinary course, jurors' pretrial knowledge of M.T.M.'s suicide would be addressed through voir dire to ensure that jurors could put aside their exposure to pretrial publicity and render a fair and impartial verdict based on the facts presented at trial.  If there is to be no mention whatsoever of M.T.M.'s suicide, however, two jury selection issues are posed. First, identifying jurors with preexisting knowledge of M.T.M.'s suicide may be difficult or impossible since they cannot be asked about it directly.  If a juror with preexisting knowledge avoids detection in voir dire, there will be no occasion to address this knowledge during trial with limiting instructions or other precautionary measures since there will have to be no reference to M.T.M.'s suicide at all.  Second, if all jurors with preexisting knowledge of M.T.M.'s suicide can be identified, they will all have to be excused, with the result, given the widespread publicity, that it may be difficult or impossible to seat a jury at all.

Assuming these jury selection hurdles could be overcome, the jurors who are seated will know, as they must given the charges and the other evidence that will be admitted, that the hole in the evidence arising from excising any mention of M.T.M.'s suicide relates to an event that arose from severe emotional distress on the part of M.T.M.  It is a natural tendency to seek to fill such a hole.  This poses the risk that jurors may

16

themselves speculate or infer what this event may be, including, possibly, that M.T.M. committed suicide.  If this occurs, it would pose all of the risks of unfair prejudice cited by defendant, without permitting the court to take the normal measures to mitigate this risk.  Precisely because there will be no official mention of the suicide, the court will not have been able to conduct voir dire to ensure that jurors would consider the suicide only for proper purposes, and will be unable to provide a limiting instruction defining what those proper purposes are, leaving the jurors to speculate and consider their speculation as they will.

For all these reasons, consideration of Rule 403 and its underlying purposes not only does not require exclusion, but favors admission of the simple fact of M.T.M.'s suicide, accompanied by proper precautionary measures, voir dire and limiting instructions, to eliminate any unfair prejudice that might arise from its admission.

///
///
///
///
///
///
///
///

17

IV.

CONCLUSION

For the reason set forth above and in the government's original opposition, defendant's motion in limine to exclude evidence of the death of M.T.M. should be denied.

Dated: November 13, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


   George S. Cardona /S/ for
MARK C. KRAUSE
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

18