1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   MARK C. KRAUSE (SBN 198142)
4  Assistant United States Attorney
   Deputy Chief, Cyber and Intellectual
5  Property Crimes Section
        1200 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-3493
        Facsimile: (213) 894-8601
8       Email: mark.krause@usdoj.gov

9  Attorneys for Plaintiff
   United States of America

10

11              UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,          )  CR NO. 08-582-GW
                                       )
14              Plaintiff,             )  GOVERNMENT'S RESPONSE TO
                                       )  DEFENDANT'S SUPPLEMENT TO
15          v.                         )  RULE 29 MOTION
                                       )
16  LORI DREW,                         )  Place: Courtroom of the
                                       )         Hon. George H. Wu
17              Defendant.             )
                                       )
18                                     )
                                       )
19                                     )
                                       )

20  ─────────────────────────────────

21       Plaintiff United States of America, by and through its

22  counsel of record, Assistant United States Attorney Mark C.

23  Krause, hereby files this response to defendant's supplement to

24  Rule 29 motion.

25  ///

26  ///

27  ///

28

1    This response is based on the attached memorandum of points

2  and authorities, the files and records in this case, and whatever

3  evidence or argument this Court may consider.

4  Dated: December 30 , 2008

5                              Respectfully submitted,

6                              THOMAS P. O'BRIEN
                               United States Attorney
7
                               CHRISTINE C. EWELL
8                              Assistant United States Attorney
                               Chief, Criminal Division
9

10                             _____

                               MARK C. KRAUSE
11                             Assistant United States Attorney

12                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                     2

**TABLE OF CONTENTS**

**Description**                                                        **Page(s)**

Table of Authorities . . . . . . . . . . . . . . . . . . . . .   ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . .   1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . .   3

      A.    THE TERMS "UNAUTHORIZED ACCESS AND
            ACCESS IN "EXCESS OF AUTHORIZATION"
            ENCOMPASS DEFENDANT'S CONDUCT . . . . . . . . . . . .   4

            1.    The Plain Language of Section 1030
                  and the Case Law Construing It
                  Demonstrate that Conduct in Violation
                  of A Website's TOS Can Be "Unauthorized"
                  and "in Excess of Authorization" . . . . . . . .   4

            2.    Defendant's Citations to
                  Theofel v. Farey-Jones, People v. Cook,
                  and People v. Donell Are
                  Not to the Contrary . . . . . . . . . . .   12

                  a.    Theofel Demonstrates that Defendant's
                        Conduct Was Unauthorized . . . . . . . .   12

                  b.    Cook and Donell . . . . . . . . . . .   16

      B.    DEFENDANT'S "EVERYBODY DOES IT DEFENSE"
            DOES NOT EXEMPT HER FROM CRIMINAL LIABILITY . . . .   18

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . .   22

# TABLE OF AUTHORITIES

Description                                                          Page(s)

**FEDERAL CASES**

America Online, Inc. v. LCGM, Inc.,
    46 F. Supp. 2d 444 (E.D. Va. 1998) . . . . . . . . . . .    5

Bro-Technology Corp. v. Thermax, Inc.,
    2006 WL 516767 (E.D. Pa. Feb. 28, 2006) . . . . . . . .    7

Calence LLC v. Dimension Data Holdings,
    2007 WL 1526349 (W.D. Wash. May 23, 2007) . . . . . . .    6

Calyon v. Mizuho Sec. USA, Inc.,
    2007 WL 2618658 (S.D.N.Y. Sept. 5, 2007) . . . . . . .   6, 7

Cohens v. Virginia,
    19 U.S. (6 Wheat.) 264 (1821) . . . . . . . . . . . .    21

Dudick v. Vaccarro,
    2007 WL 1847435 (M.D. Pa. 2007) . . . . . . . . . . . .    7

EF Cultural Travel VB v. Explorica, Inc.,
    274 F.3d 577 (1st Cir. 2001) . . . . . . . . . . . .   7, 9

EF Cultural Travel v. Zefer Corp.,
    318 F.3d 58 (1st Cir. 2003) . . . . . . . . . . . .  7, 10

George S. May International Co.,
    2004 WL 1197395 (N.D. Ill. May 28, 2004) . . . . . . .    7

Hanger Prosthetics & Orthodics, Inc.
v. Capstone Orthopedic, Inc.,
    556 F. Supp. 2d 1122 (E.D. Cal. 2008) . . . . . . . . .    6

Hewlett-Packard Co. v. Byd:Sign, Inc.,
    No. 05-CV-456, 2007 WL 275476
    (E.D. Tex. Jan. 25, 2007) . . . . . . . . . . . . . .    6

Hotmail Corp. v. Van$ Money Pie, Inc.,
    1998 WL 388389 (N.D. Cal. Apr. 16, 1998) . . . . . . .    5

Hub Group, Inc. v. Clancy,
    2006 WL 208684 (E.D. Pa. Jan. 25, 2006) . . . . . . . .    7

International Airport Centers v. Citrin, LLC,
    440 F.3d 418 (7th Cir. 2006) . . . . . . . . . . . .   7, 9

International Sec. Management Group v. Sawyer,
    No. 3:06 CV 0456, 2006 WL 1638537
    (M.D.Tenn. June 6, 2006) . . . . . . . . . . . . . .    7

1

TABLE OF AUTHORITIES (cont'd.)

2    Description                                              Page(s)

3    <u>Jackson v. Virginia</u>,
         443 U.S. 307 (1979) . . . . . . . . . . . . . . .    3

4
     <u>Joe N. Pratt Insurance v. Doane</u>,
5        2008 WL 819011 (S.D. Tex. Mar. 20, 2008) . . . . . . . .    7

6    <u>MPC Containment System Ltd. v. Moreland</u>,
         2008 WL 2875007 (N.D. Ill. July 23, 2008) . . . . . . . .    6
7
     <u>Nilfisk-Advance, Inc. v. Mitchell</u>,
8        2006 WL 827073 (W.D. Ark. Mar. 28, 2006) . . . . . . .    7

9    <u>Shurgard Storage Centers, Inc.</u>
     <u>v. Safeguard Self Storage, Inc.</u>,
10       119 F. Supp. 2d 1121 (W.D. Wash. 2000) . . . . . . . .    7

11   <u>Theofel v. Farey Jones</u>,
         359 F.3d 1066 (9th Cir. 2004) . . . . . . . . .    12, 13, 15
12
     <u>Ticketmaster LLC v. RMG Technology, Inc.</u>,
13       507 F. Supp. 2d 1096 (C.D. Cal. 2007) . . . . . . . .    5, 6

14   <u>United States v. Bancalari</u>,
         110 F.3d 1425 (9th Cir. 1997) . . . . . . . . . . .    3
15
     <u>United States v. Dreitzler</u>,
16       577 F.2d 539 (9th Cir. 1979) . . . . . . . . . .    3

17   <u>United States v. Freter</u>,
         31 F.3d 783 (9th Cir. 1994) . . . . . . . . . . .    3, 12, 16
18
     <u>United States v. Inman</u>,
19       411 F.3d 591 (5th Cir. 2005) . . . . . . . . . . . . .    7

20   <u>United States v. Iriarte-Ortega</u>,
         113 F.3d 1022 (9th Cir. 1997) . . . . . . . . . . .    3
21
     <u>United States v. Lewis</u>,
22       787 F.2d 1318 <u>modified on other grounds</u>,
         798 F.2d 1250 (9th  Cir. 1986) . . . . . . . . . .    3
23
     <u>United States v. Lopez</u>,
24       625 F.2d 889 (9th Cir. 1980) . . . . . . . . . .    3

25   <u>United States v. Phillips</u>,
         477 F.3d 215 (5th Cir. 2007) . . . . . . . . . .    7, 8
26
     <u>United States v. Ramos</u>,
27       558 F.2d 545 (9th Cir. 1977) . . . . . . . . . .    3

28

iii

TABLE OF AUTHORITIES (cont'd.)

Description                                                      Page(s)

**STATE CASES**

People v. Cook,
    228 Cal. App. 2d 716 (1964) . . . . . . . . . .    16, 17, 18

People v. Donell,
    32 Cal. App. 3d 613 (1973) . . . . . . . . . .    16, 17, 18

Schwab & Co. v. Carter,
    2005 WL 2369815 (N.D. Ill. 2005) . . . . . . . . . . .    7

**FEDERAL STATUTES**

18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . . .    passim

18 U.S.C. § 2701 . . . . . . . . . . . . . . . . . . . .    12

**FEDERAL RULES**

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . .    3

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I**

3

**INTRODUCTION**

4       On November 26, 2008, defendant Lori Drew was convicted of

5   three counts of unauthorized access to a protected computer to

6   obtain information, in violation of 18 U.S.C. § 1030(a)(2)(C).

7   On that date, defendant asked for an extension of time within

8   which to file a motion for a judgment of acquittal under Rule 29

9   of the Federal Rules of Criminal Procedure ("Rule 29 motion").  A

10  sentencing date has not been set.  On December 15, 2008,

11  defendant filed her Rule 29 motion.  On December 19, 2008, the

12  Court ordered the government to file its response no later than

13  January 2, 2009, and set a hearing regarding defendant's Rule 29

14  motion for January 8, 2009, at 9:00 a.m.

15      In her Rule 29 motion, defendant fails to review the factual

16  sufficiency of the government's case, and instead focuses on

17  reiterating arguments about the sufficiency of the indictment

18  that were already considered and rejected by the Court pretrial.

19  Defendant first reasserts that conduct in violation of website

20  Terms of Service ("TOS") while accessing a computer cannot be

21  considered "unauthorized" or "in excess of authorization" under

22  Section 1030 as a matter of law.  (Def's Mot. at 4-6).  Defendant

23  also suggests that her conduct cannot be considered criminal

24  because, in effect, "everybody does it."  (Def's Mot. at 7-8).

25  Defendant's arguments are unavailing.

26      First, as the government noted pretrial, the plain terms of

27  the statute allow the government to prosecute a defendant who

28  lies to gain access to a computer and intentionally violates the

1

1  rules established by a computer's owner for the use of that

2  computer for the purpose of committing another crime or tortious

3  act.  This plain reading of the statute has been embraced by

4  courts throughout the United States, and is consistent with the

5  statute's legislative history.  The case law cited by defendant

6  is not to the contrary and does not even address Section 1030.

7  As a consequence, any rational trier of fact could have found

8  that defendant's conduct was "unauthorized" and "in excess of

9  authorization" after hearing testimony that she intentionally

10 (1) provided untrue and inaccurate registration information;

11 (2) used information obtained from MySpace services to harass,

12 abuse, and harm other people; (3) solicited personal information

13 from someone under 18; (4) promoted information that she knew was

14 false or misleading;  (5) promoted conduct that was abusive,

15 threatening, obscene, defamatory, or libelous; and (6) posted

16 photographs of other people without their consent, when defendant

17 knew that such conduct was "illegal" and in violation of

18 MySpace's rules.

19      Second, defendant's suggestion that "everyone does it,"

20 neither justifies nor excuses her conduct.  Defendant's policy

21 argument is inappropriate for a Rule 29 motion and the assertions

22 used to advance that argument are questionable, at best.  It is

23 doubtful that "most" internet users intentionally violate TOS to

24 humiliate children.  Defendant's Rule 29 motion should be denied.

25 ///

26 ///

27 ///

28 ///

## II

### ARGUMENT

Rule 29(c) provides in relevant part that "a defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict . . . ."  Fed. R. Crim. P. 29(c)(1).  Rule 29(a) permits a trial court to enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction.  In ruling on a motion for judgment of acquittal, the court must review the evidence "in the light most favorable to the government to determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Freter, 31 F.3d 783, 785 (9th Cir. 1994) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Iriarte-Ortega, 113 F.3d 1022, 1024 n.2 (9th Cir. 1997); United States v. Bancalari, 110 F.3d 1425, 1428 (9th Cir. 1997).  In resolving a motion for a judgment of acquittal, the court must consider all of the evidence presented at trial.  United States v. Lopez, 625 F.2d 889, 897 (9th Cir. 1980).  The court "must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict."  United States v. Ramos, 558 F.2d 545, 546 (9th Cir. 1977); accord United States v. Dreitzler, 577 F.2d 539, 545 (9th Cir. 1979).  Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.  United States v. Lewis, 787 F.2d 1318, 1323, modified on other grounds, 798 F.2d 1250 (9th

Cir. 1986).

## A.    THE TERMS "UNAUTHORIZED ACCESS" AND ACCESS IN "EXCESS OF AUTHORIZATION" ENCOMPASS DEFENDANT'S CONDUCT

Defendant appears to suggest that no reasonable jury could have found defendant's access of the MySpace computers was "unauthorized" or "in excess of authorization." Rather than review the evidence presented at trial, however, defendant instead reiterates the same claim she has repeated throughout the course of the prosecution: that violations of contractual terms do not make access "unauthorized" or "in excess of authorization." (Def's Mot at 3.) Defendant's argument is belied by the plain language of the statute and the case law construing it. The Court, therefore, properly rejected that argument pretrial and instead instructed the jury that "'access without authorization' means to access a computer without the approval, permission or sanction of the computer's owner." Defendant provides no basis for revisiting that instructional issue. Accordingly, the jury properly convicted defendant of intentionally accessing MySpace's servers without authorization and in excess of authorization.

1.    <u>The Plain Language of Section 1030 and the Case Law Construing It Demonstrate that Conduct in Violation of A Website's TOS Can Be "Unauthorized" and "in Excess of Authorization"</u>

Section 1030 provides in relevant part:

    any person who intentionally accesses a computer
    without authorization or exceeds authorized access, and
    thereby obtains . . . information from any protected
    computer if the conduct involved an interstate or
    foreign communication . . . shall be punished . . .

18 U.S.C. § 1030(a)(2). TOS, by their very nature, define authorized -- and unauthorized -- uses of a website. Accessing a

4

computer in violation of terms set for its use by the computer's

owner is, therefore, plainly "unapproved," "not permitted," and

"not sanctioned" by the computer's owner. See Black's Law

Dictionary 1559, 143 8th ed. (defining "unauthorized" as "done

without authority" and "authorize" as "to give legal authority;

to empower", "to formally approve"); Webster's New World

Dictionary, 3d Collegiate Ed. 98 (1988) (defining "authorize" as

"to give official approval to or permission for");

http://dictionary.reference.com /browse/authorized (defining

"authorized" as "1. given or endowed with authority; 2. duly

sanctioned"). Accordingly, the plain language of

Section 1030(a)(2)(C) embraces the notion that computer access in

violation of written TOS is "unauthorized." Ticketmaster LLC v.

RMG Tech., Inc., 507 F.Supp.2d 1096 (C.D. Cal. 2007) (Collins,

J.) (violation of TOS resulted in "unauthorized access"); America

Online, Inc. v. LCGM, Inc., 46 F.Supp.2d 444, 450-51 (E.D. Va.

1998) (holding that massive email transmissions, or "spam," sent

by customers of the plaintiff were sent "without authorization"

because the emails violated the TOS of plaintiff); Hotmail Corp.

v. Van$ Money Pie, Inc., 1998 WL 388389 (N.D. Cal. Apr. 16, 1998)

(misuse of email addresses in violation of TOS constituted

"unauthorized" access).

Accessing information in violation of TOS also "exceeds

authorized access" as that term is defined in the statute.[1]  A

---

[1] The statute provides, in pertinent part, that "the term
'exceeds authorized access' means to access a computer with
authorization and to use such access to obtain or alter
information in the computer that the accesser is not entitled so
to obtain or alter." 18 U.S.C. § 1030(e)(6).

1  user who is granted limited access to a computer, but who abuses

2  that authority by violating the rules restricting that access in

3  order to "obtain . . . information in the computer that the

4  accesser is not entitled so to obtain" by definition exceeds his

5  or her authorized access.   18 U.S.C. § 1030(e)(6).   Courts have

6  agreed with this common sense application of the statute.   <u>See,</u>

7  <u>e.g.</u>, <u>Calyon v. Mizuho Sec. USA, Inc.</u>, 2007 WL 2618658 (S.D.N.Y.

8  Sept. 5, 2007) ("[T]he plain language of the statute seems to

9  contemplate that, whatever else, 'without access' and 'exceeds

10  authorized access' would include an employee who is accessing

11  documents on a computer system which that employee had to know

12  was in contravention of the wishes and interests of his

13  employer"); <u>Calence LLC v. Dimension Data Holdings</u>, 2007 WL

14  1526349 (W.D. Wash. May 23, 2007) (holding that "Congress

15  intended to encompass actions such as those allegedly taken by

16  defendant" where defendant allegedly breached employment and

17  confidentiality agreements by accessing and disseminating

18  information, holding "this Court has generally accepted the

19  notion that); <u>Ticketmaster LLC</u>, 507 F.Supp.2d at 1096 (violation

20  of TOS resulted in "unauthorized access"); <u>Hewlett-Packard Co. v.</u>

21  <u>Byd:Sign, Inc.</u>, No. 05-CV-456, 2007 WL 275476, at *13 (E.D. Tex.

22  Jan. 25, 2007) (defendant's conduct violated written agreements

23  regarding access and were, therefore, unauthorized).[2]

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

25       [2] <u>See also</u> <u>MPC Containment Sys. Ltd. v. Moreland</u>, 2008 WL
   2875007 at *14 (N.D. Ill. July 23, 2008) (denying motion to
26  dismiss where factual issues existed as to whether defendant
   breached duty of loyalty when accessing information); <u>Hanger</u>
   <u>Prosthetics & Orthodics, Inc. v. Capstone Orthopedic, Inc.</u>, 556
27  F.Supp.2d 1122, 1131 (E.D. Cal. 2008) ("Employees that access
   their employer's computers to obtain or delete business
28  information for their own personal benefit or the benefit of a

1    Defendant's position also ignores the great weight of

2   circuit authority which supports the view that accessing

3   protected computers in violation of written agreements by

4   computer owners is "unauthorized" within the meaning of Section

5   1030.  United States v. Phillips, 477 F.3d 215 (5th Cir. 2007);

6   Citrin, 440 F.3d at 418; EF Cultural Travel v. Zefer Corp., 318

7   F.3d 58, 63 (1st Cir. 2003); EF Cultural Travel VB v. Explorica,

8   Inc., 274 F.3d 577 (1st Cir. 2001); see also United States v.

9   Inman, 411 F.3d 591, 594-95 (5th Cir. 2005) (noting that while

10  defendant was "authorized" to use a credit card, he was

---

11  competitor act 'without authorization' or 'exceed authorization'
    within the meaning of the statute."); Joe N. Pratt Ins. v. Doane,
12  2008 WL 819011 (S.D. Tex. Mar. 20, 2008) (holding that cause of
    action sufficiently pled "if a plaintiff alleges that a defendant
13  participated in dishonest methods to obtain a plaintiff's secret
    information") (citation and quotation marks omitted); Calyon,
14  2007 WL 2618658 ("'[W]ithout access' and 'exceeds authorized
    access' . . . include an employee who is accessing documents on a
15  computer system which that employee had to know was in
    contravention of the wishes and interests of his employer");
16  Dudick v. Vaccarro, 2007 WL 1847435 at *6 (M.D. Pa. 2007)
    (discussing cases where employees steal data to assist
17  competitors);  Nilfisk-Advance, Inc. v. Mitchell, 2006 WL 827073
    (W.D. Ark. Mar. 28, 2006) (CFAA covers transfer of files in
18  excess of authority for use of that data); Bro-Tech Corp. v.
    Thermax, Inc., 2006 WL 516767 at *1 (E.D. Pa. Feb. 28, 2006)
19  (CFAA "intended" to cover employees taking confidential and
    proprietary information from former employer's computers for
20  delivery); Hub Group, Inc. v. Clancy, 2006 WL 208684 (E.D. Pa.
    Jan. 25, 2006) (access to obtain proprietary information for
21  competitor's use "exceeded the scope of [the defendant's]
    authorization"); Int'l Sec. Mgmt. Group v. Sawyer, No. 3:06 CV
22  0456, 2006 WL 1638537, at *20-21 (M.D.Tenn. June 6, 2006)
    (emailing documents to competitor was sufficient to sustain CFAA
23  claim).  Schwab & Co. v. Carter, 2005 WL 2369815, at *7 (N.D.
    Ill. 2005) (encouraging employee to transfer proprietary
24  information to competitor); George S. May Int'l. Co., 2004 WL
    1197395, at *4 (N.D. Ill. May 28, 2004) (plaintiff properly
25  stated claim under CFAA where defendant allegedly removed
    copyrighted information which he was entitled to access, but did
26  so for his personal benefit); Shurgard Storage Centers, Inc. v.
    Safeguard Self Storage, Inc., 119 F.Supp.2d 1121 (W.D. Wash.
27  2000) (employees engaged in unauthorized access when they
    accessed plaintiffs computer system to benefit defendant).
28

7

1  "unauthorized" to use it for personal expenses).

2  In <u>Phillips</u>, for example, the Fifth Circuit held that a
3  criminal defendant's conduct in accessing what defendant claimed
4  was a publicly available website was unauthorized, in part,
5  because it was not permitted by his agreement with the computer's
6  owner.  The defendant in <u>Phillips</u> was a student at the University
7  of Texas ("UT") who, like all UT students, signed UT's
8  "acceptable use" computer policy.  477 F.3d at 217.  Even though
9  that policy prohibited defendant from using his university
10 account to perform certain scanning techniques on the university
11 computer, the defendant did just that.  <u>Id.</u>  The defendant also
12 accessed a UT computer on the university network used by
13 professors and staff without authorization by automating the
14 process of guessing the passwords of server's authorized users,
15 which happened to be their social security numbers.  <u>Id.</u> at 218 &
16 n.2.

17 The defendant in <u>Phillips</u> claimed that because the UT
18 website was a public application, he, like any internet user, was
19 a <u>de facto</u> authorized user.  The Fifth Circuit rejected that
20 argument, noting that "courts have recognized that authorized
21 access typically arises only out of a contractual or agency
22 relationship."  <u>Id.</u> at 220-21.  It therefore rejected the
23 defendant's claim of "authorized" use because, among other
24 things, defendant's conduct was not permitted by UT's acceptable
25 computer use policy.  <u>Id.</u> at 221 ("While Phillips was authorized
26 to use his UT email account and engage in other activities
27 defined by UT's acceptable computer use policy, he was never
28 authorized to access TXClass.").  Accordingly, defendant's

1  conviction was affirmed.

2     The Seventh Circuit reached a similar result in Citrin,
3  holding that access of a computer in violation of unwritten
4  employment rules constituted "unauthorized" access within the
5  meaning of Section 1030.  In Citrin, the plaintiff-employers had
6  provided the defendant-employee with a laptop for his use at
7  work.  440 F.3d at 419.  Ultimately, the employee decided to go
8  into business for himself, but before he left, he destroyed data
9  on the laptop.  Id.  The district court dismissed the employers'
10 Section 1030 civil suit against defendant, but the Seventh
11 Circuit reversed.  The Seventh Circuit held that the employee was
12 "without authorization" to access his employers' computer because
13 he breached his employment agreement and the duty of loyalty owed
14 to his employer by starting a competing business.  Id. at 420-
15 21.  Accordingly, the employers properly stated a claim for
16 relief under Section 1030 because defendant's conduct was
17 unauthorized within the meaning of the statute.

18     Finally, the First Circuit has concluded that contractual
19 arrangements can help define the scope of "authorized" and, by
20 contrast, "unauthorized" access.  In EF Cultural Travel,
21 defendant, in violation of his confidentiality agreement with his
22 former employer, used confidential information that he had
23 acquired as an employee to create a program for his new travel
24 company.  Defendant sought to undercut the plaintiff's prices,
25 which were publicly available.  274 F.3d at 579.  Ultimately,
26 defendant hired a computer consultant to design a program called
27 a "scraper" to glean all of the necessary information from the
28 plaintiff's publicly available website.  Id.  To assist the

consultant, defendant violated his confidentiality agreement with the plaintiff, his former employer, by providing the consultant with proprietary information and know-how. Id. at 583. Although the First Circuit did not reach the more general arguments made about statutory meaning, including whether the use of the scraper alone rendered the defendant's access unauthorized, it concluded the defendant likely violated Section 1030 because defendant exceeded any authorized access to his employer's computer when he breached the confidentiality agreement. Id. at 582, 583-84.[3]

In sum, the First, Fifth and Seventh Circuits have looked to contractual terms to determine the scope of authorized and unauthorized access, including in a criminal case. Accordingly, defendant's statement that the instant prosecution is "novel and breathtakingly broad" is not only inaccurate, it ignores the great weight of circuit authority holding that contractual terms can identify what is "unauthorized" or in excess of authorization within the meaning of Section 1030. Defendant's suggestion that the Court erroneously instructed the jury and, therefore, the jury's verdict was not supported by adequate facts is meritless.

In light of the foregoing, this Court correctly instructed the jury that "'access without authorization' means to access a computer without the approval, permission or sanction of the computer's owner." Based on that instruction, the jury

_____

[3] In a subsequent appeal in the same case against the computer consultant, the First Circuit suggested that written TOS on the website could demonstrate what was unauthorized access on that publicly available website. EF Cultural Travel v. Zefer Corp., 318 F.3d at 63 ("[W]e think that the public website provider can easily spell out explicitly what is forbidden . . . If EF wants to ban scrapers, let it say so on the webpage or a link clearly marked as containing restrictions.").

1    reasonably found that defendant's access of the MySpace servers
2    was "unauthorized" and "in excess of authorization."  The
3    evidence at trial showed that defendant and her co-schemers
4    intentionally accessed MySpace servers without authorization and
5    in excess of authorization by (1) providing untrue and inaccurate
6    registration information; (2) using information obtained from
7    MySpace services to harass, abuse, and harm other people;
8    (3) soliciting personal information from someone under 18;
9    (4) promoting information that they knew was false or misleading;
10   (5) promoting conduct that was abusive, threatening, obscene,
11   defamatory, or libelous; and (6) posting photographs of other
12   people without their consent.  Specifically, Jae Sung of MySpace
13   described how this conduct violated the MySpace TOS, was not
14   permitted, and could result in, among other things, termination
15   of service.  In addition, Susan Marie Prouty, Christina Chu,
16   Corporal Edwin Lutz, and Michelle Mulford each testified that
17   defendant told them how she and others created a fake MySpace
18   profile by pretending to be an attractive young boy named "Josh
19   Evans."  Ashley Grills explained that she created the Josh Evans
20   account at defendant's direction and, as part of that, posted the
21   picture of an attractive teenage boy without his consent on the
22   website.  Even S.D. testified that defendant reviewed the Josh
23   Evans account and approved of it.  According to Prouty, Chu,
24   Lutz, Mulford, and J.M., defendant told them how defendant used
25   the Josh Evans account to contact M.T.M.  Prouty, Grills, and
26   J.M. described how the profile was going to be used to harass
27   M.T.M. in the real world.  Prouty testified that defendant
28   acknowledged that defendant knew her conduct was in violation of

11

MySpace rules.  Grills also testified that she, S.D., and defendant discussed how the Josh Evans account was "illegal," but defendant nevertheless insisted on maintaining it.  Based on those facts, "'any rational trier of fact could have found the essential element[ of unauthorized access] beyond a reasonable doubt.'"  Freter, 31 F.3d at 785.

> 2.    Defendant's Citations to Theofel v. Farey-Jones, People v. Cook, and People v. Donell Are Not to the Contrary

Defendant nonetheless contends that if a person or business actually grants permission for the act, conditioned on some understanding that turns out to be false, then the act is still authorized for the purpose of the law.  Defendant cites no authority for this astonishing proposition, claiming only: "[w]hen Congress or a state legislature punishes an act when it occurs 'without authorization,' that act is prohibited only when the person or business that can grant authorization has actually declined or failed to give permission."  (Def's Br. at 4.)  As previously discussed, defendant's argument is flatly contradicted by numerous federal cases that interpret the meaning of "unauthorized access" and access "in excess of authorization" in section 1030.  Moreover, defendant's reliance on Theofel v. Farey-Jones, People v. Cook, and People v. Donell to support her novel theory is misplaced.

> a.    Theofel Demonstrates that Defendant's Conduct Was Unauthorized

Defendant first tries to revive her argument regarding Theofel v. Farey Jones, 359 F.3d 1066 (9th Cir. 2004), which analogized 18 U.S.C. § 2701, which prohibits unauthorized access to stored communications, to traditional trespass statutes.

Using that rubric, the Theofel court held that just as not all efforts to obtain access using trickery or deceit result in a trespass, not all trickery or deceit results in unauthorized access. In no way did Theofel purport to entirely preclude access obtained by trickery or deceit from resulting in "unauthorized access."

The conduct at issue in Theofel arose during a discovery dispute in a separate lawsuit between the same parties. The defendants issued a subpoena on the plaintiff's ISP to obtain the plaintiff's email. 359 F.3d at 1071. The subpoena was "on its face . . . massively overbroad" and "patently unlawful." Id. at 1071-72. Using the subpoena, the defendants obtained numerous privileged documents as well as other documents immaterial to the litigation. Id. When the plaintiffs learned about the disclosure, they moved to quash the subpoena. Id. The magistrate judge hearing the motion found that the subpoena "transparently and egregiously" violated the Federal Rules and that the defendants acted in "bad faith" in issuing it because they knew or should have known that it was invalid. Id. at 1071-72.

The Theofel plaintiffs subsequently filed suit under Section 2701. The defendants moved to dismiss, claiming that the ISP "consented" to the disclosure because it turned over the email even though it could have objected. Id. The district court agreed and dismissed the case, reasoning that the third-party ISP had "authorized" the defendant's access to the email by responding to the subpoena. Id. at 1072.

The Ninth Circuit disagreed with the district court's

13

conclusion that the ISP consented to the disclosure to the email
and reversed. Id. at 1072. The Court analogized the protections
offered by Section 2701 with the tort of trespass. It noted that
just as trespass protects those who rent space from a commercial
storage facility to hold sensitive documents, Section 2701
protects users whose electronic communications are in electronic
storage with an ISP or other electronic communications facility.
Id. at 1072-73. The Ninth Circuit rejected the district court's
conclusion that the ISP's compliance with the invalid subpoena
made the access to the email "authorized." Id. It noted that
*any consent given by the ISP was invalid because it was induced*
*by fraud.* Id. at 1073 (explaining that initial assent or
willingness is not effective "if the defendant knew, or probably
if he ought to have known in the exercise of reasonable care,
that the plaintiff was mistaken as to the nature and quality of
the invasion intended") (quoting Prosser & Keeton on the Law of
Torts, § 13, at 70 (5th ed. 1984)). As the Ninth Circuit
explained:

> [t]he busybody who gets permission to come inside by
> posing as a meter reader is a trespasser. So too is
> the police officer who, invited into a home, conceals a
> recording device for the media.
>
> Not all deceit vitiates consent. The mistake must
> extend to the <u>essential character</u> of the act itself,
> <u>which is to say that which makes it harmful or</u>
> <u>offensive, rather than to some collateral matter which</u>
> <u>merely operates as an inducement.</u>

Id. at 1073 (emphasis added). Because the defendants procured
consent by exploiting a mistake of which they had constructive
knowledge, the Ninth Circuit concluded the access to the email
was not authorized and the plaintiffs' lawsuit could proceed.

1   Id. at 1074-75.

2       Notwithstanding the foregoing, defendant cites Theofel for

3   the proposition that "[i]f a person or business actually grants

4   permission or the act, conditioned on some understanding that

5   turns out to be false, then the act is still authorized for the

6   purposes of criminal law." (Def's Br. 4).  Not only does Theofel

7   not stand for that proposition — — it explicitly recognizes that

8   consent obtained through fraud can be ineffective.  359 F.3d at

9   1073.[4]  To the extent Theofel is relevant, it supports the

10  government's position that defendant's access of the MySpace

11  server was unauthorized and in excess of authorization.  Just as

12  the Theofel defendants used fraud to obtain access to documents

13  to which they were not entitled, here defendant and her co-

14  schemers used fraud to obtain access to the MySpace servers in

15  order to access M.T.M.'s personal page and exchange

16  communications with her.  Defendant's access was both harmful and

17  offensive: defendant impersonated a male juvenile, posted

18  photographs of an attractive boy without that boy's permission,

19  flirted with M.T.M. so much so that it "became sexual for a

20  thirteen year-old," and elicited information that would be used

21  to harass and torment M.T.M.  Defendant's fraud was hardly a

22  collateral matter.  It went to the very core of the promises

23  defendant and her co-conspirators made to use the MySpace system

24

25      [4] The government notes that defendant's position is somewhat
    inconsistent with her citation of Theofel pretrial when she
26  suggested that a violation of a term of service can only make
    access of a computer unauthorized or in excess of authorization
27  if such violations "go to the essential nature of the invasion"
    that 18 U.S.C. § 1030(a)(2) was designed to prohibit.  (Def's Br.
28  at 6).

                                15

1  -- that is, promises to abide by the rules in place to ensure the

2  safety of the on-line experience of MySpace users.  Accordingly,

3  if anything, Theofel demonstrates that the Court's instructions

4  to the jury were proper and, therefore, "in the light most

5  favorable to the government to determine whether 'any rational

6  trier of fact could have found the essential element [of

7  unauthorized conduct] beyond a reasonable doubt.'" Freter, 31

8  F.3d at 785.

9         b.  *Cook* and *Donell*

10     Defendant also suggests that People v. Cook, 228 Cal.App.2d

11  716 (1964), and People v. Donell, 32 Cal.App.3d 613 (1973),

12  support her position.  Neither case, however, suggests that the

13  terms "unauthorized" and "in excess of authorization" in Section

14  1030(a)(1) should be defined as anything other than their plain

15  meaning.  Both Cook and Donell are explicitly limited to

16  joyriding cases.

17     In Cook, defendant was charged with (1) grand theft of an

18  automobile, in violation of California Penal Code section 487,

19  and (2) the driving or taking of a vehicle "without the consent

20  of the owner thereof, and with intent either to permanently or

21  temporarily to deprive the owner thereof of his title to or

22  possession of the vehicle," which is commonly known as joyriding,

23  in violation of California Vehicle Code section 10851.  228

24  Cal.App.2d at 718 n.1.  Defendant and his co-conspirators bought

25  a new Pontiac with an old "trade-in" Buick that lawfully belonged

26  to the defendant.  Id. at 717.  A co-conspirator gave the Pontiac

27  dealership possession of the defendant's old Buick and, in

28  exchange, the dealership turned over title to the new Pontiac to

16

1  the co-conspirator.  Id. at 717, 721.  The Pontiac dealership

2  subsequently sold the Buick to a third-party.  Id. at 721.  Some

3  time later, defendant claimed that the trade-in was effectuated

4  without his knowledge or permission.  Id. at 717.  By then,

5  however, the Pontiac dealership had repossessed the Pontiac it

6  had sold to defendant's co-conspirator.  Id. at 721.  At trial, a

7  jury acquitted defendant of grand theft of an automobile, but

8  convicted him of joyriding.

9      The California Court of Appeals overturned defendant's

10  conviction and held that the dealership "consented" to the trade-

11  in within the meaning of section 10851.  The court reasoned that

12  fraud was not established because the jury acquitted the

13  defendant of grand theft auto, which incorporated a species of

14  fraud or false pretense.  Id. at 721.  Leaving aside the fact

15  that the jury's verdict showed that the jury did not believe that

16  defendant's shenanigans were "fraud" vitiating the Pontiac

17  dealer's "consent," the court also relied on numerous out-of-

18  state joyriding statutes to hold that, as a matter of law,

19  "fraudulent inducement does not vitiate the consent given to the

20  extent of creating the crime of auto theft."  Id. at 718

21  (emphasis added).  Thus, the Court distinguished section 10851

22  from other statutes because it did not provide that a defendant's

23  fraud could subject a defendant to liability.

24      In Donell, the California Court of Appeal followed Cook and

25  reversed a conviction under section 10851.  The defendant in

26  Donell was charged with joyriding after he rented a car using a

27  false identity and false credit card.  The government reasoned

28  that the rental company's consent to use the car was vitiated by

17

1    defendant's fraud, but the court disagreed and reasoned that,

2    under the peculiar nature of the joyriding statute, consent could

3    not be vitiated by fraud.  "For some purposes in the law a

4    consent induced by fraud is no consent at all, but that theory

5    does not apply in a prosecution for joyriding."  32 Cal.App.3d at

6    617-18 (emphasis added).  Significantly, the Donell court

7    acknowledged that outside the context of joyriding, fraud could

8    vitiate consent.

9         Cook and Donnell are clearly distinguishable from the case

10   at hand.  First, their holdings were limited to the joyriding

11   statute, which is plainly not at issue here.  Cook is also

12   distinguishable on its facts because the jury's verdict in that

13   case showed that the jury found no fraud, let alone fraud that

14   would vitiate consent.  Second, section 10851 does not employ the

15   same language as that used in section 1030.  In stark contrast to

16   the substantial federal authority on section 1030 cited above,

17   defendant's reliance on two California cases that do not even

18   refer to conduct that is "authorized" or "in excess of

19   authorization" is misplaced.  In short, there is no authority to

20   support defendant's argument, but ample authority supporting the

21   government's interpretation of section 1030.  Accordingly, based

22   upon the evidence presented at trial, any rational trier of fact

23   could have found that defendant's access of the MySpace server

24   was "unauthorized" and "in excess of authorized access."

25   B.   **DEFENDANT'S "EVERYBODY DOES IT DEFENSE" DOES NOT EXEMPT HER
          FROM CRIMINAL LIABILITY**
26

27        Defendant goes on to suggest, just as she did pretrial and

28   during trial, that her conduct was not criminal because, in

                                    18

essence, everyone does it.   (Def's Mot. at 7.)   Again, defendant

does not seem to point to any real factual deficiency appropriate

for a Rule 29 motion.   Instead, defendant asserts that "most"

Internet users violate TOS to register accounts and therefore her

conduct should not be considered criminal.

Defendant's argument is dubious at best.   First, it strains

credulity to believe that defendant is aware of any cases in

which the violations (1) were "intentional," (2) were

accomplished to obtain "information," and (3) otherwise satisfied

the jurisdictional requirements.[5]   Put simply, defendant ignores

that the statute contains several elements, which collectively

demonstrate that innocent conduct will not and could not be

prosecuted.   And while cyberbullying may be increasing in

frequency, it is doubtful that defendant can identify any cases

that approach the conduct here.   Defendant -- an adult woman --

is alleged to have engaged in a scheme to obtain information that

would be used to humiliate a child as part of a scheme that

resulted in the child's death.   To achieve this end, defendant

did not simply assume a false identity, she engaged in a course

of conduct that involved harassment, misuse of a minor's

photograph, and misuse of a minor's information -- conduct that

violated seemingly every rule established by the website operator

for use of its website.

Although the jury found that the government failed to meet

its burden of showing beyond a reasonable doubt that defendant's

---

[5] Even assuming defendant's proffer about the founder of
MySpace were accepted as true, her argument would fail.
Defendant cannot show any of the elements would be met, including
the scienter and the jurisdictional components.

conduct was in furtherance of a tortious act, namely intentional
infliction of emotional distress, the record at trial
nevertheless demonstrates that defendant embarked on a malicious
scheme to target M.T.M.  She and others created an account
belonging to an attractive young boy for the sole purpose of
contacting M.T.M.  The account was targeted to entice M.T.M., who
defendant knew was "boy-crazy," particularly after M.T.M.'s
mother told defendant not to let M.T.M. on the computer for fear
of what would happen.  Defendant, after all, knew that M.T.M. was
taking antidepressant medication, was suicidal, and had
previously attempted to take her life.  The testimony at trial
even demonstrated that defendant knew that M.T.M.'s parents were
so concerned for her safety that they switched the locks on
M.T.M.'s bedroom door so she could not lock herself in.

Defendant then directed her co-schemers to flirt with
M.T.M., even after they advised defendant that they thought what
they were doing was wrong and "illegal."  Defendant nonetheless
insisted that they continue and, as defendant later told Corporal
Lutz, the conversations became sexual for a thirteen year-old.

Defendant also bragged about what she and her co-schemers
were going to do with the information they collected.  She told
J.M. that they were going to entice M.T.M. to go to the mall
where they would reveal that there was no boy named Josh Evans
and taunt M.T.M. with the contents of her communications.  Prouty
likewise testified that defendant told her that they planned to
use the printouts of the communications to taunt M.T.M. in the
real world.  Defendant's best friend, Eugenia Finnegan, testified
she saw the communications and discussed them with defendant.

1  That evidence, even if not sufficient to establish intentional

2  infliction of emotional distress, establishes defendant's

3  malicious purposes.

4      Second, even if defendant were correct and could show that

5  such malicious conduct is widespread, that would hardly justify

6  or excuse her conduct.  No one would suggest, for example, that

7  driving while intoxicated should cease to be a crime even though

8  our roadways are regrettably filled with drunk drivers around the

9  holidays.   Likewise, even though drug use in our society is,

10 unfortunately, widespread, courts lack the authority to reverse

11 convictions based on a belief the drug laws should not exist.

12 This Court simply lacks the authority to reverse defendant's

13 convictions on policy grounds or a belief that it would have

14 written Section 1030 differently.  Cohens v. Virginia, 19 U.S. (6

15 Wheat.) 264, 404 (1821) ("We have no more right to decline the

16 exercise of jurisdiction which is given, than to usurp that which

17 is not given.").

18     For the purposes of defendant's Rule 29 motion, the Court

19 should instead consider whether any jury could have reasonably

20 found that defendant's conduct in accessing the MySpace servers

21 was "without the approval, permission or sanction of the

22 computer's owner," as the Court instructed them to consider.  As

23 explained above, defendant's conduct plainly was.  Accordingly,

24 the Court should deny defendant's Rule 29 motion notwithstanding

25 her self-serving claim that everybody does what she did to M.T.M.

26 ///

27 ///

28 ///

## III.

## CONCLUSION

Accordingly, defendant's Rule 29 motion should be denied.

Dated: December ____, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

MARK C. KRAUSE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

22