THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MARK C. KRAUSE (SBN 198142)
Assistant United States Attorney
Deputy Chief, Cyber and Intellectual Property Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3493
     Facsimile: (213) 894-8601
     Email: mark.krause@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO. 08-582-GW |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| LORI DREW, | ) | |
| | ) | Sentencing Date: 5/18/2009 |
| Defendant. | ) | Time: 8:00 P.m. |
| | ) | Honorable George H. Wu |
| | ) | |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Mark C. Krause, respectfully files its Sentencing Memorandum.

///

///

///

///

///

1    This filing is based on the included memorandum of points

2  and authorities, any oral argument permitted on these issues, and

3  all files and records of this case.

4  Dated: May __, 2009

5                                Respectfully submitted,

6                                THOMAS P. O'BRIEN
                                 United States Attorney

7                                CHRISTINE C. EWELL
8                                Assistant United States Attorney
                                 Chief, Criminal Division

9

10   _____
     MARK C. KRAUSE
11   Assistant United States Attorney

12                                Attorneys for Plaintiff
                                  United States of America

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                     2

**TABLE OF CONTENTS**

Description                                                                    Page(s)

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . .  1

II.   FACTS  . . . . . . . . . . . . . . . . . . . . . . . . .  2

      A.    DEFENDANT EMBARKS ON SCHEME TO OBTAIN
            INFORMATION ABOUT M.T.M.  . . . . . . . . . .  2

      B.    DEFENDANT AND HER CO-CONSPIRATORS CREATE THE
            FAKE "JOSH EVANS" MYSPACE ACCOUNT AND EMBARK
            ON A SCHEME TO USE IT TO HUMILIATE M.T.M. . . . . . .  3

      C.    M.T.M.'S SUICIDE AND DEFENDANT'S EFFORTS TO
            CONCEAL THE SCHEME AND DENY RESPONSIBILITY  . . . . .  4

III.  A SENTENCE OF 36 MONTHS IS APPROPRIATE . . . . . . . . . .  5

      A.    OFFENSE LEVEL CALCULATION . . . . . . . . . . . . .  5

            1.    A Role Adjustment Should Be Applied  . . . . . .  6

            2.    A Use of Minor Adjustment
                  Should Be Applied  . . . . . . . . . . . . .  8

            3.    At Least a Ten-Level Upward Departure
                  is Justified Because The Guidelines
                  Substantially Understate the Seriousness
                  of the Offenses  . . . . . . . . . . . . . .  9

                  a.    The Court Should Consider the Conduct
                        Related to the Apprendi Factor on
                        which Defendant Was Not Convicted . . . . .  9

                  b.    Clear and Convincing Evidence Demonstrates
                        That a Primary Objective of Defendant's
                        Conduct Was to Inflict Emotional Harm and
                        That Defendant's Conduct In Fact Caused
                        Severe Emotional Harm That Resulted In
                        M.T.M.'s Death . . . . . . . . . . . . .  11

                  c.    Defendant's Conduct Warrants At Least a 10-
                        Level Upward Departure To a Guideline Range
                        Encompassing the Statutory Maximum 36 Month
                        Sentence  . . . . . . . . . . . . . . .  14

i

**TABLE OF CONTENTS (cont'd.)**

Description                                                          Page(s)

IV.   A SENTENCE OF THIRTY-SIX MONTHS IN CUSTODY
      IS APPROPRIATE UNDER 18 U.S.C. § 3553 . . . . . . . . .    15

      A.   NATURE AND CIRCUMSTANCES OF THE OFFENSE . . . . . .    15

      B.   HISTORY AND CHARACTERISTICS OF DEFENDANT   . . . . .    16

      C.   NEED FOR SENTENCE CONTEMPLATED  . . . . . . . . .    16

      D.   KINDS OF SENTENCES AVAILABLE  . . . . . . . . . .    17

      E.   SENTENCING RANGES AND POLICY STATEMENTS . . . . . .    17

      F.   NEED TO AVOID SENTENCING DISPARITIES  . . . . . .    18

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . .    19

**TABLE OF AUTHORITIES**

Description                                                    Page(s)

**FEDERAL CASES**

<u>United States v. Arias</u>,
    253 F.3d 453 (9th Cir. 2001)  . . . . . . . . . . . . . .    10

<u>United States v. Dare</u>,
    425 F.3d 634 (9th Cir. 2005)  . . . . . . . . . . . . .    10

<u>United States v. Hopper</u>,
    177 F.3d 824 (9th Cir. 1999)  . . . . . . . . . . . . .    11

<u>United States v. Jordan</u>,
    256 F.3d 922 (9th Cir. 2001)  . . . . . . . . . . . . .    11

<u>United States v. Mercado</u>,
    474 F.3d 654 (9th Cir. 2007)  . . . . . . . . . . . . .    10

<u>United States v. Staten</u>,
    466 F.3d 708 (9th Cir. 2006)  . . . . . . . . . . . . .    11

<u>United States v. Watts</u>,
    519 U.S. 148 (1997) . . . . . . . . . . . . . . . . . .     9

**FEDERAL STATUTES**

18 U.S.C. § 1030  . . . . . . . . . . . . . . . . . . .   passim

18 U.S.C. § 3553  . . . . . . . . . . . . . . . . . . .   passim

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

On November 26, 2008, defendant Lori Drew was convicted of three counts of unauthorized access to a protected computer to obtain information, in violation of 18 U.S.C. § 1030(a)(2)(C). The Presentence Report ("PSR") has determined that defendant's total adjusted offense level is 4 and her criminal history category is I, resulting in a sentencing range of 0 to 6 months. The Probation Office has recommended a sentence of probation.

The government respectfully disagrees with the PSR's guideline calculation and the Probation Office's recommendation of probation. Defendant's callous disregard for the consequences of her actions has been well documented. Defendant coldly conceived of a scheme to humiliate a vulnerable girl, M.T.M., who defendant believed had wronged her daughter. Even though defendant knew M.T.M. suffered from depression, was suicidal, and was at an extremely sensitive position in her life, defendant not only initiated the scheme, but encouraged others, including minors, to participate. When the scheme resulted in M.T.M. taking her own life, defendant sought to conceal the scheme and avoid responsibility for her part in it.

Both the callousness of defendant's criminal conduct and the extraordinary harm it caused mandate a sentence of more than probation. Only a custodial sentence will provide just punishment, encourage respect for the law, and deter others from engaging in similar conduct. The Court therefore should sentence defendant to a thirty-six month term of imprisonment, comprised

1

of twelve months on each of counts two, three, and four, with all sentences to be served consecutively.

II.

FACTS

A.   DEFENDANT EMBARKS ON A SCHEME TO OBTAIN INFORMATION ABOUT M.T.M.

As outlined at trial, for several years, defendant's family and another local neighborhood family, the Meiers, were friendly. Each family had a daughter the same age. Defendant's daughter, S.D., and M.T.M. attended school together and were friends. Their relationship, however, was, at times, rocky. M.T.M. spent a great deal of time at defendant's residence and even traveled with defendant's family. During one such trip, defendant administered M.T.M. her prescription medications. On other occasions, M.T.M. feuded with defendant's daughter. In addition, at times M.T.M. would act out and defendant would send her home, telling M.T.M. that she needed to take her medication.

Over time, S.D. and M.T.M. drifted apart and, in 2005, the Meiers decided to transfer M.T.M. from the local public school to a local Catholic school. Christina Meier, M.T.M.'s mother confided in defendant that she was concerned about M.T.M.'s mental health and believed M.T.M. was particularly vulnerable. Specifically, Meier told defendant that M.T.M. was suffering from depression -- so much so that Meier expressed concern that the Meiers would need to reverse the locks on the door to M.T.M.'s bedroom so that she could not lock herself in and harm herself. Meier also told defendant that M.T.M. would become distraught when defendant spoke harshly to her and sent her home.

2

1    Over the summer of 2006, defendant and her family became

2  concerned that M.T.M. was spreading malicious rumors about

3  defendant's daughter.  Defendant discussed the matter with her

4  daughter and her eighteen year old employee, Ashley Grills.  The

5  three conceived of a scheme where they would pretend to be an

6  attractive male teenager on MySpace and approach M.T.M. through

7  MySpace using that false identity to obtain M.T.M.'s confidence.

8  Once they had gained M.T.M.'s confidence, the co-conspirators

9  planned to find out what M.T.M. was saying on MySpace, including

10  what M.T.M. was saying about defendant's daughter.  Grills

11  pointed out that there was a risk they would get in trouble if

12  the scheme were uncovered because what they were doing was

13  illegal; defendant, however, assured Grills that they would not

14  and, in any event, many people created fake identities on the

15  Internet.

16  B.   DEFENDANT AND HER CO-CONSPIRATORS CREATE THE FAKE "JOSH
       EVANS" MYSPACE ACCOUNT AND EMBARK ON A SCHEME TO USE IT TO

17     HUMILIATE M.T.M.

18    On September 20, 2008, defendant and her co-schemers created

19  a MySpace profile under the fake name "Josh Evans."  "Evans" was

20  supposedly a teenager who was new to the area and was home-

21  schooled.  "Evans" was supposedly lonely because he did not know

22  anyone in the area and "his" father had abandoned the family.

23  The co-schemers posted a photograph of an attractive boy on the

24  profile to further the fraud.  On that same date, defendant and

25  her co-schemers used the "Josh Evans" account to contact M.T.M.

26  through the MySpace communication services.  Smitten with the

27  attractive "boy's" invitation to communicate, M.T.M. agreed to

28  communicate with "him."

Although the initial communications were innocent enough, within days, defendant encouraged her co-schemers to flirt with M.T.M. Defendant also discussed using the information obtained during the scheme to humiliate M.T.M. in the real world. Specifically, when it became clear from the communications that M.T.M. was attracted to "Josh Evans," defendant proposed that the co-conspirators lure M.T.M. to a mall where they would reveal that there was no "Josh Evans" and taunt M.T.M. with the contents of her MySpace page and information learned during the scheme.

During this time, defendant told friends and colleagues about the scheme. For example, defendant told her hairdresser that defendant and others had made up a fake internet profile for a boy and started talking to M.T.M. using that profile. She added that M.T.M. may have had the "hots" for the fake boy. Defendant appeared to enjoy describing the scheme.

C.    M.T.M.'S SUICIDE AND DEFENDANT'S EFFORTS TO CONCEAL THE SCHEME AND DENY RESPONSIBILITY

On October 15, 2006, another girl in the neighborhood, J.M., obtained the username and password for the "Josh Evans" account from defendant's daughter and sent M.T.M. a message suggesting that "Evans" did not want to be friends with M.T.M. anymore because M.T.M. was not nice to M.T.M.'s friends. When the co-schemers resumed the on-line conversation the following day, the dispute escalated until Grills (as "Evans") told M.T.M. that the world would be a better place without M.T.M. in it. Distraught, M.T.M. responded to "Evans" that he was the kind of boy a girl would kill herself over. She then hung herself in her bedroom closet.

4

When emergency crews responded to the Meier residence, defendant instructed her co-conspirators to find out what had happened. Upon learning that M.T.M. had attempted to commit suicide, defendant and her husband directed the co-schemers to delete the MySpace account.

Later that evening, defendant continued to try to cover up her crime. She called the neighborhood girl who had sent M.T.M. the message on October 15. Defendant instructed J.M. to "keep her mouth shut," to "stay off the MySpace," and to avoid accessing the Josh Evans account. Sensing something was amiss because defendant never called her daughter directly, the mother of the neighborhood girl, Michelle Mulford, asked her daughter what had happened. After speaking with her daughter, Mulford subsequently confronted defendant. Defendant told Mulford that she (defendant), her daughter, and Grills had created the account to play a prank on M.T.M. and that she (defendant) caused the account to be deleted. In a subsequent phone conversation, defendant tried to disclaim responsibility, telling Mulford that M.T.M. previously tried to commit suicide.

III.

A SENTENCE OF 36 MONTHS IS APPROPRIATE

A.    OFFENSE LEVEL CALCULATION

The PSR has suggested that defendant's total offense level is 6 and her criminal history category is I, resulting in a 0 to 6 guideline range. The government respectfully disagrees. The government submits the following guideline factors apply:

Base Offense Level  :   6    [U.S.S.G. § 2B1.1(a)(2)]

Adjustments

      Role Adjustment:     +2   [U.S.S.G. § 3B1.1(c)]

      Use of Minor  :    +2   [U.S.S.G. § 3B1.4]

There is no dispute that defendant's base offense level is six. A preponderance of the evidence, however, supports the application of adjustments related to role and use of a minor. In addition, considering the application notes to USSG § 2B1.1, as well as USSG § 5K2.1, a sentence above the guideline range is appropriate given that a primary objective of the offenses was to inflict emotional harm and the offenses both risked and actually caused substantial psychological harm and severe emotional trauma that resulted in M.T.M.'s death.

    1.   <u>A Role Adjustment Should Be Applied</u>

Section 3B1.1(c) provides that "[i]f a defendant was an organizer, leader, manager or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels [defendant's offense level]." Here, the testimony at trial established that defendant worked with two co-schemers in the commission of the offenses of conviction: Grills and her own daughter S.D. The testimony likewise established that defendant was an organizer, leader, manager or supervisor of the others. Grills described how she looked up to defendant, how the scheme was conceived while she was working at defendant's house, and how defendant was her employer. Perhaps most importantly, however, when Grills and S.D. developed concerns about the scheme, it was defendant to whom they turned to find out what to do. Tellingly, defendant told them to continue, and so they did. Consequently,

although each co-schemer participated in the planning and
execution of the offenses, defendant's role was that of a manager
as she exercised "control and authority" over the others and
retained the ultimate "decision making authority" on whether to
end the scheme. USSG § 3B1.1 comment. (n.4).

The PSR declined to apply a role adjustment, assuming that
defendant and Grills were "essentially equal in culpability" as
both were adults and "played a mutually supportive role." (PSR
¶ 28). The government respectfully disagrees with that
assessment. The PSR's assumption ignores that Grills, as a
teenager who was scarcely more than a child herself, looked up to
defendant and sought her approval. The PSR's position also
ignores that when Grills had concerns about the plan and wanted
to stop, defendant ordered her to proceed.[1] In addition, the PSR
ignores S.D.'s participation in the criminal conduct, and the

---

[1] As outlined in prior pleadings filed with the Court,
defendant explicitly told Grills to proceed notwithstanding
Grills' expressed statement that what they were doing was
illegal:

Q:  During the first week after you created the
     account did anyone raise any concerns about what
     you were doing?

A:  Yes.

Q:  And who was that?

A:  It was both [S.D.] and I.

Q:  And who did you raise those concerns with?

A:  Lori.

Q:  And what did you tell the defendant?

A:  That we thought we would get in trouble because
     it's illegal to make a fake MySpace.

7

clear fact that S.D. acted under the direction and oversight of defendant. The Court should, therefore, apply a two level adjustment under USSG § 3B1.1(c).

   2.   A Use of Minor Adjustment Should Be Applied

   Section 3B1.4 provides that "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels [defendant's offense level]." Although the PSR does not address an adjustment for use of a minor, the Court should apply a two-level adjustment under that provision. Defendant used her daughter S.D. to help set up the Evans account and contact M.T.M. (PSR ¶ 28). After M.T.M.'s suicide, defendant also contacted J.M. and told J.M. to "keep her mouth shut" and not to access the Josh Evans account in an effort to cover up the scheme. Each of these acts independently supports application of USSG § 3B1.4.

   3.   At Least a Ten-Level Upward Departure is Justified Because The Guidelines Substantially Understate the Seriousness of the Offenses

   Although the government agrees with the PSR that USSG § 2B1.1 is the applicable guideline provision, the application notes to that specific guideline provision explicitly recognize that it has certain limitations -- limitations that demonstrate that in this particular case, a sentence above the applicable guideline range is appropriate. In particular, Application Note 19 provides:

   Departure Considerations. --

   (A) Upward Departure Considerations. There may be cases in which the offense level determined under this guideline

8

substantially understates the seriousness fo the offense. In such cases, an upward departure may be warranted. **The following is a non-exhaustive list of factors that the court may consider in determining whether an upward departure is warranted.**

(i) a primary objective of the offense was an aggravating, non-monetary objective. For example, **a primary objective of the offense was to inflict emotional harm.**

(ii) The offense caused or risked substantial non-monetary harm. For example, **the offense caused physical harm, psychological harm or severe emotional trauma . . . . An upward departure would be warranted, for example, in an 18 U.S.C. § 1030 offense involving damage to a protected computer, if, as a result of that offense, death resulted.**

USSG § 2B1.1 comment. (n.19) (emphasis added).

Here, clear and convincing evidence demonstrates that the otherwise applicable guideline range under USSG § 2B1.1 substantially understates the seriousness of the offenses because the object of defendant's crimes was to inflict emotional harm and the offenses in fact caused psychological harm and severe emotional trauma that resulted in M.T.M.'s death. Accordingly, at least a ten-level upward departure is warranted.

        a.   <u>The Court Should Consider the Conduct Related to the *Apprendi* Factor on which Defendant Was Not Convicted</u>

The government acknowledges that the jury did not convict defendant of a felony violation of 18 U.S.C. § 1030(a)(2)(C) because it could not reach a unanimous verdict that defendant's conduct was in furtherance of a tortious act. Both the Supreme Court and the Ninth Circuit, however, have determined that a sentencing court may use acquitted conduct to determine a defendant's appropriate sentence. In <u>United States v. Watts</u>, 519 U.S. 148 (1997), the Supreme Court stated: "[an] acquittal on

1    criminal charges does not prove that the defendant is innocent;

2    it merely proves the existence of a reasonable doubt as to his

3    guilt." Id. at 155 (internal quotation and citation omitted). As

4    a result, the Court held:

5            [A]n acquittal in a criminal case does not preclude the
             Government from relitigating an issue when it is
6            presented in a subsequent action governed by a lower
             standard of proof. The Guidelines state that it is
7            "appropriate" that facts relevant to sentencing be
             proved by a preponderance of the evidence, USSG §
8            6A1.3, comment., and we have held that application of
             the preponderance standard at sentencing generally
9            satisfies due process. . . **We therefore hold that a
             jury's verdict of acquittal does not prevent the
10           sentencing court from considering conduct underlying
             the criminal charge, so long as that evidence has been
11           proven by a preponderance of the evidence.**

12   Id. at 156-57 (internal quotation and citation omitted) (emphasis

13   added); see also United States v. Mercado, 474 F.3d 654, 656-58

14   (9th Cir. 2007) (holding, in line with "every other Court of

15   Appeals to consider the issue," that Booker does not abrogate

16   Watts and that sentencing courts remain free to rely at

17   sentencing on conduct underlying acquitted criminal charges).

18   Both Watts and the commentary to USSG Section 6A1.3 state that a

19   sentencing court may consider acquitted conduct in sentencing a

20   defendant as long as the conduct is proven by a preponderance of

21   the evidence.   The Ninth Circuit has also confirmed that, even

22   post-Booker, "[a]s a general rule, the preponderance of the

23   evidence standard is the appropriate standard for factual

24   findings used at sentencing." United States v. Dare, 425 F.3d

25   634, 642 (9th Cir. 2005).   Pre-Booker, however, the Ninth Circuit

26   held that due process considerations may require that particular

27   facts be established by clear and convincing evidence when these

28

                                    10

facts have a "disproportionate impact" on the sentence. <u>United States v. Hopper</u>, 177 F.3d 824, 832-33 (9th Cir. 1999); <u>see also</u> <u>United States v. Jordan</u>, 256 F.3d 922, 928 (9th Cir. 2001) (identifying non-exclusive list of factors for consideration relating to disproportionate effect to determine if clear-and-convincing standard applies).  The Ninth Circuit has held that <u>Hopper</u> remains valid post-<u>Booker</u> and that, accordingly "this circuit's established rule, requiring facts found in support of Guideline enhancements that turn out to have disproportionate impact on the ultimate sentence imposed be established by clear and convincing evidence, continues to govern sentencing decisions." <u>United States v. Staten</u>, 466 F.3d 708, 717-720 (9th Cir. 2006).  Even under a clear and convincing burden, the evidence in this case establishes both that a primary objective of defendant's conduct was to inflict emotional harm and that defendant's conduct in fact caused severe emotional harm that resulted in M.T.M.'s death; either of these factors alone, and certainly both in combination, supports a significant upward departure.

        b.    <u>Clear and Convincing Evidence Demonstrates That a</u> <u>Primary Objective of Defendant's Conduct Was to</u> <u>Inflict Emotional Harm and That Defendant's</u> <u>Conduct In Fact Caused Severe Emotional Harm That</u> <u>Resulted In M.T.M.'s Death</u>

As outlined at trial, defendant indicated to co-schemers, friends, work colleagues, and friends of her daughter, that the purpose of the scheme was to torment M.T.M.  Susan Marie Prouty, Christina Chu, Corporal Edwin Lutz, and Michelle Mulford each

11

testified that defendant told them how she and others created a
fake MySpace profile by pretending to be an attractive young boy
named "Josh Evans."  According to Prouty, Chu, Lutz, Mulford, and
J.M., defendant told them how defendant used the Josh Evans
account to contact M.T.M.  J.M., Prouty, and Grills described how
the profile was going to be used to harass M.T.M. in the real
world.  J.M., for example, described how defendant prompted S.D.
to outline their plan to lure M.T.M. to the mall believing she
was meeting "Evans" for a date only to learn that he was a
figment of her imagination when confronted with printouts of her
communications with "Josh Evans," all before her classmates.
Likewise, Prouty testified how defendant planned on using the
communications to embarrass M.T.M. at school.  Grills testified
about her concerns with the plans and that defendant overruled
her.

Not only was the purpose of the scheme to embarrass M.T.M.,
but also defendant's conduct was coldly calculated to maximize
the psychological harm inflicted on M.T.M.  According to the
testimony at trial, defendant knew that M.T.M. was "boy crazy."
It was a quality that was somewhat endearing but unquestionably
dangerous as it led to her contacting unknown boys over the
Internet, including while with S.D.  Defendant also knew that
M.T.M. was sensitive about her appearance, particularly about her
weight.  Knowing those vulnerabilities, defendant and her co-
schemers created the "Evans" persona as an attractive older boy
who was not interested in a girl's weight.  When "Evans" showed

interest in M.T.M., and even more so when "his" communications became flirtatious and even sexual, it was inevitable that M.T.M. would become interested and then crushed when "Evans" rebuked or ignored her.

Defendant also embarked on her scheme knowing that M.T.M. was a troubled girl who suffered from depression and was suicidal.  Defendant, after all, knew M.T.M. for most of her life and had administered M.T.M.'s antidepressant medications when M.T.M. traveled with defendant and her family.  Defendant's daughter, S.D., confided in her mother regarding M.T.M.'s precarious mental state and M.T.M.'s suicidal ideations. Defendant knew that M.T.M. was in a particularly precarious psychological state as M.T.M.'s mother told her that she was planning to reverse the locks on the door to M.T.M.'s bedroom to prevent M.T.M. from doing harm to herself.

Thus, clear and convincing evidence establishes either of two factors that place this case squarely within Application Note 15.  First, a "primary objective" of defendant's criminal conduct was "to inflict emotional harm."  Second, either in combination or alternatively, defendant's criminal conduct both "risked" and "caused" "severe emotional trauma" and "physical harm," namely, M.T.M.'s death, which resulted from the severe emotional harm occasioned by the scheme that defendant initiated and encouraged.

///

///

///

c.   <u>Defendant's Conduct Warrants At Least a 10-Level
     Upward Departure To a Guideline Range Encompassing
     the Statutory Maximum 36 Month Sentence</u>

Ultimately, defendant's crimes had consequences far beyond typical offenses under Section 1030.  The Guidelines explicitly recognize the limitations of Section 2B1.1 and that under such circumstances, a sentence above the guideline range is appropriate.  In fact, the application notes to Section 2B1.1 recognize that the section is deficient when addressing the harms associated with Section 1030 offenses that result in death.  USSG § 2B1.1 comment. (n.19) ("An upward departure would be warranted, for example, in an 18 U.S.C. § 1030 offense involving damage to a protected computer, if, as a result of that offense, death resulted").  Similarly, USSG 5K2.1 provides that where an offense results in death, "a substantial increase may be appropriate" if "the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud."

Under USSG § 2B1.1(b)(12), defendant's offense level would increase by 8 levels (from 6 to 14, prior to adjustments for role and use of a minor) simply because her offense conduct involved "conscious or reckless risk of death or serious bodily injury" even if such injury or death did not actually occur.  Under USSG 2B3.1(b)(3) (applicable to bank robberies) and 2B3.2(b)(4) (applicable to extortions), the occurrence of actual bodily injury results in an offense-level increase of between 2 and 6 levels, depending on the severity of the injury.  In light of

14

these provisions, where defendant's conduct both involved a "reckless risk" of serious harm (given defendant's awareness of M.T.M.'s depression and suicidal tendencies) and actually resulted in M.T.M.'s death, a departure of at least 10 levels is fully justified.  This would take defendant's offense level to 20, which, with criminal history category I, results in a guideline range of 33-41 months, a range encompassing the statutory maximum of 36 months.

IV.

### A SENTENCE OF THIRTY-SIX MONTHS IN CUSTODY IS APPROPRIATE UNDER 18 U.S.C. § 3553

The government submits that the following factors under 18 U.S.C. § 3553 apply and also support a sentence of thirty-six months in prison:

A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

As outlined above, defendant's crimes were unquestionably serious.  Defendant played on the insecurities of a young girl. Over a period of weeks, defendant conceived and carried out an elaborate and pernicious campaign designed to humiliate and psychically damage M.T.M.  To achieve her goals, defendant caused sexually suggestive messages to be sent M.T.M., a pubescent girl. Were this not enough, defendant employed children to achieve her criminal ends, using her daughter, S.D., as part of her scheme and trying to get another girl, J.M., to work to cover it up. Defendant's use of minors is unquestionably an aggravating factor.  Defendant's attempt to cover up the scheme, while perhaps not rising to the level of obstruction of justice,

15

likewise is an aggravating factor warranting a custodial sentence. Finally, defendant's conduct had obvious, serious consequences as her offenses resulted in the death of a little girl. The fact that defendant used a computer as a weapon and a website as a tool of torment is not a mitigating factor. But for and as a proximate cause of defendant's activities, a child died -- a fact that was altogether foreseeable given defendant's intimate knowledge of M.T.M.'s depression, suicidal thoughts, and prior suicide attempts. Anything less than a custodial sentence would understate the serious nature of defendant's offense and the serious harm that resulted from that offense.

B.    HISTORY AND CHARACTERISTICS OF DEFENDANT

There is nothing about defendant's history or characteristics that warrant a lesser sentence. Defendant has been given every advantage in life. After a seemingly privileged childhood as the daughter of an executive at the Federal Reserve, (PSR ¶ 46), she lived comfortably in a suburb of St. Louis, (¶ 47). Notwithstanding those advantages, defendant -- a middle aged woman -- chose to break the law in an effort to humiliate a child, an effort that succeeded and ultimately led that child to kill herself. The normalcy of defendant's history and characteristics are not a mitigating factor.

C.    NEED FOR THE SENTENCE CONTEMPLATED

Section 3553(a)(2) states that the Court, when considering what sentence to impose, shall consider the "need for the sentenced imposed":

16

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

Anything less than a custodial sentence would not reflect the seriousness of defendant's offense or provide just punishment. Defendant's conduct was outrageous. Moreover, a probationary sentence would hardly provide adequate deterrence for criminal conduct. Defendant has become the public face of cyberbullying. A probationary sentence might embolden others to use the Internet to torment and exploit children. Consequently, although defendant may present a limited risk of recidivism and likely does not need educational or vocational training in custody, a custodial sentence will promote the goals of Section 3553(a)(2) by reflecting the seriousness of the offenses, promoting respect for the law, providing just punishment for the offenses, and deterring others from engaging in similar cyberbullying.

D.    KINDS OF SENTENCES AVAILABLE

Custody is unquestionably an option under the facts of the case.

E.    SENTENCING RANGES AND POLICY STATEMENTS

Section 3553(a)(4) states that the Court, when considering what sentence to impose, shall consider the "kinds of sentence

17

and the sentencing range established for -- (A) the applicable
category of offense committed by the applicable category of
defendant as set forth in the guidelines . . . ." Section
3553(a)(5) states that the Court, when considering what sentence
to impose, shall consider "any pertinent policy statement issued
by the Sentencing Commission . . . ." Under the guidelines and
the Commission's policy statements, similar defendants in the
same circumstances as defendant would expect to serve a custodial
sentence based on the circumstances described above. There is no
indication that defendant is anything other than a typical
defendant in these circumstances.

F.    NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

     Section 3553(a)(6) states that the Court, when considering
what sentence to impose, shall consider the "need to avoid
unwarranted sentence disparities among defendants with similar
records who have been found guilty of similar conduct." This
crime, and its effects, is unprecedented. Nevertheless, one
would hope, in the absence of exceptional circumstances, that
defendants similarly situated to defendant -- adults who used
children to send sexually suggestive messages to a juvenile
victim as part of scheme to humilate her, a scheme that succeeded
and resulted in the victim's suicide -- will be sentenced to at
least thirty-six months.

18

V.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to a total of 36 months in custody, a one year period of supervised release, and a fine of $5,000.

Dated: May 6, 2009

                              Respectfully submitted,

                              THOMAS P. O'BRIEN
                              United States Attorney

                              CHRISTINE C. EWELL
                              Assistant United States Attorney
                              Chief, Criminal Division


                              _____
                              MARK C. KRAUSE
                              Assistant United States Attorney

                              Attorneys for Plaintiff
                              United States of America

19