1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4       THE HONORABLE GEORGE H. WU, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,          )
                                        )
7                     Plaintiff,        )
                                        )
8            vs.                        ) NO. CR 08-582-GW
                                        )
9    LORI DREW,                         )
                                        )
10                    Defendant.        )
     _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                Los Angeles, California

16

17        Wednesday, November 19, 2008, 1:15 P.M.

18

19   Day 2 of Jury Trial, Afternoon Session, Page 1 through 168

20

21

22                              PAT CUNEO, CSR 1600-CRR-CM
                                Official Reporter
23                              Roybal Federal Building
                                255 East Temple Street
24                              Room 181-E
                                Los Angeles, CA  90012
25                              (213) 617-1817
                                grammacuneo@aol.com

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:    THOMAS P. O'BRIEN
                          UNITED STATES ATTORNEY
 3                        and  MARK KRAUSE
                          and  YVONNE GARCIA
 4                        ASSISTANT UNITED STATES ATTORNEYS
                          United States Courthouse
 5                        312 N. Spring Street
                          Los Angeles, California 90012
 6                        (213) 894-3493 & (213) 894-2406
                          thomas.obrien@usdoj.gov
 7
     FOR THE DEFENDANT:    H. DEAN STEWARD
 8                        ATTORNEY AT LAW
                          107 Avenida Miramar
 9                        #C
                          San Clemente, California  92672
10                        (949) 481-4900

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## I N D E X

### CHRONOLOGICAL INDEX OF WITNESSES

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| SUSAN MARIE PROUTY | 73 | 92 | | | | 2 |
| CHRISTINA MARIE MEIER | 105 | | | | | 2 |

### ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| MEIER, CHRISTINA MARIE | 105 | | | | | 2 |
| PROUTY, SUSAN MARIE | 73 | 92 | | | | 2 |

### EXHIBITS

| GOVERNMENT'S EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 5 | Profile Printout | | 130 | 2 |
| 8 | Pharmacy Records | | 120 | 2 |
| 14 | Document | | 138 | 2 |
| 16 | Document | | 139 | 2 |
| 17 | Document | | 142 | 2 |
| 18 | Document | | 150 | 2 |
| 19 | Document | | 151 | 2 |
| 26 | Photograph | | 132 | 2 |

*Day 2 of Jury Trial, November 19, 2008*

4

1    **LOS ANGELES, CALIF.; WEDNESDAY, NOVEMBER 19, 2008; 1:15 P.M.**

2    *-oOo-*

3    *(The following was held outside the prospective jurors'*

4    *presence:)*

5    THE COURT:  All right.  Let me ask.  Is there

6    anything that we need to take up before we bring the jury

7    in?

8    MR. STEWARD:  No, Your Honor.

9    MR. KRAUSE:  No, Your Honor.

10   THE COURT:  In that case, I'll go back for five

11   minutes until the jury comes back in.

12   *(Pause in the proceedings.)*

13   MR. STEWARD:  Your Honor, may I ask?  I assume

14   we're going to get a few moments -- a few moments --

15   THE COURT:  Let me stop.  Once we select the jury,

16   swear them and everything, I still have to read a

17   preliminary set of instructions and then at that point, I'll

18   do that before, but we'll take a break once we have the jury

19   selected so you'll have at least ten minutes so you'll have

20   time to set up.

21   MR. STEWARD:  I was just going to ask whether

22   Mr. O'Brien and I might have a few moments of attorney voir

23   dire when the court is finished on the follow-up folks.

24   THE COURT:  Oh, no, no, no.  I'll give you time to

25   voir dire.  In fact, when I finish my questioning, I'll turn

1    it over to Mr. O'Brien next.  I'll give you guys ten minutes

2    each for this particular set.

3           MR. KRAUSE:  Actually, I think you're getting the

4    B team on this one, and I think I'm not going to ask any

5    questions so. . . .

6           THE COURT:  The B team is yourself?

7           MR. O'BRIEN:  It's a self-esteem issue.  We're

8    working on it in the office.

9           THE COURT:  We'll just leave that untouched.

10          All right.  Not a problem.  I will let you guys do

11   whatever you want.  But as I indicated, you guys still have

12   time for questions.  Once we choose a jury, we'll take a

13   ten-minute break so you can set up and then we'll begin.

14          MR. KRAUSE:  Great.

15                        *(Recess.)*

16      *(The following was held outside the prospective jurors'*

17                       *presence:)*

18          THE COURT:  Let me ask counsel.  We're missing one

19   juror who's Number 78.  She's not actually in the box.

20   She's just in the audience.

21          Do you have any objection as to -- if we were to

22   start without her and, when she walks in, that would be

23   fine?

24          MR. KRAUSE:  None.

25          THE COURT:  Because she's not actually being voir

1    dired.

2              MR. STEWARD:  That's fine, Your Honor.

3              MR. O'BRIEN:  No objection.

4              THE COURT:  Okay.  Bring all the jurors in and

5    then you can check.

6              THE CLERK:  Okay.

7                  *(Pause in the proceedings.)*

8              THE COURT:  Also, let me have counsel at the

9    sidebar for just a moment while the jury is coming in.

10                 *(The following was held at the bench:)*

11             THE COURT:  You understand that insofar as the

12   alternates are concerned, each side has only one challenge

13   each?

14             MR. O'BRIEN:  Yes, Your Honor.

15             THE COURT:  Okay.  And what we will do, once we

16   have 12 jurors, I'll swear in those two jurors and then

17   we'll do the peremptories insofar as the alternates are

18   concerned.

19             MR. STEWARD:  You swear in those 12 jurors and

20   then --

21             THE COURT:  The next two will automatically be the

22   alternates.  If either uses a peremptory, then the next

23   juror would be the alternate.

24             MR. O'BRIEN:  Thank you.

25             MR. STEWARD:  Thank you.

```
 1          (The prospective jurors entered the courtroom.)
 2              THE COURT:  All right.
 3              Good afternoon, ladies and gentlemen.  At this
 4  point -- am I interrupting the conversation?  All right.
 5  Thank you.
 6              At this point in time, we'll have questioning from
 7  counsel.  Let me ask the government's counsel.
 8              Do you have any questions for the new prospective
 9  jurors?
10              MR. KRAUSE:  No, thank you, Your Honor.
11              THE COURT:  All right.  Let me ask the defense
12  counsel.  Do you have questions?
13              MR. STEWARD:  Yes, Your Honor, just a few.
14              THE COURT:  All right.
15              MR. STEWARD:  Good afternoon to all you folks.
16              (The prospective jurors responded.)
17              MR. STEWARD:  Miss Hanley, if I can ask you a few
18  questions.  Maybe I didn't catch it.  Do you have any
19  children?
20              THE PROSPECTIVE JUROR:  Yes.
21              MR. STEWARD:  And how many children do you have?
22              THE PROSPECTIVE JUROR:  I have three children that
23  are grown, not living at home.
24              MR. STEWARD:  And did you hear the questions that
25  I was asking the folks the first time I had a chance to
```

```
 1   talk?
 2            THE PROSPECTIVE JUROR:  I think most of them, yes.
 3            MR. STEWARD:  Okay.  And, specifically, I guess
 4   what I want to know, I had one other question here on your
 5   questionnaire.
 6            You indicate what you use the Internet for and
 7   it's talking with friends, family, social, and it looks like
 8   the word "mobsters."
 9            THE PROSPECTIVE JUROR:  Yes.
10            MR. STEWARD:  Okay.  Can you tell me what a
11   "mobster" is?
12            THE PROSPECTIVE JUROR:  It's on MySpace.  It's
13   mobsters.  My son got me into playing it so . . . .
14            MR. STEWARD:  And I see in the questionnaire that
15   you are, in fact, a MySpace member?
16            THE PROSPECTIVE JUROR:  Yes.
17            MR. STEWARD:  And have been for a year and a half?
18            THE PROSPECTIVE JUROR:  Yes.
19            MR. STEWARD:  Anything about that positive or
20   negative that you think might affect listening to this
21   evidence?
22            THE PROSPECTIVE JUROR:  Not that I can think of.
23            MR. STEWARD:  Okay.  You signed up and became a
24   member, right?
25            THE PROSPECTIVE JUROR:  My son's girlfriend signed
```

1  me up.  Well, she did my profile.  That's why I say she did

2  like the background and all of that for me.

3              MR. STEWARD:  Okay.

4                        *(Laughter.)*

5              MR. STEWARD:  I'm not going to ask more questions.

6  I think I better not go there at this point.

7              Is there anything else about the subjects that

8  you've heard yesterday and today that you give you pause or

9  make you think for some reason you can't be fair here?

10             THE PROSPECTIVE JUROR:  I don't think so.

11             MR. STEWARD:  Okay.  You know, I get kind of

12  concerned when people say "I don't think so" because if in

13  the middle of jury deliberations you think so, that's going

14  to make it real difficult.

15             And let me hit the ball squarely.  You know

16  there's going to be some emotional testimony in this trial,

17  right?

18             THE PROSPECTIVE JUROR:  Yes.

19             MR. STEWARD:  Okay.  We've already heard that

20  there's going to be evidence of a suicide although that's

21  not part of the charges, right?

22             THE PROSPECTIVE JUROR:  Right.

23             MR. STEWARD:  Is that what causes you to have at

24  least a little bit of hesitation about whether or not you

25  can fairly listen to this evidence?

```
 1              THE PROSPECTIVE JUROR:  No.

 2              MR. STEWARD:  Okay.  What, if anything, does give

 3    you pause?  And when I ask that, I'm saying when you said "I

 4    think so," what I'm looking for is "Yeah, I can be fair."

 5              THE PROSPECTIVE JUROR:  To the best of my ability,

 6    I feel I can be fair.

 7              MR. STEWARD:  Okay.  And nothing about the

 8    evidence or the types of evidence that you heard -- you may

 9    hear -- gives you any cause for concern or doubt about the

10    possibility that you could be fair?

11              THE PROSPECTIVE JUROR:  No.

12              MR. STEWARD:  Okay.  If you were me, would you

13    want a juror that's in your frame of mind?

14              THE PROSPECTIVE JUROR:  Yes.

15              MR. STEWARD:  Can't ask for more than that.

16              Thank you.

17              THE COURT:  Any further questions?

18                        (No response.)

19              THE COURT:  I presume there are no further

20    questions.

21              MR. STEWARD:  Correct, Your Honor.

22              THE COURT:  All right.  Let me have counsel on

23    sidebar for a moment.

24                  (The following was held at the bench:)

25              THE COURT:  Any for-cause challenges?
```

```
 1            MR. STEWARD:  None other than the ones that I
 2   previously made.
 3            THE COURT:  Let me ask.  As to the ones you
 4   previously made, are any of them on the jury at this point?
 5            MR. STEWARD:  Not in the box, the 14, no.
 6            THE COURT:  Okay.  What about the next ten?
 7            MR. STEWARD:  Oh, boy.  I can't remember whether I
 8   had her on here and I don't have my list.
 9            THE COURT:  Let me just identify her for you.
10   No. 33 would be Miss Joslyn.
11            MR. STEWARD:  Correct.  If I hadn't already made
12   that a challenge for cause, I do make it now specifically
13   for the reasons that she stated when she spoke to the court.
14            THE COURT:  All right.  I probably would grant.
15   But I won't excuse her now.
16            Let me just ask if there is any objection from the
17   government.
18            MR. O'BRIEN:  No, I think she should be excused at
19   this time.
20            THE COURT:  Okay.  I won't excuse her now until a
21   time that I need to.  But if she is coming close, then I
22   will excuse her at that point.  Okay?
23            Anyone else?
24            MR. STEWARD:  No.
25            THE COURT:  No?
```

1        MR. O'BRIEN:  If I could preserve this, No. 36,

2   Miss Gottschalk, indicates you can't send someone to jail.

3        THE COURT:  Okay; that's fine.  I would actually

4   agree with that one.  Let me ask the defense counsel.

5        Do you object?

6        MR. STEWARD:  Yes.

7        THE COURT:  You would agree?

8        MR. STEWARD:  Yes.  No, no, I would not agree.  I

9   think she can be fair and nobody wants to go to jail.  My

10  kind of juror.

11       THE COURT:  Okay.  I would actually overrule that

12  objection.  I would probably find her for cause; but why

13  don't we leave her in at this point in time.  We'll see if

14  it becomes necessary for me to make a final ruling on that.

15       Anything else from either side?

16       MR. STEWARD:  No, Your Honor.

17       MR. O'BRIEN:  No.

18       THE COURT:  Okay; thank you.

19   *(The following was in the prospective jurors' presence:)*

20       THE COURT:  All right.  The next opportunity to

21  exercise a peremptory is with the government.

22       Does the government wish to exercise a peremptory?

23       MR. O'BRIEN:  Yes, Your Honor.  The government

24  would ask the court to please thank and excuse Prospective

25  Juror No. 1, Mr. Medhat.

```
 1              THE COURT:  All right.  Thank you very much.
 2    Mr. Medhat.  Please go back to the jury room and indicate to
 3    them you've been excused from this matter.
 4              THE PROSPECTIVE JUROR:  Thank you.
 5          (The prospective juror exited the courtroom.)
 6              THE COURT:  And for the defense?
 7              MR. STEWARD:  Your Honor, the jury is acceptable
 8    as constituted.
 9              THE COURT:  All right.
10              And for the government?
11              MR. O'BRIEN:  I would ask the court to please
12    thank and excuse Prospective Juror No. 9.
13              THE COURT:  All right.  Thank you very much Mr. --
14              MR. O'BRIEN:  Wrong one -- I'm sorry -- the
15    numbers.  Mr. Imbagliazzo.
16              THE COURT:  Mr. Imbagliazzo?  Okay.  Thank you
17    very much.  You may go back to the jury room and tell them
18    you've been excused in this matter.
19          (The prospective juror exited the courtroom.)
20              THE COURT:  And for the defense?
21              MR. STEWARD:  We remain satisfied with the jury,
22    Your Honor.
23              THE COURT:  Okay.
24              And for the government?
25              MR. O'BRIEN:  The government accepts the panel,
```

1  Your Honor.

2           THE COURT:  All right.

3           Let me then make sure that we all are on the same

4  page.  At this point in time, the jury which consists of

5  Juror No. 2, Juror No. 3, Juror No. 6, Juror No. 9,

6  Juror No. 12.  Let me see if I'm right.

7           That is you Mrs. Nolan?

8           THE PROSPECTIVE JUROR:  12.

9           THE COURT:  12, yes.

10          Juror No. 14, Juror No. 15, Juror No. 20,

11  Juror No. 22, Juror No. 25, Juror No. 26, and Juror No. 27.

12          Those are our twelve jurors, right?

13          MR. O'BRIEN:  Agreed, Your Honor.

14          THE COURT:  Let me have the clerk swear in the

15  jury panel.

16          MR. STEWARD:  Your Honor, just to make absolutely

17  sure, it's everybody in the box?

18          THE COURT:  It's everybody in the box.

19          MR. STEWARD:  And the first two folks?

20          THE COURT:  Not yet.  The jury of twelve is

21  everybody in the box.

22          At this point in time, Juror No. 28 and 29 would

23  be the alternates.  At this point in time, the twelve jurors

24  in the box would be the jury panel.

25          MR. STEWARD:  Understood; thank you.

1          THE COURT:  Okay.  At this point, let me have the

2     clerk swear in the jury panel.

3          THE CLERK:  Please stand.  Raise your right hand.

4                        **JURORS SWORN**

5          THE CLERK:  Ladies and gentlemen, do you and each

6     of you solemnly swear that you will well and truly try the

7     cause now before this court and a true verdict therein

8     render according to the evidence, so help you God?

9          THE JURORS:  I do.

10         THE CLERK:  Thank you.  Please be seated.

11         THE COURT:  All right.  Let me ask the jurors in

12    the front row.  Do all of you know what an alternate juror

13    is?  If you don't raise, your hand.

14               *(A prospective juror responded.)*

15         THE COURT:  Okay.  One of you does not.

16         Basically, what an alternate juror is is a person

17    who is treated in the same way as a regular juror except

18    that that juror does not go in and deliberate with the

19    original twelve jurors unless one of the original twelve

20    jurors becomes unavailable because of an emergency matter or

21    something of that sort.  Then we replace the absent juror

22    with one of the alternate jurors.

23         Okay.  So you all know what an alternate juror is.

24    Would any of you not want to sit as an alternate juror for

25    any reason?  If you don't want to sit as alternate juror,

1    raise your hand.

2                    *(A prospective juror responded.)*

3            THE COURT:  One of you doesn't.  I still won't

4    relieve you.  I just wanted to know --

5                             *(Laughter.)*

6            THE COURT:  And now the attorneys know, too, so

7    they can keep that in mind.

8            However, at this point, the alternate jurors would

9    be Juror No. 28 and 29.

10           Let me ask counsel to approach sidebar for just

11   one second.

12               *(The following was held at the bench:)*

13           THE COURT:  I can give counsel -- sometimes

14   counsel can stip as to the two alternates.  You can do that.

15   If you don't want to stip and if you want to exercise the

16   peremptories, technically the last peremptory is exercised

17   by the government.

18           But, the order in which it's done makes no

19   difference to the court.  If you guys can agree on the order

20   in which you wish to exercise the peremptories, that is

21   fine.

22           MR. STEWARD:  As of now, I don't want to exercise

23   the peremptories.

24           MR. O'BRIEN:  Agreed.  I'll take the next two.

25           THE COURT:  Both stip to them?

```
1              MR. STEWARD:  Yes.

2              MR. O'BRIEN:  Yes.

3              THE COURT:  All right.  At this point, the

4    alternates would be Jurors No. 28 and 29.  Let me have the

5    clerk swear in the alternate jurors at this point.

6              THE CLERK:  Please raise your right hand.

7                    ALTERNATE JURORS SWORN

8              THE CLERK:  Ladies and gentlemen, do you and each

9    of you solemnly swear that you will well and truly try the

10   cause now before this court and a true verdict therein

11   render according to the evidence, so help you God?

12             THE JURORS:  I do.

13             THE CLERK:  Thank you.  Please be seated.

14             THE COURT:  All right.  At this point in time, let

15   me thank and excuse all of the other prospective jurors.  At

16   this point you are free to go upstairs tell them you've been

17   released from this matter.  Thank you for your participation

18   so far.

19             Also, what I will be doing is we're going to take

20   a short ten-minute break because we need to set up prior to

21   the actual start of the trial itself.

22             So what I'm going to do is I'm going to ask the

23   clerk to take the prospective jurors -- actually the

24   jurors -- into the jury room to show you where it is first

25   of all; and if you have any questions in regards to the
```

1    operation of the jury room, you can ask the clerk at that

2    point in time.

3              And then she'll get you in approximately ten

4    minutes and we'll start the evidentiary portion of the trial

5    at that point in time.

6              All right.  Any of you have any questions at this

7    stage?

8                   *(An alternate juror responded.)*

9              THE COURT:  Yes, ma'am.

10             THE ALTERNATE JUROR:  Do the alternate jurors --

11   I, as an alternate juror, do I go in the jury room when they

12   go in now?

13             THE COURT:  You will always be able to go into the

14   jury room because one of the instructions that I'll be

15   giving is that when you go into the jury room, until the

16   case is complete, in other words, until you've heard all the

17   evidence, et cetera, nobody is to deliberate.  You're not

18   supposed to talk about the case.

19             But you are free to go into the jury room because

20   it's more convenient to wait in there because there are

21   chairs and restrooms and things of that sort.

22             THE ALTERNATE JUROR:  At the time when they do --

23             THE COURT:  Once they are actually -- the jury is,

24   in fact, in deliberations, you will not go into the jury

25   room.  You'll be waiting outside in a different room.

```
 1              THE ALTERNATE JUROR:  Okay.  But we don't go home
 2    at that time either, do we?
 3              THE COURT:  No, you do not go.  In other words,
 4    you have to be here in case we need you.
 5              THE ALTERNATE JUROR:  Okay.  Got it.  Thank you.
 6              THE COURT:  Okay.  Let me have the jury go into
 7    the jury room and we'll start in ten minutes.
 8              THE CLERK:  All rise.
 9              MR. STEWARD:  Your Honor, we have matters outside
10    the presence of the jury.
11              THE COURT:  Sure.
12              (The jurors exited the courtroom.)
13              THE COURT:  Yes.
14              MR. STEWARD:  Your Honor, we'd ask the court to
15    reconsider switching this to a bench trial; and I base it on
16    all the things that I've talked about before and filed
17    before.
18              For the record, the court is smiling at me.
19    Specifically --
20              THE COURT:  It's kind of like a -- sort of a
21    strange request in the sense that I've already made a ruling
22    on it.  I don't see what any new factor that would cause the
23    court to change its decision.
24              MR. STEWARD:  Two new factors.  First was the
25    juror this morning who, from the back of the courtroom and
```

1    in front of everybody, recited what she heard on the radio

2    this morning about how the jury had already made up their

3    mind, there was a lot of venom.  The record is what the

4    record is.

5         THE COURT:  Well, let me just stop you.  She had

6    reported as to what she had heard on the radio.  Not, in

7    fact, what had occurred in real life.

8         And, obviously, there's always a difference

9    between what one hears in the media and what actually

10   happens in real life.  No offense to the media who reported,

11   but there is a difference.

12        MR. STEWARD:  Well, in this case, I think if you

13   compare my words with what she reported this morning, you'll

14   find they are virtually the same.

15        THE COURT:  Well, but the mere fact that the media

16   reports back what you said doesn't necessarily make it true.

17        MR. STEWARD:  No, no.  And I understand that.  But

18   it's another sense of why this case needs to be a bench

19   trial rather than a jury trial.

20        THE COURT:  Okay.  Let me ask you this.  For all

21   intents and purposes, if I reach a conclusion that the

22   verdict reached is incorrect, what authority do I have at

23   that point?  Don't I have whatever authority I would have,

24   the same authority I would have here?

25        MR. STEWARD:  Right, of course.

```
 1              THE COURT:  So I don't understand what the point
 2      is.
 3              MR. STEWARD:  Well, if -- I think the bottom line
 4      here is that the case is not only complicated in the sense
 5      that they're having a lot of trouble figuring out why the
 6      suicide is even here when the court is telling them that
 7      it's not part of the elements and we've had this continued
 8      instructions; and my proof of that is the gentleman,
 9      Mr. Imbagliazzo -- starts "Im" --
10              THE COURT:  Yes.
11              MR. STEWARD:  -- who is now gone.  But this
12      morning at sidebar asked the court why is the suicide being
13      read to the jury and, in his view, a layman's view, it was
14      causing a great deal of complication and confusion in the
15      jury selection process.
16              I think Mr. Imbagliazzo hit the nail on the head
17      when he made those comments and it's further proof of what
18      I've been saying all along.
19              THE COURT:  Juror No. 16.
20              As the court will indicate in the preliminary set
21      of instructions, the court will state that insofar as the
22      treatment of the suicide is concerned, the jurors are free
23      to make a determination that the suicide does not have
24      sufficient relevancy for them to make a decision on any
25      issue in the case.
```

```
 1              But, conversely however, the jurors may find that
 2    the suicide does relate to certain aspects of the
 3    government's case-in-chief insofar as the elements are
 4    concerned, specifically those elements which relate to the
 5    fact of intentional infliction of emotional distress and
 6    also actions following the knowledge of the suicide insofar
 7    as what conduct took place vis-a-vis the defendant
 8    purportedly and the coconspirators.
 9              MR. STEWARD:  So I take it the court is not
10    entertaining my motion?
11              THE COURT:  I am entertaining it, but I'm
12    indicating to you my response to the motion.  I obviously am
13    entertaining it.  I entertained the original motion as well.
14              MR. STEWARD:  Okay.  So the court is going to
15    decline to go to a bench trial?
16              THE COURT:  Let me ask the government.  What is
17    your response?
18              MR. KRAUSE:  Your Honor, I think your analysis is
19    correct.  There was a juror who basically wanted to know
20    what a limiting instruction would be that would be given
21    during the trial.  His question was premature.
22              There's no indication that there is any real
23    confusion.  The jurors have indicated they are openminded
24    and they are prepared to evaluate the case and follow the
25    court's instructions.
```

```
 1           They've been questioned extensively about this
 2   both by Your Honor and defense counsel, and they all
 3   indicated that they are going to follow and abide by their
 4   oath to evaluate the evidence fairly on both sides.
 5           THE COURT:  All right.  Anything else?
 6           MR. STEWARD:  Alternatively, I move for a mistrial
 7   on the same grounds now that we have the jury impaneled.
 8           THE COURT:  I'll deny that at this point.
 9           Anything else before we take a short break?
10           MR. STEWARD:  No, Your Honor.
11           MR. O'BRIEN:  No, Your Honor.
12           THE COURT:  Okay.  Thank you very much.
13                   (Recess.)
14      (The following was held outside the jury's presence:)
15           THE COURT:  All right.  Let me ask counsel.  Is
16   there anything I should do before I bring the jury out?
17           MR. KRAUSE:  No, Your Honor.
18           MR. STEWARD:  No, Your Honor.  I would only move
19   to exclude witnesses at this time.
20           THE COURT:  All right.  I presume there is no
21   objection.
22           MR. KRAUSE:  No objection.
23           THE COURT:  I obviously don't know who the
24   witnesses are, what they look like.  So if counsel sees or
25   otherwise observes a witness in the courtroom, they'll bring
```

1    it to my attention and I will ask the person to leave until

2    such time as they are called.

3            Also, the first thing we'll be doing when we bring

4    the jury back in is to read the preliminary set of

5    instructions which I previously gave to each counsel and

6    both sides indicated they had no objections to the

7    preliminary instructions so I will be reading them

8    momentarily.

9            Also, may I have a stipulation that the reporter

10   does not need to transcribe the jury instructions while I'm

11   reading them because we have a copy which will serve?

12           If I miss a word or something like that, you can

13   bring it to my attention thereafter.

14           MR. KRAUSE:  We so stipulate.

15           MR. STEWARD:  Fine, Your Honor.

16           THE COURT:  Would you give this to the jury.

17   There should be 14 copies.

18           All right.  Why don't we bring the jury in.

19                *(The jurors entered the courtroom.)*

20           THE COURT:  All right.  Let me ask the jurors in

21   the box if you could all move over one seat except for

22   Juror No. 7 who can't; and then let's have the alternate

23   jurors, would you take one and two seats in the respective

24   rows.  Either one is fine.

25                *(Pause in the proceedings.)*

```
 1              THE COURT:  All right.  Ladies and gentlemen, what
 2    I'm do be doing is reading the preliminary set of
 3    instructions.
 4              As I indicated to you earlier on, you must follow
 5    the court's instructions even if were you to disagree with
 6    any of these instructions so -- and I have given each juror
 7    a copy in writing of the instructions as well.
 8              After I'm done reading these instructions, would
 9    you pass them down to the juror to your left and then my
10    clerk will collect them.
11              These instructions are preliminary.  At the end of
12    the case, I'll be giving to you a written set, another
13    written set of instructions.  Those instructions will be
14    applicable insofar as your deliberations are concerned; but
15    the initial instructions are preliminary so you understand
16    what's going to be going on.  Okay?
17              Also, if at any point in time you have a question
18    as to what the instructions mean, if you want a further
19    explanation, please raise your hand and ask for a further
20    instruction and I'll give it to you.  All right?
21              Instruction 1.1.
22              Ladies and gentlemen, you are now the jury in this
23    case.  I want to take a few minutes to tell you something
24    about your duties as jurors and to give you some
25    instructions.
```

```
1              These are preliminary instructions.  At the end of

2    the trial, I will give you more detailed instructions.

3    Those instructions will control your deliberations.

4              You should not take anything I may say or do

5    during the trial as indicating what I think of the evidence

6    or what your verdict should be.

7              Instruction 1.2.

8              This is a criminal case brought by the United

9    States Government against the defendant Lori Drew.  The

10   government charges the defendant with the following four

11   crimes:

12             1.  Conspiracy to violate 18 USC, Section

13   1030(a)(2)(C) and Section 1030(c)(2)(B)(ii) by intentionally

14   accessing a computer without authorization or in excess of

15   authorization and thereby obtaining information from a

16   protected computer in furtherance of the commission of a

17   tortious act and

18             2.  Three counts of violating 18 USC, Section

19   1030(a)(2)(C) and Section 1030(c)(2)(B)(ii) by contravening

20   the MySpace terms of service and accessing MySpace computer

21   servers to obtain information regarding Megan Meier who was

22   then a 13-year-old girl.

23             The charges against the defendant are contained in

24   the Indictment which was read to you -- I have down here

25   "earlier today" but actually it was read to you yesterday.
```

```
 1          The Indictment is simply the description of the
 2   charges made by the government against the defendant.  It is
 3   not evidence of anything.
 4          The defendant has pled not guilty to the charges
 5   and is presumed innocent unless and until proved guilty
 6   beyond a reasonable doubt.
 7          A defendant has the right to remain silent and
 8   never has to prove her innocence or present any evidence.
 9          In order to help you follow the evidence, I will
10   now give you a brief summary of certain of the elements of
11   the crimes which the government must be prove to make its
12   case.
13          These instructions are preliminary and the
14   instructions I will give you at the end of the case will
15   control your deliberations.
16          As stated above, the two basic crimes charged
17   herein are:
18          1.  Conspiracy to violate 18 USC, Sections
19   1030(a)(2)(C) and 1030(c)(2)(B)(ii) and
20          2.  Violating on three occasions 18 USC, Sections
21   1030(a)(2)(C) and 1030(c)(2) (b)(ii).
22          18 USC, Sections 1030(a)(2)(C) and
23   1030(c)(2)(B)(ii) state that:  "Whoever intentionally
24   accesses a computer without authorization or exceeds
25   authorized access and thereby obtains information from any
```

1    protected computer, If the conduct involved an interstate or

2    foreign communication" is guilty of a felony if "the offense

3    was committed in furtherance of any criminal or tortious act

4    in violation of the Constitution or laws of the United

5    States or of any state. . . ."

6           The elements of this crime are:

7           First, the defendant intentionally accessed a

8    computer without authorization or in excess of

9    authorization.

10          Second, the defendant's access of that computer

11   involved an interstate or foreign communication.

12          Third, by accessing that computer without

13   authorization or in access of authorization, the defendant

14   thereby obtained information from a computer used in

15   interstate or foreign commerce or communication, and

16          Fourth, the offense was committed in furtherance

17   of a tortious act, here the tort of intentional infliction

18   of emotional distress.

19          The tort of intentional infliction of emotional

20   distress has four elements:

21          1.  The defendant must act intentionally or

22   recklessly.

23          2.  The defendant's conduct must be extreme and

24   outrageous.

25          3.  The conduct must be the cause.

```
 1              4.  Of severe emotional distress.

 2              While there exists no precise definition, the

 3   conduct must be so outrageous in character and so extreme in

 4   degree as to go beyond all possible bounds of decency and to

 5   be regarded as atrocious and utterly intolerable in a

 6   civilized community.

 7              The defendant's conduct must be more than

 8   malicious and intentional.  The liability does not extend to

 9   mere insults, indignities, threats, annoyances, or petty

10   oppressions.

11              The elements of the crime of conspiracy are:

12              First, there was an agreement between two or more

13   persons to commit at least one crime as charged in the

14   Indictment.

15              Second, the defendant became a member of the

16   conspiracy knowing of at least one of its objects and

17   intending to help accomplish it.

18              And, third, one of the members of the conspiracy

19   performed at least one overt act for the purpose of carrying

20   out the conspiracy with all of you agreeing on a particular

21   overt act that you find was committed.

22              A conspiracy is a kind of criminal partnership, an

23   agreement of two or more persons to commit one or more

24   crimes.

25              The crime of conspiracy is the agreement to do
```

1    something unlawful.  It does not matter whether the crime

2    agreed upon was committed.

3            For a conspiracy to have existed, it is not

4    necessary that the conspirators made a formal agreement or

5    that they agreed on every detail of the conspiracy.

6            It is not enough, however, that they simply met,

7    discussed matters of common interest, acted in similar ways,

8    or perhaps helped one another.

9            You must find that there was a plan to commit at

10   least one of the crimes alleged in the Indictment as an

11   object of the conspiracy with all of you agreeing as to the

12   particular crime which the conspirators agreed to commit.

13           One becomes a member of a conspiracy by willfully

14   participating in the unlawful plan with the intent to

15   advance or further some object or purpose of the conspiracy

16   even though the person does not have full knowledge of all

17   the details of the conspiracy.

18           Furthermore, when one -- sorry.

19           Furthermore, one who willfully joins an existing

20   conspiracy is as responsible for it as the originators.

21           On the other hand, one who has no knowledge of a

22   conspiracy but happens to act in a way which furthers some

23   object or purpose of the conspiracy does not, therefore,

24   become a conspiracy.

25           Similarly, a person does not become a conspirator

1    merely by associating with one or more persons who are

2    conspirators nor merely by knowing that a conspiracy exists.

3            An overt act does not itself have to be unlawful.

4    A lawful act may be an element of a conspiracy if it was

5    done for the purpose of carrying out the conspiracy.

6            The government is not required to prove that the

7    defendant personally did one of the overt acts.

8            Instruction 1.3.

9            The evidence you are to consider in deciding what

10   the acts are consists of:

11           1.   The sworn testimony of any witness,

12           2.   The exhibits which are received into evidence,

13   and

14           3.   Any fact to which all the lawyers stipulate.

15           Instruction 1.4.

16           The following things are not evidence and you must

17   not consider them as evidence in deciding the facts of this

18   case:

19           1.   Statements and arguments of the attorneys,

20           2.   Questions and objections of the attorneys,

21           3.   Testimony that I instruct you to disregard,

22   and

23           4.   Anything you may see or hear when the court is

24   not in session even if what you see or hear is done or said

25   by one of the parties or by one of the witnesses.

1              Instruction 1.5.

2              Some evidence may be admitted for a limited

3    purpose only.  When I instruct you that an item of evidence

4    has been admitted for a limited purpose, you must consider

5    it only for that limited purpose and for no other.

6              During this trial you will hear testimony that

7    Megan Meier committed suicide in the fall of 2006.

8    Lori Drew is not charged with causing that suicide, and it

9    would be wrong to convict the defendant solely because of

10   feelings of sympathy for Megan Meier and her family as a

11   result of the suicide.

12             Megan Meier's suicide will be the subject of some

13   testimony only because you may determine, but are not

14   required or obligated to determine, that such evidence is

15   relevant to your conclusion as to whether or not the

16   government has met its burden of proving all of the elements

17   of the crimes with which she is charged beyond a reasonable

18   doubt.

19             You should review this evidence in the same

20   unbiased and impartial way as you would any other testimony

21   offered by either side in this case.

22             Please recall that at the beginning of this trial

23   you took an oath to be fair and impartial to both sides in

24   this case.

25             No matter what you may think of such evidence, you

1  must still abide by that oath and comply with your duty to

2  follow the law as I will instruct you.

3          And, again, I now instruct you that the defendant

4  is presumed innocent of the charges against her and the

5  government bears a burden of proof on each of the elements

6  of the offenses charged.

7          Instruction 1.6.

8          Evidence may be direct or circumstantial.  Direct

9  evidence is direct proof of a fact such as testimony by a

10 witness about what that witness personally saw or heard or

11 did.

12         Circumstantial evidence is indirect evidence, that

13 is, it is proof of one or more facts from which you can find

14 another fact.  You are to consider both direct and

15 circumstantial evidence.  The law permits you to give equal

16 weight to both, but it is for you to decide how much weight

17 to give to any evidence.

18         Instruction 1.7.

19         There are rules of evidence which control what can

20 be received into evidence.  When a lawyer asks a question or

21 offers an exhibit into evidence and a lawyer on the other

22 side thinks that it is not permitted by the rules of

23 evidence, that lawyer may object.

24         If I overrule the objection, the question may be

25 answered or the exhibit received.  If I sustain the

1  objection, the question cannot be answered and the exhibit

2  cannot be received.

3          Whenever I sustain an objection to a question, you

4  must ignore the question and must not guess what the answer

5  would have been.

6          Instruction 1.8.

7          In deciding the facts in this case, you may have

8  to decide which testimony to believe and which testimony not

9  to believe.  You may believe everything a witness says or

10  part of it or none of it.

11          In considering the testimony of any witness, you

12  may take into account:

13          1.  The opportunity and ability of the witness to

14  see or hear or know the things testified to,

15          2.  The witness's memory,

16          3.  The witness's manner while testifying,

17          4.  The witness's interest in the outcome of the

18  case and any bias or prejudice.

19          5.  Whether other evidence contradicted the

20  witness's testimony,

21          6.  The reasonableness of the witness's testimony

22  in light of all the evidence, and

23          7.  Any other factors that bear on believability.

24          The weight of the evidence as to a fact does not

25  necessarily depend on the number of witnesses who testify.

```
 1              Instruction 1.9.

 2              I will now say a few words about your conduct as

 3   jurors.

 4              First, you are not to discuss this case with

 5   anyone, including your fellow jurors, members of your

 6   family, people involved in the trial, or anyone else nor are

 7   you allowed to permit others to discuss the case with you.

 8              If anyone approaches you and tries to talk to you

 9   about the case, please let me know about it immediately.

10              Second, do not read any news stories or articles

11   or listen to any radio or television reports about the case

12   or about anyone who has anything to do with it.

13              Third, do not do any research such as consulting

14   dictionaries, searching the Internet, or using reference

15   materials; and do not make any investigation about the case

16   on your own.

17              Fourth, if you need to communicate with me, simply

18   give me -- simply give a note to the clerk to give to me.

19              And, fifth, do not make up your mind about what

20   the verdict should be until after you had gone into the jury

21   room to decide the case and you and your fellow jurors have

22   discussed the evidence.  Keep an open mind until then.

23              Instruction 1.10.

24              At the end of the trial, you will have to make

25   your decision based upon what you recall of the evidence.
```

1   You will not have a written transcript of the trial.  I urge

2   you to pay close attention to the testimony as it is given.

3          Instruction 1.11.

4          If you wish, you may take notes to help you to

5   remember what the witnesses said.  If you do take notes,

6   please keep them to yourself until you and your fellow

7   jurors go to the jury room to decide the case.

8          Do not let notetaking distract you so that you do

9   not hear the other answers by the witnesses.

10          When you leave, your notes should be left in the

11   jury room.

12          Whether or not you do take notes, you should rely

13   on your own memory of what was said.  Notes are only to

14   assist your memory.  You should not be overly influenced by

15   the notes.

16          Instruction 1.12.

17          The next -- sorry -- the next phase of the trial

18   will now begin.  First, each side may make an opening

19   statement.  An opening statement is not evidence.  It is

20   simply an outline to help you understand what that party

21   expects the evidence will show.

22          A party is not required to make an opening

23   statement.  Also, the defendant can decide to reserve her

24   opening statement and give it after the government has

25   presented the evidence in its case.

1          The government will then present evidence and

2     counsel for defendant may cross-examine.  Then the defendant

3     may present evidence and counsel for the government may

4     cross-examine.

5          After the evidence has been presented, I will

6     instruct you on the law that applies to the case and the

7     attorneys will make closing arguments.

8          After that, you will go to the jury room to

9     deliberate on your verdict.

10          Ladies and gentlemen, any questions on that

11     initial set of instructions?

12               (No response.)

13          THE COURT:  All right.  Actually, I'll let you

14     keep these instructions for a little bit longer just in case

15     you need to refer to them at the start of the case; but I

16     will collect them sometime prior to the close of the

17     evidence because, as I've indicated, the final set of jury

18     instructions will control your deliberations.

19          Also, just one additional comment in regards to

20     taking notes and listening to the testimony.  Sometimes I

21     find it that because of the newness of the experience some

22     jurors tend to be somewhat distracted when the testimony

23     starts, the first witness testifies, et cetera; and

24     sometimes they will ask for a readback which is a readback

25     of testimony from a reporter.

1          Normally, the jurors do not receive a copy of the

2    transcript.  However, if the jurors cannot agree on what the

3    testimony actually was, we do have a court reporter who does

4    transcribe what is actually said in the courtroom.

5          However, you're not to rely on that transcript.

6    You're to rely on your own recollection.  The only time that

7    I will have the reporter provide you with the transcript is

8    if the jury cannot, among themselves, agree as to what the

9    testimony actually was.

10         Do all of you understand that?

11         *(The jurors indicated in the affirmative.)*

12         THE COURT:  All right.  Finally, before we start,

13   you do recall you promised that if at any point in time you

14   can't hear or understand what's going on or something is

15   distracting you from the ongoing proceedings, you will raise

16   your hand and bring it to my attention so I can correct it

17   so, therefore, if I don't see a hand raise I will presume

18   everything is fine.

19         Sir, Mr. Matsuura.  Yes.

20         JUROR NO. 6:  In this instruction that I cannot

21   listen to television or radio during the trial?

22         THE COURT:  No, you can but you cannot listen to

23   -- for example, you cannot listen to anything where you

24   expect a report about this trial to appear because, again,

25   at that point you might be receiving information which you

1    shouldn't be receiving.

2          So I'm not saying do not listen to any radio or

3    any TV because, obviously, most things on the radio or TV

4    will not concern this trial.

5          But as already demonstrated this morning, there

6    might be a situation where if you're driving to the

7    courthouse and you're listening to news radio, it might

8    report the fact that this trial is occurring and supposedly

9    what transpired during the trial; and, again, you're not to

10   listen to that.

11         But other than news-type programs, you are free to

12   listen to whatever you want or watch whatever TV you want.

13   Okay?

14              JUROR NO. 6:  Thank you.

15              THE COURT:  Any other questions from the jury?

16                   (No response.)

17              THE COURT:  All right.  At this point we'll start

18   with opening statements.  Let me ask.  Is the government

19   prepared to make an opening statement at this point in time?

20              MR. O'BRIEN:  We are, Your Honor.

21              THE COURT:  All right.

22              **OPENING STATEMENT BY MR. O'BRIEN**

23              MR. O'BRIEN:  In September of 2006, in a town

24   called O'Fallon, Missouri, just outside St. Louis, the

25   defendant Lori Drew, her 13-year-old daughter Sarah Drew, an

1    18-year-old employee of the defendant's named Ashley Grills

2    hatched a plot in order to prey on the psyche of a

3    vulnerable little 13-year-old girl named Megan Meier.

4            The plot consisted of opening up a MySpace account

5    not under the defendant's true name, but under the name

6    "Josh Evans"; and they would pose in this account to be a

7    good-looking 16-year-old boy.

8            When the defendant opened this account, she did it

9    in order to gather information from 13-year-old Megan Meier

10   who also had a MySpace account.

11           Now, the defendant, in particular knew that

12   Megan Meier was vulnerable.  The defendant knew that Megan

13   was depressed, she was suicidal, and she was boy crazy.

14           And yet the defendant, the defendant's daughter,

15   the defendant's employee, opened this account to communicate

16   with 13-year-old Megan and build up a romance online.

17           When the defendant did this, her purpose was to

18   tease Megan Meier, to embarrass her, to humiliate her, to

19   make fun of her, and to hurt her.

20           Almost four weeks after opening this account and

21   allowing the relationship to develop between young

22   Megan Meier and Josh Evans, on October 16th of 2006, from

23   the defendant's home where the account was opened and

24   maintained, Ashley Grills sent, under the pseudonym

25   Josh Evans, after an hour or so of attacking Megan Meier,

1    calling her names, sent the following message to Megan:  The

2    world would be a better place without you.  Have a shitty

3    rest of your life.

4           Upon receiving that, Megan Meier sent back a

5    message, the last message she would ever send; and she sent

6    that message to who she believed was Josh Evans.

7           She said:  You are the kind of boy a girl would

8    kill herself over.

9           30 minutes later, Megan hanged herself to death;

10   and the reason we know the defendant did this, she opened

11   the account, she planned to embarrass and humiliate

12   Megan Meier, was first we have -- and you will see during

13   this trial -- records from MySpace indicating that the

14   Josh Evans account was opened by the defendant Lori Drew.

15          You'll see, although some of the records, most of

16   the records were destroyed, you will see partial

17   conversations, typed conversations between Josh Evans and

18   Megan Meier.

19          You'll hear from a coconspirator, the 18-year-old

20   employee of the defendant who worked out of the defendant's

21   home, Ashley Grills, will tell you what happened.

22          And the other reason we know that that's what the

23   defendant did and that's what she intended to do is because

24   she admitted it to a friend, to a neighbor, to a neighbor's

25   child, to a business client, to her hairdresser, and to the

1    police.

2              Good afternoon.  My name is Tom O'Brien.  Together

3    with Mark Krause and Yvonne Garcia, we represent the United

4    States in this case charging the defendant Lori Drew with

5    one count of conspiracy, with three counts of unauthorized

6    access to a computer and exceeding authorized access in

7    order to inflict emotional distress on a 13-year-old girl

8    named Megan Meier.

9              During this trial, you'll hear evidence that the

10   defendant's family, the Drew family, and the Meier family

11   were close both in physical proximity as well as

12   relationship-wise.

13             The families lived in O'Fallon, Missouri; and the

14   defendant's daughter Sarah became friends with Megan Meier.

15   They are the same age, attended the same school for a number

16   of years.

17             Much like little girls in fifth grade and sixth

18   grade and seventh grade, they would get together and they

19   would talk and they would play and sometimes they would

20   fight and they would make up again.

21             You will hear testimony that Megan Meier would go

22   on vacations and trips with the defendant's family, and

23   you'll hear that during these trips the defendant gave

24   Megan Meier medication.

25             For you see, Megan Meier, as the defendant was

1     well aware, since third grade had been taking medication for

2     ADD and also for severe depression.

3             And so when the Meiers allowed their daughter

4     Megan Meier to go on these trips, Tina Meier, Megan's mom,

5     would give the defendant the antidepressant medication to

6     give to Megan.

7             You'll hear that at one time the Meiers were

8     concerned about their daughter Megan hurting herself, and

9     they switched the locks on Megan's bedroom door so she

10    couldn't lock herself in so they could keep an eye on her.

11            And the defendant was aware of that before she

12    opened up the Josh Evans account.

13            You'll also hear testimony that in 2005, about a

14    year before this occurred, that Megan, while at school, made

15    cuts on her wrist.  A cry for help.

16            You'll hear in the summer of 2006, several months

17    before the Josh Evans account was hatched, that the Meiers

18    transferred their daughter Megan to a Catholic school to

19    begin her eighth grade.

20            And that transfer seemed to regenerate Megan Meier

21    because her grades got better.  Her attitude got great.  And

22    she actually was boy crazy by getting one who was 13 years

23    old.

24            And because she was doing so well, her mother

25    Tina Meier allowed Megan to open up a MySpace account.

```
 1            You'll learn during testimony in this trial that
 2    although the conversations between Megan Meier and defendant
 3    posing as Josh Evans appeared on its face to only occur in
 4    O'Fallon, Missouri, that under MySpace the communications
 5    are actually directed through a server in Los Angeles in
 6    this district and they travel in interstate commerce.
 7            You'll hear testimony from Tina Meier that she was
 8    very careful, as careful as a mother could be, to have a
 9    13-year-old on the Internet.
10            She wouldn't give Megan the password to get on to
11    the account.  Tina Meier did everything possible to sit with
12    Megan when she was on her MySpace account to make sure
13    nothing untoward came Megan's way.
14            You'll also hear the defendant was not happy when
15    Megan was switched to a new school.  Defendant's daughter
16    Sarah stopped playing with Megan Meier.
17            You'll hear testimony that Megan Meier was saying
18    mean things, mean things a 13-year-old was saying about the
19    defendant's 13-year-old daughter.
20            With that as a background, you will hear that in
21    order to find out what Megan was saying about her
22    13-year-old girl, the defendant decided to open up her own
23    MySpace account to communicate with Megan on Megan's MySpace
24    account to find out what Megan was saying.
25            Now, in order to get information on Megan Meier,
```

1   Lori Drew couldn't open up her own account under the name

2   "Lori Drew" so she and her employee Ashley Grills, who

3   worked out of the defendant's home, and the defendant's

4   13-year-old daughter cooked up a persona:  Josh Evans.

5          The name was made up from someone that Ashley had

6   known years ago.  You'll hear testimony that Ashley Grills

7   went on the Internet and searched and just found a photo of

8   a really good-looking young boy.  Formed this account,

9   MySpace account, Josh Evans.

10          Under the profile, it said Josh Evans had just

11  moved into O'Fallon, Missouri.  He was looking to meet new

12  friends.  He was home-schooled.  His father was a bastard.

13  He lived in a mobile home with his mother.

14          And in so doing, in making up those facts, you

15  will learn that the defendant violated the terms of service

16  of MySpace.  You'll hear from MySpace experts on what those

17  terms of service are.

18          You're not allowed to harass anyone, annoy anyone

19  through MySpace.  You're not allowed to obtain personal

20  information on a child under the age of 18.

21          You're not allowed to use a photograph without

22  someone's permission; and yet all of that was done by the

23  defendant, Ashley Grills, and the defendant's daughter

24  Sarah.

25          And even if you didn't think common sense, you'd

1   know it was wrong to pose as a 16-year-old boy when you

2   weren't one, the defendant was specifically told by

3   Ashley Grills that this is wrong.

4          And you'll hear testimony she was told by a

5   hairdresser that this is wrong; and the defendant opened the

6   account and maintained the account anyway.

7          You'll see about September 20, 2006, when the fake

8   Josh Evans account was started at her home under her

9   direction and guidance, the defendants -- they reached out

10  under the pseudonym of Josh Evans to Megan Meier.

11         You'll hear you have to actually reach out to

12  someone to be invited into their account.  You'll hear

13  testimony from Tina Meier that she was monitoring her

14  daughter when Josh Evans' photo pops up and wants to join.

15         You'll hear testimony that Megan was all excited.

16  Here's a hot boy.  He's new in O'Fallon, Missouri, and he

17  wants to meet me.

18         Megan allowed Josh Evans in and began an online

19  relationship with him.  Megan clearly didn't know and never

20  knew that who she was building a relationship with was not a

21  16-year-old boy but with the defendant.

22         You'll hear testimony in this trial that the

23  defendant had a number of plans to take that information on

24  Megan Meier.

25         One of her plans was to print out the conversation

```
 1    between Megan Meier and Josh Evans and go to Megan's school
 2    with it and have all the children make fun of this
 3    13-year-old depressed girl.
 4            You'll hear another plan the defendant came up
 5    with was to have Josh Evans invite Megan Meier to the mall
 6    for a date where all Sarah's friends could be waiting; and
 7    when Megan Meier showed up excited to meet this new,
 8    good-looking boy, all these young girls could pop out and
 9    make fun of Megan Meier.
10            These are two plans that defendant talked upon
11    you'll hear during this trial, and you'll also hear that the
12    defendant thought this is very funny.
13            About three and a half weeks into this plan,
14    you'll hear on October 16th, 2006, it was a good day for
15    Megan.  Coming back from school.  Her mom picked her up,
16    took her home.  Megan was excited to go on to MySpace to see
17    if she had any communications from Josh Evans, the
18    relationship.
19            She had some messages.  At that time, Tina Meier
20    had to take Megan's sister to the orthodontist.
21            Megan begged her mom:  Can I just stay on and
22    communicate with Josh Evans?
23            Tina Meier said:  Okay.  Finish the messages and
24    log off.
25            You'll learn that Tina Meier took Megan's sister
```

1   to the orthodontist and called back when she got there to

2   check up on Megan; and she found out that Megan was still

3   online.

4           And Tina Meier told Megan:  Get off.  Get off the

5   MySpace account.

6           About half an hour later, Tina called back to her

7   home and she found Megan Meier was distraught.  She was

8   crying.  Tina asked her daughter:  What's the problem?

9   What's wrong?

10          She said:  Mom, you have to come home to see this.

11  They're being mean to me.

12          And Tina came home to look on the computer; that

13  Megan was crying; and Tina could see where Josh Evans and

14  several other people were just attacking Megan, calling her

15  mean, mean to her friends, no one wants to be your friend.

16          And you will hear testimony that the last message

17  that Josh Evans -- this was actually Ashley Grills right

18  down the street -- sent to Megan was:  The world will be a

19  better place with without you.  Have a shitty rest of your

20  life.

21          And, again, Megan responded:  You're the kind of

22  boy a girl would kill herself over.

23          You'll hear that Tina Meier told her 13-year-old

24  girl:  I told you about the Internet.  We have to be

25  careful.

```
 1              Megan told her mom:  You're supposed to be on my

 2   side and ran upstairs.

 3              You'll hear 30 minutes later Tina ran upstairs and

 4   found that Megan had hanged herself in a closet.

 5              An ambulance was called and you'll hear testimony

 6   the defendant heard because the defendant's home was just

 7   down the street from the Meier home.

 8              The defendant heard the sirens of the ambulance as

 9   it came closer and pulled up in front of the Meier's home to

10   treat Megan Meier.

11              You'll hear that the defendant sent Ashley Grills

12   and her own daughter down to the Meier's house to find out

13   what happened.

14              They did so and came back and told the defendant:

15   We just heard that Megan Meier tried to kill herself.  At

16   that point, the defendant said that she knew that

17   Megan Meier was suicidal and she ordered Ashley Grills to

18   destroy the Josh Evans account.  Delete it.

19              In spite of that, you will see during this trial

20   that some of the records were recovered.  You will see some

21   of the communications between the defendant, Ashley Grills,

22   and her daughter Sarah with Megan Meier.

23              You'll find that the account of Josh Evans was

24   established at the defendant's home.

25              And during this trial, you'll hear from
```

1    Ashley Grills, the 18-year-old employee of the defendant's.
2    Ashley Grills is testifying under the grant of immunity from
3    the federal government in exchange for her testimony.
4            She will tell you that she was a paid employee
5    working out of the home of the defendant who ran a coupon
6    magazine business out of her home.
7            She'll tell you about the plan the defendant came
8    up with, they all came up with and agreed to start the
9    Josh Evans account to foster a relationship with
10   Megan Meier.
11           And she will tell you that all three of them --
12   Ashley Grills, 13-year-old Sarah, and Lori Drew -- took
13   turns sending messages posing as Josh Evans to Megan Meier.
14           You'll hear from Jessica Mulford, a friend of
15   Sarah's.  You'll hear that while this operation is -- this
16   three-and-a-half week plan was unfolding, that Sarah
17   actually gave the password of the Josh Evans account to
18   Jessica so that Jessica could jump in.
19           You'll hear that one time she was in a car,
20   Jessica Mulford was in a car with her girlfriend Sarah and
21   the defendant; and the defendant said:  Shall we tell
22   Jessica about the account?
23           And then the defendant told another 13-year-old
24   girl Jessica about the defendant's idea, about the MySpace
25   account, about the fact they're posing as a 16-year-old boy,

1   about the plan:  Hey, why don't we go to the mall?  Why

2   don't we invite Megan to the mall where she can meet Josh

3   Evans and we can all pop out and make fun of her; and the

4   defendant laughed at that plan.

5          You'll hear that within minutes of the ambulance's

6   arriving to treat Megan Meier, the defendant Lori Drew

7   called over to the Mulford home, asked to speak to young

8   Jessica.

9          Jessica got on the phone and the defendant said:

10  Keep quiet about the MySpace account.  Keep off the

11  Josh Evans account.  Don't tell anybody.

12         And then the defendant asked her:  Did Megan try

13  to commit suicide before?

14         You'll hear in this trial from Jessica's mother,

15  Michelle Mulford, who once she learned about this phone call

16  between Lori Drew and Jessica, she confronted Lori Drew the

17  next day.

18         The defendant admitted to the account, admitted to

19  opening the account.  The defendant said young 13-year-old

20  Megan Meier was mean and the defendant wanted to get

21  information from Megan.

22         Several weeks later, the defendant had another

23  conversation with Michelle Mulford.  At that point, the

24  defendant just justified:  Well, if not this, Megan would

25  have killed herself anyway.

1          You'll hear from a friend of the defendant's named

2    Eugenia Finnegan who we expect will tell you that the

3    defendant admitted to her to opening the account in order to

4    obtain information of a 13-year-old girl.

5          The defendant told her friend, Miss Finnegan:  But

6    I didn't know about the prior suicide so I don't feel that

7    bad about it now.

8          Our first witness you'll hear this afternoon is

9    Susan Prouty.  Susan Prouty is a business client of the

10   defendant's.  Susan Prouty placed advertising in the

11   defendant's coupon magazine.

12         And you'll hear, we expect, Miss Prouty testify

13   defendant admitted to her once, after Megan's suicide, that

14   she opened the account, the Josh Evans account.  She was

15   well aware that Megan Meier was suicidal when she did that.

16         Months after the suicide, the defendant told

17   Susan Prouty that the plan was to take the printout of the

18   conversation between Josh Evans and Megan Meier to school

19   and laugh at Megan Meier.

20         And defendant told Susan Prouty:  Well, it did get

21   nasty, the relationship between Josh Evans and Megan.  And

22   when Miss Prouty asked the defendant:  Well, why didn't you

23   just shut this down when it got nasty?

24         The defendant said:  Well, girls are girls.  Just

25   had a life of its own.

1          You'll hear from a St. Charles County Deputy

2     Sheriff Lutz who will testify that about six weeks after

3     Megan passed away, he was called to the house of the

4     defendant.  The defendant wanted to file a report with the

5     deputy.

6          During that conversation with Deputy Lutz,

7     defendant admitted her involvement, again, in the MySpace

8     account; that she orchestrated it.

9          She admitted that sometimes the conversation

10    between themselves posing as Josh Evans and 13-year-old

11    depressed Megan Meier became sexual but the defendant

12    allowed these conversations to continue anyway.

13         And the reason you'll hear that the defendant

14    called Deputy Lutz over to their house was not really to

15    admit her role in the MySpace Josh Evans account; it was

16    because the defendant was afraid that neighbors were going

17    to hurt her property because word had leaked out that she

18    was involved and she was concerned about her property.

19         You'll also hear from Dawn Christina Chu who's a

20    hairdresser from the hair salon that the defendant goes to

21    with her daughter Sarah.

22         We expect you'll hear that after the MySpace

23    Josh Evans account was up and running for a week or two, the

24    defendant brought her daughter Sarah to get her hair done,

25    was laughing about the account, thought it was funny.

1        Even the defendant's own daughter Sarah told her

2   mother to stop talking about it.  It's embarrassing.

3        We expect to hear Dawn Chu was so upset that

4   defendant was doing this that Miss Chu admonished the

5   defendant, said:  How could you do this?  You're an adult.

6   You're doing this to a 13-year-old girl.  You'll hear that

7   the defendant didn't react to that.

8        And, lastly, you'll hear from Dawn Chu who will

9   testify that the day of Megan's wake, the defendant went

10  back to the hair salon, brought her daughter Sarah to the

11  hair salon right before the wake.

12       While there, she admitted to deleting the

13  Josh Evans account after Megan died; and when asked by one

14  of the hairdressers why the defendant was going to

15  Megan Meier's wake after her involvement, the defendant's

16  response was:  It's not like I pulled the trigger.

17       Ladies and gentlemen, that's the evidence we

18  expect to be put forth before you in the next several days.

19  As the court has mentioned a number of times, we expect this

20  trial to be fairly short.  We expect the evidence will be in

21  your hands by Monday.

22       We believe that the evidence in this case will

23  show that when the defendant opened and operated that

24  Josh Evans account, she fully intended to hurt and prey on

25  Megan's psyche; and we expect the evidence to show that the

1  defendant Lori Drew is guilty.

2          THE COURT:  All right.  Let me ask the defense.

3  Does the defense wish to make an opening statement at this

4  point?

5          MR. STEWARD:  Yes, please, Your Honor.

6          THE COURT:  All right.

7              OPENING STATEMENT BY MR. STEWARD

8          MR. STEWARD:  Ladies and gentlemen, good afternoon

9  again.  It's my pleasure at this time to present to you the

10 defense's opening statement; and as you all know, there are

11 two sides to every story.

12         I can tell you that the evidence that you're going

13 to hear in the next couple of days you'll see that we do

14 agree on a couple of items.

15         First and foremost, this was a deeply tragic case

16 for everybody:  The Meier family, the Drew family, their

17 friends, everybody.  And, of course, most of all for

18 Megan Meier.  No doubt about that.  We all agree with that.

19         You're also going to hear that the events in this

20 case took place exclusively in O'Fallon, Missouri.

21         O'Fallon, you're going to hear, is a small town in

22 the Midwest outside of St. Louis.  Very typical midwestern

23 town and, in fact, many of the events took place in one

24 particular neighborhood.

25         As counsel already pointed out, you're going to

1    hear about a couple of families in this case.  You're going

2    to hear about the Meiers, you're going to hear about the

3    Drews; and, in particular, central to the evidence is going

4    to be the relationship between Sarah Drew and Megan Meier.

5          And you're going to hear details of that

6    relationship and how all of that fit together in what

7    tragically happened in the fall of 2006 back in Missouri.

8          The two young girls were friends off and on for a

9    number of years through elementary school and as they got

10   older; and you'll hear what would happen is that Megan would

11   be very close friends with Sarah for a while and then,

12   perhaps like many young girls, would find other friends and

13   go off with them.

14         And what would happen is after a period of time,

15   Megan would come back to Sarah Drew.  And you'll hear that

16   each time this would happen, Sarah would simply accept the

17   fact that the cool friends that Megan had had were either no

18   longer cool or, for whatever reason, Megan was back as her

19   friend.  And you'll hear that Sarah, again and again, took

20   her back as a friend.

21         You'll hear that in the summer of 2006 for the

22   most part the friendship was off.  One of the reasons is

23   that Megan had moved to a different school.  But more

24   importantly, Megan had different friends; and you'll hear

25   that Sarah just didn't hear from her at all the beginning of

1    that summer.

2          Now, for some reason, during that summer of 2006,

3    rumors started flying that Megan Meier was saying bad things

4    about Sarah and about some other girls as well; and, again,

5    this may or may not be typical teenage behavior.

6          But you'll hear that the things that Megan was

7    rumored to be saying were, quote, horrible things; awful

8    things about Sarah, awful things about girls in this area.

9          You're also going to hear from Ashley Grills.

10   Ashley Grills at the time was 18 years old and working as a

11   clerical assistant for Lori Drew.

12          You'll hear that Lori had a local business in

13   O'Fallon that basically would sign up merchants to create

14   coupons.  The coupons were then put into a book and mailed

15   out to members of the community.

16          And at the time in the summer of 2006, the

17   business was quite busy.  You'll hear that Ashley Grills was

18   hired right out of high school to be an employee, and she

19   just would put together business cards and keep files

20   together and that sort of thing.

21          But you're also going to hear that Ashley Grills

22   had been a close friend of the Drew family for many years,

23   ten or twelve years.  And when I say "close friend," you'll

24   hear that she was almost a member of the Drew family.

25          She was over at the Drew house two, three, four

1    times a week.  She would babysit for the Drews because she

2    was several years older than the Drew children.

3            She would go on outings with them.  They would go

4    to the YMCA together.  She became almost a member of the

5    family, and you'll hear that the reason was Ashley Grills

6    had a pretty miserable home life.

7            Her parents were constantly fighting.  They

8    divorced.  Money problems.  And I believe you'll hear from

9    Ashley Grills that at times the Grills didn't have enough to

10   eat at home and she would come to the Drew family home and

11   always be taken in.

12           She would hang out at the Drew house, and that was

13   the relationship that you're going to hear was going on.  So

14   not only was Ashley an employee, but she was almost like a

15   member of the family.

16           You're going to hear that one of the things that

17   started the tragic chain of events was that Ashley Grills,

18   who knew Megan Meier somewhat, got an e-mail from her; and

19   Megan's e-mail was one of these horrible e-mails about

20   Sarah Drew.

21           And I believe that Ashley Grills will tell you --

22   maybe she will, maybe she won't; we'll see -- exactly what

23   that e-mail contained; and the e-mail upset Ashley Grills

24   and she shared that e-mail with Sarah Drew.

25           And you're going to hear that the way this whole

1   MySpace account came up was as a result of a conversation

2   between Ashley Grills and Sarah Drew about how they could

3   find out exactly what Megan Meier was saying about

4   Sarah Drew.

5            You'll hear that's how this started.  You'll hear

6   that at some point in this conversation, Lori Drew, the mom,

7   is there.  But equally true you will hear is the fact that

8   she didn't create this account, push it, do anything other

9   than say:  All right, girls.  If you want to do that, go

10  ahead.

11           You will hear that Ashley Grills actually created

12  the false account.  You will hear she came up with all the

13  information.  She came up with the picture of Josh Evans

14  which she just found somewhere on the Internet.

15           You'll hear that Lori Drew wouldn't know how to

16  set up something like a MySpace account and knew nothing

17  about it.  You'll hear she knows very little about computers

18  generally at all.

19           So the point you'll hear of this entire account

20  was simply to see what Sarah Drew -- I'm sorry -- what

21  Megan Meier was saying about Sarah Drew.

22           Importantly, ladies and gentlemen, you will hear

23  that this account was only open for 28 days; and of the 28

24  days, all of the e-mail was friendly, noncontroversial,

25  nonconfrontational until the last day, October 16th, 2006.

1        The other 27 days, the e-mails going around were

2   just what you'd see in any other teenager anywhere in the

3   United States.

4        Now, at one point in the middle of that 28 days,

5   something kind of unusual happened.  You will hear that

6   Ashley Grills became concerned because it seemed like

7   Megan Meier was starting to have a real interest in this

8   fictitious boy and was starting to hint that she would like

9   to meet this Josh Evans.

10        When Ashley mentioned that to Lori Drew, Lori told

11   her:  Shut it down.  Shut down the account.  And at that

12   point, Lori thought it had been shut down but it wasn't.

13        What happened was -- and I believe Ashley Grills

14   will admit this -- Ashley came up with a story for

15   Megan Meier to say that Josh Evans had to go to his

16   grandma's funeral, or something like that, and Lori was not

17   aware that it had not been shut down for a number of days.

18        At some point in the days after that, Lori became

19   aware that it hadn't been shut down but very little was

20   going on by way of communication in this account so it

21   became a nonfactor.

22        In the days prior to October 16th, 2006, there

23   just wasn't that much going on with the account.

24        October 16th, 2006, was a deeply tragic day.

25   You're going to hear details of that from a number of

1  people.

2         You'll hear that Lori Drew on this day met with a

3  number of her business customers, the people that were

4  involved with the coupon book.

5         You're going to hear that late in that afternoon

6  an argument erupted on MySpace.  The argument you're going

7  to hear was started by a girl named Jessica Mulford who I

8  believe you'll hear from.

9         She had been upset with Megan Meier because Megan

10 was -- rumor had it -- saying bad things about Jessica.

11 Jessica asked for the password to use the Josh Evans

12 account, and Ashley Grills gave her that password.

13        Jessica Mulford then sent a very negative message

14 to Megan Meier.  This started off a firestorm of negative

15 e-mails between a number of teenagers.  This was not, you'll

16 learn, Josh Meier against Megan Meier.  I'm sorry.

17 Josh Evans against Megan Meier.  I apologize for mixing up

18 their names.

19        What you're going to hear is that the teenagers

20 involved were the Josh Evans account which was

21 Jessica Mulford and Grills, Megan Meier -- that's three -- a

22 girl named Shawna Dingey -- that's four -- a friend of

23 Shawna's -- that's five -- and another boy that we're not

24 really sure who his identity was.

25        So you will hear this was a group of six teenagers

1    all insulting each other, having an electronic argument, an

2    electronic brawl, if you will.

3           Now, let me stand back for a moment and tell you

4    that you're going to hear -- and keep in mind, this is a

5    computer fraud and abuse act case.  This is not a homicide

6    case.  This is not anything like that.

7           And you've been instructed that and you know that,

8    and I know you've taken it to heart.  Some of the technical

9    side of this is going to be important because when we get

10   around to the elements of computer fraud and abuse act,

11   who's using what here is going to be important.

12          When I say that, you're going to hear evidence

13   that these teenagers -- and all the ones that I'm talking

14   about here -- were using MySpace, yes, but they were also

15   used AOL Instant Messenger wholly unrelated to MySpace.

16          They were using Xenga which I never heard of

17   myself but it's X-e-n-g-a, another communication service.

18   They were using Yahoo Instant Messenger and they were using

19   text messages.

20          They were also using combinations of each one of

21   these to communicate with each other.  So while there has

22   been a great deal -- and you'll hear a lot about MySpace.

23   You will also hear these other services were being used and

24   you'll see that that's of importance when we get to the end

25   of the case.

1    Counsel mentioned to you that there are missing

2    messages in this case and there are.  In fact, you'll hear

3    that most of the messages the government claims were sent do

4    not exist anymore; and there are reasons for that and you'll

5    hear one or more experts talking about that.

6          But you're going to hear about -- going back to

7    October 16th of 2006, that as Lori Drew arrived home, she

8    was met by Ashley Grills and her daughter Sarah.

9          You will hear that the message that counsel talked

10   about -- the world would be a better place -- was sent while

11   Lori Drew was on the road and not even home.  She was not

12   there when it was sent.

13         And you will hear that that's exactly what

14   Ashley Grills told the Federal Bureau of Investigation in

15   December of 2006; and the way this went down is that

16   as Ashley -- I'm sorry -- as Lori Drew walks in the front

17   door, she's on her cellphone.

18         And Ashley Grills and Sarah Drew say:  We've got

19   something we need to talk to you about.  And you will hear,

20   I believe, from Ashley Grills, that she then briefed

21   Lori Drew on what had happened with this electronic argument

22   and this last message.

23         You will hear from a couple of experts in the

24   computer field; and one of the things that you're going to

25   hear is the last e-mail message about the world will be a

1    better place does not exist.

2              It was not located in the Drew's computer.  It was

3    not located in the Meier's computer.  And I don't think

4    you'll hear anybody check Ashley Grills' home computer.  But

5    the bottom line is the evidence will show several experts

6    looked for that message and never found it.

7              Now, you're also going to hear that the Meier

8    house and the Drew house was only four doors apart in

9    O'Fallon.  You're going to hear that on that last day when

10   these heated e-mail messages are being sent around,

11   Megan Meier was by herself down in her basement which is

12   where the computer at the Meier house was at that time.

13             Her mother Tina Meier was at the orthodontist with

14   Megan's sister.  Her father, Ron, was asleep taking a nap

15   upstairs.

16             Tina Meier had talked with Megan twice on the

17   cellphone during this period of time; and when Tina Meier

18   arrived home, she found Megan upset.

19             Specifically, you'll hear that Megan told her

20   mother that one of the teenagers had called her fat.

21   Megan's online answer was, quote, I'm skinny now.

22             Megan's mother said to Megan:  Why would you say

23   that?  Megan told her mother:  You're supposed to be my mom.

24   You're supposed to be on my side.

25             And she ran upstairs.  Running up the stairs, she

 1    ran into her father, bumped into him going up.

 2            A short while later, down at the Drew family

 3    house, the family and Ashley Grills heard sirens going to

 4    the Meier house.

 5            They heard from a neighbor that Megan had, quote,

 6    lost her breath and was being taken to the hospital.

 7            You'll hear that Curt Drew, husband of Lori Drew,

 8    became angry and ordered Grills to shut down the MySpace

 9    account.  Ashley Grills complied and the whole while

10    Lori Drew was sitting quietly in her home, and you'll hear a

11    witness describe her situation as stunned silence.

12            As you can all see, these are details and facts

13    that are terribly tragic.  And, again, that's certainly one

14    thing we agree with government counsel.  But back to what

15    you're going to have to decide here.

16            What you're going to have to decide:  Did the

17    elements that the court read to you -- and you've still got

18    it over there -- on the computer fraud and abuse act; and

19    one of the important things that you're going to hear from

20    the defense side is a computer expert.

21            The computer expert you will hear examined both

22    the hard drives from the Drew household and the Meier

23    household; and, further, you will hear that the defense got

24    these hard drives as mirror copies from the government.

25            The government got them from the Drew household.

1    Lori Drew gladly let them copy it.  And the Meier household.

2    And what you're going to hear is a series of conclusions by

3    the computer expert.

4           You're going to hear, for example, that the

5    computer expert did not find any evidence that the

6    Josh Evans MySpace account was created on the Drew's

7    computer.  And remember what we're talking about here is the

8    forensic evidence.  The *CSI* evidence if you will.  Okay?

9           The computer expert did not find any evidence that

10   the photograph of the boy alleged to be Josh Evans was

11   posted from the Josh Evans MySpace account from the Drew's

12   computer on September 20th, 2006.

13          The computer expert will testify that she did not

14   find any evidence that the Josh Evans MySpace account sent

15   the message or posted a comment to Megan Babi, one of the

16   screen names of Megan Meier, on September 20th, 2006, from

17   the Drew's computer.

18          The expert will also testify that she did not find

19   any evidence that Josh Evans, the account, sent any

20   electronic communication to Megan Meier on September 22nd,

21   2006, from the Drew's computer.

22          She did not find any evidence that the Josh Evans

23   account sent any electronic communication to Megan Meier on

24   September 24th, 2006, from the Drew's computer; and you'll

25   see that these dates are important because they are overt

1    acts that are alleged in the Indictment.  They match up with

2    that.

3            The expert did not find any evidence that the

4    Josh Evans MySpace account was altered on September 26, '06,

5    using the Drew's computer.

6            The expert did not find any evidence that the

7    Josh Evans MySpace account sent the message or posted a

8    comment to the Megan Babi account on October 7, '06, from

9    the Drew's computer.

10           The expert will testify that she did not find any

11   evidence that the Josh Evans MySpace account sent a message

12   or posted a comment on October 16th, the critical day,

13   2006.

14           The expert did not find any evidence that the

15   Josh Evans MySpace account was deleted on or after

16   October 16th, 2006, from the Drew's computer.

17           The expert did not find any evidence that the

18   Josh Evans06 AIM screen name was accessed from the Drew's

19   computer on September 20th at 7:03 but did find evidence

20   that the account was created using the Drew's computer.

21           The expert will tell you that she found evidence

22   that Sarah Drew had multiple e-mail addresses, screen names,

23   and online profiles and communicated using online e-mails,

24   Instant Messenger, MySpace, Xenga.

25           However, the expert did not find evidence that

1   Sarah Drew was using the Drew's computer during the dates

2   and times that the Josh Evans account was being accessed or

3   edited.

4          The expert found evidence that Lori Drew had one

5   e-mail address.  It was used primarily for business.  She

6   did not find any evidence that Lori Drew was using the

7   Drew's computer during the dates and times that the

8   Josh Evans account was being accessed or edited.

9          The expert found that Ashley Grills had multiple

10  screen names and online profiles and communicated online

11  using instant messaging, MySpace from the -- I'm sorry --

12  instant messaging and MySpace from the Drew's computer.

13         In addition, the expert found evidence that

14  Ashley Grills was using the computer on October 16th, '06,

15  when the Josh Evans account was being accessed and edited.

16         The expert found evidence that Megan Meier had

17  multiple screen names and online profiles and communicated

18  online using AOL Instant Messenger, Yahoo Instant Messenger,

19  MySpace and Xenga.

20         In addition, the expert found Megan Meier was

21  communicating with Josh Evans using AIM, MySpace Messaging

22  and MySpace Comments.

23         The expert did not find any evidence that messages

24  from Josh Evans to Meier were of a tormenting, harassing,

25  humiliating, or embarrassing nature as alleged in the

1    Indictment.

2         Quite the contrary, the expert found messages from

3    Megan Meier to several individuals that were more indicative

4    of tormenting, harassing, humiliating, and embarrassing

5    behavior, specifically her instant messaging conversations

6    to Sarah Drew.

7         The expert also found the Indictment claims that

8    Drew and coconspirators used Josh Evans' alias to flirt with

9    Meier.  While the communications from Josh Evans may be

10   indicative of flirting, Meier's first comment is --

11        MR. O'BRIEN:  Your Honor, this is argument.

12        MR. STEWARD:  What the evidence is going to show.

13        THE COURT:  I'll allow him to complete his

14   thought.  One could make the argument that both opening

15   statements contained some arguments.  I'll allow him to

16   complete this thought, but I think you'll end it at that

17   point.

18        MR. STEWARD:  Thank you.

19        Meier's first comment posted to the Josh Evans

20   picture page was that he is sexy.

21        In addition, Meier was communicating with several

22   boys online during the same period of time making suggestive

23   comments and calling them sexy.

24        Her online conversations also referenced several

25   different boyfriends of hers.

1          Now, you're going to hear from an expert from

2    MySpace and you're going to hear a couple of things about

3    MySpace.

4          First, it's a large multi-national,

5    multi-million-dollar company.  It has millions and millions

6    of members.  You will also hear that it's a for-profit

7    company and that profit is their bottom line.

8          You're going to hear that -- you're going to hear

9    a lot about the Terms of Service; and that is part of what

10   you need to determine in this case; and we'll all get to the

11   legalities of it at some point in the future.

12         But you're going to hear the Terms of Service at

13   the beginning of the web page when you sign up is to ward

14   off lawsuits.  It's to try to save money.

15         MySpace, you'll hear, is a commercial endeavor and

16   you will hear about their efforts or lack thereof to enforce

17   the Terms of Agreement.

18         You will hear that Ashley Grills and Sarah Drew

19   and Lori Drew never got any information or data from

20   Megan Meier or anyone else that would trigger a violation of

21   the Terms of Service.

22         You're also going to hear that Ashley Grills never

23   read the Terms of Service, that Sarah Drew never read the

24   Terms of Service, and that Lori Drew would have never had

25   any reason to read the Terms of Service.

```
1              In the end, ladies and gentlemen, I continue to
2    agree with government counsel and you will hear evidence
3    that this was a deeply painful, deeply sad case.
4              But at the end of the day, you're also going to
5    find out that Lori Drew did not violate the computer fraud
6    and abuse act and is not guilty.
7              Thank you.
8              THE COURT:  All right.  At this point let me ask,
9    does the government have its first witness?
10             MR. O'BRIEN:  We do, Your Honor.
11                  (Pause in the proceedings.)
12             THE COURT:  I received word.
13             Actually, we're going to take a break because the
14   jury room has asked that the jury go up to the jury room so
15   they can be scanned in.  Is that the term?  Scanned in.
16             So we'll take at this point in time a
17   fifteen-minute break.  Let me ask the jury to go up to the
18   jury room.  Actually, my clerk will take you up to the jury
19   room to be scanned in.
20             THE CLERK:  All rise.
21                  (The jurors exited the courtroom.)
22             THE COURT:  Let me ask counsel.  Anything to do
23   between now and the time we come back at 3:30?
24             MR. O'BRIEN:  No, Your Honor.
25             MR. STEWARD:  No, Your Honor.
```

```
 1              THE COURT:  Okay.
 2                          (Recess.)
 3              THE CLERK:  All rise.
 4                 (The jurors entered the courtroom.)
 5              THE CLERK:  Please be seated.
 6                    GOVERNMENT'S CASE-IN-CHIEF
 7              THE COURT:  All right.  Let me ask the government:
 8     Do you have your first witness?
 9              MR. O'BRIEN:  I do, Your Honor.
10              THE COURT:  All right.
11              MR. O'BRIEN:  Government calls Susan Prouty.
12              THE COURT:  Okay.
13          SUSAN MARIE PROUTY, GOVERNMENT'S WITNESS, SWORN
14              THE CLERK:  If you can stand behind the court
15     reporter, please raise your right hand.
16              Do you solemnly swear that the testimony you're
17     about to give in the cause now before this court shall be
18     the truth, the whole truth, and nothing but the truth, so
19     help you God?
20              THE WITNESS:  Yes.
21              THE CLERK:  Please be seated.
22              Can you please state your full name and spell your
23     last name for the record.
24              THE WITNESS:  Susan Marie Prouty.  P-r-o-u-t-y.
25              MR. O'BRIEN:  May I proceed, Your Honor?
```

```
 1              THE COURT:  Yes.
 2                      DIRECT EXAMINATION
 3   BY MR. O'BRIEN:
 4   Q.   Good afternoon, Ms. Prouty.
 5   A.   Good afternoon.
 6   Q.   Where do you live, ma'am?
 7   A.   In Winfield, Missouri.
 8   Q.   Is that in the County of St. Louis?
 9   A.   St. Charles County.
10   Q.   St. Charles County?  How long have you lived there?
11   A.   34 years.
12   Q.   And how old are you?
13   A.   34.
14   Q.   Is that near O'Fallon, Missouri?
15   A.   Yes, it is.
16   Q.   How far away is it?
17   A.   About ten miles.
18   Q.   What's your line of work?
19   A.   We own an interior design shop.
20   Q.   Where is that located?
21   A.   In Winfield, Missouri.
22   Q.   How long have you owned that shop?
23   A.   My mom has owned it since 1969.  I've worked there for
24   thirteen years.
25   Q.   The last thirteen years you worked there?
```

```
 1   A.    Uh-huh.

 2   Q.    Is that a "yes"?

 3   A.    Correct.

 4   Q.    Ms. Prouty, do you know somebody named Lori Drew?

 5   A.    Yes, I do.

 6   Q.    And how do you know Lori Drew?

 7   A.    She was a business acquaintance.  She did advertising

 8   with a trade group.  She was on trade with us.

 9   Q.    What does that mean?

10   A.    We do barter.  It's where you sell goods to somebody

11   and that money goes into a pot and you can use it anywhere

12   else you want to spend it, whoever is within the network.

13   Q.    Are you a member of a trade group?

14   A.    I'm sorry?

15   Q.    Are you a member of a trade group?

16   A.    Yes.  ITEX.

17   Q.    I'm sorry?

18   A.    ITEX.

19   Q.    How do you spell that?

20   A.    I-T-E-X.

21   Q.    Does the trade group advertise with Lori Drew?

22   A.    Yes, they do.

23   Q.    And how do they do that?

24   A.    She belongs to the trade group and so anytime she sells

25   advertising, the money we paid for that advertising comes
```

1    out of our trade account.

2    Q.    When you say "she," are you referring to Lori Drew?

3    A.    Lori Drew.

4    Q.    How long have you known Lori Drew?

5    A.    I've known her since 2004.

6    Q.    And what was your relationship with Lori Drew?

7    A.    She came in and we did advertising.  I'd see her maybe

8    once, twice a month when she'd come in with ad copy and

9    questions.

10   Q.    Does Lori Drew own a coupon-type circular?

11   A.    Yes, she does.

12   Q.    And does your trade group and/or your business

13   advertise in the circular?

14   A.    Yes, we do.

15   Q.    Is that how you know Lori Drew?

16   A.    Yes.

17   Q.    I'm sorry.  Did you -- since 2004 up until 2006, how

18   often did you see Lori Drew?

19   A.    Once, sometimes twice a month.

20   Q.    And where did you see her?

21   A.    At my place of business.

22   Q.    Do you see Lori Drew in court today?

23   A.    Yes, I do.

24   Q.    And would you point to her, please, and describe what

25   she's now wearing for the record.

```
 1              MR. STEWARD:  Stipulate to the identification,
 2   Your Honor.
 3              THE COURT:  All right.  Is that acceptable?
 4              MR. O'BRIEN:  It is.
 5              THE COURT:  All right.  Thank you.
 6   BY MR. O'BRIEN:
 7   Q.    Ms. Prouty, do you know someone named Megan Meier?
 8   A.    Yes.
 9   Q.    Have you ever met Megan Meier?
10   A.    No.
11   Q.    How do you know of Megan Meier?
12   A.    Through, you know, the things that Lori had said when
13   she'd come into the shop and then through the media.
14   Q.    And when did -- when you say "Lori," you're referring
15   to Lori Drew, the defendant?
16   A.    Correct.
17   Q.    And what's the first time you had a conversation with
18   the defendant regarding Megan Meier?
19   A.    She came into my place of business and she talked about
20   how she needed --
21              MR. STEWARD:  Objection; nonresponsive.
22              THE COURT:  Overruled.  I presume this is
23   foundational.  Are you describing --
24              THE WITNESS:  When she -- yes.
25              THE COURT:  -- the circumstance of the discussion?
```

```
 1              THE WITNESS:  I think so, yeah.

 2              THE COURT:  I'll overrule the objection.

 3              MR. STEWARD:  The question is when.

 4              MR. O'BRIEN:  I can start again if you'd like.

 5              THE COURT:  All right.

 6   BY MR. O'BRIEN:

 7   Q.   Did you have a conversation with the defendant

 8   regarding Megan Meier?

 9   A.   Yes.

10   Q.   When was the first time you had a conversation with the

11   defendant regarding Megan?

12   A.   January of 2007.

13   Q.   And where did that conversation take place?

14   A.   At my place of business.

15   Q.   And how did that conversation regarding Megan come up?

16   A.   She came in and she needed to --

17   Q.   When you say "she" --

18   A.   I'm sorry.  When Lori Drew came in, she needed to

19   discuss the fact that she needed to get blinds for the back

20   of her house, or shades.

21   Q.   Did the defendant tell you why she wanted blinds for

22   the back of her house?

23   A.   Yes, she did.

24   Q.   What did she tell you?

25   A.   She had told me that she was being harassed by her
```

1    neighbors that lived behind her and that she needed privacy

2    and she needed to put some shades on the back of her house

3    for privacy.

4    Q.   Did you talk to her about these neighbors or about the

5    harassment?

6    A.   Yes, we did.

7    Q.   And "we" being?

8    A.   Lori Drew and myself.

9    Q.   And what did the defendant say about that?

10   A.   She said that she had neighbors that were behind her

11   that were harassing her and doing some bad things to her as

12   far as property damage and putting signs in her yard and

13   doing things that she was -- she was -- she feared that --

14   she wanted, you know, her privacy; she needed more privacy

15   in the back of her house so we showed her shades.

16   Q.   Okay.  Did she identify these people?

17   A.   She just said her neighbors.

18   Q.   During this meeting in January of 2007, did you have a

19   discussion with the defendant regarding Megan Meier?

20   A.   Yeah.  She had talked about, because I had asked her,

21   you know, I felt I couldn't believe what she was telling me

22   about these neighbors.

23            MR. STEWARD:  Objection; nonresponsive.

24            THE COURT:  I'll sustain the objection.

25            Why don't you rephrase the question.

```
 1              MR. O'BRIEN:  Certainly.
 2   Q.   Did you ask the defendant why she needed the blinds?
 3   A.   Correct.  I asked her, you know, when she --
 4   Q.   Yes?
 5   A.   Yes.
 6   Q.   Okay.  And after mentioning that to the defendant, did
 7   the defendant talk to you about Megan Meier?
 8   A.   Yes.
 9   Q.   What did the defendant tell you about Megan Meier?
10   A.   She told me that she was friends with her daughter
11   Sarah and they had a falling out and that's why there was so
12   much hate between the two of them; and she had told me that
13   that's when Megan had committed suicide is because there was
14   a problem between the two families.
15   Q.   Did the defendant talk about where Megan had gone to
16   school before she committed suicide?
17   A.   Yes, she did.
18   Q.   And where did she tell you that Megan went to school?
19   A.   She told me that she went to a public school.
20   Q.   Did she tell you that the -- Megan had switched
21   schools?
22   A.   Yes, she did.  She told me that Megan had switched
23   schools to the school that her daughter went to, which was
24   Sarah, because they were such good friends, and that Megan
25   was having problems at her public school.
```

1    Q.    Did she ever mention whether or not Megan Meier had

2    gone -- let me withdraw that.

3              Did she ever identify Megan as Megan Meier?

4    A.    No.

5    Q.    How did she refer to Megan?

6    A.    The neighbor, the little girl, the neighbor girl, the

7    little girl.

8    Q.    Did she mention -- did she mention by name also as

9    Megan?

10   A.    Not until later.

11   Q.    Later on, she mentioned her as Megan?

12   A.    Yeah, in later conversations.

13   Q.    Did she mention whether this little girl had gone on

14   vacations with the defendant?

15   A.    Yes, she did.  She said that they were really good

16   friends with the family and that Megan would go on vacations

17   with them.

18   Q.    Did she say, while on these vacations, the defendant

19   did something regarding medication?

20   A.    Yes.  She said that Megan took medication and that she

21   had even asked Megan's mom what the medication was for and

22   Megan's mom had said that it was for depression.

23             MR. STEWARD:  Objection; hearsay.

24             THE COURT:  I'll sustain the objection.

25

```
 1   BY MR. O'BRIEN:

 2   Q.   Did the defendant indicate she knew why she was

 3   administering medication to Megan?

 4   A.   Yes, she did.

 5   Q.   Did she indicate she knew what the medication was for?

 6   A.   Yes, she did.

 7   Q.   What did the defendant tell you the medication was for?

 8   A.   For depression.

 9   Q.   The defendant talk about Sarah's friends and their

10   relationships with Megan?

11   A.   Yes.

12   Q.   What did she say about that?

13   A.   She said her daughter -- she referred to Sarah as her

14   daughter that had problems --

15              Can you ask me the question again?

16   Q.   Certainly.  What did the defendant say regarding

17   Sarah's friends and their relationship with Megan?

18   A.   She told me that Sarah's friends didn't take kindly to

19   Megan when she moved to the private school that Sarah was

20   going to.

21   Q.   Did the defendant say anything regarding comments Megan

22   was making about her own daughter?

23   A.   (No response.)

24   Q.   Shall I ask it again?

25   A.   Yeah.
```

1    Q.    Did the defendant say that Megan was saying things

2    about Sarah?

3    A.    Yes.  She had said that Megan was saying -- they were

4    in a fight and that Megan was saying things about Sarah and

5    her -- and Sarah's friends; but she didn't say specifically

6    what.

7    Q.    Did the defendant say anything regarding Megan being

8    attracted to boys?

9    A.    Yes.  Lori had told me on numerous times that Megan was

10   very boy crazy.

11   Q.    Did you have another conversation -- withdrawn.

12            During this conversation in January of 2007, did

13   you have any conversation with the defendant regarding

14   Josh Evans or MySpace?

15   A.    No.

16   Q.    Did you have another conversation with the defendant in

17   April of 2007?

18   A.    Yes.

19   Q.    And where was this conversation?

20   A.    At my place of business.

21   Q.    Same place as the prior conversation?

22   A.    Correct.

23   Q.    And did the defendant talk to you about -- more about

24   Megan Meier?

25   A.    Yes.

1   Q.   What did the defendant say during this conversation in

2   April of 2007?

3   A.   An incident happened at school so I had another parent

4   confront me because --

5            MR. STEWARD:  Objection; nonresponsive.

6            THE COURT:  Overruled.

7            You can finish the answer.

8            THE WITNESS:  Okay.  Ask me the question again.

9   BY MR. O'BRIEN:

10  Q.   If I could ask it this way.

11           Did you confront the defendant in April of 2007?

12  A.   Yes.  I confronted her --

13  Q.   I'm sorry.

14  A.   Oh.

15           MR. O'BRIEN:  Before the judge does it, I'm going

16  to beat him to the punch.

17           THE COURT:  I wasn't going to throw a punch.

18           MR. O'BRIEN:  Verbal.

19                         (Laughter.)

20           THE COURT:  Let me say this to the witness.

21           Sometimes a question can simply be answered by a

22  "yes" or a "no."

23           THE WITNESS:  Okay.

24           THE COURT:  If you have to expound further, then

25  expound further.  But at least initially if the question can

1    be answered "yes" or "no" --

2            THE WITNESS:  Okay.

3            THE COURT:  -- it should be answered "yes" or

4    "no."

5            MR. O'BRIEN:  Thank you, Your Honor.

6    Q.   Ms. Prouty, why did you confront the defendant in April

7    of 2007 at your place of business?

8    A.   I had a parent at my daughter's Catholic school

9    confront me, the fact that I advertised with Lori; and she

10   said that I shouldn't advertise with her; that I was

11   advertising with a killer.

12           MR. STEWARD:  Move to strike, Your Honor, as

13   hearsay.

14           THE COURT:  I'll overrule the objection.

15           I will allow the answer in not for the truth of

16   the comment but just simply to explain this witness's

17   additional conversations with the defendant.

18   BY MR. O'BRIEN:

19   Q.   After that conversation with the parent, did you then

20   confront the defendant at your place of business?

21   A.   Yes, I did.

22   Q.   What happened then?

23   A.   She proceeded to tell me what exactly happened and she

24   told me more and actually told me -- elaborated more on what

25   happened.

1    Q.    When you say "she," you mean the defendant?

2    A.    Lori Drew.

3    Q.    What did defendant tell you then?

4    A.    And that's when she told me about the whole MySpace and

5    about what had happened with the rift between Megan and

6    Sarah; and she explained what had happened because before I

7    had just thought it was a rift between the families.  I had

8    no idea it had anything to do with MySpace until that April

9    conversation.

10   Q.    What did the defendant tell you about MySpace?

11   A.    She said that she had decided that she wanted to find

12   out what her daughter -- what Megan was saying about her

13   daughter and that she had put together on MySpace to engage

14   Megan in a conversation to hear exactly what she had to say

15   about Megan and Megan's -- I'm sorry -- about Sarah and

16   Sarah's friends.

17   Q.    Did the defendant tell you that she was aware whether

18   or not Megan had her own MySpace account?

19   A.    Yes.  She said she was aware.

20   Q.    Did she indicate in this conversation as she had

21   previously that Megan was boy crazy?

22   A.    Yes.

23   Q.    What was the defendant's demeanor when she explained to

24   you that she had set up a MySpace account to see what Megan

25   was saying about Sarah?

1   A.   She was -- she was real light-hearted and kind of giddy

2   about it and kind of giggly.

3   Q.   Giggly?

4   A.   Yeah.  Like it was, I don't know, just giggly about it.

5   Q.   Ms. Prouty, did you say the defendant had ownership of

6   the account?

7   A.   Yes.  She said that she created the account.

8   Q.   Did she, during this conversation, ever mention the

9   name Ashley Grills?

10  A.   No.

11  Q.   Do you know Ashley Grills?

12  A.   No.

13  Q.   During this conversation in April of 2007, did the

14  defendant tell you what she was going to do -- what the plan

15  was regarding the conversations on MySpace?

16  A.   Yes.  She said that she had found out that they were

17  then going to tape the conversations.  They were going to

18  print them out and take them to school.

19  Q.   To do what?

20  A.   To humiliate Megan.

21  Q.   Did you talk to the defendant about whether she knew

22  you had to be a certain age to communicate with children on

23  the Internet?

24  A.   Yes, yes.  I had said I totally didn't know it was

25  MySpace.  I didn't have a MySpace at that point.  And I, you

1    know, being -- because she always referred to Megan as the

2    little girl, you know, the neighbor girl, you know.  That's

3    when I had asked her --

4              MR. STEWARD:  Objection; nonresponsive.

5              THE COURT:  Overruled.

6              You can complete your answer.

7              THE WITNESS:  That she had, you know, always

8    referred to her as the little girl so I even asked her, you

9    know, knowing that, you know, children are on the computer,

10   I asked her --

11             MR. STEWARD:  Objection; nonresponsive.

12   Narrative.

13             THE COURT:  Overruled.  She may continue.

14             THE WITNESS:  That's when I asked her exactly

15   how old these girls were, you know.

16   BY MR. O'BRIEN:

17   Q.   And what was the defendant's response?

18   A.   Thirteen.

19   Q.   Defendant told you she knew that Megan was thirteen?

20   A.   Yes.

21   Q.   Did the defendant ever provide you with any details

22   regarding the messages that were sent from her MySpace

23   account to Megan Meier?

24   A.   No.

25   Q.   Did the defendant tell you what name she used on the

1    MySpace account?

2    A.    No.

3    Q.    Do you recall the name Josh Evans?

4    A.    Only after it came out in the media.  No.

5    Q.    You learned that from the media?

6    A.    Right.

7    Q.    Did you ever hear from that the defendant?

8    A.    No.

9    Q.    Did the defendant ever talk to you about whether or not

10   she typed messages herself to Megan on the MySpace account?

11   A.    Yes.  She said that she had told Sarah what to type,

12   but at points that she had even typed some herself.

13   Q.    To Megan?

14   A.    To Megan.

15   Q.    Did the defendant say how the defendant herself was

16   going to act when she was typing?

17             MR. STEWARD:  Objection; vague.

18             THE COURT:  Rephrase the question.

19   BY MR. O'BRIEN:

20   Q.    Did the defendant indicate that she was going to play

21   some role when she was typing?

22   A.    Yes.  She was going to act like she was a boy because

23   she kept mentioning how boy crazy Megan was.

24   Q.    Did you ask the defendant why she was doing all this or

25   why she had done all this?

1    A.    Yes, I did.  And she said that as a mother you have to

2    protect your daughter; and she wanted to find out exactly

3    what was being said; and like I said, as a mother, she had

4    to protect her daughter.

5    Q.    Did the defendant admit that it got nasty?

6    A.    Yes.

7              MR. STEWARD:  Objection; leading.

8              THE COURT:  I'll sustain the objection.  I'll

9    strike the question; I'll strike the answer.

10   BY MR. O'BRIEN:

11   Q.    Did the defendant describe what had occurred during the

12   MySpace ruse?

13   A.    Yes, she did.  Lori had said that it just spun out of

14   control and it got nasty and that it was all just supposed

15   to be, you know, a joke.  It wasn't supposed to be anything

16   so serious; that it just got out of control and she couldn't

17   control it.

18   Q.    Did you ask her why she didn't just shut it down when

19   it got ugly?

20   A.    No.

21   Q.    Did the defendant ever use the term "girls are girls"

22   in front of you?

23             MR. STEWARD:  Objection; leading.

24             THE COURT:  I'll sustain the objection.

25             Rephrase the question.

BY MR. O'BRIEN:

Q.   Did the defendant ever describe her interpretation of why this had spun out of control?

A.   Yes.  She said that, you know, girls are girls and that -- that they're going to be catty and everything and that it wasn't a big deal.

Q.   Did the defendant, during that conversation, talk to you about Megan's mental condition?

A.   She had told me about Megan's mental condition in the conversation we had back in January about why she was switching schools.

Q.   Okay.  And what did she say about Megan's mental condition back in January?

A.   She said that the reason why Megan was switching schools to the Catholic school was that she had a lot of mental issues and she had a hard time dealing with the kids at the public school because they teased and taunted her at the public school.

Q.   Did she define those mental issues?

A.   Yes.  She said that she shouldn't be blamed for everything that happened because Megan was suicidal anyway.

Q.   And when did the defendant tell you that?  In January or in April?

A.   In April.

Q.   Did the defendant tell you whether or not she had ever

1    taken Megan on vacations?

2    A.    Yes, she did.

3    Q.    Did she say anything regarding medication?

4            MR. STEWARD:  Objection; asked and answered.

5            THE COURT:  I'll sustain the objection.

6    BY MR. O'BRIEN:

7    Q.    Did she have a conversation with you about medication

8    and vacations -- medication and vacations in April?

9    A.    It was -- no, it was in January.

10   Q.    Did she, the defendant, either in January or in April

11   of 2007, indicate whether or not she was aware that Megan

12   was seeing a psychiatrist?

13   A.    Yes.  She told me that in April.

14   Q.    That she was aware Megan was seeing a psychiatrist?

15   A.    Yes.

16   Q.    Did the defendant ever tell you whether or not she had

17   asked Megan why Megan was taking medication?

18   A.    She said she had talked to the mom about it.

19   Q.    Megan's mom?

20   A.    Yeah, Megan's mom.

21   Q.    And did the defendant tell you why Megan was taking

22   medications?

23   A.    For depression.

24           MR. O'BRIEN:  One moment, please, Your Honor.

25           THE COURT:  All right.

```
 1                    (Counsel conferred.)

 2    BY MR. O'BRIEN:

 3    Q.   Are you still doing business with the defendant?

 4    A.   No.

 5    Q.   And why not?

 6    A.   She --

 7              MR. STEWARD:  Objection; irrelevant.

 8              THE COURT:  I'll sustain the objection.

 9              MR. O'BRIEN:  I have no further questions, Your

10    Honor.

11              THE COURT:  All right.

12              For the defense?

13              MR. STEWARD:  Thank you.

14                      CROSS-EXAMINATION

15    BY MR. STEWARD:

16    Q.   Ms. Prouty, you say that the first time there was a

17    conversation with Lori Drew about any of this was in your

18    business?

19    A.   Yes.

20    Q.   And this was in January of '07, right?

21    A.   Correct.

22    Q.   And, in fact, wasn't it you that said to Ms. Drew

23    something to the effect of:  Did you hear what happened?

24    And then give some details that you had heard?

25    A.   I'm sorry.  Ask that again.
```

1  Q.    Sure.  Weren't you the person that brought up the
2  conversation of the suicide to begin with?
3  A.    No.
4  Q.    Okay.  Didn't you tell Ms. Drew that the suicide and
5  what had happened was a big topic of conversation among a
6  group of women at the Catholic school that your daughter
7  attended?
8  A.    Yes.  That was the April conversation I was referring
9  to.
10 Q.    Okay.  And it's true that it was a big topic of
11 conversation at your daughter's school, right?
12 A.    Correct.
13 Q.    And when you talked to Ms. Drew about that, she told
14 you something to the effect of:  That was me, right?
15 A.    Yes.
16 Q.    Okay.  But she also told you:  You don't know what
17 really happened; isn't that true?
18 A.    Correct.
19 Q.    Okay.  And wasn't that the end of the conversation that
20 you ever had with Ms. Drew about what happened to
21 Megan Meier?
22 A.    No.
23 Q.    Now, you mentioned that you had two sources of
24 information about this incident, right?  Ms. Drew and the
25 media?

94

1   A.   Correct.

2   Q.   Fair to say that the media in O'Fallon and in the town

3   you live in and in that whole area has had a great deal of

4   publicity about this case, right?

5   A.   Correct.

6   Q.   And there have been many, many details in the newspaper

7   about supposedly what happened, correct?

8   A.   Correct.

9   Q.   And you've read that, right?

10  A.   Correct.

11  Q.   And it's been on the TV news, right?

12  A.   Yes.

13  Q.   And detail after detail has been laid out, correct?

14  A.   Yes.

15  Q.   You sure you're not confusing with what you heard on

16  the media and what you just heard or testified that

17  Lori Drew said?

18  A.   I'm not confused at all.

19  Q.   Okay.  When was the first time you talked to the FBI

20  about all this?

21  A.   A couple of months ago.

22  Q.   Would it be September 15th, 2008?

23  A.   I assume so.

24  Q.   Does that sound right?

25  A.   I guess.

1    Q.    Well, I got a document that maybe you would like to

2    look at and maybe refresh your recollection?

3    A.    No.  I know the conversation you're talking about, but

4    I don't know the date.

5    Q.    Okay.  And I have a document that -- well, let me ask

6    you right out.  Have you seen a copy of your statement from

7    the FBI?

8    A.    No.

9    Q.    Okay.  I've got a document you want to take a look at?

10   Might help you refresh your recollection.

11   A.    No.

12   Q.    No?  Okay.  Would you take my word for it that the FBI

13   report says, "Conversation, September 15th, 2008"?

14   A.    Yes.

15   Q.    Okay.  So that's less than two months ago, right?

16   A.    Yes.

17   Q.    Is that the first time you ever talked to law

18   enforcement about all this?

19   A.    Yes.

20   Q.    Well, you understand this case is a big deal in your

21   neighborhood, right?

22   A.    Correct.

23   Q.    And yet what you've testified about you had two

24   conversations with Lori Drew in January and April of '07,

25   right?

1    A.    Correct.

2    Q.    And you waited from April of '07 until September of

3    2008 to go to law enforcement?

4    A.    No.  Because Lori had told me how involved the police

5    were and the FBI were and there was no need for me to go to

6    law enforcement if they were already involved.

7    Q.    Ms. Prouty, here you are the first witness in a very

8    big case, right?

9    A.    Correct.

10   Q.    You have testified to a lot of bad things about

11   Lori Drew, right?

12   A.    Correct.

13         MR. O'BRIEN:  I object, Your Honor.  It's

14   argumentative.

15         THE COURT:  Sustain the objection.  I'll strike

16   the last question and answer.

17   BY MR. STEWARD:

18   Q.    You testified to a great deal of detail about these

19   conversations with Lori Drew, right?

20   A.    Correct.

21   Q.    You understand the importance of what you have

22   testified to, right?

23   A.    Yes.

24   Q.    Okay.  And you waited from April of '07 through the

25   first part of '08 into the summer of '09 and into September

1    of '09 before you came forward, right?

2            MR. O'BRIEN:  I'll object, Your Honor.  We're not

3    in '09 so I think the dates are incorrect.

4                        (Laughter.)

5            THE COURT:  On that, I can't argue with.

6            I'll ask you to rephrase your question.

7            MR. STEWARD:  That's fine, Your Honor.  I will and

8    I apologize for my age.

9    Q.    Ms. Prouty, who called who in regard to the FBI?  They

10   call you or you call them?

11   A.    They called me.

12   Q.    Okay.  And do you know how they came across you?

13   A.    After I had a conversation with Ron Meier.

14   Q.    Ron Meier?

15   A.    Ron Meier, Megan's father.

16   Q.    Oh, okay.  So when was this conversation with

17   Ron Meier?

18   A.    It was probably the beginning of September.  September.

19   Q.    Of this year?

20   A.    Yes.

21   Q.    Okay.  And tell me the circumstances of that

22   conversation.

23   A.    It was actually e-mail.  I e-mailed him and he was

24   throwing a golf tournament in memory of Megan Meier for the

25   Ched Coalition; and I told him I'd like to donate something

1    to his golf tournament.

2    Q.    Okay.  And did you actually talk to Ron Meier?

3    A.    I did after I e-mailed him a couple of times.

4    Q.    How many times did you talk to him?

5    A.    Twice.

6    Q.    Have you ever talked to his ex-wife Tina Meier?

7    A.    Not till today.

8    Q.    Okay.  So at the urging of Ron Meier, you came forward?

9    A.    No.  The FBI called me.

10   Q.    Okay.  Now, I think you told the FBI that Lori Drew

11   opened up about the Meier situation.  Does that sound right?

12   A.    Yes.

13   Q.    You and Lori Drew close friends?

14   A.    No.

15   Q.    Okay.  And I think you said you met her in 2004?

16   A.    Yes.

17   Q.    Okay.  So when was the last time you talked with

18   Lori Drew?

19   A.    Umm, probably this past June.

20   Q.    Okay.  Did you have business with her then?

21   A.    Yes.

22   Q.    Okay.  What kind of business?

23   A.    She needed blinds for the basement of her house.

24   Q.    Okay.  So you sold her blinds a couple of months ago,

25   right?

1    A.    Yes.

2    Q.    And I think you said that you saw Lori Drew once or

3    twice a month, right?

4    A.    Yes.

5    Q.    And that would have been from -- when was the beginning

6    of the relationship?   '04?

7    A.    Yeah, it was the beginning of '04, like February or

8    March of '04.

9    Q.    Are you social friends?

10   A.    No.

11   Q.    But she opened up to you?

12   A.    Yes.

13   Q.    She gave you all this rich detail about what had

14   happened?

15   A.    Yes.

16            MR. O'BRIEN:   I'm going to object, Your Honor.

17   The word "rich"; argumentative.

18            THE COURT:   Rephrase the question.

19   BY MR. STEWARD:

20   Q.    She gave you all this detail?

21   A.    Yes, she did.

22   Q.    Who else did you talk to about this case?

23   A.    A lot of people.

24   Q.    Any people from the media?

25   A.    No.

1   Q.    Talked to the Meier family, or at least Ron Meier,

2   correct?

3   A.    Correct.

4   Q.    Anybody else connected with the Meier family?

5   A.    No.

6   Q.    Now, at one point you said that Lori Drew needed blinds

7   because there was a problem with the neighbors, right?

8   A.    Yes.

9   Q.    Did she also share with you that a neighbor had thrown

10  a brick through her window?

11              MR. O'BRIEN:  Objection; hearsay, Your Honor.

12              MR. STEWARD:  It's not offered for the truth.

13              THE COURT:  Well, I understand that but let me

14  have counsel at sidebar and have the reporter come to the

15  sidebar.

16              (The following was held at the bench:)

17              THE COURT:  Just out of curiosity.  I understand

18  that he's not offering it for the truth; but where are you

19  planning on going with this?

20              MR. STEWARD:  Proving up all the bad things that

21  were happening to her from the neighbors.

22              MR. O'BRIEN:  Which is being offered for the

23  truth, Your Honor.

24              THE COURT:  But whether the client --

25              MR. STEWARD:  I'll move on.

```
 1            THE COURT:  Okay.
 2      (The following was in open court in the jury's presence:)
 3   BY MR. STEWARD:
 4   Q.   Ms. Prouty, is it fair to say that today you have
 5   negative feelings about Lori Drew?
 6   A.   Yes.
 7   Q.   You don't like her very much, do you?
 8   A.   I don't like what she did.
 9   Q.   But you don't like her, do you?
10   A.   I never had a personal relationship with her.  It was
11   strictly business.
12   Q.   Okay.  And you don't know for a fact what she did,
13   correct?
14   A.   Just what she told me.
15   Q.   Okay.  And this is what you claim that she told you
16   even though you're not close friends?
17   A.   Correct.
18   Q.   She just opened up to you even though you're just
19   business associates?
20   A.   Can I tell you why?
21   Q.   Well, no, unfortunately, you've got to answer the
22   questions that I ask you.
23            What is Windows and the Work by Dawn Marie?
24   A.   We're interior decorators.
25   Q.   Okay.  And what's your role there?
```

1   A.    I manage the shop.

2   Q.    Okay.  And I think you testified that a couple of

3   months ago you sold Ms. Drew some mini-blinds, right?

4   A.    Yes.

5   Q.    And, in fact, your husband installed them in the Drew

6   home, right?

7   A.    Correct.

8   Q.    Now, have you ever done any sort of socializing with

9   Lori Drew in a business sense?

10  A.    Yes.

11  Q.    Okay.  Tell us about that.

12  A.    We have ITEX Christmas shows we have once a year that

13  we go to and it's just a way for people to sell their

14  merchandise on trade before Christmas.

15  Q.    Okay.  Is this part of that bartering system?

16  A.    Yes.

17  Q.    Okay.  You folks pay taxes on that?

18  A.    Yes.

19  Q.    Now, when you testified that Lori Drew told you that

20  Megan Meier had gone on a vacation, or vacations, with the

21  Drews, do you recall that being singular or multiple?

22  A.    Multiple.

23  Q.    Did she give you any detail about that?

24  A.    No.

25  Q.    Did you testify -- and I may have missed this -- that

1    Sarah Drew was going to private school as well?

2    A.    Yes.

3    Q.    Okay.  And that's your understanding from Lori Drew?

4    A.    Yes.  She always said her daughter.

5    Q.    Okay.  You mentioned something about you having some

6    negative feedback for advertising with Lori Drew.

7    A.    Correct.

8    Q.    Okay.  And that was from where?

9    A.    From people at my school and then phone calls to the

10   shop.

11   Q.    Okay.  So you had negative business consequences from

12   your relationship with Lori Drew, right?

13   A.    Not financially, no.

14   Q.    Okay.  You didn't lose any customers or anything like

15   that?

16   A.    No.

17   Q.    But certainly you had some goodwill lost?  Bad will.

18   A.    Yes.

19   Q.    Okay.  Now, you indicated something about her being

20   giggly about the site.  What do you mean by that?

21   A.    Just real flip.  Like it didn't -- it was like no

22   consequence.  It was like, yeah, you know, like no big deal

23   type thing.  And that's how I took it is it wasn't like she,

24   you know, she always -- she just found it comical that she

25   was being even charged with any of this.

1    Q.    Okay.

2    A.    She was being accused.

3    Q.    She wasn't giggling about this, was she?

4    A.    No, not giggling.  Just real flip about it.  Like --

5    like huh, you know.  It was just very, very light.

6    Q.    And her reference to that was the account, the

7    Josh Evans account itself and the use of that, right?

8    A.    Say that again.

9    Q.    It was the account and the use of it, not the tragic

10   circumstantial ending of it, right?

11   A.    No.  It was about how boy crazy she was and she knew

12   how to do it.

13   Q.    Okay.  So this flip attitude had nothing to do with the

14   sad death of Megan Meier, right?

15   A.    No.

16              MR. STEWARD:  Okay.

17              Nothing further.

18              THE COURT:  Redirect?

19              MR. O'BRIEN:  No, Your Honor.  Thank you.

20              THE COURT:  All right.

21              Thank you very much.  The witness is excused.

22              THE WITNESS:  Thank you.

23              THE COURT:  Let me ask:  Does the government have

24   another witness?

25              MR. O'BRIEN:  We do.

```
 1            THE COURT:  All right.  And the witness is?
 2            MR. O'BRIEN:  The government would call
 3   Tina Meier, Your Honor.
 4            THE COURT:  All right.
 5       CHRISTINA MEIER, GOVERNMENT'S WITNESS, SWORN
 6            THE CLERK:  Please step forward behind the court
 7   reporter.  Please raise your right hand.
 8            Do you solemnly swear that the testimony you're
 9   about to give in the cause now before this court shall be
10   the truth the whole truth, and nothing but the truth, so
11   help you God?
12            THE WITNESS:  I do.
13            THE CLERK:  Please be seated.
14            Can you please state your full name and spell your
15   last for the record.
16            THE WITNESS:  Christina Marie Meier.
17   M-e-i-e-r.
18            THE COURT:  All right.  You may proceed.
19            Thank you.
20            MR. O'BRIEN:  May I proceed, Your Honor?
21            THE COURT:  Yes.
22                       DIRECT EXAMINATION
23   BY MR. O'BRIEN:
24   Q.   Ms. Meier, do you go by Tina?
25   A.   Yes, I do.
```

1   Q.   Where do you live, Ms. Meier?

2   A.   I live in Dardenne Prairie, Missouri.

3   Q.   In what county is that?

4   A.   St. Charles County.

5   Q.   How long have you lived there?

6   A.   About fifteen years.  Well, I guess more.  About

7   sixteen years.

8   Q.   Sixteen years in the home you're living in now or just

9   in the county?

10  A.   In the county.  In the home I'm living in now, less

11  than a year.

12  Q.   And where did you live before the home you're living in

13  now?

14  A.   I lived in 251 Waterford Crystal Drive.

15  Q.   What city is that in?

16  A.   St. Charles County.  It's Dardenne Prairie, Missouri.

17  Q.   The name of the town?

18  A.   It's Dardenne Prairie, Missouri.

19  Q.   How long did you live there?

20  A.   About fourteen years.

21  Q.   What is your occupation?

22  A.   Right now I'm a founder of the Megan Meier Foundation

23  and I work for Wired Safety.

24  Q.   And what did you do before that?

25  A.   I was a real estate agent for nine years.

1   Q.   When did you stop being a real estate agent?

2   A.   Shortly after Megan passed away.

3   Q.   What is your marital status, Ms. Meier?

4   A.   I'm divorced.

5   Q.   What is your ex-husband's name?

6   A.   Ronald Meier.

7   Q.   And when did you divorce Mr. Meier?

8   A.   In May of '08.

9   Q.   Were you married to Mr. Meier back in the fall of 2006?

10  A.   Yes, I was.

11  Q.   Do you have a daughter?

12  A.   Yes, I do.

13  Q.   And what is her name?

14  A.   It's Allison Meier.

15  Q.   How old is Allison?

16  A.   She's twelve and a half.

17  Q.   And did you also have a daughter named Megan?

18  A.   Yes, I did.

19  Q.   And when was Megan born?

20  A.   Megan was born November 6th of 1992.

21  Q.   Would you describe Megan for us, please.

22  A.   Megan was just a fun, energetic, had a huge sense of

23  humor girl.  Megan had, you know, a couple of different

24  sides of her.  One part of her was this bubbly, fun, you

25  know, energetic person.  She loved animals.  Loved being

1    around her friends and family.

2              Megan also had, you know, an attention deficit

3    disorder and depression; but Megan certainly was somebody

4    that could make you laugh in a heartbeat and make you smile

5    certainly.

6    Q.   Did Megan have any self-esteem issues?

7    A.   Definitely, yes.

8    Q.   And what were those?

9    A.   It was certainly about her body image and her weight

10   and that was something that Megan struggled with for a long

11   time.

12   Q.   Struggled with her weight in what way?

13   A.   Megan compared herself a lot of times to other girls

14   the same age, the way that she looked as far as with

15   clothing.  She wanted to be able to fit in with other kids

16   the same age and didn't feel like her body image was the

17   same as other girls the same age.

18   Q.   Did Megan think she was heavy?

19   A.   Yes.  She thought she was fat compared to the other

20   girls.

21   Q.   How old was Megan when she passed away?

22   A.   She was thirteen.

23   Q.   Megan like boys?

24   A.   Definitely.

25   Q.   What do you mean by "definitely"?

1    A.   That was about all she talked about, you know.   When

2    they're that age, they definitely talk about boys.   They

3    giggle about boys.   They certainly want boys to be

4    interested in them, but she certainly talked about boys and

5    had them on her walls and liked boys.

6    Q.   Pictures of boys on her walls?

7    A.   Oh, yes.

8    Q.   You mentioned that Megan suffered from depression and

9    ADD; is that correct?

10   A.   Yes.

11   Q.   And when was she diagnosed with those two conditions?

12   A.   She was diagnosed in about the third grade.

13   Q.   What treatment was she receiving for those conditions,

14   if any?

15   A.   We first took her to a pediatrician, and the

16   pediatrician had suggested to take her to a psychiatrist,

17   and a psychologist felt that it was something above what he

18   wanted to handle.   So we took her to both of them, and the

19   psychiatrist prescribed medication.

20          MR. STEWARD:   Objection to the narrative at this

21   point, Your Honor.

22          THE COURT:   She may finish the answer.

23          THE WITNESS:   And the psychologist had -- would

24   counsel Megan.

25

```
 1   BY MR. O'BRIEN:

 2   Q.   Okay.  Did she receive that medication since the third

 3   grade until she passed away?

 4   A.   Yes, she did.  It changed through the years but yes.

 5   Q.   And did she also regularly see a psychiatrist or

 6   psychologist during those years, also?

 7   A.   Yes.

 8   Q.   Do you know whether or not your daughter Megan

 9   attempted to take her own life back in 2005?

10   A.   I received a call from her school counselor, Tina

11   Larrigan, that one of her school friends had contacted her

12   and told her that Megan had cut her wrists.

13            MR. STEWARD:  Objection, Your Honor.  Hearsay and

14   nonresponsive.

15            THE COURT:  I'll sustain the objection.

16            Rephrase the question.

17   BY MR. O'BRIEN:

18   Q.   Did you ever talk to Megan back in 2005 to see whether

19   or not she had attempted to take her own life?

20   A.   Yes, I talked to Megan; and she did tell me that she

21   had tried cutting her wrists.

22            And I asked her what was going on, why she would

23   do that; and she said that, you know, she was, you know,

24   upset.  There were things that were going on.

25            I certainly talked to her psychiatrist, her
```

1    counselors about it; and that was -- that was where it went.

2    Q.    Did you examine Megan's wrists when she told you she

3    had attempted to cut her wrists?

4    A.    Absolutely.

5    Q.    And what did you see?

6    A.    There were small marks.  There was nothing that was,

7    you know, it was not a major cut.  It was just a small mark

8    that was covered by a shirt.

9    Q.    I think you mentioned you reported that to her

10   psychologist or the psychiatrist?

11   A.    Yes.

12   Q.    Did Megan have a friend named Sarah Drew?

13   A.    Yes, she did.

14   Q.    And when did Megan become friends with Sarah Drew?

15   A.    I think it was about in the fourth grade.

16   Q.    And how did you react to learning that Megan had a

17   friend named Sarah?

18   A.    Actually, I was the one who encouraged Megan to be

19   friends with Sarah Drew.

20   Q.    And why is that?

21   A.    Because Megan was having, you know, troubles with boys

22   in school; and I told her that Sarah seems like a nice girl

23   and I thought that it would be good for her to spread out

24   and become friends with somebody nice.

25   Q.    And when Megan met Sarah back in the fourth or fifth

```
 1   grade, did you know where the Drews lived?
 2   A.    Yes, I did.
 3   Q.    Where did they live then?
 4   A.    They lived in a subdivision.  I know they lived on
 5   Sprucefield but it was in O'Fallon.  It was only a few miles
 6   away from our subdivision.
 7   Q.    And how did Megan and Sarah get along?
 8   A.    You know what?  When they were younger, they got along
 9   pretty well.  As they got older, it was spats on and off.
10   They were friends, you know, one day; the next day, they
11   weren't friends; and it was the typical on-and-off
12   friendship.
13   Q.    Did Megan ever go on family vacations and other outings
14   with Sarah and her family?
15   A.    Yes, she did.
16   Q.    Do you know how many times since the fourth or fifth
17   grade until Megan passed away she went out on family outings
18   with the Drew family?
19   A.    I would think it was at least three times and it was
20   usually to either Curt's family's or Lori's parents' house.
21   Q.    Is that Lori Drew or Curt Drew?
22   A.    Yes.
23   Q.    Did you become friends with the Drew family?
24   A.    Yes.
25   Q.    Did you become friends with Sarah's mother?
```

1    A.    Yes, I did.

2    Q.    Sarah's mother, again, is Lori Drew?

3    A.    Correct.

4    Q.    And Sarah's father is Curt Drew?

5    A.    Correct.

6    Q.    Do you see Lori Drew in court today?

7    A.    Yes, I do.

8    Q.    Point to her now, please, and describe what she's

9    wearing for the record.

10              MR. STEWARD:  Stipulate to the identification,

11   Your Honor.

12              MR. O'BRIEN:  Accepted.

13              THE COURT:  All right.  Let me indicate both this

14   witness and the last witness the stipulation is they have

15   identified the defendant as Lori Drew.

16   BY MR. O'BRIEN:

17   Q.    When you were acting as a realtor, Ms. Meier, did you

18   sell the Drews their home?

19   A.    Yes, I sold them their current home -- the home that

20   they have and I also sold their house that they had.

21   Q.    During those years when Sarah and Megan became friends,

22   were you friendly with the defendant?

23   A.    Yes.

24   Q.    And her husband?

25   A.    Yes.

1    Q.    Did you and your husband Ron socialize with the

2    defendant and her husband?

3    A.    You know, it was most of the time we would talk.  I

4    would talk to Lori or Curt when I would drop Megan off if

5    she was spending the night or if Sarah was coming over to

6    spend the night or do something.

7              We didn't go out to dinners.  We didn't go out and

8    do things.  Lori did come down with one of her friends to

9    one of our functions that we had at our boat, but we

10   certainly talked quite a bit on the phone or stopped by

11   so. . . .

12   Q.    And, again, when you say "Lori," you're referring to

13   the defendant Lori Drew?

14   A.    Yes, I'm sorry.  Lori Drew, yes.

15   Q.    And you also mentioned, I believe, there were times

16   that Sarah Drew spent the night at your house?

17   A.    Yes, definitely.

18   Q.    And times that Megan spent the night at the defendant's

19   home?

20   A.    Correct.

21   Q.    Did you ever discuss Megan's depression with the

22   defendant?

23   A.    Absolutely.

24   Q.    How often did you do that?

25   A.    You know, over the years, it was several times because

```
1   Megan's medications and things changed throughout the years.
2   Q.   Why did you have a discussion with the defendant about
3   that?
4   A.   One time in particular, it was --
5           MR. STEWARD:  Objection; nonresponsive.
6           THE COURT:  Rephrase the question.
7   BY MR. O'BRIEN:
8   Q.   Did you ever -- you had discussions with the defendant
9   regarding Megan's depression?
10  A.   Yes.
11  Q.   Why would you have a discussion with the defendant?
12  A.   Her stepson had -- was taking medication for attention
13  deficit, and I talked to her about Megan taking medication
14  for attention deficit disorder and depression.
15          And we were discussing in her hallway about the
16  different medications Megan was taking, the doctors that she
17  was going to, and counseling that Megan was receiving; and I
18  was giving her information about that.
19  Q.   When you say "her," you're referring to the defendant?
20  A.   Yes, Lori Drew.
21  Q.   Do you know whether or not the defendant ever
22  administered antidepression medication to your daughter?
23  A.   Yes.  Whenever Megan would go on vacation with them or
24  spend the night, I absolutely made sure Megan had her
25  medication.  Anywhere Megan went, no matter where she went,
```

```
 1    she had to take her medication.  That was something
 2    extremely important, and so Lori Drew definitely knew Megan
 3    had to take her medication.
 4              MR. STEWARD:  Move to strike.  Nonresponsive and a
 5    conclusion of the witness.
 6              THE COURT:  Overruled.
 7    BY MR. O'BRIEN:
 8    Q.   Did you provide that antidepression medication to the
 9    defendant when your daughter was going to go on trips with
10    the defendant?
11    A.   Yes, I did.
12    Q.   Did you explain what the medications were to be used
13    for?
14    A.   Yes, I did.
15    Q.   And how to give out, the dosage, et cetera?
16    A.   Yes, I did.
17    Q.   Did it appear to you that the defendant understood what
18    you were telling her?
19    A.   Yes, absolutely.
20    Q.   Did you ever have an issue with your daughter Megan
21    when you did something with a door lock in her bedroom?
22    A.   There was a time when I asked her father, Ron Meier, to
23    reverse the door lock on her bedroom because --
24    Q.   Why did you do that?
25    A.   Because I was concerned with Megan's safety.
```

```
1    Q.    What do you mean by that?
2    A.    You know, if she was in the bathroom for too long, I
3    would get nervous that she could possibly do something to
4    hurt herself; and if she was in her bedroom for too long, I
5    was nervous that she would do something and so. . . .
6    Q.    Is that because of her depression?
7    A.    Yes, absolutely.
8    Q.    Did your ex-husband change the door lock to Megan's
9    door?
10   A.    Yes, he did.
11   Q.    Did you ever have a conversation with the defendant
12   where you explained that?
13   A.    Yes, I did.
14   Q.    And did you explain to the defendant why you had the
15   door locked changed?
16   A.    Yes, I did.
17   Q.    Did she appear to understand that?
18   A.    Yes, she knew.
19   Q.    Were there times when Megan appeared to go through
20   harder times than others?
21   A.    Yes, definitely.
22   Q.    Did you talk to the defendant about that?
23   A.    Certainly.  We had a lot of conversations about ups and
24   downs that Megan was going through with depression.  We
25   talked about when Megan was switching -- when, you know,
```

1    through the seventh grade.

2            Seventh grade was an extremely hard year for

3    Megan.  She was getting bullied a lot in school.  She was

4    getting called names.  Stopped eating lunch because boys

5    were stomping behind her in line calling her fat.  Getting

6    made fun of in gym class, and her father and I decided to

7    switch her to a private school.

8    Q.   Up to that point, was the school Megan was going to in

9    the seventh grade where she was having these problems, was

10   Sarah going to the same school?

11   A.   Yes.

12   Q.   Were there times when Megan was playing over at the

13   Drews' home when the defendant would send Megan home?

14           MR. STEWARD:  Objection; foundation.

15           THE COURT:  Rephrase the question.

16   BY MR. O'BRIEN:

17   Q.   Are you aware of times when Megan was playing at the

18   Drews' home and she came home early?

19   A.   Yes.

20   Q.   And did you ever talk to defendant about why Megan

21   returned to your home early?

22   A.   Megan would come home at times and say that Lori Drew

23   was being mean; and I would say, you know:  What's going on?

24   I would contact Lori at times and ask her what was going on;

25   and she said that Megan just needs to go home for a while.

1    Megan didn't take her medication or I could tell she didn't

2    take her medication.  She needs to come home and chill out

3    for a while, take her medication, and then she can come

4    back.

5    Q.   I'm going to ask if you can -- there's an exhibit, Your

6    Honor.  There appears to be a red well next to you,

7    Ms. Meier.  Do you see that?  I'm going to ask you to pull

8    out the folder labeled Government's Exhibit 8.

9    A.   *(Witness complies.)*

10   Q.   Do you have that in front of you, ma'am?

11   A.   Yes, I do.

12   Q.   Have you had a chance to go look at it?

13   A.   Yes, I'm looking through it now.

14   Q.   Have you seen this exhibit before?

15   A.   No.

16   Q.   Do you recognize what this exhibit is now that you're

17   seeing it?

18   A.   Yes.  It's medications that -- from her pharmacy for

19   Megan.

20   Q.   These are all medications from -- is it Schnuck's,

21   S-c-h-n-u-c-k-s, Pharmacy?

22   A.   Yes.  It's Schnuck's Pharmacy, uh-huh.

23   Q.   Thank you.  Is that the pharmacy where you obtained

24   medication for Megan?

25   A.   Yes.

1    Q.    Do these appear to be these prescriptions filled?

2    A.    Correct, yes.

3    Q.    From August 5th, 2002, until July 13th, 2006?

4    A.    Yes.

5          MR. O'BRIEN:  Your Honor, I would move

6    Government's Exhibit 8 into evidence as a business record.

7          MR. STEWARD:  No objection, Your Honor.

8          THE COURT:  All right.  Exhibit 8 is admitted.

9          *(Exhibit 8 received in evidence.)*

10         MR. O'BRIEN:  If you would return it to the manila

11   envelope and replace it back.

12         Thank you, ma'am.

13         THE WITNESS:  Okay.

14   BY MR. O'BRIEN:

15   Q.   Ms. Meier, you said at the end of the seventh grade

16   Megan was having problems at the school she was at; is that

17   correct?

18   A.    Yes.

19   Q.    And what did you do at the end of seventh grade?

20   A.    We decided to switch her to a private school in

21   O'Fallon.

22   Q.    O'Fallon, Missouri?

23   A.    Yes.  O'Fallon, Missouri.

24   Q.    And how far was that school from your home?

25   A.    It was maybe about four miles from the house.

1  Q.    And what was the name of the school you transferred her

2  into?

3  A.    It was Immaculate Conception Church at Dardenne

4  Prairie, Missouri.

5  Q.    And Dardenne is spelled D-a-r-d-e-n-n-e?

6  A.    Yes.

7  Q.    And when was Megan scheduled to start at that new

8  school?

9  A.    It was the end of August of 2006.

10  Q.    And what grade was Megan going to start?

11  A.    Eighth grade.

12  Q.    And she was still thirteen at the time until November,

13  correct?

14  A.    Correct.

15  Q.    Did you talk to the defendant Lori Drew regarding your

16  family decision to move Megan to this Catholic school?

17  A.    Yes.

18  Q.    And what was defendant's reaction?

19  A.    You know, Lori had stated that she did not think this

20  was a good move; that, you know, she felt that this was, you

21  know, a bad decision to be made.

22        I explained to her that Megan was having a really

23  tough time; and Lori stated that, you know, they moved into

24  the subdivision; that her and Sarah were friends and that

25  Sarah was going to be going to that school with Megan; that

1    it was just not a good decision to be made.

2              She was upset.  She was not happy with the fact

3    that we were moving Megan to a private school now.

4    Q.    During that summer when she left the public school

5    before she started at Immaculate Conception, did Megan and

6    Sarah still play?

7    A.    No.  It actually tapered off quite a bit.

8    Q.    Did Megan stop calling Sarah?

9    A.    You know, at the very, very beginning of the summer,

10   they did a few things; and then their friendship just

11   began -- there was never a major meltdown.  There was some

12   rifts back and forth; and I told Megan that I was tired of

13   those two arguing back and forth and to just stop.  But they

14   ended up where they just stopped calling each other, stopped

15   talking and doing things.

16   Q.    And when you say the two arguing back and forth, you're

17   talking about Megan and Sarah?

18   A.    Correct.

19   Q.    Now, at the end of that summer in 2006, did you

20   overhear your daughter say something about Sarah?

21   A.    Yes.  I heard Megan and another neighbor girl calling

22   Sarah a lesbian.

23   Q.    And what did you do when you heard Megan and the other

24   neighbor girl say that about Sarah Drew?

25   A.    I told them to immediately stop it.  If you're not

1    friends with somebody, to not call them names.  Just go on.

2    Stop calling names.  And that was the end of it.

3    Q.   Also during 2006, that summer, did you learn that Sarah

4    and Megan had created a false MySpace account?

5    A.   Yes, I did.

6    Q.   How did you learn that?

7    A.   Megan had spent the night over at my cousin's house and

8    my cousin had contacted me and told me that he found -- he

9    was on his computer and was looking at the computer and told

10   me to look up this website, MySpace account.

11        I looked it up; and when I looked it up, I was not

12   happy about it.  It was with the name Kelly on it and it had

13   pictures of a girl.

14        And I contacted Megan.  I talked to her about it

15   and asked her what this MySpace account was about.

16   Q.   What was her response?

17   A.   She said that her and Sarah Drew had made this up; that

18   it was to talk to boys.  I asked her who this girl Kelly

19   was; and she said:  Mom, it's just someone we picked out

20   randomly.

21        And she said that they had been talking to boys

22   from different places, different states.  And I told her to

23   immediately shut it down.

24   Q.   Did she tell you, she being Megan, tell you where she

25   accessed this false Kelly account that she had created with

1  Sarah?

2  A.   She said at Sarah Drew's house and, obviously, also at

3  my cousin's house.

4          MR. STEWARD:  Objection, Your Honor.

5  Nonresponsive.

6          THE COURT:  Overruled.

7          MR. O'BRIEN:  I missed her answer.

8          THE COURT:  And also at her cousin's house; is

9  that correct?

10          THE WITNESS:  Correct.

11          MR. O'BRIEN:  Thank you, Your Honor.

12  Q.   You found out that they had created this account and

13  contacting boys around the nation, did you say?

14  A.   Just throughout the United States.

15  Q.   What did you do to Megan?

16  A.   I grounded her from the computers at our house and I

17  put password protections on both of our computers at our

18  home; and she was not allowed on any computers anywhere

19  else.

20          I contacted our family members and let them know,

21  and I even contacted Lori Drew and told her that Megan was

22  not allowed on the computers at her home.

23  Q.   And why did you do all this?

24  A.   Because I wanted to protect Megan.  You know, children

25  who have attention deficit disorder have depression, have

1    low self-esteem.  You know, they want to get people to, you

2    know, like them.  They want to be able to know that people

3    are there.  You have to be able to protect them, and I

4    wanted to be able to protect Megan.

5    Q.   Do you know whether or not any of these boys in

6    different states actually contacted your daughter or Sarah?

7    A.   They contacted Sarah Drew through her cellphone.

8    Q.   How do you know that?

9    A.   Because Lori Drew told me that she had to change Sarah

10   Drew's cellphone number because of it.

11   Q.   In the fall of 2006, did Megan begin school at her new

12   Catholic school?

13   A.   Yes, she did.

14   Q.   I'm sorry.  Was that eighth grade then?

15   A.   Yes, it was.

16   Q.   Did she start in August?

17   A.   Yes.

18   Q.   How did she do?

19   A.   She did wonderful.  She made new friends and started a

20   volleyball team and was doing great.

21   Q.   How about academically; do you know?

22   A.   Well, we didn't get a report card but she was doing

23   very well.  It's pretty strict but she was doing very well.

24   Q.   And how did she appear emotionally at this school?

25   A.   Wonderful.  You know, she was very happy and probably

1    the happiest we had seen her in a long time.

2    Q.   And sometime after she started in the new school, did

3    you allow her to have a MySpace account of her own?

4    A.   Yes, I did.

5    Q.   Why did you do that?

6    A.   You know, Megan had gone through a lot and she was

7    going to be turning fourteen and I decided that -- I talked

8    to her dad about it -- that with certain restrictions in

9    place, that we would allow her to have it just prior to her

10   fourteenth birthday but with certain restrictions.

11   Q.   And what restrictions did you impose?

12   A.   That her father and I were the only ones that had her

13   password.  She didn't have the password.

14   Q.   To get on to her MySpace account?

15   A.   Correct.  That it had to be kept private so nobody

16   could access the MySpace account without us approving it.

17   The computer -- I had to approve of all the content that was

18   put on the MySpace account.

19           I had a Watch Right program on the computer which

20   monitored any instant messaging going back and forth and

21   also monitored any Internet sites that were visited on the

22   computer.

23           And, also, I had to be in the room or her father

24   had to be in the room at all times when Megan was on the

25   computer.

1   Q.   Did Megan agree to those conditions?

2   A.   She wasn't the most thrilled in the world but the

3   thought of being able to have a MySpace account to talk to

4   her friends at school, she was still happy about doing that

5   so she agreed and went ahead.

6   Q.   Did she indicate to you other girls her age had MySpace

7   accounts?

8   A.   Correct, yes.

9   Q.   Do you remember what her e-mail address was on this

10  account?

11  A.   Yes.

12  Q.   What was it?

13  A.   It was prettynbling16@hotmail.com.

14  Q.   That's the word "pretty," the letter "N" as in November

15  and the word "bling."  That's one word?

16  A.   Right; yes.

17  Q.   16?

18  A.   Uh-huh.

19  Q.   Number 1 and number 6?

20  A.   Correct.

21  Q.   And what did your daughter choose as her screen name?

22  A.   The screen name was Megan Babi.

23  Q.   Was Babi spelled B-a-b-i?

24  A.   Correct.

25  Q.   And, again, did you provide -- you or your husband

1  provide Megan with the password to this account?

2  A.    No.

3  Q.    What was the password?

4  A.    At the time it was Dock No. 4.

5  Q.    What did that mean?

6  A.    We had a boat at the time and it was on Dock No. 4.

7  Q.    Did your daughter Megan have any access to this MySpace

8  account without either you or your husband providing the

9  password?

10 A.    No.

11 Q.    And once she started the account, would she have

12 friends that she could chat with?

13 A.    Yes, she certainly did.

14 Q.    Did she reach out to people and ask to be their friends

15 and did people reach out to Megan and ask to be her friend?

16 A.    Correct.

17 Q.    Do you recall whether or not Sarah Drew reached out to

18 Megan?

19 A.    No.

20        MR. STEWARD:  Objection; foundation.

21        THE COURT:  Well, she's indicated she doesn't have

22 a basis so I don't understand the nature of the objection.

23        MR. STEWARD:  Withdrawn.

24        THE COURT:  Thank you.

25

```
 1   BY MR. O'BRIEN:
 2   Q.   Do you know whether or not Megan ever reached out to
 3   Sarah Drew to ask to be her friend?
 4   A.   No, she did not.
 5   Q.   And what about Jessica Mulford?  Do you know that name?
 6   A.   Yes, I do.
 7   Q.   Who is Jessica Mulford?
 8   A.   Jessica is a girl that lives down the street from where
 9   Megan lived.
10   Q.   And do you know whether or not Jessica Mulford was
11   friends with Sarah Drew?
12   A.   Yes, she was.
13   Q.   And was your daughter friends with Jessica Mulford at
14   that time?  And by "that time," I'm referring to in the fall
15   of 2006.
16   A.   Not at that time, no.
17   Q.   Do you know whether or not Jessica ever reached out to
18   Megan and asked to join Megan's MySpace or have access to
19   Megan's MySpace account?
20   A.   She did, and it was towards the end of September.
21   Q.   And did Megan allow her to access her as a friend?
22   A.   No, Megan denied it.
23   Q.   I'm going to ask you, ma'am, if you could once again
24   look in that red well and pull out Government's Exhibit 5,
25   please.
```

1    A.    *(Witness complies.)*

2    Q.    Do you have it?

3    A.    Yes, I do.

4    Q.    Do you recognize Government's Exhibit 5?

5    A.    Yes, I do.

6    Q.    How do you recognize that?

7    A.    Because it's the first page of Megan's MySpace page.

8    Q.    And you've seen this before?

9    A.    Yes, I have.

10   Q.    And did you help Megan actually create this or did you

11   watch her create it?

12   A.    I sat next to her while she created it.

13   Q.    And this is what she -- this is on her page at

14   MySpace.com?

15   A.    Correct.

16          MR. O'BRIEN:  Your Honor, I would offer Exhibit 5

17   in evidence.

18          MR. STEWARD:  No objection, Your Honor.

19          THE COURT:  All right.  Exhibit 5 is admitted.

20            *(Exhibit 5 received in evidence.)*

21          MR. O'BRIEN:  May I publish, Your Honor?

22          THE COURT:  Yes.  Assuming there is no objection.

23          MR. STEWARD:  None, Your Honor.

24          THE COURT:  Okay.

25          *(The exhibit was displayed on the screen.)*

```
 1   BY MR. O'BRIEN:

 2   Q.   Can you see Exhibit No. 5 on the TV monitor in front of

 3   you?

 4   A.   Yes, I can.

 5   Q.   On the left-hand side it says, "Hello, Megan Babi."

 6            Do you see that?

 7   A.   Yes, I do.

 8   Q.   There's a picture underneath that.

 9            Do you recognize that picture?

10   A.   Yes.  That's a picture Megan took of herself.

11   Q.   And put on the site?

12   A.   Yes.

13   Q.   I'm also going to ask you, Ms. Meier, if you can, could

14   you pull out of the red well Exhibit No. 26, please.

15   A.   (Witness complies.)

16   Q.   Do you have Number 26, ma'am?

17   A.   Yes, I do.

18   Q.   Do you recognize that?

19   A.   Yes.  That's Megan.

20   Q.   And do you know when that photograph was taken?

21   A.   That was taken probably in September of '06.  Megan

22   took that picture also of herself.

23   Q.   Did she post that on her website?

24   A.   Yes.

25            MR. O'BRIEN:  I'd offer 26, Your Honor.
```

```
 1            MR. STEWARD:  No objection, Your Honor.
 2            THE COURT:  All right.  Exhibit 26 is admitted.
 3            (Exhibit 26 received in evidence.)
 4            MR. O'BRIEN:  Publish, Your Honor?
 5            THE COURT:  Any objection?
 6            MR. STEWARD:  None, Your Honor.
 7            THE COURT:  All right.
 8            (The exhibit was displayed on the screen.)
 9   BY MR. O'BRIEN:
10   Q.   Now, on Megan's website she put her own photographs,
11   things like we're looking at now; is that correct?
12   A.   Correct.  I would have to approve the pictures but yes.
13   Q.   And she would describe her likes, et cetera?
14   A.   Correct.
15   Q.   A profile, is that what they call it?
16   A.   Yes.
17   Q.   Did you also approve that?
18   A.   Yes, absolutely.
19   Q.   Ms. Meier, in early September of 2006 -- correction --
20   in September of 2006, did an individual named Josh Evans ask
21   to join your daughter's site as a friend?
22   A.   Yes, he did.
23   Q.   And how do you know?
24   A.   Because I was actually sitting next to her while that
25   friend's request came over.
```

1    Q.    Part of your monitoring of what she was doing?

2    A.    Yes.   Many times -- most of the time I was sitting next

3    to her which drove her crazy but yes.

4    Q.    Did Megan indicate whether or not she knew who this

5    person was?

6    A.    Megan did not.   I asked her who this was and she said

7    she thought he was hot, and I asked her if she knew who he

8    was.   She said she thought maybe he knew her through another

9    friend.

10           And I told her that she could add him as a friend;

11   but if there was anything negative, anything said, that he

12   was going to be deleted automatically.

13   Q.    What happens -- can you please explain very briefly

14   what happens when you add someone as a friend to the

15   account.

16   A.    When your account is private, they can only see just

17   your picture and just your basic information.   When you add

18   them as a friend, they can see your whole profile.

19           And so when she added him, then he was able to

20   have access to her file; she was then able to have access to

21   see who he was at the time.

22   Q.    You also said that before you allowed Megan to add him

23   Megan thought Josh Evans' photo was hot?

24   A.    Correct.   That was her word.

25   Q.    When Josh Evans had reached out to ask to be your

1    daughter's friend, was his photo a part of the message?

2    A.    Yes, his photo was.

3    Q.    And what was your daughter's demeanor when she saw this

4    picture of Josh Evans?

5    A.    She was excited, you know.  She thought he was, you

6    know, a hot boy and, you know, typical 13-year-old girl who,

7    you know, was excited and wanted to see, you know, what his

8    other pictures were, what his profile was, what he had to

9    say.

10   Q.    And so once --

11         THE COURT:  Let me stop you, counsel.  Let me just

12   ask.  I presume you're finished publishing the exhibit?

13         MR. O'BRIEN:  Yes.

14         THE COURT:  Why don't you remove it.

15              (Pause in the proceedings.)

16   BY MR. O'BRIEN:

17   Q.    Once Megan added Josh Evans, was she able then to look

18   at the Josh Evans profile?

19   A.    Yes, she was.

20   Q.    Did you look at it also?

21   A.    Yes, I did.

22   Q.    What did it say -- or what did Josh Evans say about

23   himself?

24   A.    Said he was, you know, was moving here with his mom and

25   his brother; that he was home-schooled.  He had just turned

1    sixteen, moved around a lot, didn't know who his father was,

2    was born in Florida, I think Boca Raton, Florida, you know.

3             Had a lot of likes and dislikes, different things,

4    but liked playing the guitar.  Just a lot of different

5    things.  Had, I think, at that time maybe one or two

6    pictures of himself besides the profile picture.

7    Q.   Did Josh Evans indicate where he lived?

8    A.   He was moving into the O'Fallon area but did not have

9    any specifics.  Just the O'Fallon area.

10   Q.   That was the area that you lived in; is that correct?

11   A.   Correct.

12   Q.   Did it indicate whether he lived in a mobile home or a

13   house or an apartment; do you recall?

14   A.   It was a mobile home.

15   Q.   With his brother and his mom?

16   A.   Correct.

17   Q.   And did Josh Evans, on his profile, say whether or not

18   he was looking for new friends?

19   A.   Yes.  He said he wanted to make some new friends in

20   this new area that he was moving into.

21   Q.   And after your daughter allowed Josh Evans access, did

22   they begin corresponding?

23   A.   Yes, they did instantly.

24   Q.   Instantly being that same day?

25   A.   Yes.

1    Q.    Were you present when they started corresponding?

2    A.    Yes, I was.

3    Q.    When I say "corresponding," does it mean she would send

4    a message and Josh Evans would send one back?

5    A.    Yes.

6    Q.    Were any of those messages objectionable to you --

7    A.    No.

8    Q.    -- at that time?

9    A.    No.   It was, you know, how -- Megan was asking, you

10   know, how do you know me?

11             MR. STEWARD:   Objection; nonresponsive.

12             THE COURT:   I'll sustain the objection.

13             Rephrase the question.

14   BY MR. O'BRIEN:

15   Q.    What type of messages at that time was Megan sending

16   back and forth to Josh?

17   A.    Megan asked:   How do I know you?

18             And Josh says:   You don't.   I just thought you

19   were pretty cute.

20   Q.    Did you like that response?

21   A.    You know, I really didn't as a mom with a 13-year-old

22   girl.   But I also had to take a deep breath and, you know,

23   know that she was -- try to trust her somewhat and try to

24   teach her some values and allow her to make some decisions

25   on her own.   But I also knew I was monitoring everything,

```
 1    too.
 2    Q.   What was Megan's response when Josh told her he thought
 3    she was pretty cute?
 4    A.   Well, of course she thought it was great.  I mean, a
 5    13-year-old girl that thought a boy who thought they were
 6    cute thinks it's wonderful.
 7    Q.   I'm going to ask you, ma'am, to pull out Government's
 8    Exhibits in one of the folders, No. 14, 16, and 17, please.
 9    A.   (Witness complies.)
10    Q.   Let's look at 14, the two pages, please.
11    A.   Okay.
12    Q.   Do you have those in front of you?
13    A.   Yes, I do.
14    Q.   Do you recognize Government's Exhibit 14?
15    A.   Yes, I do.
16    Q.   How do you recognize that?
17    A.   Because I monitored Megan's messages back and forth,
18    and there were messages from Josh to Megan and from Megan to
19    Josh.
20    Q.   These appear to be part of a conversation between your
21    daughter and Josh Evans?
22    A.   Yes.
23           MR. O'BRIEN:  Your Honor, the government would
24    offer 14.
25           MR. STEWARD:  No objection, Your Honor.
```

```
 1              THE COURT:  All right.  Exhibit 14 is admitted.
 2              (Exhibit 14 received in evidence.)
 3              MR. O'BRIEN:  May I publish?
 4              THE COURT:  Yes.  Is there any objection?
 5              MR. STEWARD:  None, Your Honor.
 6              THE COURT:  All right.
 7              (The exhibit was displayed on the screen.)
 8              JUROR NO. 1:  I can't read it.
 9                   (Pause in the proceedings.)
10  BY MR. O'BRIEN:
11  Q.    I'm just going to point to a few sections if I can to
12  see if you can identify what we're looking at here.  Okay?
13  A.    Okay.
14  Q.    At the top it says "From Megan"; is that right?
15  A.    Yes.
16  Q.    That's your daughter?
17  A.    Uh-huh.
18  Q.    Is that a "yes"?
19  A.    Yes.
20  Q.    And then the date and the time?
21  A.    September 20th, 2006 at 8:01 p.m.
22  Q.    A little farther down it says "From Josh"?
23  A.    Correct.  And it's September 20th, 2006 at 8:00 p.m.
24  Q.    And, again, this is a conversation or part of a
25  conversation between your daughter and Josh Evans?
```

1    A.    Yes, correct.

2    Q.    That was 14.

3          Would you take a look at 16, please, ma'am.

4    A.    Yes.

5    Q.    Ready?

6    A.    Uh-huh.

7    Q.    Do you recognize Government's Exhibit 16?

8    A.    Yes, I do.

9    Q.    How do you recognize 16?

10   A.    Because it's the -- it's Megan's comments on her page

11   from her MySpace page.

12   Q.    Does this appear to come from Megan's MySpace page?

13   A.    Yes, it does.

14         MR. O'BRIEN:  Your Honor, the government would

15   offer 16.

16         MR. STEWARD:  No objection, Your Honor.

17         THE COURT:  All right.  Exhibit 16 is admitted.

18         *(Exhibit 16 received in evidence.)*

19         MR. O'BRIEN:  Publish, Your Honor?

20         THE COURT:  Any objection?

21         MR. STEWARD:  None, Your Honor.

22         THE COURT:  All right.

23         *(The exhibit was displayed on the screen.)*

24   BY MR. O'BRIEN:

25   Q.    I'm going to show just the, again, just the first few

1    pages of this exhibit.  Okay?

2    A.    Okay.

3           THE COURT:  Let me just say to the jury that if I

4    have admitted an exhibit, that means the exhibit will be

5    able to be taken into the jury room by the jury and you can

6    examine the exhibit at that point in time at your leisure.

7    Okay?

8    BY MR. O'BRIEN:

9    Q.    Can you see the screen in front of you, Ms. Meier?

10   A.    Yes.

11   Q.    Okay.  At the very top of this first page on

12   Government's 16, do you know what we're looking at here?

13   A.    Yes.  That was the bottom part of the MySpace page, the

14   front page of Megan's.

15   Q.    And that information regarding body type, ethnicity,

16   religion, is that all information that your daughter filled

17   out on herself?

18   A.    Yes.

19   Q.    And at the bottom of that page, there's something

20   called "Megan's Blurbs."  Do you see that?

21   A.    Correct, yes.

22   Q.    Is that more information that Megan filled out on

23   herself?

24   A.    Yes.

25   Q.    I just want to show you the next page.

```
 1                (The exhibit was displayed on the screen.)
 2    BY MR. O'BRIEN:
 3    Q.   Do you recognize what this page is, Ms. Meier?
 4    A.   This was Megan's top friends that she had at the time.
 5    Q.   What are "top friends"?
 6    A.   Top friends are friends that you pick and choose who
 7    you want to be on your top friends list.  It's something
 8    that's very important on MySpace that kids pick and choose.
 9    Q.   I have zoomed into the picture which is in the upper
10    left-hand corner of this particular page.  Can you see that?
11    A.   Yes, I can.
12    Q.   It's the name "Josh" and there's a photograph.
13    A.   Uh-huh.  And that's Josh Evans.
14    Q.   This is the photograph that accompanied Josh Evans when
15    he reached out to be your daughter's friend?
16    A.   Yes, it is.
17    Q.   You can put that away, Ms. Meier, and pull out
18    Government's 17, please.
19    A.   (Witness complies.)
20    Q.   Do you have it?
21    A.   Yes, I do.
22    Q.   Do you recognize Government's 17?
23    A.   Yes, I do.
24    Q.   What is Government's 17?
25    A.   It's another part of the front page of Megan's MySpace.
```

1    It changed.  This was -- she changed her tag name that she

2    had and I did not like it but she had this one in the

3    beginning.

4    Q.    This is also a part of Megan's MySpace page?

5    A.    Correct.

6              MR. O'BRIEN:  We offer 17, Your Honor.

7              MR. STEWARD:  No objection, Your Honor.

8              THE COURT:  All right.  It's admitted.

9              (Exhibit 17 received in evidence.)

10             MR. O'BRIEN:  May I publish the front page, Your

11   Honor?

12             THE COURT:  Any objection?

13             MR. STEWARD:  None, Your Honor.

14             THE COURT:  All right.

15             (The exhibit was displayed on the screen.)

16   BY MR. O'BRIEN:

17   Q.    Just showing you the bottom of the front page of this

18   exhibit, can you see that?

19   A.    Yes, I can.

20   Q.    Labeled "Megan's interests, general, music, movies"; is

21   that right?

22   A.    Correct, yes.

23   Q.    Who filled in that information about Megan's interests?

24   A.    Megan filled in the interest about the general which

25   was the hot guys.  The music she filled out.  And then under

1    the movies, the take-a-quiz, that's something they fill in

2    and it has Abercrombie & Fitch.  That's something that they

3    fill in and it pulls that up.  But she filled in the other

4    two parts.

5    Q.   Very brief.  Just on top of that, the very top of that

6    page, can you see this where it says "Megan," the box area?

7    A.   Yes, I do.

8    Q.   In quotes.  Can you read that?

9    A.   Yes.  "It's white girl with black girl moves because

10   I'm poppin' it."

11   Q.   Who put that on that page?

12   A.   That would be called Megan.  That's what I did not like

13   and that's why she removed it.

14   Q.   Do you know what it means "because I'm poppin' it"?

15   A.   Because she thought she could dance very well.

16   Q.   You can set those aside, Ms. Meier.

17   A.   Okay.

18   Q.   Now, how often would your daughter have communications

19   with Josh Evans starting when she first allowed him into her

20   MySpace page?

21   A.   In the beginning, it was more often.  It was probably

22   daily.  Then things slacked off.  For a period of time, it

23   wasn't as often.  Josh Evans stated that he had a

24   grandfather pass away and he wasn't able to be around.

25           So there were certain times when it was not, you

1    know, they weren't talking as much.  But in the beginning,

2    they did talk quite a bit.

3    Q.   And how did Megan respond when Josh Evans said that he

4    had to leave because his grandfather passed away?

5    A.   She was certainly upset for him and told him that she

6    was sorry and, you know, hoped he came back because, you

7    know, she wanted to be able to see him and, you know.

8    Q.   Did it appear to you that your daughter was developing

9    a romantic interest in Josh Evans?

10   A.   Yes, definitely.

11   Q.   At some point in these communications between your

12   daughter and Josh Evans, did you become suspicious of

13   Josh Evans?

14   A.   Yes, I did.

15   Q.   Why?

16   A.   Because, you know, there were certain things that were

17   said.  I knew that, one, when Megan was talking to him, that

18   the few things that were being said, Megan would try to say:

19   Well, are you going to go to the mall?  Or what mall did you

20   go to?  Maybe we can meet and go to the mall or the movies.

21        And I would tell Megan:  Sure.  You can go to the

22   movies with your dad on one side and me on the other side

23   but never going to happen.

24        And Josh would respond back with:  Well, I don't

25   remember what mall or I don't know what highway or I

1    don't -- and there was always something.

2         And so things started not making sense; and I

3    explained to Megan several times.  You don't know who the

4    people are on the other side.  You have to -- you know, this

5    could be a 40-year-old person.  This could be a 70-year-old

6    person.  You have to be careful and, you know, you can't

7    build a relationship online, Megan.

8         And Megan would always give me the hand, you know,

9    and think she was -- she knew what was going on.

10   Q.   You mean giving the hand?

11   A.   Like *(gesturing)*.

12   Q.   Like stop?

13   A.   Yeah.

14   Q.   Besides these occasions when Josh Evans appeared to you

15   to be evasive regarding meeting Megan, were there any

16   conversations that you found disturbing?

17   A.   Megan asked him:  Why don't you give me a call

18   sometime; and Josh stated that they didn't have a phone yet.

19   They don't have a phone line.

20        And I said to Megan:  Doesn't that seem a little

21   bit odd to you?  Because how is he using the Internet?

22        And Megan was like:  You know, mom.

23        I said:  Megan, you know, something is not right.

24   Q.   Was there any conversation that you saw from Josh Evans

25   that you found to be sexual in nature?

1    A.    There was one time when I came around the corner and I

2    saw something about a snake; that Josh Evans had a snake.

3    Q.    Excuse me.  Are you reading this on the computer

4    screen?

5    A.    Yes.  It was on AOL Instant Messenger; and Josh Evans

6    had stated that he had a pet snake and wanted to know if

7    Megan would touch his pet snake.

8              And Megan said:  Ew, no, that's nasty.

9              And then he said he had a tarantula and wanted to

10   know if Megan would hold the tarantula.

11   Q.    And what did Megan respond to that?

12   A.    Megan said:  Ew, that's nasty.

13             I said:  Megan, you need to get off the computer

14   right now.  I don't know if the person is talking about his

15   private parts.  I don't know what's going on.

16   Q.    And did she log off?

17   A.    She did.

18   Q.    What did you do, if anything?

19   A.    I told her that I was going to contact the police

20   department because something didn't seem right.

21   Q.    And did you do so?

22   A.    Yes, I did.

23   Q.    When did you do that?

24   A.    I did it that evening.  It was sometime in September.

25   Q.    And who did you call?

```
 1   A.   I called the -- well, I called our local authorities
 2   which was the O'Fallon Police Department; and they told me
 3   to contact the St. Charles County Sheriff's Department.
 4   Q.   Did you do so?
 5   A.   Yes, I did.
 6   Q.   And what occurred then?
 7   A.   They told me -- they transferred me to the Cyber Crimes
 8   Division; and I spoke to them, explained to them what was
 9   going on; and they basically told me there was no way to
10   investigate it unless there was somebody who was contacting
11   them, we met them somewhere and found out that, you know,
12   something improper was done, nothing could be done.
13   Q.   Did you find later on at another date later --
14   withdrawn.
15        Subsequent to that, did you find out whether or
16   not your daughter had told Josh Evans you had contacted the
17   authorities?
18   A.   Megan told me that she told Josh Evans that her mom had
19   contacted the po-po is what kids call the police.
20   Q.   P-o hyphen p-o?
21   A.   I guess it's p-o-p-o, yeah.
22        And I asked her why in the world would she do
23   that?
24        And she stated:  Well, you contacted them.  I
25   wanted to tell him.
```

1   Q.   I'm going to ask you to pull out -- I believe it's the

2   last exhibits -- 18, 19, and 20, please, Ms. Meier.

3   A.   *(Witness complies.)*

4   Q.   Exhibit 18, it's the single page.

5   A.   Okay.  I have it, yes.

6   Q.   Do you recognize Government's Exhibit 18?

7   A.   Yes, I do.

8   Q.   How do you recognize that?

9   A.   Because it's the instant messaging going back and forth

10  between Megan and Josh Evans, and it was talking about

11  the -- Megan was talking about her dog Berry and that was

12  when Josh Evans looks like he was talking about the snake

13  and the spider.

14  Q.   And you said that before is this through MySpace or did

15  you say AOL?

16  A.   This is AOL.

17  Q.   America Online?

18  A.   Yes.

19          MR. O'BRIEN:  Government offer 18, Your Honor.

20          MR. STEWARD:  Objection, Your Honor.  Foundation

21  and also relevance being non-MySpace.

22          THE COURT:  Are you going to attempt to lay a

23  foundation?

24          MR. O'BRIEN:  I will.

25          THE COURT:  All right.

1    BY MR. O'BRIEN:

2    Q.   Did you read Government's Exhibit 18?  Did you see it,

3    this conversation on the computer screen of your daughter?

4    A.   Yes, I did.

5    Q.   Where it starts out:  Evans06:  So what is your fav

6    thing to do?

7    A.   Correct.

8    Q.   All the way down to:  Prettynbling162:  You playin' ya?

9    A.   Correct.

10   Q.   That entire conversation, did you observe it on your

11   computer screen?

12   A.   Yes, I did.

13   Q.   You saw it come through America Online instant

14   messaging?

15   A.   Correct.

16           MR. O'BRIEN:  Offer the exhibit, Your Honor.

17           MR. STEWARD:  Objection, Your Honor.

18           We have no idea where this particular piece of

19   evidence came from.  Even if it's absolutely identical, this

20   may not have been what she had looked at because we don't

21   know the foundation of this particular document.

22           THE COURT:  Overruled.

23           She has testified that she saw this on her screen.

24   You can cross her in regards to those issues.

25           MR. O'BRIEN:  Is the exhibit admitted?

```
 1                 THE COURT:  Yes, it is.
 2                 (Exhibit 18 received in evidence.)
 3                 MR. O'BRIEN:  Thank you, Your Honor.
 4    Q.   I'm going to ask you to take a look at Exhibit 19,
 5    please.
 6    A.   (Witness complies.)
 7                 THE COURT:  Let me just ask one additional
 8    question; just confirm it.
 9                 THE WITNESS:  Okay.
10                 THE COURT:  Your daughter was sitting next to you
11    while you were reading it?
12                 THE WITNESS:  Yes.
13                 THE COURT:  Okay.
14                 THE WITNESS:  Yes, absolutely.
15    (Reading.)  Yes.
16    BY MR. O'BRIEN:
17    Q.   Do you recognize Government's Exhibit 19?
18    A.   Yes, I do.
19    Q.   And how do you recognize 19?
20    A.   It was more of the conversation between Megan and
21    Josh Evans on AOL instant messaging about the, you know, the
22    snakes and the tarantula and all of that.
23    Q.   As the court just asked, were you siting next to your
24    daughter when this conversation took place?
25    A.   Yes, I was.
```

1    Q.    It was part of the conversation you looked at in 18?

2    A.    Correct.

3               MR. O'BRIEN:  Offer 19 into evidence.

4               MR. STEWARD:  Same objection, Your Honor.

5    Foundation.

6               THE COURT:  I'll overrule it.  I'll allow it.

7               *(Exhibit 19 received in evidence.)*

8    BY MR. O'BRIEN:

9    Q.    I'm going to Exhibit 20.  You can put that all away.

10   A.    Okay.

11   Q.    One day, Ms. Meier, after your daughter had begun this

12   conversation with Josh Evans, were you ever home alone and

13   received an instant message from Josh?

14   A.    Yes, I was.  It was -- actually, I think it was the

15   next day or the day after I had contacted the police.

16   Q.    After you contacted the O'Fallon Police and the

17   St. Charles County Sheriff?

18   A.    Correct.

19   Q.    And describe what occurred.

20   A.    I turned --

21   Q.    I'm sorry.  I'm asking poor questions here.

22          Please describe what occurred regarding the

23   instant message you saw from Josh Evans?

24   A.    Okay.  I had to turn my computer off and turn it back

25   on.  When I turned it on, Megan had had it set up where when

1    we had set up the instant messaging, you can click a button

2    on or off to where instant messaging can turn on in your

3    computer; and it turned on automatically.

4            When my computer started up, there was an instant

5    message that popped up from Josh Evans that stated:  I

6    didn't know.  I thought you had school today and --

7    Q.   Did you respond to that?

8    A.   Yes, I did.

9    Q.   What did you respond?

10   A.   I said:  Actually, Megan is at school.  This is her

11   mom.

12   Q.   And how did Josh Evans respond to that, if he did?

13   A.   He said:  Oh, okay.  Sorry.  And --

14   Q.   Did you have a conversation with Josh Evans through

15   instant messaging?

16   A.   Yes, I did.  I responded back and I said:  Actually,

17   I'd like to talk to you.

18           And he responded back to me and said:  Okay.

19           And I said:  I understand that Megan told you I

20   contacted the police, and you might be a great person.  I

21   don't know.  But I'm here to protect Megan, and I think that

22   you need to go hang out with kids your own age, Megan needs

23   to go hang out with kids her own age, and I think that's the

24   way it needs to be.

25   Q.   How did Josh respond to that?

1   A.   He just said:  I understand.  And that was the end of

2   it.

3   Q.   Did you ever tell Megan that you had that instant

4   message conversation with Josh Evans?

5   A.   No, I didn't.

6   Q.   Were you with your daughter on Sunday, October 15,

7   2006, when she received a message from Josh Evans?

8   A.   Yes, I was.

9   Q.   Tell us about that message.

10  A.   Megan -- I had signed her on to the computer later in

11  the evening, and Megan turned the computer on -- or I turned

12  the computer on and signed her on, and there was a message

13  from Josh that said:  I don't want to be friends with you

14  anymore.  I heard you're not a nice person.

15  Q.   How did Megan react to that?

16  A.   She was confused and looked at me and said:  What is he

17  talking about?

18       And I said:  Meg, you know, I don't know.  Just

19  ask him what he's talking about.

20  Q.   Did she?

21  A.   She said:  What?  And there was no response.  And she

22  typed it in again and said:  What?  Still no response.  And

23  she typed in:  Where did you get this from?

24  Q.   What was the response?

25  A.   Nothing.

1    Q.    How did your daughter react to this?

2    A.    She wasn't -- you know, she was just more confused,

3    didn't understand what was going on; and I think she typed

4    one more thing and it said:  I am a nice person.

5              And I said:  Meg, it's time.  Let's turn it off

6    and, you know, deal with it tomorrow.  So she signed out

7    and, you know, she got ready for bed.

8    Q.    And before doing so, did she also receive something

9    called a chain survey?

10   A.    Yes, she did.

11   Q.    What is that?

12   A.    They're surveys that kids pass around to one another

13   that ask random things.  This one was, in particular, it

14   asked, you know:  If it was raining, would you walk with me

15   in the rain?  If I was wearing sweats and had no makeup on,

16   would you hold my hand and introduce me to your family?

17   Q.    The survey asked her questions and the recipient

18   responds to it?

19   A.    Right.  And it's basically a do-you-like-me thing.

20   Q.    And who had sent her that chain survey; do you know?

21   A.    It was from Josh Evans to Megan.  I'm sorry.  It was

22   from Megan.  Megan had filled it out and sent it to

23   Josh Evans.

24   Q.    Do you know where she got it from?

25   A.    I don't know where she got it from.  They send them all

1    the time.

2    Q.    And when she sent it to Josh Evans, that indicates she

3    likes him?

4    A.    Correct.

5    Q.    The next day, Monday, October 16th, 2006, did it

6    start as a typical day at the Meier household?

7    A.    You know, it was a good day.  Megan was excited.  She

8    had -- the night before -- the weekend before, she spent the

9    weekend at her grandmother's house.  She had her fourteenth

10   birthday invitations.  She was excited for her birthday to

11   come up.  She had them ready.  We went to school and I

12   dropped her off at school.  She was in a great mood.

13   Q.    And did you pick her up from school?

14   A.    Yes, I did.

15   Q.    Do you remember about what time?

16   A.    School got out at about 3:10, 3:15; and so I picked her

17   up.

18   Q.    And where did you go when you picked up Megan from her

19   school?

20   A.    I picked her up from school, picked her up in the

21   front.  Megan was the last one to come out because she was

22   always talking and giggling and laughing, and she came

23   running out of the school.  And we went -- from there, we

24   went straight home.

25   Q.    Was she in a good mood?

```
 1   A.   Great mood.  She said all of her friends could come to

 2   her birthday party except she just couldn't hand out one

 3   invitation because he wasn't available at school that day.

 4   Q.   So she sent out invitations that day to her birthday

 5   party?

 6   A.   Correct.

 7   Q.   Her birthday was November 6th?

 8   A.   Correct.

 9   Q.   Do you know what time you got home?

10   A.   It was probably, I would have to say, somewhere between

11   3:30 and 3:45.

12   Q.   And who was home when you came home with Megan?

13   A.   Her father was home but he was sleeping because he

14   works early in the morning.

15   Q.   What happened when you arrived home with Megan?

16   A.   We came home and Megan wanted to instantly sign on to

17   MySpace to see what Josh had to say, what his responses were

18   from the night before so I --

19   Q.   Did you allow her to do so?

20   A.   Yes, I did.

21   Q.   And what happened next?

22   A.   Well, when we went downstairs and I signed her on, she

23   had a message from Josh that said:  You heard me.  I told

24   you you weren't a nice person.

25            And then she also had the survey request that was
```

1    filled out that said all of these positive nice things to

2    her.

3    Q.   In response to the survey she had sent to Josh?

4    A.   Correct.  Which said:  Yes, I like you.  Yes, I would

5    walk in the rain with you.  Yes, I'd hold your hand.  And so

6    she was really confused.

7    Q.   What occurred next?

8    A.   They started going back and forth with, you know, she

9    said:  I'm a nice person unless someone is mean to me first.

10          And, you know, he said:  Well, I heard you're not

11   nice to your friends and I don't want to be friends with you

12   anymore.

13          And I said:  Megan, you've got a couple of

14   minutes.  I've got to go take your sister to the

15   orthodontist.  So I went upstairs really quick to check,

16   because it was raining really hard that day, to check to see

17   if her sister was -- the bus was getting there.

18          And I ran back downstairs and said:  Megan, it's

19   time to sign off.  I've got to leave.

20   Q.   And was she still communicating with Josh Evans at that

21   time?

22   A.   Yes.  And I looked at the screen and they were just the

23   messages, you know, back and forth of Megan was saying, you

24   know:  Who said this to you?  Who's telling you I'm not a

25   nice person?

```
 1              And I said:  You need to sign off.
 2              And she said:  Mom, just let me please finish this
 3    last message.  I promise I'll get off.
 4    Q.   And what did you do?
 5    A.   I said:  Okay.  But I'm leaving now and sign off.
 6              And she said:  Okay.
 7              And so I ran upstairs and got her sister off the
 8    bus and I left.
 9    Q.   Her sister is a younger sister?
10    A.   Correct.
11    Q.   And where did you go?
12    A.   I took her to the orthodontist in O'Fallon, Missouri.
13    Q.   And when you took Megan's sister to the orthodontist,
14    Megan was still in the -- was it down in the basement she
15    was using the computer?
16    A.   Correct.
17    Q.   And she was still on MySpace?
18    A.   Correct.
19    Q.   Had you ever left her alone for that period of time on
20    MySpace?
21    A.   No.
22    Q.   Before you left, did Megan promise to log off?
23    A.   Yes.
24    Q.   How long did it take you to get to the orthodontist?
25    A.   Probably like fifteen, twenty minutes at the most.
```

1    Q.    And what happened after you arrived there?

2    A.    I arrived there.  We signed in and about maybe ten

3    minutes went by and I decided to call Megan to see how she

4    was doing.

5    Q.    Did Megan answer the phone?

6    A.    She did and she was crying.

7    Q.    Did you ask her why she was crying?

8    A.    Yes.  And she said:  Mom, they're just saying all kinds

9    of mean horrible things about me.

10   Q.    What did you say?

11   A.    I said:  Who is saying mean horrible things about you?

12         And she said:  On MySpace.

13         And I said:  Who on MySpace?

14         And she said:  Just people on MySpace.

15         And I said:  Megan, you're still on the MySpace?

16         And she said:  Yeah.

17         I said:  Megan, get off MySpace now.

18         And she said:  Okay.

19   Q.    Did you hang up?

20   A.    Uh-huh.  Yes, I did.

21   Q.    What happened next?

22   A.    It was probably a half an hour went by and I called her

23   again because I was concerned; and when she answered the

24   phone and I -- when she answered the phone, she was sobbing.

25         And I said:  Meg, what's going on?

1          And she said:  Mom, I can't even explain it to

2     you.  You're just going to have to come home and see it for

3     yourself.

4     Q.   Did you ask her whether she was still on MySpace?

5     A.   I did.  I said:  Megan, are you still on MySpace?

6          And she said:  Yes.

7          And I said:  Megan, please get off the MySpace

8     now.  You know the rules.  Please.

9          And she said:  Okay.

10          And --

11     Q.   Did you -- sorry.

12     A.   I just said:  I will be home soon.

13     Q.   And how much longer were you at the orthodontist?

14     A.   Maybe five, ten minutes.

15     Q.   And you gathered up your youngest daughter and headed

16     home?

17     A.   Correct.

18     Q.   How long did it take you to get home?

19     A.   Maybe another ten -- or maybe fifteen, twenty minutes

20     with the rain.

21     Q.   Do you recall what time you got home that afternoon?

22     A.   I'm assuming it was probably around 4:30.  Maybe

23     5 o'clock.

24     Q.   Is this an estimate?

25     A.   Correct, yes.

1    Q.    What happened when you walked in the door?

2    A.    Her sister, younger sister, ran across the street to go

3    to a friend's house; and I went downstairs in the basement

4    and -- to see how Megan was.

5              And she was sitting at the computer and she was

6    crying; and I told her to get up from the computer.  I

7    wanted to see what was going on.

8    Q.    Did you do so?

9    A.    Yes, I did.

10   Q.    What did you see?

11   A.    There were horrible messages.  With MySpace, there's

12   messages, there's comments, and then there's bulletins.

13   There's three different ways that messages go across on

14   MySpace.

15             And I looked at the bulletins which, if you're

16   friends, anybody can see.  And those were going from

17   Josh Evans to Megan and back and forth; and then also

18   another girl -- two other girls were involved now, also.

19             And they were going back and forth at Megan, also.

20   Q.    When you say "going back and forth on Megan," what do

21   you mean?

22   A.    Calling names.

23   Q.    What type of names?

24   A.    Not the nicest names.  Fat ass, whore, slut.

25   Q.    Who was calling Megan these names?

1    A.    Josh Evans was calling her names.  Said he would kick

2    her ass if she, you know, did anything to any of the girls.

3    The other girls were calling her those names.

4              They sent out bulletins to anybody who's a friend

5    with anybody.  The bulletins went out to all of them.

6              And I said:  Megan, Megan, you knew the rules.  We

7    could have dealt with this if you would have listened.

8              And --

9    Q.    What was her reaction?

10   A.    She was -- she was upset; and she said:  Mom, no one is

11   going to believe me.  They're all going to believe them.

12             And I said:  Megan, but you're calling them names

13   now, too, and it's all going back.  Now it's a big mess

14   and --

15   Q.    How did she respond to that?

16   A.    She looked at me --

17   Q.    Take your time.

18   A.    The last words that she said to me were:  You're

19   supposed to be my mom.  You're supposed to be on my side.

20   And took off running upstairs to her room.

21   Q.    What did you do next?

22   A.    I went upstairs and Ron was up at this point in time,

23   and he had stopped Megan on the top of the stairs and had

24   talked to her for a minute.

25             And he came downstairs into the kitchen and was

1   talking to me about what was going on; and he started

2   cooking dinner and we were discussing everything that was

3   going on.

4   Q.   When you say "everything," you mean regarding

5   MySpace and the --

6   A.   Correct.

7   Q.   -- things being said?

8   A.   Yes, correct.

9   Q.   And Megan's reactions?

10  A.   Yes.  I was discussing, you know, why all of these

11  things were going on.

12  Q.   What happened next?

13  A.   In the middle of talking to him, my heart just kind of

14  sank.  I just had a horrible feeling, and I just took off

15  running upstairs to her room.

16  Q.   What happened?

17  A.   I opened her door and I found her hanging in the

18  closet.

19  Q.   Was Megan hanging with a belt around her neck?

20  A.   Yes.

21  Q.   What happened next?

22  A.   I ran over and started screaming for Ron and I tried

23  picking her up but I couldn't.  And Ron came upstairs.  He

24  screamed to me to go get a knife, and I went downstairs and

25  got a knife and he cut the belt from around her neck.

1            And I called 911.  And her sister came home in the

2    middle of it, and we asked her to please go down to the

3    neighbor's house and get the neighbor who -- Wayne Dockelson

4    knew CPR.  He was a lifeguard.

5    Q.    Did he come over?

6    A.    Yes, he did.

7    Q.    Did he begin to administer CPR to Megan?

8    A.    He and Ron both did, yes.

9    Q.    Did the ambulance come?

10   A.    Yes, it did.

11   Q.    Did they take Megan away?

12   A.    Yes, they did.

13   Q.    Did she die the next day?

14   A.    Yes, she did.

15   Q.    October 17th, 2006?

16   A.    Yes.

17   Q.    Did you go to Sarah's fourteenth birthday party?

18   A.    Yes, we did.

19   Q.    Sarah Drew?

20   A.    Yes.

21   Q.    How many days later was it?

22   A.    Megan would have turned fourteen on November 6th and

23   Sarah Drew turned fourteen on November 9th, and they asked

24   us to come down to Sarah's birthday party and have cake and

25   ice cream and we went.

1    Q.    Who asked you?

2    A.    Lori Drew.

3    Q.    Did you go to Curt Drew's birthday party?

4    A.    Yes, we did.

5    Q.    When was that?

6    A.    It was probably maybe three weeks or so after Megan

7    passed away and Lori asked us to come.

8    Q.    Did the defendant Lori Drew come to Megan's wake?

9    A.    Yes, they did.

10   Q.    "They" being?

11   A.    Lori Drew, Curt Drew, Sarah Drew, and Chris Drew.

12   Q.    Is Chris her son --

13   A.    Yes.

14   Q.    -- the defendant's son?

15         And did those same four individuals, including the

16   defendant, did they go to Megan's funeral?

17   A.    Yes, they did.

18         MR. O'BRIEN:  I have no further questions.

19         THE COURT:  All right.  Why don't we take our

20   evening recess.  We'll start again tomorrow.  Tomorrow I do

21   have a morning calendar.  I will not be able to start the

22   trial until 10:45 tomorrow.  10:45.

23         Remember when you're on these breaks, do not talk

24   about the case with anyone.  Do not attempt to do any

25   independent investigation.

```
 1              Also, let me ask you to be prompt tomorrow because
 2    we'll start promptly at 10:45.  Okay?
 3              Thank you very much.
 4              Also, if you could put the jury instructions and
 5    all of your notebooks in the jury room.
 6              Have a very pleasant evening.
 7              A JUROR:  I'm sorry.  Could you repeat that?
 8              THE COURT:  Put your notebooks and the jury
 9    instructions in the jury room.
10              THE CLERK:  All rise.
11                   (The jurors exited the courtroom.)
12              THE COURT:  All right.  Let me have counsel here
13    tomorrow at 10:30.
14              MR. O'BRIEN:  Yes, Your Honor.
15              THE COURT:  Is there anything else we need to
16    discuss at this point before I let you all go?
17              MR. O'BRIEN:  Not from the government, Your Honor.
18              MR. STEWARD:  Yes, Your Honor.
19              I'm going to renew my mistrial motion based on the
20    admission of this type of testimony in a computer fraud
21    case.  The last hour and a half, hour and 45 minutes.  We
22    still have the witness sitting up there, Your Honor.
23              THE COURT:  And?
24              MR. STEWARD:  Would you excuse her, please.
25              THE COURT:  I had indicated that we're stopping
```

1    the testimony.  We've already stopped the testimony.  She

2    can leave at any point in time.

3            MR. O'BRIEN:  You can go.

4            MR. STEWARD:  In any event, very heart-wrenching

5    testimony.  Totally improper in a computer fraud case.  It's

6    hard to describe on paper by way of a transcript the

7    emotional impact of what we just listened to for the last

8    hour and 45 minutes.

9            THE COURT:  Actually, you could have objected to

10   it and I would sustained the objection.

11           MR. STEWARD:  I have objected so many times about

12   this.

13           THE COURT:  Not on the actual testimony in front

14   of the jury.  In other words, parts of it are fully more

15   admissible than others; and there's parts that had you made

16   the objection, I would have sustained it.  So, you know,

17   what can I say?

18           MR. STEWARD:  You can grant the mistrial motion.

19           THE COURT:  Well, not at this time.

20           MR. STEWARD:  Thank you.

21           THE COURT:  All right.  Thank you very much.

22           Have a very pleasant evening.

23           *(At 5:28 p.m. proceedings were concluded.)*

24

25                          -oOo-

168

1                          CERTIFICATE

2

3          I hereby certify that pursuant to Section 753,

4   Title 28, United States Code, the foregoing is a true and

5   correct transcript of the stenographically reported

6   proceedings held in the above-entitled matter and that the

7   transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United States.

9
    Date:  June 16, 2009
10

11

12                              _____

13                              PAT CUNEO, OFFICIAL REPORTER
                                CSR NO. 1600
14

15

16

17

18

19

20

21

22

23

24

25