1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                          WESTERN DIVISION

4          THE HONORABLE GEORGE H. WU, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,          )
                                        )
7                        Plaintiff,     )
                                        )
8              vs.                      ) NO. CR 08-582-GW
                                        )
9    LORI DREW,                         )
                                        )
10                       Defendant.     )
     _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   Los Angeles, California

16

17            Friday, November 21, 2008, 1:24 P.M.

18

19   Day 4 of Jury Trial, Afternoon Session, Page 1 through 162

20

21

22                              PAT CUNEO, CSR 1600-CRR-CM
                                Official Reporter
23                              Roybal Federal Building
                                255 East Temple Street
24                              Room 181-E
                                Los Angeles, CA  90012
25                              (213) 617-1817
                                grammacuneo@aol.com

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:    THOMAS P. O'BRIEN
                           UNITED STATES ATTORNEY
 3                         and  MARK KRAUSE
                           and  YVONNE GARCIA
 4                         ASSISTANT UNITED STATES ATTORNEYS
                           United States Courthouse
 5                         312 N. Spring Street
                           Los Angeles, California 90012
 6                         (213) 894-3493 & (213) 894-2406
                           thomas.obrien@usdoj.gov
 7
      FOR THE DEFENDANT:    H. DEAN STEWARD
 8                         ATTORNEY AT LAW
                           107 Avenida Miramar
 9                         #C
                           San Clemente, California  92672
10                         (949) 481-4900

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                  CHRONOLOGICAL INDEX OF WITNESSES

3
   GOVERNMENT'S                                        VOIR
4  WITNESS              DIRECT CROSS REDIRECT RECROSS DIRE VOL

5  EDWIN VINCENT LUTZ       5     12                        4

6
   DEFENDANT'S                                          VOIR
7  WITNESS              DIRECT CROSS REDIRECT RECROSS DIRE VOL

8  TAMI LOEHRS             41     62                        4

9  BILLY COX              98                              4

10 SARAH DREW            109    127                      4

11

12                  ALPHABETICAL INDEX OF WITNESSES

13
                                                       VOIR
14 WITNESS              DIRECT CROSS REDIRECT RECROSS DIRE VOL

15 COX, BILLY             98                              4

16 DREW, SARAH           109    127                      4

17 LOEHRS, TAMI           41     62                        4

18 LUTZ, EDWIN VINCENT      5     12                        4

19                             EXHIBITS

20
   GOVERNMENT'S                      FOR         IN
21 EXHIBIT     DESCRIPTION     IDENTIFICATION  EVIDENCE  VOL

22   27       Document                            69      4

23

24

25

4

```
 1    LOS ANGELES, CALIF.; FRIDAY, NOVEMBER 21, 2008; 1:24 P.M.

 2                              -oOo-

 3        (The following was held outside the jury's presence:)

 4            THE COURT:  Let's bring the jury back in.

 5            MR. KRAUSE:  May I approach counsel for a second?

 6            THE COURT:  Sure.

 7            (Mr. Krause and Mr. Steward conferred.)

 8            THE CLERK:  All rise for the jury.

 9               (The jurors entered the courtroom.)

10            THE CLERK:  Please be seated.

11            THE COURT:  All right.

12            Good afternoon, ladies and gentlemen.

13            At this point let me ask the government.  Do you

14    have the next witness?

15            MS. GARCIA:  Yes, Your Honor.  The government

16    calls Edwin Lutz To the stand.

17            THE COURT:  All right.

18        EDWIN VINCENT LUTZ, GOVERNMENT'S WITNESS, SWORN

19            THE CLERK:  Please stop there, sir.

20            Raise your right hand.

21            Do you solemnly swear that the testimony you shall

22    give in the cause now before this court shall be the truth,

23    the whole truth, and nothing but the truth, so help you God?

24            THE WITNESS:  I do.

25            THE CLERK:  Please have a seat.
```

```
 1          Please state your name and spell your last name

 2     for the record.

 3          THE WITNESS:  My name is Edwin Vincent Lutz.  Last

 4     name is L-u-t-z.

 5                    DIRECT EXAMINATION

 6     BY MS. GARCIA:

 7     Q.   Good afternoon, Mr. Lutz.  What do you do for a living?

 8     A.   I'm currently a corporal with the St. Charles County

 9     Sheriff's Department in St. Charles, Missouri.

10     Q.   And how long have you been with the department?

11     A.   Almost three years.

12     Q.   What did you do prior to joining the department?

13     A.   I was a police officer in a city outside Tampa,

14     Florida, for three years.

15     Q.   So how many years total have you been in law

16     enforcement?

17     A.   Almost six years, ma'am.

18     Q.   And what did you do prior to entering law enforcement?

19     A.   I was in the Second 75th Ranger Regiment, Special

20     Operations in the U.S. Army for almost four years.

21     Q.   What are your duties as a corporal with the St. Charles

22     County Sheriff's Department?

23     A.   Currently, I'm a field training officer.  I teach

24     pepper spray, less lethal, and domestic violence.

25     Q.   What is less lethal?
```

1    A.    Weapons that aren't lethal force such as stun grenades,

2    flash bangs, beanbag rounds for shotgun.

3    Q.    Now, are you familiar with Ms. Lori Drew?

4    A.    Yes, ma'am.

5    Q.    How did you meet Lori Drew?

6    A.    I responded to a call for service to her residence.

7    Q.    When did you respond to that call?

8    A.    It was November 25th, 2006.

9    Q.    Approximately what time of the day was it?

10   A.    It was near the beginning of my shift around 3:00 p.m.,

11   ma'am.

12   Q.    And did you have a chance to speak with the defendant

13   when you responded to her home?

14   A.    Yes.  Yes, ma'am.

15   Q.    Do you see the defendant -- do you see Lori Drew in the

16   courtroom today?

17   A.    Yes, ma'am.

18   Q.    Can you please identify her.

19           MR. STEWARD:  Pleased to stipulate to the

20   identification, Your Honor.

21           THE COURT:  All right.  The stipulation is

22   accepted.

23   BY MS. GARCIA:

24   Q.    How long was your conversation with the defendant at

25   her home?

1    A.    I believe it was a little over an hour.

2    Q.    Was anyone else present?

3    A.    Yes, ma'am.

4    Q.    Who else was there?

5    A.    I believe both of Ms. Drew's parents were there and her

6    daughter.

7    Q.    Were any of those people taking notes throughout this?

8    A.    Absolutely not.

9    Q.    Were you taking notes?

10   A.    Yes, ma'am.

11   Q.    Now, did the defendant explain to you why she had

12   called for service to the sheriff's department?

13   A.    Yes, ma'am.

14   Q.    What did she say?

15   A.    Well, it was a -- it was a bit unclear.  The original

16   dispatch was for a neighborhood dispute and that was part of

17   her initial reasoning for me to respond.

18   Q.    Did she explain that there was any other reason for you

19   to respond?

20   A.    She -- there was a -- when I first arrived, there was a

21   section that was disjointed and out of context as far as me

22   not understanding anything that was happening prior to when

23   I arrived.

24          And she had mentioned a neighborhood dispute and a

25   piece of her property.  I believe it was a pool table that

```
 1    had been broken.  And then the focus swung drastically to a
 2    story that she wanted -- or something she had to tell me.
 3    Q.   What is it that she wanted to tell you?
 4    A.   She got -- as I said, we went right -- dispensed
 5    quickly with the neighborhood dispute and everything and
 6    went straight to her involvement with Megan Meier's suicide.
 7    Q.   What did defendant tell you about her involvement with
 8    the suicide?
 9    A.   She stated that she had contributed to it by creating a
10    MySpace account with a purpose of communicating with Megan.
11    Q.   Did she explain why she had tried to communicate -- why
12    she had tried to communicate with Megan?
13    A.   It was in order to gain her confidence -- gain Megan's
14    confidence to find out what she was saying about her
15    daughter.
16    Q.   Was anybody -- did the defendant say that anyone else
17    was involved in creating the MySpace account?
18    A.   Yes, ma'am.
19    Q.   Who else was involved?
20    A.   She stated that a temporary employee named Ashley
21    assisted her in creating a fake male profile on MySpace.
22    Q.   Did she mention anyone else?
23    A.   Not that assisted her in creating the --
24    Q.   Was anyone else involved in using the account?
25    A.   Yes.  She stated her daughter was also involved in the
```

1  communication between the -- after the creation of the male
2  profile with Megan.
3  Q.   Now, did the defendant explain who communicated with
4  Megan Meier using the account that she had set up?
5  A.   Yes, ma'am.
6  Q.   Who communicated with Megan?
7  A.   Herself, Ms. Drew, her daughter, and Ashley.
8  Q.   How did they communicate with Megan Meier?
9  A.   They had created a good-looking male profile and,
10  through that profile, had contacted Megan and communicated
11  through and as the good-looking male.
12  Q.   Did she explain what kind of communications they used?
13  A.   I'm not sure what you mean, ma'am.
14  Q.   You said they communicated through the MySpace account.
15  A.   Yes, ma'am.
16  Q.   Did she explain to you how they communicated using the
17  MySpace account?
18  A.   Yes.  They read -- they read back and forth, typed
19  different things back and forth, generally monitored what
20  was going on as communication.
21          I don't know much about MySpace so . . . .
22  Q.   And the defendant stated that she herself communicated
23  with Megan?
24          MR. STEWARD:  Objection; leading.
25          THE COURT:  Sustained.

```
 1            Why don't you rephrase the question.
 2   BY MS. GARCIA:
 3   Q.   Did the defendant state that she communicated with
 4   Megan Meier?
 5            MR. STEWARD:  Objection.
 6            THE COURT:  Same question.
 7            When I ask you to rephrase, you should change a
 8   couple of words, basically.
 9                        (Laughter.)
10   BY MS. GARCIA:
11   Q.   Who participated in communicating with Megan?
12   A.   Ms. Drew, her daughter, and Ashley.
13   Q.   Now, did the defendant mention anything unusual about
14   the communications with Megan Meier?
15   A.   It eventually turned sexual for a 13-year-old.
16   Q.   Did defendant explain what happened after those
17   conversations turned sexual?
18   A.   Ms. Drew stated that she continued the communication
19   despite it had become sexual.
20   Q.   Now, what else happened with the MySpace account?
21   A.   Ms. Drew stated that eventually MySpace users were
22   somehow able to gain access to the fake male profile that
23   she had created and subsequently Megan had found out she had
24   been tricked; and from there, arguments had broken out
25   between MySpace users, whoever they are, and Megan about the
```

1    fact that she had been tricked into caring about a fake male

2    profile.

3    Q.   What was the defendant's demeanor as she told you all

4    of this?

5    A.   It was -- it was creepy is the best term I can use in

6    both the context, in both in how her demeanor and our

7    dynamics of the conversation was.

8    Q.   Can you elaborate further and explain what you mean by

9    "creepy"?

10   A.   The original context for me to arrive as a police

11   officer is to investigate a crime; and when I arrived, as I

12   mentioned before, she quickly dispensed with any kind of

13   reference to the pool table and all that; and she

14   specifically focused on getting me -- wanting to tell me

15   something which is not typical for calls that I go to.

16          And when she insisted I come into her home and sit

17   down where she had assembled her family there to be with us

18   while she spoke with me which, again, is not normal as far

19   as how I respond to calls.

20          And then as she spoke about things such as her

21   feeling guilty or responsible in Megan's suicide and her

22   contribution, she was very emotionless, very cold, very

23   matter of fact, and always insistent on me listening to what

24   she was trying to tell me, almost if she wanted to approval.

25          MR. STEWARD:  Objection, Your Honor, to the

1  narrative at this point.

2          THE COURT:  I presume he is finished answering

3  that question so I don't think we need go into any more than

4  that.

5          MS. GARCIA:  Thank you, Your Honor.

6          May I have one moment, please.

7          *(Ms. Garcia and Mr. Krause conferred.)*

8          MS. GARCIA:  I have no further questions at this

9  time.

10         THE COURT:  All right.

11         Cross?

12         MR. STEWARD:  Thank you, Your Honor.

13                      **CROSS-EXAMINATION**

14  BY MR. STEWARD:

15  Q.    Corporal Lutz, good afternoon.

16  A.    Good afternoon, sir.

17  Q.    I think you indicated that you took notes of this

18  conversation.

19  A.    I did, sir.

20  Q.    Where are those notes today?

21  A.    Keeping with what I have done for my entire career --

22  Q.    Excuse me, sir.  I didn't ask you that.  I asked where

23  the notes are today.

24  A.    I threw the notes away and wherever they go from there,

25  sir.

1   Q.   When did you throw them away?

2   A.   As I always do, after the completion of the use of that

3   particular notebook, I throw the whole notebook away.

4   Q.   Corporal Lutz, I want you to listen to my question.

5   A.   Okay.

6   Q.   When did you throw it away?  In 2006?  2007?  When?

7   A.   It would have likely have been 2006 or beginning of

8   2007.  I don't know how many pages were there or how many

9   cases.  So it's a fluctuating thing.  It's not a regular

10  tempo.  It's just whenever it's done, it's done and it gets

11  thrown away.

12  Q.   Okay.  And you realized that the interview that you

13  conducted with Lori Drew involved the death of a 13-year-old

14  girl in some way, correct?

15  A.   Yes, that's what she told me.

16  Q.   Yes?  And you threw those notes away?

17  A.   Yes.

18  Q.   How often do you get involved with cases involving

19  people who have passed?

20  A.   I'm sure it could be looked up, but I've been involved

21  in more than one criminal case and many cases where people

22  die that are not necessarily criminal in nature.

23  Q.   Now, you indicated, in terms of your background, that

24  you were in Florida before this, right?

25  A.   Yes, sir.

1   Q.    Where were you actually trained as a police officer?

2   A.    I was trained first at the Law Enforcement Training

3   Institute in Columbia, Missouri, after I graduated college

4   at MissU; and after that, I went into the service.  And just

5   after getting out of the service, I went to St. Petersburg

6   College which has an academy there.

7   Q.    And where is St. Petersburg College?

8   A.    In St. Petersburg, Florida, which is near Tampa,

9   Florida, sir.

10   Q.    In your training, you've been trained in at least one

11   of those places about writing reports, correct?

12   A.    Yes.

13   Q.    Okay.  And reports, as you understand it, are so that

14   you can use it later to adequately testify in court.

15          Does that sound right?

16   A.    That's one of the purposes of it, yes, sir.

17   Q.    Okay.  And you were taught that taking notes initially

18   is a wise thing to do; isn't that true?

19   A.    I think it is -- it's common sense, sir.

20   Q.    Okay.  Now, did you work for a company called Computer

21   Masters?

22   A.    That was my father's company, sir.

23   Q.    Did you ever work for the company?

24   A.    I'm not sure if I ever officially worked for the

25   company or not.  It was my father's company.

1    Q.    How about Penske Truck Leasing?

2    A.    Yes, sir.

3    Q.    And when was that?

4    A.    That was just prior to me going into the military, sir,

5    so it would have been before 1999.

6    Q.    Okay.  And as I understand it, you switched from

7    Florida to Missouri police departments in 2006?

8    A.    Yes, sir.

9    Q.    Okay.  And you didn't like get fired or anything in

10   Florida, did you?

11   A.    Absolutely not.

12   Q.    Okay.  When you encountered Ms. Drew, how long had you

13   been with the department?

14   A.    I believe I was hired in the beginning of 2006 so I'm

15   trying to remember what exactly date.  It was February or

16   March and so this was November so however many months that

17   is.

18   Q.    Okay.  And at the time you spoke with Ms. Drew, you

19   gave her your cell number, correct?

20   A.    Yes, sir.

21   Q.    And that was a Florida number; isn't that true?

22   A.    It may have been at the time, yes, sir.

23   Q.    Why did you give her your cell number?

24   A.    Because when I had responded to Ms. Drew's house, it

25   was not an adversarial investigation.  It was me responding

1   for her.  She had a complaint; and as I do with anyone, I

2   responded to her.

3           She said that she would have maybe some further

4   questions.  I left a card, a business card; and because that

5   number is not linked to any -- that number at that time was

6   not linked to anything, it's a Florida number; I'm in

7   Missouri; it's not a big deal to give that out.

8   Q.   And didn't the topic of conversation of the personal

9   safety of the Drew family come up that day?

10  A.   I'm not -- what do you mean by "personal safety," sir?

11  Q.   Wasn't the Drew family concerned about their own

12  personal safety?

13  A.   I believe she was concerned more about her property

14  being damaged.

15  Q.   Did you discuss with her what was going on in the

16  neighborhood?

17  A.   She briefly mentioned, as I mentioned before, she

18  quickly at the beginning mentioned what was going on in the

19  neighborhood in very brief terms.

20  Q.   Okay.  And, in fact, the original -- one of the

21  original purposes of the call was a vandalism call; isn't

22  that true?

23  A.   I was dispatched as neighborhood dispute.  I don't know

24  what she told dispatch to initiate the call.  But that

25  was -- she did mention that.

```
 1   Q.   And what did you learn about the neighborhood dispute?

 2   A.   She was very vague; that there had been hostility in

 3   the neighborhood due to her involvement with Megan's

 4   suicide.

 5   Q.   And you understood that some people in this

 6   neighborhood were hostile to the Drew family, right?

 7   A.   That was her word, sir.

 8   Q.   Okay.  And, specifically, an item of furniture, if you

 9   will, had been destroyed and dumped in her front driveway,

10   right?

11   A.   The second part of that, sir, I'm not sure if she told

12   me.  She did mention that that a pool table or something

13   like that had gotten damaged.  But, again, that was not her

14   focus.

15   Q.   Now, you found her to be cooperative with you?

16   A.   Yes.

17   Q.   Cordial?

18   A.   She was -- yes, she was -- I was there for her and she

19   was communicating fine.  She was nice.

20   Q.   Okay.  And I think you said that her parents were

21   present, right?

22   A.   Yes, sir.

23   Q.   Did you get their names?

24   A.   No, sir.

25   Q.   Okay.  Did you note in your report that they were
```

1    present?

2    A.    No, sir.

3    Q.    Would that have been a helpful detail to include?

4    A.    At that time, sir, I had no background on what was

5    going on.  This is just something that she felt she needed

6    to tell me and I recorded.

7              It wasn't something that she -- if she would have

8    requested or made note or reference to, I would have.  But

9    at the time it didn't seem like it was relevant to anything.

10   Q.    Okay.  So in reading your report, there's no mention of

11   the fact that, in addition to Lori Drew, there were her

12   parents, two people, and also her daughter Sarah present;

13   isn't that true?

14   A.    I'm sorry, sir.  Her parents were there and her

15   daughter was there.

16   Q.    Right.  In reading your report, you wouldn't know that,

17   right?

18   A.    I did not put that in there, sir.

19   Q.    Did you have, by chance, a tape recorder of any kind?

20   A.    I do not have one, sir.

21   Q.    Just your notes; is that true?

22   A.    Yes.  Just my notebook, sir.

23   Q.    Okay.  Now, I think on direct for counsel you said that

24   she did discuss Ashley Grills as being a temporary clerical

25   person; something like that?

1   A.   I don't know Ashley by any other name other than just

2   what she mentioned.

3   Q.   I'm sorry.  Did she mention to you that Ashley was a

4   temporary clerical person of hers?

5   A.   A temporary employee, sir.

6   Q.   But she did say that, correct?

7   A.   Yes, sir.

8   Q.   All right.  And did she explain to you anything more

9   about why it was -- the MySpace account was set up?

10  Specifically, what was the purpose of the MySpace account?

11  Did she explain that to you?  Let's start with that.

12           Yes or no on that.

13  A.   I believe she did, yes.

14  Q.   Okay.  And what did she tell you?

15  A.   That the MySpace account was to communicate with

16  Megan Meier.

17  Q.   Did she also tell you that it was to find out what

18  Megan Meier was saying about her daughter Sarah?

19  A.   Yes.

20  Q.   Okay.  Did she tell you specifically what they

21  believed -- what Lori Drew believed that Megan Meier was

22  saying about Sarah?

23  A.   No.

24  Q.   Are you sure she didn't?

25  A.   No -- yes, I'm sure she didn't get into any specifics

```
 1   about that, sir.
 2   Q.   And didn't she tell you that Ashley was the one that
 3   came up with the idea of creating the account?
 4   A.   No, sir.
 5   Q.   No?
 6   A.   That was a co-creation, sir.
 7   Q.   Is that what she told you?
 8   A.   Yes, sir.  She and Ashley.
 9   Q.   Okay.  Didn't she tell you that Lori had set
10   restrictions on the MySpace account to, quote, keep it
11   clean?  Do you recall that?
12   A.   Not at all, sir.
13   Q.   Okay.  Had she done that, would that have been
14   something you would have put in those notes?
15   A.   I can't answer.  That is completely speculation.  If
16   she would have -- anything Ms. Drew would have made relevant
17   to me, I would have been happy to add to the report.
18            Like I said, it wasn't a confrontational
19   situation.  I was there for her.  So if she would have asked
20   me to make note, by all means I would have.
21   Q.   Okay.  And did she tell you that she instructed Ashley
22   to shut down the MySpace at one point?
23   A.   No, sir.
24   Q.   Did she talk to you about the persona of Josh Evans at
25   all?
```

1   A.   Just that it was a good-looking male, sir.

2   Q.   Okay.  She did tell you, however, that she was not home

3   when the final angry e-mails were sent on MySpace; isn't

4   that true?

5   A.   I don't know.  I don't know what you're even referring

6   to at this point, sir.

7   Q.   Okay.  Well, she told you that there had been on

8   MySpace an argument on the last day.  Didn't you testify to

9   that on direct?

10  A.   She said that they had an argument.  She didn't

11  reference like what day or what actual communication.  There

12  were arguments going on.

13  Q.   What more did she tell you about the argument, if

14  anything?

15  A.   Just that they there were arguments between MySpace

16  users and Megan had found out that she had been tricked, I

17  guess.

18  Q.   Okay.  So your best recollection is that Lori Drew told

19  you that Megan Meier found out about the Josh Evans account?

20  A.   Yes.  She found out somehow.  She didn't elaborate.

21  Q.   Okay.  Did you tell Lori Drew that she had a right to

22  feel safe in her own home and neighborhood?

23  A.   I don't remember saying that.

24  Q.   Did you tell all of them gathered there that they

25  looked like a good Christian family?

1    A.    That doesn't sound like anything I would say.

2    Q.    Now, some days later did you meet again with Lori Drew?

3    A.    Yes, sir.

4    Q.    Okay.  And where was that?

5    A.    The Denny's parking lot at Cave -- I'm sure no one --

6    at Cave Springs, Missouri.

7    Q.    Okay.  And how was it that that meeting was arranged?

8    A.    She had called me a few times on the phone and asked if

9    I would meet her there; and I said yes.

10   Q.    Okay.  And she told you what she wanted to talk to you

11   about was the safety of her own family; isn't that true?

12   A.    No.

13   Q.    What did she want to talk to you about?

14   A.    She had stated that the FBI had begun an investigation

15   and, again, the relationship at that time that Ms. Drew and

16   I had was not confrontational so she was seeking advice from

17   me; and I was trying to do the best I could with someone

18   that I serve.

19   Q.    Do you recall having a conversation with Lori Drew

20   about problems her daughter Sarah was having at school?

21   A.    I don't remember that, sir, no.

22   Q.    That she was being harassed and having problems at

23   school generally?

24   A.    She mentioned that the neighborhood situation was

25   hostile.  I don't know if she meant that.  But I don't

1   remember that specifically, sir.

2   Q.   Did she tell you any more details about the hostility

3   in the neighborhood?

4   A.   I don't recall her elaborating on that, sir.

5   Q.   Okay.  And if you would, tell us what was the topic of

6   conversation in the Denny's parking lot several days later.

7   A.   Ms. Drew was concerned that the FBI had begun an

8   investigation and, you know, as a police officer, I'm not

9   going to hand out legal advice.

10         And I told her that if I was being investigated by

11   the FBI, I would get a lawyer; and I recommended that she do

12   that.

13   Q.   Now, you didn't memorialize that meeting in any way,

14   did you?

15   A.   No, sir.

16   Q.   No reports or anything at all?

17   A.   No, sir.

18   Q.   Okay.  Now, it appears that you wrote the report at

19   least sometime after the meeting on November 25th, '06; is

20   that true?  Or do you recall writing it right away?

21   A.   I believe I started it, the report, on the 26th and

22   it was turned in -- completed and turned in by the 28th,

23   sir.

24   Q.   And did you speak with anyone else in the neighborhood

25   prior to writing the report?

1    A.    I don't believe so, sir.

2    Q.    Okay.  Have you ever spoken with Tina Meier?

3    A.    I have said hi to her a few minutes ago and that was

4    it, sir.  I never met her before that.

5    Q.    How about Ron Meier, her ex-husband?

6    A.    I have never talked to him before today to say hi.  I

7    didn't even know it was him.

8    Q.    Now, after the Denny's meeting, were you aware that

9    Lori Drew tried to contact you on May 1st, 2007?

10   A.    I don't -- how did she try to contact me?  I mean, I'm

11   not aware, I guess, because I don't remember how she would

12   have done that.

13   Q.    Okay.  You work for the sheriff's department, right?

14   A.    Yes, sir.

15   Q.    And in 2006, in the fall, physically where was the

16   sheriff's offices?

17   A.    The sheriff's department --

18   Q.    Department offices.

19   A.    North of where she's at in the same general --

20   Q.    Okay.  And if someone in that period of time had wanted

21   to talk to you and came to that department, would they be

22   able to contact you?

23   A.    If I was on duty and available, yeah, they would have

24   me respond.  Or they would give a passing message if that's

25   what she wanted to do or whatever.

1   Q.   If you weren't on duty that day, would someone get a
2   message to you?
3   A.   She could.
4   Q.   Okay.  And did you receive a message from your
5   department on or about May 1st, 2006 -- I'm sorry -- '7,
6   that Ms. Drew wanted to speak with you?
7   A.   I know that Ms. Drew had at some point after this call
8   and everything had been completed for a while, that she had
9   wanted to talk to me.  But I don't remember the date nor
10  why.
11  Q.   Okay.  Let me ask you a little more specifically in
12  addition to that.
13         May 8th, 2007, do you recall getting three
14  different calls on your cellphone from Lori Drew?
15  A.   I don't recall that, sir.
16  Q.   Okay.  How about the next day, May 5th, 2007, one
17  call from Ms. Drew?
18  A.   I don't remember that that happened.
19  Q.   Okay.  During this period of time, early May of 2007,
20  did you receive any calls from Lori Drew?
21         MS. GARCIA:  Objection, Your Honor.  This is
22  beyond the scope.
23         THE COURT:  Where does this go?
24         MR. STEWARD:  Want to wait and see?
25         I could call him as my own witness.  It's their

1    last one.

2              THE COURT:  Is this your last witness?

3              MS. GARCIA:  It is, Your Honor.

4              THE COURT:  Oh, go ahead.

5              MR. STEWARD:  Thank you.

6    Q.   And then back to these calls, Corporal Lutz,

7    approximately May 11th, 2007, did you receive any kind of

8    communication or message from your department, specifically

9    from the officer at the desk, that Lori Drew had stopped by

10   to see you?

11   A.   I don't -- I don't remember that, sir.

12   Q.   During the first week of June of 2007, did you receive

13   any kind of message from your department that Lori Drew was

14   trying to get ahold of you?

15   A.   I don't remember any days.  I know at some point she

16   tried to get ahold of me in reference to the report.  But I

17   don't -- I don't know the date or the time or what even year

18   at this point.

19              I know -- I mean, I remember that she tried to at

20   some point but I don't know the times.  You're giving me

21   times and I don't remember that.

22   Q.   I feel your pain, Corporal Lutz.  I've proven it all

23   week that I can't remember those either.

24              Who is Sergeant Joel Fann, F-a-n-n?

25   A.   I don't know, sir.

1    Q.   Is he someone with your department?

2    A.   I don't know.

3    Q.   If you don't know him, that's fine.

4    A.   I don't know him personally, sir.

5    Q.   Is it safe to say that you were aware that Lori Drew

6    was trying to get ahold of you in May and June of 2007,

7    right?

8    A.   I don't remember the dates, sir.  She tried, like I

9    said, she tried to get ahold of me at some point but I don't

10   know if it was May or June.

11   Q.   Okay.  Could it also have been into November of 2007?

12   A.   Sir, I just don't know what times.  So, I mean, you can

13   ask me times but I'm not going to remember what times.  I

14   can tell you at some point she tried to contact me, but I'm

15   not going to know what time because it wasn't --

16   Q.   She tried multiple times, though, right?

17   A.   I don't know how many times she did, sir.

18   Q.   More than once?

19   A.   I don't know, sir.

20   Q.   Who is Sergeant Ostermeyer?

21   A.   Sergeant Ostermeyer is my shift sergeant, sir.

22   Q.   Okay.  On November 12th, 2007, did you get any

23   message from Sergeant Ostermeyer that Lori Drew was trying

24   to get ahold of you regarding your report?

25   A.   Sergeant Ostermeyer told me that Ms. Drew wanted to

1    contact me.  He didn't say why.

2    Q.   Okay.  But I think you testified a moment ago that you

3    knew it was about your report, right?

4    A.   Well, that's the only contact I've ever had with her.

5    Q.   Well, you also knew that she didn't agree with what you

6    put in your report, right?

7    A.   I have no idea if that time or what time she did or

8    didn't agree with it, sir.

9              MR. STEWARD:  I have no further questions, Your

10   Honor.  Thank you.

11             THE COURT:  All right.

12             Redirect?

13             MS. GARCIA:  No, Your Honor.

14             THE COURT:  All right.  Mr. Lutz, you are excused.

15   Thank you very much.

16             I take it the government rests?

17             MR. O'BRIEN:  The government rests, Your Honor.

18             THE COURT:  Are all the exhibits you have wanted

19   in, are they all in at this point?

20             MR. O'BRIEN:  They are, Your Honor.

21             THE COURT:  Okay.  For the defense?

22             MR. STEWARD:  I have a motion to make, Your Honor,

23   before we start the defense case.

24             THE COURT:  All right.  Let me have the jury go

25   into the jury room.

```
 1              (The jurors exited the courtroom.)

 2                      RULE 29 MOTION

 3          MR. STEWARD:  Yes, Your Honor.  Just I'll make

 4  this very brief.

 5          I would make a motion to dismiss the Indictment

 6  based on Rule 29 and also on my motions previously filed.  I

 7  would renew them.

 8          And I just want to focus very briefly on the Terms

 9  of Service.  I refer to the government's entirety of their

10  evidence on that.

11          First, we had the affirmative evidence from

12  Ashley Grills that she never read the Terms of Service.  She

13  never discussed with them either Lori or Sarah Drew and she

14  never saw either of those two read or review the Terms of

15  Service.

16          The second point would be the gentleman this

17  morning from MySpace; and the way the page is set up, the

18  page is set up so that in 2006 -- it may still be today --

19  but certainly in 2006 you could become a member by only

20  checking the box that says:  I have read the Terms of

21  Service.

22          In order to actually affirmatively read them, you

23  have to go to another box, click that and then read them.

24          I would suggest that between these two pieces of

25  testimony, the government's argument about the Terms of
```

1    Service has been completely undermined.

2             As I understand their argument here, their case is

3    based upon a violation of the Terms of Service.  But before

4    we even get to an analysis of whether or not a violation of

5    the Terms of Service equals unauthorized access, my

6    suggestion is the Terms of Service, they haven't proven up

7    that portion of the fact -- I'm sorry -- of the facts.

8             And this would go to a knowing violation of a

9    legal obligation or anything along that line; and here the

10   government has not shown that Grills, Sarah Drew, or

11   Lori Drew ever read or had knowledge of the Terms of

12   Service.

13            And I understand the government, at least

14   pretrial, had maintained that Lori Drew's subsequent actions

15   somehow proved that she knew the Terms of Service.

16            I would suggest that that is an argument that just

17   doesn't hold weight.  Her actions, even if you give the

18   government their best view, which I believe you have to do

19   at this point, the best view of the government's evidence is

20   ambiguous at best.

21            The deletion of the MySpace, even if that's true

22   and the court were to find that that's credible evidence,

23   that doesn't show any knowledge of the Terms of Service

24   without something more.

25            So my suggestion is the building block here is the

1    Terms of Service, and that building block was not

2    established, and I would submit it.

3            THE COURT:  All right.

4            Let me hear a response from the government.

5            MR. KRAUSE:  Your Honor, defense counsel's

6    argument appears to be that the -- there is an insufficient

7    amount of evidence for the jury to find the defendant

8    intentionally accessed the MySpace servers without

9    authorization.

10           His condensation of the argument, however, I think

11   is improper.  The issue is, number one, whether the access

12   was unauthorized and, second, whether the defendant intended

13   her access to be without authorization or in excess of

14   authorization.

15           The scope of the authorization is determined by

16   the Terms of Service, and it doesn't seem to be the

17   defendant is claiming that her actions were authorized.

18   Here it's just that she didn't intend to access the service

19   without authorization.

20           THE COURT:  Well, there has to be intention, or

21   the potentiality is an element that is required.

22           MR. KRAUSE:  Right.  Which I'm getting to, Your

23   Honor.  The issue is proven circumstantially, as the

24   government has maintained, the government has shown that the

25   defendant intended to access the computers without

1   authorization.

2          She was put on notice that:  Look.  We're breaking

3   the rules.  Ashley Grills actually testified that she

4   expressed her concerns that their activities were, quote,

5   illegal, end quote; and yet the defendant persisted and did

6   not --

7          THE COURT:  But the comment is the -- comment by I

8   guess what could be a cocon -- well, the problem is the

9   conspiracy has to be that they intentionally accessed the

10  computer without authorization or in excess of authorization

11  and so that would have to be a conspiracy.

12         MR. KRAUSE:  They conspired --

13         THE COURT:  And so where, if the -- if no one read

14  the Terms of Service and -- well, let me ask first.

15         Does the government concede that at this point in

16  time there is no evidence that anyone had ready, certainly

17  the defense had not read the Terms of Service?

18         MR. KRAUSE:  Oh, yes.  But the government, I

19  think, has proven --

20         THE COURT:  So, in other words, you're conceding

21  that nobody read the Terms of Service at the time that the

22  account was created?

23         MR. KRAUSE:  At the time the account was created.

24  But they knew that what they were doing was in violation of

25  the Terms of Service.

```
 1              THE COURT:  Well, but I don't understand.  How
 2    could you know that your actions would be in violation of
 3    the Terms of Service if you haven't read the Terms of
 4    Service?
 5              MR. KRAUSE:  Because you know what the Terms of
 6    Service are contained in the Terms of Service.  MySpace, as
 7    you've heard, has a number of educational aspects advising
 8    people that there's not to be bullying and they're not to
 9    harass people.  It's common sense.
10              THE COURT:  But how would you know that unless
11    you -- well, what is the evidence that they were somehow
12    provided with the educational aspects of the Terms of
13    Service?
14              MR. KRAUSE:  You heard testimony from Jae Sung
15    that it was an aspect that MySpace promotes the safe use of
16    the website; that they communicate to the members.
17              THE COURT:  Let me put it this way.  After
18    listening to the testimony, I didn't hear him say anything
19    as to how the public would be aware.
20              I mean, in other words, once you're on this site,
21    I suppose there might be some educational aspect of it
22    somewhere.  But I didn't hear that there is, you know,
23    MySpace advertises where, for example, so everybody who is
24    familiar with MySpace would be familiar with this aspect of
25    it.  So where would it come into play?
```

1           MR. KRAUSE:  I believe that he did testify about

2    educational outreach efforts.  But the issue, Your Honor, I

3    think should be whether there is circumstantial evidence to

4    show that they knew that what they were doing in excess of

5    authorization.

6           THE COURT:  How would they know unless they read

7    the Terms of Service?  And the problem is that -- in other

8    words, I could understand that if, in fact, as with some

9    sites, you have to go through the Terms of Service in order

10   to get to the button that lets you join.  That's not the

11   case in this particular situation.

12          MR. KRAUSE:  I think the thing is, Your Honor,

13   you've heard testimony that both Ashley Grills and Sarah

14   told the defendant -- Ashley Grills said:  Look.  What we're

15   doing is illegal.

16          And it has only -- and it only has meaning -- she

17   says:  We're breaking MySpace rules.

18          And Sarah also told her that what they were doing

19   was wrong.

20          And what is the defendant's response?  Everybody

21   does it.

22          In other words, who cares that we're breaking the

23   rules?  Everybody does it.  That comment demonstrates that

24   she knows that what she's doing is breaking the rules,

25   violating the Terms of Service.

1            How she learned about it, I can see the testimony
2   as it is now, at the time that they opened the account, they
3   didn't at that moment read the Terms of Service.
4            But that doesn't mean they didn't know that what
5   they were doing was in violation of the Terms of Service or
6   the rules of MySpace.
7            You've heard testimony that they had a number of
8   electronic accounts; that there was active MySpace activity.
9            You heard testimony that Sarah Drew previously had
10  a MySpace account.  Proof that they read at the moment that
11  they clicked does not necessarily mean that they weren't on
12  notice previously or had that knowledge previously and had
13  knowledge during the scope of the conspiracy during the
14  duration of the conspiracy.
15           THE COURT:  Everything you just said, why isn't
16  that just pure speculation?
17           MR. KRAUSE:  Those are inferences that the jury
18  can draw from the fact Sarah Drew had an account before; the
19  fact that she was put on notice that what we're doing is
20  illegal, that it's wrong, that we should stop or we're going
21  to get in trouble.
22           The fact that they -- of all the accounts that
23  they delete on the night of October 16th, the only account
24  they delete is the MySpace account because they knew what
25  they were doing was violating the Terms of Service.

```
 1              They didn't go out and find their Xenga account
 2    and scrub that clean.
 3              THE COURT:  How do you know that Sarah Drew had
 4    this MySpace account?
 5              MR. KRAUSE:  You heard testimony that Tina Meier
 6    learned of MySpace account that was opened by Sarah and
 7    Megan the previous year.
 8              THE COURT:  Why isn't that hearsay?
 9              MR. KRAUSE:  I'm sorry?
10              THE COURT:  Why isn't that pure hearsay?
11              MR. KRAUSE:  It wasn't objected to.  It's before
12    the jury.  And it's not hearsay because she testified that
13    she checked it out and then raised, I think, some objection
14    with the defendant following her realization of the
15    existence of the account and its authorship by Sarah and
16    Megan.
17              THE COURT:  What's the response of the defense to
18    that?
19              MR. STEWARD:  That particular argument, Your
20    Honor?
21              THE COURT:  Actually, that argument and the prior
22    argument in regards to what could be considered to be
23    sufficient or potentially sufficient circumstantial evidence
24    of knowledge.
25              MR. STEWARD:  I think on a continuum it is way
```

1    down at the speculation end of things.  There is an

2    affirmative evidence here, affirmative evidence, that none

3    of those three people read or discussed or had anything to

4    do with the Terms of Service.

5           THE COURT:  Well, let me ask.  Is there sufficient

6    evidence that the jury could find that the daughter had a

7    prior MySpace account and, from that, she had knowledge --

8    could have knowledge as to the illegality or --

9           MR. STEWARD:  No.

10          THE COURT:  Why isn't that sufficient?

11          First of all, why isn't there sufficient evidence

12   of that?

13          MR. STEWARD:  I don't think there was any

14   evidence.  I didn't get what counsel was talking about.

15          THE COURT:  He was talking about Tina Meier had

16   made the -- had testified that the daughter had a MySpace

17   account.

18          MR. STEWARD:  I didn't hear that at all.

19          MR. KRAUSE:  The account was in the name of a girl

20   named Kelly.

21          MR. STEWARD:  Oh, okay.  I did hear that.

22          No, that's absolutely insufficient.

23          For one thing, I don't recall that that being

24   identified as a MySpace account.  There was certainly a lot

25   of other accounts it could have been.  We've heard about

1    Xenga and AOL and Instant Messenger and the rest of those.

2    I don't remember that being a MySpace account.

3         Not only that, if this was created, as I recall

4    the testimony, was at the Drews or at the cousin's house.

5    There would be no way for anybody at the Meier house to know

6    that that was, in fact, a MySpace account.

7         MR. KRAUSE:  Actually, that's not what the

8    testimony was.  The testimony was it was at the Drews' house

9    and that Megan Meier used the account elsewhere.  That her,

10   I think Tina's cousin or some sort of relative, told her:

11   Check out this account.  She did in front of the defendant.

12        THE COURT:  Let me do this.

13        Is this Pat over there?

14        THE COURT REPORTER:  Yes.

15        THE COURT:  Is Wil in his office?

16        THE COURT REPORTER:  I believe so.

17        THE COURT:  I'm going to take a break, and I will

18   ask the reporter to give me the portion of the transcript.

19   I do recall the testimony, but I think this one is

20   sufficiently close.

21        I want to see what the testimony actually was in

22   this regard.  So I am taking a break.  And also tell the

23   jury that we'll be taking a break for at least twenty

24   minutes.

25        Actually, tell them a half hour.

```
 1              THE CLERK:  Okay.
 2                        (Recess.)
 3      (The following was held outside the jury's presence:)
 4              THE COURT:  Let me indicate to counsel I'm taking
 5      the matter under submission because I need to get the
 6      testimony of Miss Ashley Grills; and I have the testimony
 7      from Tina Meier; and it's -- she does reference the -- she
 8      had said that she had encountered -- she had talked to her
 9      daughter Megan about the prior situation where Megan and
10      Sarah Drew were on a computer with a MySpace account
11      involving a girl named Kelly that they had made up.
12              But that is not sufficient one way or the other at
13      this point in time so I need to find out what Miss Grills
14      says so I'll take the matter under submission and I will
15      talk about it with counsel on Monday.
16              All right?
17              So with that, I guess we will continue.
18              MR. STEWARD:  Fair enough, Your Honor.
19              THE COURT:  And I presume both sides will give me
20      just something briefly in writing as to what your stand is
21      because I think I know what you're stand is.  I want to know
22      if you guys know your stand is.
23              One last thing.  If my reporter can get me the
24      transcript of Miss Grills' testimony, I'll give it to both
25      sides as well, obviously, so you guys can read it; and there
```

1    will be no dispute as to what the testimony was; and I will

2    also give you that portion of Ms. Meier's testimony where

3    she talks about that.

4              THE CLERK:  All rise for the jury.

5                   *(The jurors entered the courtroom.)*

6              THE COURT:  All right.

7              Good afternoon, ladies and gentlemen, and we'll

8    continue now with the defense case.

9                        DEFENSE CASE

10             MR. STEWARD:  Yes, Your Honor.  The defense calls

11   Tami Loehrs.

12             THE COURT:  Let me have her approach.  Just walk

13   over here next to the court reporter and the clerk will

14   swear you in.

15       **TAMI LOEHRS, DEFENDANT'S WITNESS, SWORN**

16             THE CLERK:  Raise your right hand.

17             Do you solemnly swear that the testimony you shall

18   give in the cause now before this court shall be the truth,

19   the whole truth, and nothing but the truth, so help you God?

20             THE WITNESS:  Yes, I do.

21             THE CLERK:  Have a seat there, and please state

22   your name and spell your last name for the record.

23             THE WITNESS:  My name is Tami Loehrs.

24   L-o-e-h-r-s.

25

1          **DIRECT EXAMINATION**

2     BY MR. STEWARD:

3     Q.   Ms. Loehrs, how are you employed?

4     A.   I am the president of a company called Law2000.

5     Q.   What does Law2000 do?

6     A.   We specialize in computer forensics at this time.  We

7     also have a litigation department.

8     Q.   And where is this company located?

9     A.   In Tucson, Arizona.

10    Q.   How long have you been so employed?

11    A.   Since '99.

12    Q.   And can you give the jury a sketch of your education?

13    A.   Sure.  I spent a couple years at a community college

14    right after high school.  Then went on to the University of

15    Arizona.  Had my son.  Got married.  Left the UofA.  After a

16    while, went back to Pima College to get a paralegal degree.

17            Left shortly after that to have an another child.

18    After my divorce, I went back to school to the University of

19    Phoenix; and I obtained a degree in Information Systems.

20            Once I started getting into forensics, I've had

21    training with guidance software which is the EnCase.  It's a

22    forensic tool.  I've taken training classes through them and

23    their certification process which involves a test, both a

24    written test and a practical exam.

25            I have to maintain credit hours every year.  I

1    think it's 64 credit hours every two years of additional

2    forensics training so I've had hundreds of hours of

3    additional forensics trainings, labs on various subjects

4    from viruses to hacking to Windows, et cetera.

5            I've had training through Access Data which is the

6    parent company for Forensic Tool Kit, another forensic tool.

7    I am also certified in their product.  I took their

8    certification.

9            I've given seminars, speeches.  I think that about

10   covers the educational part.

11   Q.   And for how many years have you been in the field of

12   computer forensics?

13   A.   Well, I've been in computers for 20 years.  I've been

14   in computer forensics specifically since '99.

15   Q.   And have you performed a number of computer

16   examinations?

17   A.   I have performed hundreds of forensic exams on

18   thousands of hard drives, removable media, cellphones,

19   cameras, anything with data in it.

20   Q.   And have you worked as a computer -- as an expert

21   appointed by courts?

22   A.   Yes.  I've worked in both state and federal courts all

23   over the country.

24   Q.   Have you testified as an expert in computer issues in

25   courts before?

43

A.   Yes.  Again, I've testified in state and federal courts
all over the country I think about 25 times.

Q.   Okay.  And in each of the times that you testified,
were you allowed as an expert in the area of computer
examination forensics?

A.   Yes, I was testifying as a computer forensic expert in
all of those cases.

Q.   And when was the last time you testified?

A.   Two weeks ago.

Q.   Okay.

         MR. STEWARD:  Your Honor, at this time I offer
Ms. Loehrs as an expert in computer forensics.

         THE COURT:  Any objection?

         MR. KRAUSE:  No, Your Honor.

         THE COURT:  All right.  We'll recognize her as an
expert in that area.

BY MR. STEWARD:

Q.   Ms. Loehrs, turning to this specific case, did you
receive two mirror copies of a couple of hard drives?

A.   Yes, I did.

Q.   And what was your understanding of what was contained
on these computer hard drives?

A.   I received one hard drive with forensic images of two
separate drives identified as QLA1 and QLA2.  I understood
those to be the home computer of the Drews and the home

1    computer of the Meiers.

2    Q.   And when we say "a mirror copy," what does that mean?

3    A.   It's a forensic copy.  It's a bit-for-bit forensic

4    image.  They take a hash value which is sort of like a

5    signature of the original hard drive.  They make a forensic

6    image using a write blocker and forensic tools.

7              Then they get the hash value of that copy and they

8    match those hash values to verify that it is exactly the

9    same bit for bit.

10   Q.   And when you got these hard drives, what did you do?

11   A.   I connected the drive to my forensic machine and using

12   tools, EnCase that I mentioned, I added the evidence files

13   into those tools and began doing a forensic exam on the hard

14   drives.

15   Q.   And why did you do that?

16   A.   I was asked to look for evidence related to this case

17   for a time period.  I believe it was from September 20th,

18   '06, until October of '06 regarding MySpace and instant

19   messages and that sort of thing.

20   Q.   And how long did you your examination take?

21   A.   I think all in all I spent approximately 30, 35 hours

22   doing the exam.

23   Q.   And did you do your review geared to anything in

24   particular, for example, the Indictment in this case?

25   A.   Yes.  One of the first things I do when I get these

1   cases I review the disclosure materials to see what the

2   issues are.

3           So in this case I reviewed the Indictment where

4   there were several specific acts listed in the Indictment so

5   I was looking specifically for evidence related to those

6   overt acts.

7   Q.   And did you produce a report?

8   A.   I did.

9   Q.   And it's some 70 pages, something like that?

10  A.   It's 80.

11  Q.   In full color or quite a bit of color?

12  A.   Yes.

13  Q.   Okay.  Let me ask you about some of your findings from

14  this particular view and specifically -- and I would ask you

15  if you can remember, if you can recall your conclusions

16  without reading the report, please do so.  If you can't, let

17  me know and we'll take care of it that way.

18          Did you find any evidence that the Josh Evans

19  MySpace account was created on the Drew's computer as

20  alleged in Overt Act No. 1?

21  A.    No.  I found no evidence that that account was created

22  on the Drew's computer.

23  Q.   Okay.  Was that surprising to you?

24  A.   Based on what I had heard, yes.  I believed that this

25  whole case was about this account being created by Lori Drew

1   so, yes, I was very surprised.

2   Q.   Can you think of any reason -- well, let's assume for a

3   moment as an expert that it was, in fact, created on that

4   computer.  Can you think of any reason why it wouldn't have

5   shown up in your examination?

6   A.   The only reason that something like that wouldn't show

7   up is if the data had been irretrievably overwritten; and

8   for it not to come back forensically, it would have to be

9   overwritten to the point where it was gone.

10          The problem is in this particular case is the hard

11  drive I was dealing with was 120 gigabytes.  That was the

12  complete, the total size.  Only 22 gigabytes was allocated

13  to data meaning the drive was only approximately 18 percent

14  full.  So there were 80 gigabytes on the hard drive of empty

15  space where data would reside.

16          Even if you delete files, they continue to reside

17  on your hard drive.  So if your hard drive is very large,

18  there's plenty of space for data to go.  I wouldn't expect

19  to see this overwritten entirely.

20          And on top of that, the time period this account

21  was allegedly created on September 20th and, according to

22  the acquisition information, I believe it was -- it was

23  forensically imaged on December 27th so you have only three

24  months of time to overwrite all this data sitting in 80

25  gigs, and that didn't seem possible.

1    Q.   Next, did you find any evidence that the photograph of

2    the boy alleged to be Josh Evans was posted to the

3    Josh Evans MySpace account from the Drew's computer on

4    September 20th, 2006, as alleged in Overt Act No. 2 of the

5    Indictment?

6    A.   No.  I looked for every image on the computer.  In

7    fact, I ran a file carving process.  Every image file has a

8    header and a footer.  The forensic tools can go through the

9    unallocated portion of the drive; that 80 gigs of deleted

10   space or empty space.

11          It looks at every file and pulls up every deleted

12   image based on the file header and the file footer.  So I

13   ran searches for every image on this computer, and the image

14   of Josh Evans does not exist on this computer.

15   Q.   And that would have been on the Drew's computer,

16   correct?

17   A.   Correct.

18   Q.   Okay.  Next, did you find any evidence that the

19   Josh Evans MySpace account sent a message or posted a

20   comment to Megan Babi on September 20th, 2006, from the

21   Drew's computer as alleged in Overt Act No. 3?

22   A.   No.  There was no evidence that a message was actually

23   sent or posted from the Drew's computer on the 20th of

24   September, 2006.

25   Q.   Did you find any evidence that the Josh Evans -- that

1  the Josh Evans profile sent an electronic communication to

2  Megan Meier on September 26th from the Drew's computer as

3  alleged in Overt Act No. 4?

4  A.    I believe that's September 22nd.

5  Q.    I'm sorry.  My creeping dyslexia has struck again.

6  A.    No, I did not find any evidence, again, that a message

7  was actually sent from that computer or message was posted

8  from that computer on the 22nd of September of 2006.

9  Q.    Did you find any evidence that the Josh Evans profile

10  sent an electronic communication to Megan Meier on

11  September 24th, 2006, from the Drew's computer as alleged

12  in Overt Act No. 5 of the Indictment?

13  A.    No.  And I don't recall what Overt Act 5 was.  These

14  overt acts were very specific about the messages that were

15  sent; but I did not find any message sent or posted

16  specifically related to this overt act on that date.

17                    *(Pause in the proceedings.)*

18  BY MR. STEWARD:

19  Q.    Did you find any evidence that the Josh Evans MySpace

20  account was altered on September 26th of 2006 using the

21  Drew's computer as alleged in Overt Act No. 6 of the

22  Indictment?

23  A.    No.  I found no evidence that the profile was altered

24  from the Drew's computer on the 26th of September, 2006.

25  Q.    Next, did you find any evidence that the Josh Evans

1    MySpace account was -- I'm sorry.  I did that one.

2            Did you find any evidence that the Josh Evans

3    MySpace account sent a message or posted a comment to Megan

4    Babi on October 7th, 2006, from the Drew's computer as

5    alleged in Overt Act No. 7 of the Indictment?

6    A.    Again, no.  No evidence on the Drew's computer that the

7    message sent in Overt Act 7 was actually sent or posted from

8    the Drew's computer.

9    Q.    Did you find evidence on the Meier's computer that

10   Megan Babi posted a comment to the Josh Evans MySpace

11   account on October 7th as alleged in Overt Act No. 8 of

12   the Indictment?

13   A.    Yes.  I did find evidence on the Meier's computer that

14   a message was posted on October 7th.

15   Q.    Did you find any evidence that Megan Babi sent a

16   message or posted a comment to the Josh Evans MySpace

17   account on October 10th, 2006 -- let me skip that one.

18           Did you find any evidence that the Josh Evans

19   MySpace account sent a message or posted a comment on

20   October 16th, 2006, as alleged in Overt Act No. 10 of the

21   Indictment?

22   A.    And, again, with respect to this particular one, Overt

23   Act 10, I believe was the message:  The world would be a

24   better place without you.  That message was not found on the

25   Drew's computer sent or posted on October 16th of 2006.

1  Q.   Did you ever find that on the Meier's computer?

2  A.   No, I did not.

3  Q.   Did you look for it?

4  A.   Yes, I did.

5  Q.   Did you find any evidence that the Josh Evans MySpace

6  account was deleted on or after October 16th, 2006, from

7  the Drew's computer as alleged in Overt Act No. 11 of the

8  Indictment?

9  A.   I did not find any evidence that this account was

10  deleted from the Drew's computer.

11  Q.   What sort of evidence would have convinced you that it

12  was, in fact, deleted on that date?

13  A.   When you delete a MySpace account, you have to take

14  several steps in order for that account to be deleted.  You

15  have to go to your profile, you have to log in, you have

16  to -- and, again, I don't know where the specific location

17  is -- but you have to say:  I want to delete this account.

18       The -- several different pages will come up asking

19  you why you want to delete the account and asking you to

20  confirm the deletion of this account.

21       For each of these steps that we take on MySpace,

22  for every page, every button that you click on and every new

23  page that comes up, there's HTML code inside that page.

24  That code is cached to your hard drive.

25       So as I go through the steps of deleting an

51

1   account, all of those pages would be cached to the hard

2   drive or saved to the hard drive much like some of the other

3   stuff we found.

4              I ran searches on some of this code and found no

5   evidence that any of these pages ever existed on this hard

6   drive.

7              Secondly, after you deleted it, you would get an

8   e-mail confirming a deletion of your account; and I searched

9   for all e-mails on this as well; and there were no e-mails

10  on the Drew's computer indicating that the account had been

11  deleted from this computer.

12  Q.   If it was successfully deleted, wouldn't that delete

13  all of the evidence that you're talking about?

14  A.   Absolutely not.

15  Q.   And why is that?

16  A.   Because, again, when you delete files, they don't go

17  away on the hard drive.  A pointer that says that file is

18  there is simply removed so the data itself remains in the

19  sector of the hard drive.

20             That's how we bring this back forensically.  We

21  pull the data out of these sectors.  Unless those sectors

22  are completely overwritten and the data is gone forever,

23  that information is there to be retrieved and, forensically,

24  we can often retrieve things from years ago.

25  Q.   And let me sidetrack for just a moment.

```
 1            Did you find evidence that the teenagers at the
 2   Drew residence and Megan Meier were using communications
 3   means other than MySpace?
 4   A.    Oh, absolutely.
 5   Q.    And what were they using?
 6   A.    They had Xenga accounts, they had AOL Instant Messenger
 7   accounts, and they were e-mailing each other with several
 8   different -- each of them had several different e-mails and
 9   several different AOL instant messaging profiles.
10   Q.    How about Yahoo Instant Messenger?  Did you find
11   evidence of that as well?
12   A.    I believe there was.  I believe there was Yahoo instant
13   messaging as well.
14   Q.    And when you say "they," did that include evidence from
15   both the Drew's computer and the Meier's computer?
16   A.    Yes.  And I did.  I found multiple profiles in Yahoo
17   Messenger.
18            MR. KRAUSE:  Your Honor, I'm going to object.  She
19   is reading from her report.  I'm not entirely sure if she's
20   reading from personal knowledge or just reading from a
21   script.
22            MR. STEWARD:  That's my fault; I'm sorry.
23            THE COURT:  Why don't we remove the report at this
24   point; and you can use it, obviously, to refresh your
25   recollection if it needs to be refreshed.
```

1     MR. STEWARD:  Sure.  Just put it aside for now;
2  and, again, that's my fault.  I'm sorry.
3     THE WITNESS:  Sorry.
4     MR. STEWARD:  I don't think I want to go too far
5  with it.  Thanks.
6  Q.   And, again, let me know if you need it.
7  A.   Okay.
8  Q.   Did you find evidence that the Josh Evans06 AIM -- I
9  assume that is AOL Instant Messenger screen name -- was
10 accessed by the Drew's computer on September 20th, '06 at
11 7:03 p.m.?
12 A.   I did.
13 Q.   Did you find evidence that the account was created
14 using the Drew's computer?
15 A.   That account was not created on the Drew's computer.
16 Q.   And what do you mean by that?
17 A.   When you create an account in AOL Instant Messenger, it
18 creates a folder under the user account.  Under the user
19 account, I found several folders with different AIM --
20 that's AOL Instant Messenger -- profile names.
21     If you use an AOL Instant Messenger account on a
22 computer but you didn't create it there, it will create
23 what's called the file lib folder.  It will create a file
24 under that.  That file existed with Josh Evans' name on it
25 indicating that somebody had used that AOL Instant Messenger

1    from the Drew's computer but that it was not actually

2    created there.

3    Q.   Next, did you find evidence that the Josh Evans MySpace

4    account was accessed and edited from the Drew's computer on

5    October 16th, 2006?

6    A.   I did.  I did find evidence that the account profile

7    was edited on October 16th, 2006.

8    Q.   Okay.  Did you find evidence that MySpace messages were

9    sent and comments were posted to and from unknown accounts

10   from the Drew's computer on October 16th, '06?

11   A.   Yes, I did.  I found several messages sent and also

12   messages posted, comments posted on October 16th from the

13   Drew's computer.

14   Q.   Okay.  In your examination of the Drew's computer, did

15   you find evidence that Sarah Drew had multiple e-mail

16   addresses?

17   A.   Yes, I did.

18   Q.   How about multiple screen names?

19   A.   Yes, she did.  She had multiple screen names in both

20   AOL and Yahoo.

21   Q.   And online profiles as well?

22   A.   Yes, she did.

23   Q.   Did you find any evidence that Sarah Drew was using the

24   Drew's computer during the dates and times that the

25   Josh Evans account was being accessed or edited?

1   A.   I believe I did.  I believe I saw evidence of

2   Sarah Drew on the computer during those times.

3   Q.   Okay.  Did you find evidence -- well, let me direct you

4   just at Lori Drew.  Did you find that she had any e-mail

5   addresses?

6   A.   Lori Drew, I believe, had one e-mail address for work

7   that I located on the computer.

8   Q.   And did you review the e-mail messages?

9   A.   Yes, I did.

10  Q.   Okay.  And was there a primary use for those messages?

11  A.   They appeared to be all work related.

12  Q.   Did you find any evidence that Lori Drew was using the

13  Drew's computer during the dates and times that the

14  Josh Evans account was being accessed or edited?

15  A.   No, I didn't find any evidence of Lori Drew on the

16  computer during those dates and times.

17  Q.   Focusing for a moment on Ashley Grills, did you find

18  whether or not she had multiple screen names?

19  A.   I did find multiple screen names for Ashley Grills on

20  the Drew's computer.

21  Q.   Do you recall approximately how many?

22  A.   My best recollection is she had two or three of them.

23  Q.   Okay.  Did she also have more than one online profile?

24  A.   I recall at least one profile that I saw her editing,

25  but I don't recall if she had another one.

56

```
1   Q.   Okay.  Did you find evidence that she communicated
2   online using the Instant Messenger?
3   A.   Yes, I did.  From the Drew's computer.  Sorry.
4   Q.   I'm sorry.  And also MySpace?
5   A.   Correct.  Yes, I did.
6   Q.   Did you find evidence that Ashley Grills was using the
7   Drew's computer on October 16th, 2006, when the Josh Evans
8   account was being accessed and edited?
9   A.   Yes, I did find evidence that Ashley Grills was using
10  the Drew's computer on October 16th, 2006.
11  Q.   Okay.  Now focusing for a moment on the Megan Meier
12  accounts and computer evidence, did you find that she had
13  multiple screen names?
14  A.   Yes, she did.
15  Q.   Okay.  Did she have more than one online profile?
16  A.   Yes, she did.
17  Q.   Did she communicate AOL using AOL Instant Messenger?
18  A.   Yes, she did.
19  Q.   Yahoo Instant Messenger?
20  A.   Yes, she did.
21  Q.   MySpace?
22  A.   Yes.
23  Q.   And Xenga?
24  A.   Correct.
25  Q.   Okay.  Let me ask you -- stop just a moment and ask you
```

1    about passwords.  If a MySpace account is password

2    protected, would an individual be able to use AOL Instant

3    Messenger to communicate from that same computer?

4    A.   Yes.  AOL Instant Messenger has nothing to do with

5    MySpace.  It's a completely separate account so yes.

6    Q.   Can you password protect an AOL Instant Messenger

7    account if you know?

8    A.   Oh, good question.

9    Q.   If you don't know, that's fine.

10   A.   I believe you can but I'm not positive.

11   Q.   Okay.  And a Xenga account, is that like MySpace as

12   well?

13   A.   Yes.

14   Q.   Now I'm going to ask you a couple of specific

15   questions.  Did you find any evidence in the period of time

16   that you were reviewing these hard drives of Megan Meier

17   communicating with boys other than the Josh Evans profile?

18   A.   Yes.  She communicated with several boys other than

19   Josh Evans.

20   Q.   And, again, the period of time that you were reviewing

21   was from when to when?

22   A.   From September 20th of 2006 through October 16th of

23   2006.

24   Q.   Okay.  Do you recall any specific online conversations

25   with boys during that period of time?

58

1  A.   The gist of them, yes.

2  Q.   Well, let me ask you about any specifics.  You remember

3  word for word any of them?

4  A.   Umm, wow.  There's a lot of messages.  I don't remember

5  every word.

6  Q.   Okay.  Would it help your recollection if you looked at

7  your report?

8  A.   Yes, it would.

9       MR. STEWARD:  Your Honor, may I approach?

10       THE COURT:  Yes.

11       MR. STEWARD:  Thank you.

12  Q.   And, again, Ms. Loehrs, what I'd ask you to do is if

13  you can, use your recollection.  If not, we'll go to

14  specific spots.

15       What I'd like to do is start with page 56 and 57

16  and take a look at those and see if that refreshes your

17  recollection.

18  A.   *(Searching through documents.)*  Yes.

19  Q.   Okay.  First looking at me and not the report, who was

20  this a conversation between?

21  A.   This was a conversation with an online screen name of

22  "Pimp."

23  Q.   Okay.  And did you determine that "Pimp" was a teenage

24  boy?

25  A.   He appeared to be a teenage boy.

1   Q.   Okay.  Do you recall -- well, what was the date of the

2   conversation with "Pimp"?

3   A.   Can I look at my report?

4   Q.   Sure.

5          MR. KRAUSE:  It doesn't appear that she has any

6   independent recollection she's having to refer to her

7   report.  I'd object to this line of testimony.

8          THE COURT:  Well, let's just do it the official

9   way.  Basically, what you should be doing is asking the

10  question.  If she indicates that she cannot recall, then ask

11  her if there's something to assist in her recollection.

12          If she says yes, then you show her that item; and

13  after she has reviewed it she says whether or not her

14  recollection is refreshed or not; and if her recollection is

15  not refreshed, then that pretty much ends it.

16          If it is refreshed, you can take that document

17  away from her and ask her if her recollection is refreshed.

18          MR. STEWARD:  Fine.

19          THE COURT:  So I presume you're going to do that

20  now?

21          MR. STEWARD:  Yes.

22          THE COURT:  Okay.

23  BY MR. STEWARD:

24  Q.   Ms. Loehrs, do you recall reviewing a conversation --

25  electronic conversation between Megan Meier and "Pimp" on

1    October 15th, '06 at 8:14 p.m.?

2    A.    I do recall the conversation.  I don't recall the dates

3    and times exactly without looking at my report because there

4    are many, many conversations.

5    Q.    Do you recall the words that were used in the

6    conversation?

7    A.    I don't -- again, I don't recall the words word for

8    word specifically.  I recall the conversations in general.

9    Q.    Okay.  Not remembering, would it help if you looked at

10   your report page 56?

11   A.    It would.

12   Q.    Please do so.

13   A.    Okay.  *(Looking at document.)*

14          THE COURT:  It would assist her also, you can ask

15   her -- if you're going to be asking her specific questions

16   about a specific conversation, she can look specifically at

17   that particular one; and if that refreshes her recollection

18   rather than trying to look through all of it at one period

19   of time.  You can do that.

20          MR. STEWARD:  Thank you, Your Honor.

21   Q.    Did you have a chance to look at 56?

22   A.    Yes.

23   Q.    Does that refresh your recollection about the

24   conversation?

25   A.    Absolutely.

1   Q.   And, again, that was October 15th, 2006, at

2   approximately 8:14 at night?

3   A.   That is correct.

4   Q.   And how long was the electronic conversation?

5   A.   It went from -- it was approximately four or five

6   minutes.

7   Q.   What was said if you remember?

8   A.   "Pimp" says to Megan Babi --

9           MR. KRAUSE:  She's just reading from her report.

10          THE COURT:  I'll sustain the objection.

11          MR. STEWARD:  All right.

12  Q.   Is it fair to say that there are a number of

13  conversations like this one which you discovered?

14          MR. KRAUSE:  Objection.  This is no recollection

15  refreshed; there's no basis for that.

16          MR. STEWARD:  I'm not doing that anymore.

17          THE COURT:  I'll overrule the objection.

18          THE WITNESS:  I recall all of these conversations.

19  They are using language that's abbreviated and difficult to

20  remember.  I remember all of the conversations.  I don't

21  remember word for word.

22  BY MR. STEWARD:

23  Q.   Okay.  And, again, fair to say that in the period of

24  time you reviewed there were a number of these

25  conversations, right?

```
 1   A.    Correct.  There were conversations between Megan Babi

 2   and several different boys, yes.

 3              MR. STEWARD:  Thank you.

 4              I believe that's all I have, Your Honor.  Thank

 5   you.

 6              THE COURT:  All right.

 7              Cross?

 8              MR. KRAUSE:  Thank you, Your Honor.

 9                        CROSS-EXAMINATION

10   BY MR. KRAUSE:

11   Q.    Good afternoon.

12   A.    Hi.

13   Q.    Now, my understanding your company is Law2000?

14   A.    Correct.

15   Q.    And you do some computer forensics work?

16   A.    Right now that's most of what we do, correct.

17   Q.    And you also advise companies on how they can preserve

18   electronic evidence; is that right?

19   A.    I have done some E-discovery work.

20   Q.    As part of that, you advise them on your website about

21   best practices?

22   A.    Absolutely.

23   Q.    And you tell them what they need to do if they are

24   going to be -- making sure that they collect all the

25   evidence that they need to collect; is that right?
```

```
 1   A.    Absolutely.

 2   Q.    In fact, you tell them it is absolutely imperative if

 3   you want to collect the evidence that you need to stop using

 4   whatever computers you're using; is that correct?

 5   A.    Correct.   It's called a legal hold; that's correct.

 6   Q.    In fact, you talk about electronic evidence being

 7   fragile; is that right?

 8   A.    Absolutely.

 9   Q.    In fact, you talk about computer evidence being more

10   fragile than documentary evidence?

11   A.    That's correct.

12   Q.    Because computer evidence can be lost in ways that

13   documentary evidence cannot?

14   A.    That is correct.

15   Q.    Because while a piece of paper might last for

16   centuries, computer evidence can be, for example,

17   overwritten?

18   A.    It can be.

19   Q.    And, in fact, you also talk about the need to use

20   write-blocking devices during forensic analysis; is that

21   correct?

22   A.    Absolutely.

23   Q.    Because you use write-blocking devices just to make

24   sure that during your forensic examination you don't

25   actually overwrite the data that you're trying to analyze?
```

1   A.    No.   You use a write-blocker so that you don't touch

2   that evidence because then it becomes forensically unsound.

3   It's not about overwriting data necessarily; it's about

4   accessing it.

5   Q.   Well, as you access the data, can't you change the file

6   modified date?

7   A.   Absolutely.   Things can change.   There's no question.

8   Q.   And you don't want to change things --

9            THE COURT:  Let me stop.  Let me stop.

10           Go a little bit slower.

11           MR. KRAUSE:  Oh, I apologize.

12           THE COURT:  It's like watching tennis.

13                     *(Laughter.)*

14           MR. KRAUSE:  The court reporter is excellent.

15           THE COURT:  She is excellent but she wants to

16  maintain her health.

17                     *(Laughter.)*

18           MR. KRAUSE:  How you doing there?

19                     *(Laughter.)*

20  BY MR. KRAUSE:

21  Q.   So we were talking about the acquisition of evidence.

22  A.   Correct.

23  Q.   And when you acquire evidence, you have to make sure

24  that you don't, to use a term from the drug world, step on

25  it; is that right?

1   A.   Correct.

2   Q.   Because if you were to step on it, you might overwrite

3   evidence that you're trying to preserve?

4   A.   Sure.

5   Q.   Sure?  You disagree with that?

6   A.   Umm, in a way.  It's an access issue.  Yes, you can

7   overwrite small pieces of data by accessing a hard drive.

8   It's mainly to make sure that that hash value matches and

9   that no files are touched by you because it's evidence and

10  it needs to be secured.

11  Q.   And that's why, for example, on your website you tell

12  people not to use their IT specialists in order to collect

13  evidence; is that right?

14  A.   Absolutely.

15  Q.   Because you don't want to destroy evidence?

16  A.   Absolutely.

17  Q.   You don't want to alter evidence?

18  A.   Correct.

19  Q.   Because electronic evidence more than documentary

20  evidence is fragile?

21  A.   Absolutely.

22  Q.   Easily lost?

23  A.   Absolutely.

24  Q.   In fact, it's also very important that you move quickly

25  or else you're going to lose electronic evidence; isn't that

1    right?

2    A.    You want to preserve it as soon as possible, yes.

3    Q.    In fact, you advise your clients to discontinue using

4    any computer if you think evidence exists on that computer?

5    A.    Absolutely.

6    Q.    Because if you use the computer, you might be stepping

7    on evidence, right?

8    A.    Absolutely.

9    Q.    You might be losing evidence?

10   A.    That is correct.

11   Q.    Because during the process of using a computer, you

12   could be overwriting evidence; isn't that right?

13   A.    That is correct.

14   Q.    So, in fact, you advise your clients, if possible,

15   discontinue any use of the computer; isn't that right?

16   A.    That is best practice; absolutely.

17   Q.    In fact, you go on to tell them to place the computer

18   in a secure facility; isn't that right?

19   A.    Correct.

20   Q.    Because you don't want anybody to alter the evidence in

21   any way?

22   A.    Yes.

23   Q.    Because continued use is going to result in the loss of

24   evidence?

25   A.    That is correct.

1    Q.    And a secure facility will make sure that you will not

2    continue to lose evidence; isn't that right?

3    A.    That is correct.

4    Q.    And it's your advice to your clients that if you think

5    there's any evidence at all, you have to move as, quote,

6    soon as possible; isn't that right?

7    A.    Absolutely.

8    Q.    So if a client were to call you and say:  I'd like you

9    to look at a computer in only a few months or do the

10   analysis?

11   A.    Particularly they do.  They don't actually follow my

12   advice but. . . .

13   Q.    But when you get a call, you don't say:  Well, I've got

14   time in three months?

15   A.    I advise them, when they call me, to stop using it,

16   secure it, and let me get a forensic image of it.

17   Q.    Okay.  Because it doesn't make sense to wait for a few

18   months?

19   A.    No, it doesn't.

20   Q.    Because if you do that, then you start -- then you've

21   already lost evidence?

22   A.    You have lost potential evidence.

23   Q.    And you've lost the ability to make sure that you're

24   getting everything?

25   A.    Correct.

1   Q.   Because the overwriting process is going on as you

2   continue to use the evidence -- or continue to use the

3   computer?

4   A.   That is correct.

5   Q.   If you haven't stopped and put it in a secure facility?

6   A.   That is correct.

7   Q.   And if you don't do that, you'll result in a situation

8   where evidence might be spoiled, right?

9   A.   That's possible, yes.

10  Q.   Because you already started to overwrite stuff that's

11  in an allocated space?

12  A.   Sure.

13  Q.   Now, turning to your examination of the computers in

14  this particular case, you had testified that you had found

15  evidence that the Josh Evans profile was edited on

16  October 16th, 2006; is that right?

17  A.   Correct.

18  Q.   In fact, it was an accessed at 4 o'clock?

19  A.   I don't recall.  I'd have to look in my report.

20  Q.   Would it be helpful if I handed up a portion of the

21  report to you?

22  A.   Sure.  Yes.   *(Looking at document.)*

23  Q.   Does that refresh your recollection?

24  A.   Oh.  I'm sorry, yes.  4 o'clock on 10-16.

25  Q.   Thank you.

```
 1              I'm going to hand another exhibit to you.  I guess
 2     I'll put it as government's next in order.  I think we're
 3     on -- What? -- 27.
 4              THE COURT:  Have you given a copy to counsel?
 5              MR. KRAUSE:  I'm going to go hand him one now.
 6              THE COURT:  Let me ask defense counsel.
 7              Do you know what that is?
 8              MR. STEWARD:  Yes, Your Honor, I do.
 9              THE COURT:  Any objection?
10              MR. STEWARD:  None.
11              THE COURT:  All right.  It will be marked as
12     Exhibit 27 and it will be admitted.
13              (Exhibit 27 received in evidence.)
14     BY MR. KRAUSE:
15     Q.   And do you recognize this exhibit?
16     A.   Yes, I do.
17     Q.   This is from your report, isn't it?
18     A.   Yes, it is.
19     Q.   And this is --
20              (The exhibit was displayed on the screen.)
21     BY MR. KRAUSE:
22     Q.   This is something that you found on the defendant's
23     computer showing that the Josh Evans account was accessed.
24     A.   That the actual profile was edited.
25     Q.   Right.  In other words -- and isn't it true,
```

1    Ms. Loehrs?

2    A.    Loehrs.

3    Q.    Loehrs.  I'm sorry.

4    A.    That's okay.

5    Q.    Ms. Loehrs, isn't it true that in order to edit the

6    profile, you need to access the account?

7    A.    Oh, absolutely.

8    Q.    And so the Josh Evans account was actually accessed

9    from the defendant's computer?

10   A.    Absolutely.

11   Q.    And it was edited from the defendant's computer?

12   A.    Absolutely.

13   Q.    On October 16th, 2006?

14   A.    Yes.

15   Q.    But this isn't just the only evidence that the

16   Josh Evans account was accessed from the defendant's

17   computer; isn't that right?

18   A.    The Josh Evans account was accessed from the computer

19   on several different dates in different ways.

20   Q.    For example, it was used to send messages to Megan Babi

21   at 4:18?

22   A.    On what date?

23   Q.    October 16th, 2006.

24   A.    Again.  I'm going to take your word for it out looking.

25   Q.    You don't have to take my word for it.

1     A.    Then I need my report.

2     Q.    I'm going to hand you something.

3           MR. KRAUSE:  I'm sorry, Dean.  I'll run back.

4     Q.    It's page 13 of the report.

5     A.    *(Looking at document.)*

6     Q.    Does that refresh your recollection?

7     A.    This is a e-mail sent -- a reply message at 4 -- yes,

8     at 4:18, correct.

9     Q.    So, in other words, you found evidence not only that

10    the Josh Evans account profile was edited but that it was

11    used to send messages to Megan on October 16th, 2006 at

12    4:18 p.m.?

13    A.    Oh, absolutely.

14    Q.    And one of the ways that you were able to show that the

15    account was actually used there is that it was a reply

16    message, was it not?

17    A.    That's correct.

18    Q.    And a reply message would indicate that the account was

19    used by the person who's actually typing the message, then?

20    A.    That's correct.

21    Q.    Okay.  Actually, while we're talking about that, you

22    had testified that you had no evidence that the defendant

23    was using the computer to send messages to Josh Evans.

24          Was there a camera on the computer that you were

25    able to access to see who was actually typing?

1    A.    I reviewed the computer evidence.

2    Q.    Right.  And there was no video camera on the computer

3    that left trace evidence as to who was typing at any given

4    time, was there?

5    A.    Absolutely not.

6    Q.    So you have no idea who was actually typing at any

7    given time?

8    A.    No.  I looked for activity surrounding that --

9    identifying other users.

10   Q.    So if there is only one -- it's called a process,

11   right? -- that's going on in the computer at any given time?

12   You heard of the term "process"?

13   A.    I'm not quite clear what you mean by "process."

14   Q.    Okay.  When you have one program running at any given

15   time and it's a word processing program, how might you

16   determine who was using that word processing program at any

17   given time?

18   A.    Let's say a word processing document was being created

19   at 4:18.  At 4:17, if someone logs into their e-mail account

20   and said:  Hey, mom, you know, what have you --

21   Q.    Let me stop you right there.  Let me stop you right

22   there.  There's only one thing going on at any given time,

23   there is no conflict, you have no basis for determining who

24   was using that one program at any given time; isn't that

25   right?

1    A.    Oftentimes you can't tell who's at the keyboard,

2    absolutely.

3    Q.    Unless you have sort of an eyewitness, for example, who

4    might be able to tell you who was typing at any given time?

5    A.    Well, that would certainly be the best way to do it.

6    Q.    Eyewitness testimony is the best way, isn't it,

7    Ms. Loehrs?

8    A.    That's not what I did.  I examine computer evidence.

9    Q.    And you weren't there at the computer at any of these

10   instances?

11   A.    Absolutely not.

12   Q.    So you don't know who was typing at any given time?

13   A.    Absolutely not.

14   Q.    You're only guessing based on inferences, based on

15   processes, that may have or may not have been happening?

16   A.    I analyze the data that I see on the computer and I'm

17   making conclusions based on that data.

18   Q.    And your conclusions are primarily based on an

19   inference on the absence of evidence; isn't that right?

20   A.    That confused me.  I'm not quite sure.

21   Q.    Okay.  Let me -- it's 3:30 on a Friday and I apologize.

22   You should be glad I got a verb in there.

23   A.    *(Laughing.)*

24                        *(Laughter.)*

25             MR. KRAUSE:  Miss Loehrs -- Miss Loehrs --

```
 1              THE COURT:  I don't want to dwell on that last
 2    comment.
 3                          (Laughter.)
 4              MR. KRAUSE:  Those are the best ones I've got,
 5    Your Honor.  It goes down from here.  Then we go to
 6    knock-knock jokes.
 7                          (Laughter.)
 8    BY MR. KRAUSE:
 9    Q.   Ms. Loehrs, your conclusion that the Josh Evans account
10    was not formed on the defendant's computer is based on your
11    conclusion that you found no evidence on that computer for
12    that; isn't that right?
13    A.   That's correct.  I can -- again, I analyze the
14    evidence, I didn't find a shred of evidence, so my
15    conclusion was it wasn't created there.
16    Q.   But, Ms. Loehrs, isn't the inference then you're asking
17    the jury to find is that if you can't find evidence, then it
18    must not have happened?
19              MR. STEWARD:  Objection.  I don't think the
20    witness is asking the jury to find anything.
21              THE COURT:  Rephrase the question.
22    BY MR. KRAUSE:
23    Q.   Very well.
24              Ms. Loehrs, isn't the inference that you're
25    suggesting is that it didn't happen because you couldn't
```

```
 1   find any evidence?
 2   A.   I'm simply saying there is no evidence of the account
 3   being created, period.  I'm not making any inferences.  I
 4   found no evidence.
 5   Q.   Well, Ms. Loehrs --
 6           MR. STEWARD:  Excuse me.  The witness should be
 7   able to answer the question.
 8           THE COURT:  I'll sustain the objection.  Let her
 9   finish her answer.
10   BY MR. KRAUSE:
11   Q.   Ms. Loehrs, isn't the issue that you couldn't find --
12           THE COURT:  Hold on.
13           MR. KRAUSE:  Oh, I'm sorry.  I think it was your
14   soft voice, Your Honor.
15                       (Laughter.)
16           THE COURT:  You get feisty later on in the
17   afternoon, don't you?
18                       (Laughter.)
19           THE COURT:  Had you completed your answer?
20           THE WITNESS:  Yes; thank you.
21           THE COURT:  Okay.  Thank you.
22   BY MR. KRAUSE:
23   Q.   Ms. Loehrs, isn't the issue that you couldn't find any
24   evidence?
25   A.   I'm a hundred percent positive that there is no
```

76

1    evidence.

2    Q.    But you were basing that on your search of the

3    computer, didn't you?

4    A.    Absolutely.  I've been doing this a long time.  You are

5    correct.

6    Q.    Now, Ms. Loehrs, did you look at any IP records prior

7    to your testimony today?

8    A.    I did.

9    Q.    What are IP records?  Or IP logs?

10   A.    What are IP records?  Are we talking about the --

11   Q.    No, I'm asking what are log files.

12   A.    Okay.  Log files are created by various applications,

13   systems, that log activity that happen to be a number of

14   different things.

15   Q.    And, oftentimes, log files are chronological, are they

16   not?

17   A.    Oh, absolutely.

18   Q.    And sometimes you use a log file in order to determine

19   who might have intruded into a particular system; is that

20   right?

21   A.    Who?  No.  How?  Yes.

22   Q.    Let me rephrase the question.

23          Log files are often computer-generated lists that

24   contain types of information regarding the activities of a

25   computer; is that right?

```
 1   A.    Very good definition, yes.
 2   Q.    Thank you.  And it might let you know which -- which IP
 3   addresses, for example, were used to access a particular
 4   computer at any given time; is that right?
 5   A.    That's possible, absolutely.
 6   Q.    It might exist like a phone record; is that right?
 7   A.    Yeah.  I don't like using IP with phone but okay.
 8         Because IP addresses can be used by multiple
 9   computers so. . . .
10   Q.    Well, an IP address is a unique number, though, is it
11   not?
12   A.    It is a unique number.
13   Q.    And it's used to route traffic over the Internet?
14   A.    Correct.
15   Q.    And make sure that data goes from one point to the
16   other point with -- well, at least the idea is that it's
17   going in the right direction to the right place; is that
18   right?
19   A.    Sure.
20   Q.    Sure?
21   A.    Yeah.  I -- yes.
22   Q.    Okay.  And prior to preparing this report that we've
23   been discussing, did you review any MySpace log files?
24   A.    I reviewed in the disclosure -- again, to the best of
25   my recollection, I reviewed that there were several
```

```
 1   different IP addresses that were mentioned that had accessed

 2   the Josh Evans account.

 3   Q.   And did you look at the IP records that had accessed

 4   the Josh Evans account on, say, September 20th, 2006?

 5   A.   I don't recall specifically.  Again, if you can show

 6   them to me, I can tell you if I've seen those.

 7   Q.   Well, let me show you something then.

 8           There should be a folder in front of you.  I'd

 9   like you to look at what has been marked as Government's

10   Exhibit 2 in evidence.

11   A.   (Searching through documents.)  Oops.

12           MR. KRAUSE:  I can hand up another exhibit if it

13   would be easier.  We have another book, Your Honor.  I can

14   hand you one.

15           THE COURT:  I know what it looks like.

16           THE WITNESS:  Oops.

17           (The exhibit was displayed on the screen.)

18           THE WITNESS:  I don't believe I did see this

19   record.

20   BY MR. KRAUSE:

21   Q.   You didn't look at this record?

22   A.   I don't believe I saw this one.

23   Q.   You didn't look at this record before you prepared your

24   report?

25           MR. STEWARD:  Objection; asked and answered.
```

```
 1              THE COURT:  Let me stop.
 2              You've asked her -- she is giving you a response.
 3    You kind of twisted the response so I don't know if that was
 4    intentional.  But listen to what her answer was.
 5              MR. KRAUSE:  Okay.
 6    Q.   Well, please look at the report if you could.
 7    A.   Yes.  This report was not provided to me so I never saw
 8    it.
 9    Q.   I'd like you to turn to the last page of that report.
10    A.   (Witness complies.)  Okay.
11    Q.   And you see an IP address associated with
12    September 20th, 2006?
13    A.   I do.
14    Q.   And what is that IP address?
15    A.   68.188.35.101.
16    Q.   Did you ever investigate to whom that IP address was
17    assigned on September 20th, 2006?
18    A.   That IP address would have been assigned to the Drew's
19    router.
20    Q.   So the Drew's router was in the Drew's house, right?
21    A.   I would assume.
22    Q.   And do you see any other activity on -- associated with
23    any other IP address on that date?
24    A.   I only see one entry for September 20th.
25    Q.   That's the one with IP address 68.188.35.101?
```

1    A.    Correct.

2    Q.    Ms. Loehrs, a computer associated with that router then

3    accessed the Josh Evans account on September 20th, 2006?

4    A.    I don't know which computers used that IP address on

5    September 20th in 2006.  I don't -- I have no idea which

6    computers used that IP address.

7    Q.    But the router, in your opinion, was in the defendant's

8    residence?

9    A.    I didn't see the router.  My understanding is the ISP

10   provided this number as being subscribed to the Drews on

11   this particular date and time which means this IP address

12   would have been used by their router, or their modem from

13   their ISP.

14   Q.    Turning your attention to the first page of that same

15   exhibit --

16          (The exhibit was displayed on the screen.)

17   BY MR. KRAUSE:

18   Q.    -- have you had a chance to review that?

19   A.    Yes.

20   Q.    And does this log -- does this report indicate what IP

21   address was used to sign up in the Josh Evans account or

22   friend ID No. 112131046?

23   A.    Yes.  It's the same IP.

24   Q.    Okay.  And that's assigned to the Drews by Charter,

25   right?

1    A.    Absolutely.

2    Q.    Turning, if you could, to the second page of that

3    exhibit --

4              (The exhibit was displayed on the screen.)

5    BY MR. KRAUSE:

6    Q.    -- do you see an IP address 68.188.35.101?

7    A.    Yes.

8    Q.    In fact, there are several listings for that IP

9    address, are there not?

10   A.    There are several IP addresses on here.  Yeah, there's

11   a bunch of them.

12   Q.    There are several log-in dates and times associated

13   with IP address 68.188.35.101; is that not right?

14   A.    That's correct.

15   Q.    In fact, I see one, two, three, four, five, six, seven,

16   eight, nine log-ins on October 16th from that IP address.

17   A.    That is correct.

18   Q.    And that IP address belongs to the defendant, does it

19   not?

20   A.    Again, according to Charter, it was assigned to their

21   router on that date and time, yes.

22   Q.    In fact, we see that IP address also on a little

23   further down the page on October 14th, do we not?

24   A.    Yes, we do.

25   Q.    In fact, we see it several times in this log?

1    A.    Yes.

2    Q.    In fact, it's the number that comes up the most, does

3    it not?

4    A.    Umm --

5    Q.    If you need to take a look at the exhibit.

6    A.    There's another one that comes up.  Yeah, it looks like

7    it comes up more than the other ones.  Yes.

8    Q.    Now, Ms. Loehrs, let's talk about temporary Internet

9    files.  Temporary Internet files are not kept forever, are

10   they?

11   A.    Forever?  Temporary Internet files can be deleted

12   automatically and temporary Internet files can be deleted by

13   a user and some people have temporary Internet files on

14   their system for years.

15   Q.    Let's talk about each of those scenarios that you've

16   talked about.  A person can delete one's temporary Internet

17   files, can they not?

18   A.    Yes, they can.

19   Q.    In fact, could you please tell the members of the jury

20   how you delete temporary Internet files on the Internet

21   Explorer?

22   A.    You go to the -- there's an options tab and there's a

23   button in there that you can tell it to delete your

24   temporary Internet files.

25   Q.    And once those temporary Internet files are deleted,

1    those files are pushed into unallocated space?

2    A.    That's correct.

3    Q.    And once it's in unallocated space, it's at risk of

4    getting overwritten, is it not?

5    A.    That's correct.

6    Q.    Now, isn't it also true that they sell software that

7    allows you to wipe the Internet history files?

8    A.    There's software to wipe all kinds of data, yes.

9    Q.    In fact, you've used such software in order to

10   forensically wipe a drive, correct?

11   A.    Absolutely.  We use it every day.

12   Q.    Yeah.  Because there are sometimes where you want to

13   eliminate all of the evidence on a particular device?

14   A.    Absolutely.

15   Q.    And when you do that, then there is no longer any

16   evidence on that drive?

17   A.    That's correct.  Whatever you wipe is irretrievable.

18   Q.    But, Ms. Loehrs, but if you were to come across a drive

19   that has been forensically wiped, you would have no way of

20   knowing whether evidence existed on that drive before?

21   A.    Well, wiping software sometimes leaves logs.

22   Certainly, if the wiping software is installed.  If the

23   wiping software is installed and used and then uninstalled,

24   then, no, I probably wouldn't have any way to track that.

25   Q.    Okay.  And in those situations you'll not be able to

84

1    infer that -- if you were to -- let me try that again.

2              If you were to come across a drive that had been

3    forensically wiped and then the software has been, you know,

4    removed so that there's no trace of it, you could not -- the

5    issue you inferred that there was never any evidence on that

6    computer because you didn't find any, you would be wrong; is

7    that right?

8    A.    Again, I would look for evidence.  If I didn't find any

9    evidence, I would say:  I found no evidence.

10   Q.    And if you found no evidence, would you necessarily

11   infer that there was never any evidence on that drive?

12   A.    I can only tell you if I don't find evidence of it, I

13   don't find events of it.  That's all I can tell you.  I

14   can't guess what was there.  I can only tell you I found no

15   evidence.

16   Q.    Okay.  And, again, that would be a conclusion that you

17   reached based on your own review that you couldn't find

18   evidence; isn't that right?

19   A.    Based on forensic methodologies, correct.

20   Q.    And you could have missed something, then?

21   A.    I'm going to say no because I'm pretty thorough.

22   Q.    You're just that good?

23   A.    I think so, yes.

24   Q.    How much do you charge?

25   A.    Huh?

```
1    Q.    How much do you charge?

2    A.    250 an hour.

3    Q.    Is that 250 for the examination?

4    A.    That's 250 an hour for everything.

5    Q.    That includes testimony?

6    A.    That includes testimony.

7    Q.    But you're only called to testify if you have something

8    to say; isn't that right?

9    A.    I'm called to testify when we go to trial.

10   Q.    Well, if you don't have evidence that is favorable to

11   the defendants, you don't get called; is that right?

12   A.    Yes, I do get called.

13   Q.    To testify that the defendant is guilty?

14   A.    No, sir.  I testify about the evidence that I find on

15   the computer whether it hurts the defendant or helps the

16   defendant.  If the case goes to trial and I'm the one that

17   examines the hard drive, then I still get called whether the

18   evidence is good for us or bad for us.

19   Q.    Well, why would someone call you if the evidence was

20   bad for that side?

21   A.    That's a very good question, and you'd have to ask

22   attorney who brings me to trial on those cases.

23   Q.    Okay.  So then isn't it fair to say that if you have

24   evidence that is not favorable to the defense, it's not

25   likely that you're going to get called?
```

86

1   A.   I would suspect that they would try to settle that

2   case.

3   Q.   And the fact of the matter is that you get $250 an hour

4   for your examinations, and you spent how many hours on this

5   case?

6   A.   The number of hours I was paid for or the number of

7   hours I actually spent?

8   Q.   I'm asking you how many you got paid for first.

9   A.   I think approximately 35.

10  Q.   And 35 at 250, how much is that?

11  A.   Oh, God.   *(Laughing.)*

12          MR. KRAUSE:  Probably the court could judicially

13  notice that.

14          THE COURT:  You want me to give this to her?

15  *(Holding calculator.)*

16          MR. KRAUSE:  That's great.

17              *(Pause in the proceedings.)*

18          THE WITNESS:  Thank you.

19          Apparently, math is not my thing.  250 times 35.

20          THE COURT:  The numbers are small.

21          THE WITNESS:  8,750; and it keeps disappearing.

22          THE COURT:  It's light sensitive.

23          THE WITNESS:  Okay.

24  BY MR. KRAUSE:

25  Q.   So you received approximately $9,000 for your testimony

1   and analysis in this case?

2   A.   Actually, no.  I billed -- I believe it was 6800 and,

3   no, I haven't been paid anything.

4   Q.   But you expect to be paid?

5   A.   I hope so.

6   Q.   Because you're in this to make money?

7   A.   Yes.  It's my job.

8   Q.   Right.  Let's talk about that job.

9            Now, isn't it true, Ms. Loehrs, that you are

10  interested in franchising your business model?

11  A.   No.  That's not very old, old material.  That was back

12  when I had an IT company that I sold a year and a half ago.

13  Q.   Isn't it true, Ms. Loehrs, that you have described your

14  role as to find scenarios for defense counsel; isn't that

15  right?

16  A.   No.  I actually find all the scenarios, not just the

17  scenario that the prosecution presents.

18  Q.   Well, that's not what you told the reporter now, isn't

19  it?

20  A.   I have no idea what I told the reporter and what got

21  printed.

22  Q.   Well, isn't it true, Ms. Loehrs, that you say:  Usually

23  I try to find out other scenarios for the defense; isn't

24  that right?

25  A.   No.  That was an article that was printed, I believe,

1    in 2002-2003; and, again, what I actually said to the

2    reporter and what they put in the thing in the article, I

3    don't know.

4              I find all of the scenarios with the evidence, not

5    just one scenario presented by one side.  I'll tell all the

6    good and all the bad.  That's what I do.

7    Q.   So are you saying that you did not talk with Karen

8    Mersak of the *Arizona Daily Star*?

9    A.   I'm sure I did.

10   Q.   And this wasn't -- didn't she do a profile on you?

11   A.   Yes, she did.

12   Q.   And talked about your marketing niche in the legal

13   profession?

14   A.   I have the article hanging on my wall.

15   Q.   And so you're proud of the article?

16   A.   Absolutely.

17   Q.   Doesn't it say in the article:  Usually I try to find

18   out other scenarios for the defense.

19   A.   That's what it says in the article, absolutely.

20   Q.   And isn't it true, Ms. Loehrs, that you are less

21   interested in finding what happened and just finding

22   scenarios in which you can argue?

23   A.   I don't agree with that statement.  I look for

24   everything, good or bad.

25   Q.   And, of course, are you familiar with system restore

1    points?

2    A.    Yes, I am.

3    Q.    And what is a system restore point?

4    A.    It's a -- in Microsoft Windows, a system restore point

5    takes a snapshot of your system at various times.  It can be

6    set automatically.

7         It can do a system restore point if something

8    happens on your computer.  Say something major is changed,

9    it will take a system restore point.

10   Q.    And then why didn't you do an analysis of the

11   change-out log file showing the existence of additional

12   Josh Evans06 folders?

13   A.    I'm sorry.  I missed that question.

14   Q.    I'm asking why didn't you then do an analysis of the

15   change.log.1 file showing the existence of additional

16   Josh Evans06 folders?

17   A.    It's probably something I did not get to.  I have no

18   idea what you're talking about.

19   Q.    Okay.  So you did not perform this analysis and you did

20   not find -- you can't tell this jury that you found the

21   existence of additional Josh Evans folders that were

22   resident on the defendant's computer?

23   A.    I ran keyword searches on Josh Evans that covers

24   everything:  Slap dates, allocated, unallocated.

25   Q.    But you testified to this jury that there were no

```
 1   Josh Evans folders indicating that the Josh Evans account
 2   was formed on the defendant's computer; is that right?
 3   A.   That's correct.
 4   Q.   But you didn't bother to do a system restore analysis
 5   specifically the change.log.1 file showing there's
 6   additional Josh Evans06 folders.
 7            MR. STEWARD:  Objection; argumentative.
 8            THE COURT:  Also, you said it so fast.  I don't
 9   know if the jury caught it all.  Also, let me ask the
10   witness.  Do you understand the terminology that he's using?
11            THE WITNESS:  I think -- I think I understand what
12   he's getting at.
13            THE COURT:  All right.  Do you understand the
14   question?
15            THE WITNESS:  Yes.  He wants to know why I didn't
16   do the analysis.
17            THE COURT:  Okay.  I'll allow her to answer the
18   question.
19            THE WITNESS:  I ran the keyword searches.
20   BY MR. KRAUSE:
21   Q.   And that's all you did?
22   A.   That's correct.
23   Q.   So you didn't look for additional Josh Evans folders
24   that would have shown that the Josh Evans account was formed
25   on your client's computer?
```

```
 1   A.    I did not do the analysis that you're talking about.

 2   Q.    Okay.  You didn't bother to check whether the

 3   Josh Evans account was actually formed on the computer?

 4            MR. STEWARD:  Objection; argumentative.

 5            THE COURT:  I'll sustain the objection.

 6   BY MR. KRAUSE:

 7   Q.    Is it fair to say you didn't do everything you could do

 8   to see whether or not it was formed on your client's -- on

 9   the client's computer?

10   A.    I could have worked on this case for months.  I have a

11   very limited amount of time I'm approved for so I did as

12   much as I can.

13   Q.    So you didn't do it?

14   A.    That's exactly right.  I did as much as I could.  I did

15   the keyword searches which covers all of that.

16   Q.    Now, did you attempt to determine how many temporary

17   Internet files were on the computer?  The defendant's

18   computer?

19   A.    The software would tell me how many.  It's not

20   important to me, the number of temporary Internet files.  It

21   wasn't key in this case.

22   Q.    Did you bother to determine which temporary Internet

23   files had been deleted?

24            MR. STEWARD:  Objection; argumentative.

25            THE COURT:  Let me ask the witness.
```

92

```
 1              Do you understand the question?
 2              THE WITNESS:  Yes.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Yeah.  All the temporary Internet
 5   files were deleted.  All the ones that I recovered were
 6   deleted.
 7   BY MR. KRAUSE:
 8   Q.   And did you attempt to determine which temporary
 9   Internet files or the dates of temporary Internet files that
10   were unrecoverable?
11   A.   Did I -- again, I'm sorry.
12   Q.   Did you do an analysis to determine which temporary
13   Internet files, which ranges of dates were unrecoverable?
14   A.   Which ranges?  I'm sorry.  Again, I'm confused by your
15   question.
16   Q.   Okay.  Let me try this rephrase it.
17              You're familiar with temporary Internet files?
18   A.   Absolutely.
19   Q.   And you recovered the deleted temporary Internet files?
20   A.   Yes.
21   Q.   And did you attempt to determine if there were date
22   ranges for temporary Internet files -- file dates that were
23   unrecoverable?  In other words, temporary Internet files for
24   a range of dates that just didn't exist?
25   A.   I don't understand how I could determine files that
```

```
 1   don't exist.  I guess that's what I'm missing.
 2            Again, I ran keyword searches on the important
 3   keywords; and through those keyword searches, I'm able to
 4   recover web pages and things that happened on the Internet.
 5            Sometimes those include dates in the HTML code;
 6   sometimes they do not.  But if you're saying:  Did I do that
 7   analysis, yes, I did.  But I did it through the keyword
 8   searches.  I didn't specifically look for temporary Internet
 9   files.  I looked for keywords that matched this case.
10   Q.   I think we understand what it is you did.  I'm trying
11   to understand whether or not you looked for temporary
12   Internet files to determine whether or not they had been
13   overwritten?
14   A.   Again, I guess I'm just not understanding what you're
15   saying.
16   Q.   I use the testimony that all you did was keyword
17   searches?
18   A.   No.  I mean, I looked for other things.  I ran chat log
19   searches, I ran e-mail searches.
20   Q.   But, again, ma'am, did you look for -- try to identify
21   all of the temporary Internet files?
22            MR. STEWARD:  Objection; vague.
23            THE COURT:  Can you explain "temporary"?
24            MR. KRAUSE:  The question is, Your Honor, she said
25   she's performed keyword searches in an attempt to look for
```

1  logs.  I'm trying to determine whether she tried to

2  determine the extent to which evidence was overwritten.

3          I'm trying to identify if there were temporary

4  Internet files with file creation dates that no longer

5  existed on the computer.

6          THE COURT:  I think I understand what you're

7  asking.  You're asking her whether or not she made an

8  attempt to determine whether or not there was a pattern,

9  a -- temporal pattern insofar as temporary -- logs of

10  temporary Internet files?

11          MR. KRAUSE:  Correct.

12          THE COURT:  How would she be able to do that

13  unless she knew which ones were lost before?

14          MR. KRAUSE:  I'm asking if she did such an

15  analysis to determine whether there was such a pattern.

16          THE COURT:  Let me ask the witness.  Do you

17  understand the question?

18          THE WITNESS:  I really don't and I apologize.  It

19  doesn't make any sense to me forensically so maybe I'm just

20  misunderstanding.

21  BY MR. KRAUSE:

22  Q.   Well, ma'am, is the answer then you did not do an

23  analysis to determine whether there was a pattern by which

24  the temporary Internet files were overwritten?

25          THE COURT:  Well, it may assume a fact not in

1    evidence.

2            MR. KRAUSE:  Your Honor, there actually has been

3    evidence on this.

4            THE COURT:  I understand that.  But you get that

5    evidence to this witness such that this witness understands

6    what you're referencing.

7            MR. KRAUSE:  Well, what I'm asking the witness is

8    whether she did such an analysis; and if the answer is, no,

9    she didn't do the analysis, I'll move on.

10           THE COURT:  All right.  Do you understand the

11   question now?

12           THE WITNESS:  I still don't but I'll say no, I

13   didn't do the analysis.

14   BY MR. KRAUSE:

15   Q.   But you didn't do that analysis.  That's fine.  I'll

16   move on having established that you did not perform that

17   analysis.

18           Ms. Loehrs, did you find any AIM chat evidence

19   between Josh Evans and prettynbling on the Meier computer?

20   A.   I ran chat searches on AIM.  I don't think I found

21   anything relevant to this case.

22   Q.   So you didn't find any AIM chat evidence between

23   Josh Evans and prettynbling?

24   A.   No, I did.  Again, my work was relevant to the overt

25   acts in the Indictment so, yes, there were chats.  I did

1   find chat fragments.  I didn't find any that were relevant

2   to the overt acts in the Indictment.

3   Q.   You're testifying that you did not find any chat

4   fragments regarding snakes or tarantulas?

5   A.   Oh, I did.  Absolutely.  But it had nothing to do with

6   the Indictment so I didn't put it in my report.  Did I find

7   that --

8            MR. KRAUSE:  Objection; calls for -- the answer is

9   beyond the scope and it's also a legal conclusion.

10           THE COURT:  Well, no.  You asked her a question.

11   She is explaining why she didn't do something so I'll allow

12   the answer to come in.

13   BY MR. KRAUSE:

14   Q.   Now, did you find any evidence showing private messages

15   between Josh Evans and Megan Meier on September 20th,

16   2006?

17   A.   I did find messages between Josh Evans and Megan Meier

18   on September 20th.

19   Q.   Okay.  And you included that in your report?

20   A.   Some of them.

21   Q.   And did those messages that were included messages that

22   were sent from the defendant's computer?

23   A.   No.  I found no evidence that those messages were

24   actually sent from the defendant's computer.  I found that

25   the defendant's computer accessed the Josh Evans page which

```
1    had those messages on it but that it wasn't actually sent
2    from that computer.
3    Q.   So you didn't find any evidence of it?
4    A.   There is no evidence that those messages were sent from
5    that computer.
6    Q.   That is your testimony.  Your testimony is only what
7    you found; is that right?
8    A.   My testimony is about my work.
9    Q.   And you did not find any evidence?
10   A.   I did not find any evidence that that stuff was sent.
11   Q.   Okay.  And it's your conclusion that it didn't happen
12   because you couldn't find it?
13   A.   Again, I conclude what I find with the evidence.  I
14   found no evidence of it.
15                   (Counsel conferred.)
16           MR. KRAUSE:  I have no further questions.
17           THE COURT:  All right.
18           MR. STEWARD:  No redirect, Your Honor.
19           THE COURT:  All right.  You're excused.
20           THE WITNESS:  Thank you.
21           MR. STEWARD:  Next witness, Your Honor, is Agent
22   Billy Cox.
23           THE COURT:  All right.
24           MR. STEWARD:  I'm not quite sure what he looks
25   like.  Maybe I can get Mr. Krause's help.
```

98

```
 1              Thank you.
 2          BILLY COX, DEFENDANT'S WITNESS, SWORN
 3              THE CLERK:  Please stop there.  Raise your right
 4     hand.
 5              Do you solemnly swear that the testimony you shall
 6     give in the cause now before this court shall be the truth,
 7     the whole truth, and nothing but the truth, so help you God?
 8              THE WITNESS:  Yes, sir.
 9              THE CLERK:  Have a seat.
10              Please state your name and spell your last name
11     for the record.
12              THE WITNESS:  It's Billy Cox.  C-o-x.
13                      DIRECT EXAMINATION
14     BY MR. STEWARD:
15     Q.   Agent Cox, how are you employed?
16     A.   I'm a Special Agent with the FBI.
17     Q.   And where are you stationed?
18     A.   Out of the St. Louis Division but I'm actually located
19     in a satellite office in St. Peters, Missouri.
20     Q.   And how long have you been so employed?
21     A.   A little over eleven years.
22     Q.   Been through the FBI academy, have you?
23     A.   Yes, sir.
24     Q.   Do you have any other specialized training?
25     A.   Yes, sir.
```

1   Q.   Like what?

2   A.   I was on our evidentiary response team for ten years so

3   I've been through numerous forensic classes and some SWAT

4   training, a variety of different in-service classes.

5   Q.   And at some point in your training, you've been trained

6   on report writing, correct?

7   A.   Yes, sir.

8   Q.   Let me direct your attention to the 20th of December,

9   2006.  Do you recall interviewing an Ashley Grills?

10  A.   Yes, sir.

11  Q.   And can you tell the jury where that took place?

12  A.   That took place at her grandmother's house in O'Fallon.

13  Q.   And what time of day was that, if you remember?

14  A.   I don't remember the time.  I'm pretty sure it happened

15  in the afternoon, though.

16  Q.   By the way, do you have a copy of your report with you?

17  A.   No, sir.

18  Q.   And how long did that interview take?

19  A.   Roughly an hour.

20  Q.   Okay.  And was Miss Grills -- what was her demeanor?

21  A.   Umm, I'd say she was a little nervous.

22  Q.   Cooperative?

23  A.   Cooperative, yes, sir.

24  Q.   Okay.  And in the course of your interview of her,

25  generally, just general topic, what did she discuss with

1    you?

2    A.    In general?

3    Q.    Right.

4    A.    We talked about the Josh Evans account.  The MySpace

5    account, obviously, is the main issue we discussed.

6    Q.    Okay.  And at some point did she explain to you what

7    the purpose of the Josh Evans account was?

8    A.    Yes, sir.

9    Q.    And what did she tell you?

10   A.    Basically, the purpose was that they set it up in order

11   to reach out and contact Megan Meier to see what she was

12   saying about Sarah Drew.

13   Q.    Okay.  And did she tell you whether or not the purpose

14   of the Josh Evans, account over the life of the account,

15   changed at some point?

16   A.    I'm not sure I understand that.

17   Q.    Okay.  She told you that it was, in fact, to see what

18   Megan Meier was saying about Sarah Drew, correct?

19   A.    Yes, sir.

20   Q.    At any point in your conversation with her, do you

21   remember her telling you that during the 27, 28 days it was

22   open the purpose of the Josh Evans profile changed; it had a

23   different goal?

24   A.    No, sir, I don't.

25   Q.    And you don't remember or she didn't tell you that?

1   A.   I don't remember her saying the objective changed.

2   Q.   Okay.  And in order -- well, would it help your memory

3   if you look at your report?

4   A.   Oh, sure, yes.

5            MR. STEWARD:  Your Honor, may I?

6            THE COURT:  Yes.

7            THE WITNESS:  Okay.  Thank you.  *(Looking at*

8   *document.)*  Okay.

9   BY MR. STEWARD:

10  Q.   Agent Cox, did that refresh your recollection as to

11  whether or not she told you that the goal of the Josh Evans

12  profile changed at some point?

13  A.   Yes.  Basically, what my report says is that their

14  plans were to add Sarah on to Josh Evans' favorites or

15  contact person in hopes that Megan would see that and maybe

16  generate conversation.

17  Q.   Okay.  Do you recall Grills telling you at any point

18  that the purpose at some point changed to harass or mess

19  with Megan Meier?

20  A.   If I can see my report one more time.

21  Q.   Sure.

22           MR. STEWARD:  May I, Your Honor.

23           THE WITNESS:  I apologize.  *(Looking at document.*

24  Thanks.

25

1   BY MR. STEWARD:

2   Q.   Have you looked at the report?  Does that refresh your

3   recollection as to whether or not she told you that the Josh

4   Evans' profile was changed to harass or mess with

5   Megan Meier?

6   A.   I looked through there and, you know, I didn't see what

7   I was actually looking for.  But at one time I do remember

8   and I believe it come from Miss Grills that it was created

9   to mess with Megan Meier.

10  Q.   Okay.  And when would you have heard that?

11  A.   I thought it would have been that --

12  Q.   You'll agree with me in reviewing your report just now

13  you did not see that in the report, correct?

14  A.   I didn't see it.

15  Q.   Do you recall Grills telling you that, again in regards

16  to the Josh Evans profile, that as messages would be sent

17  out that she, Ashley Grills, did all of the typing?

18  A.   I remember saying she did most of it but there was

19  other people that did typing as well.

20  Q.   Okay.  Do you recall writing in your report -- for

21  counsel's benefit, I'm at page 3 at the top of the page --

22  writing the following:  Grills advised that although Sarah

23  was with her she, Grills, did all the typing.

24  A.   Yes, sir.

25  Q.   Okay.

1   A.   Yes, sir.

2   Q.   And that's what Grills told you, right?

3   A.   Yes, sir.

4   Q.   Now, you also recall discussing with Grills the last

5   few communications between herself and Megan Meier?

6   A.   Yes, sir.

7   Q.   Okay.  And Grills told you in December of 2006 that the

8   last few communications were something to the effect of:

9   The world would be a better place without you.  Right?

10  A.   Yes, sir.

11  Q.   Okay.  And she did not tell you at that time anything

12  about:  Have a shitty rest of your life.  Isn't that true?

13  A.   She didn't mention that, but she said that was not from

14  her.

15  Q.   Okay.  Do you recall that when you wrote this report

16  there was nothing to the effect of -- by anybody -- have a

17  shitty rest of your life?

18  A.   Can I see it real quick?

19          MR. STEWARD:  May I, Your Honor?

20          THE COURT:  Yes.

21          THE WITNESS:  (Looking at document.)  Yes.

22          You're correct, yes.

23  BY MR. STEWARD:

24  Q.   So, certainly, that's not contained in your report,

25  correct?

1  A.   Yes.

2  Q.   And the way you would write a report like this is that

3  as you're interviewing a witness, you would be taking notes,

4  correct?

5  A.   Yes.

6  Q.   And then those notes would then be transferred into a

7  formal report?

8          MR. KRAUSE:  Objection; leading.

9          MR. STEWARD:  I'm sorry.  He's right.

10          THE COURT:  I presume you called this witness as a

11  hostile witness.

12          MR. STEWARD:  I think that's fair to say.

13          THE COURT:  So you can lead to a certain extent

14  with a hostile witness.

15          MR. KRAUSE:  Okay.

16  BY MR. STEWARD:

17  Q.   And, Agent Cox, is that then put into a written report?

18  A.   Yes, sir.

19  Q.   And that's called a FBI 302 report, right?

20  A.   Yes, sir.

21  Q.   And you have written many of those in your day,

22  correct?

23  A.   More than I can count.

24  Q.   Do you also recall having a conversation that day,

25  December of '06 with Ashley Grills, that Lori Drew was not

1    home at the time the last angry e-mails were sent?

2           Do you remember Grills telling you that?

3    A.   I basically remember her saying basically by the time

4    the conversation was coming to an end or had concluded,

5    Mrs. Drew was just getting home.

6    Q.   You specifically remember Grills telling you that at

7    the time the conversation was over Drew had come home and

8    Grills briefed her about what had transpired between the

9    individuals involved?

10          Do you remember Grills telling you that?

11   A.   Yes, sir.  Something about at the time the conversation

12   was over, Mrs. Drew had come home, yes, sir.

13   Q.   You also remember the part about Grills telling you

14   that she, Ms. Grills, briefed Lori Drew on what had

15   transpired?

16   A.   Can I see my report?

17   Q.   Of course.

18          MR. STEWARD:  May I, Your Honor?

19          THE COURT:  Yes.

20          MR. STEWARD:  Down there *(indicating)*.

21          THE WITNESS:  *(Looking at document.)*

22   BY MR. STEWARD:

23   Q.   So is that correct?

24   A.   Could you repeat the question?

25   Q.   Sure.  Did Ashley Grills tell you that she, Grills,

```
1   briefed Lori Drew about what had transpired between the
2   individuals involved?
3   A.   Yes, sir.  And also to include another person as well.
4   Q.   I'm sorry.  What do you mean by that?
5   A.   Later on in my report, it states that Ashley said that
6   Mrs. Drew didn't have really a reaction to what Grills and
7   her daughter Sarah had told her.
8   Q.   Okay.  You understand I didn't ask you that, right?
9   I'm just asking what she told you about the time when Drew
10  got home.  Okay?
11  A.   Right.
12  Q.   And I think you now agreed with me that by the time the
13  conversation was over, Grills told you, Drew had come home
14  and Grills briefed her about what had transpired between the
15  individuals involved, right?
16  A.   Yes, sir.  She was one of the people that briefed her,
17  yes.
18          MR. STEWARD:  Nothing further, Your Honor.
19          THE COURT:  All right.
20          Any questions for this witness?
21          MR. KRAUSE:  If I could have a moment, Your Honor.
22          THE COURT:  Sure.
23          Let's take a break a short period.  Let's take
24  about a ten-minute break or eight-minute break.
25              (The jurors exited the courtroom.)
```

```
 1                        (Recess.)

 2      (The following was held outside the jury's presence:)

 3              THE COURT:  Let me ask.  When am I going to get

 4   the --

 5              MR. KRAUSE:  They're being -- I had to look at the

 6   identified changes and I have marked it up.  The secretary

 7   is inputting the changes now.  I'm assuming the secretary is

 8   going to want to leave within the near future so she is

 9   proceeding with all due haste.  I hope to get it within the

10   next half hour.

11              THE COURT:  Okay.

12              MR. KRAUSE:  The problem was that just because

13   some of these were nonstandard instructions per the last

14   jury instruction conversation, I had to make sure those

15   instructions were not changed to revert them back to the

16   original instructions.

17              THE COURT:  Okay.

18              All right.  Is she going to bring down two copies?

19   One for me and also one for defense counsel?

20              MR. KRAUSE:  I think the instructions I gave it

21   was to put it on disk.

22              THE COURT:  You can give one to defense counsel.

23              MR. KRAUSE:  I'm assuming we're going to have to

24   look at this over the weekend so I'll get it over to you.

25   But before I do that, I want to make sure that what I'm
```

```
 1   giving both the court and counsel is consistent with what we
 2   were supposed to do; that they haven't basically made
 3   changes to make it consistent with the Ninth Circuit
 4   instruction; that they have not undone what the court wanted
 5   me to do with the supplemental instructions, for example.
 6   So it make take a little more time to get it.  I'll e-mail
 7   it tonight.
 8            THE COURT:  Why don't we do this?  You'll give me
 9   the disk and the new version.
10            MR. KRAUSE:  As long as the court doesn't mind me
11   doing it tonight.  I'd rather make sure it gets down right
12   then I'll e-mail it to you at the same time.
13                 (Court and the clerk conferred.)
14            THE COURT:  All right.
15            Why don't we bring in the jury.
16                 (The jurors entered the courtroom.)
17            THE CLERK:  You may be seated.
18            THE COURT:  All right.
19            MR. KRAUSE:  Your Honor, the government would not
20   like to ask this witness any more questions.
21            THE COURT:  You have no questions for this witness
22   is what you're saying?  That's fine.
23            The witness is excused.
24            Your next witness?
25            MR. STEWARD:  The next witness, Your Honor, is
```

1    Sarah Drew.

2              THE COURT:  All right.

3              **SARAH DREW, DEFENDANT'S WITNESS, SWORN**

4              THE CLERK:  Please stop there.  Ma'am, please

5    stop.  Raise your right hand.

6              Do you solemnly swear that the testimony you shall

7    give in the cause now before this court shall be the truth,

8    the whole truth, and nothing but the truth, so help you God?

9              THE WITNESS:  I do.  I do.

10             THE CLERK:  Have a seat.  Please state your name

11   and spell your last name for record.

12             THE WITNESS:  S -- Sarah.  S-a-r-a-h.

13             THE CLERK:  And your last name?

14             THE WITNESS:  Drew.  D-r-e-w.

15                    **DIRECT EXAMINATION**

16   BY MR. STEWARD:

17   Q.   How old are you, Sarah?

18   A.   Sixteen.

19   Q.   And are you related to Lori here?

20   A.   Yes, I am.

21   Q.   And how are you related?

22   A.   She's my mom.

23   Q.   Now, I want to ask you some questions about

24   Megan Meier.  How long did you know Megan?  When did you

25   first meet her?

1  A.    I met her in kindergarten and we became good friends in

2  fourth grade.

3  Q.    Okay.  And up through October of 2006, can you tell the

4  jury about your relationship with Megan?

5  A.    It was on and off and it was all controlled by Megan;

6  and she would come and go; and we were friends for like two

7  weeks and not friends for the next two weeks.

8  Q.    And when you would not be friends, would Megan come

9  back as friends later?

10  A.    Yes, she would.

11  Q.    And what would you do?

12  A.    I would let her because she was my best friend.

13  Q.    Now, I want to ask you about Megan and the teen Kelly

14  account.  Okay?

15  A.    All right.

16  Q.    What was that?

17  A.    It was MySpace account created by Megan, and it was

18  done on our computer but I had nothing to do with it.

19  Q.    When you say you had nothing to do with it, what does

20  that mean?

21  A.    I did not create it or type on it.

22  Q.    The -- at the beginning when it was created, did you

23  read the terms of service?

24  A.    No.

25  Q.    Did you see Megan read the terms of service?

1    A.    No, I did not.

2    Q.    Were you actually with her at the computer when the

3    account was created?

4    A.    I was in a different room at the time.

5    Q.    And what was the point of having this Kelly account?

6    A.    To meet cute guys.

7    Q.    Did it work?

8    A.    Yes.

9    Q.    And how did it work?

10   A.    She -- she gave out my phone number and we had to

11   change it because she gave it out to people from different

12   states.

13   Q.    Okay.  When you say "people," is that boys?

14   A.    Yeah, boys.

15   Q.    Okay.  And how would the -- how would the boys -- well,

16   that doesn't make sense.

17         Who did the messages on that MySpace account?

18   A.    Megan did.

19   Q.    Okay.  Did you ever type any of them?

20   A.    No, I did not.

21   Q.    Okay.  And why did you know did she put your phone

22   number on the messages?

23   A.    Yes, she did.

24   Q.    And why?

25   A.    So they could call her.

1    Q.    But why use your phone number?

2    A.    Because she didn't want her mom to know.

3    Q.    And did that account get found out?

4    A.    After the fact.

5    Q.    Okay.  And how did it get found out?

6    A.    I think she -- her mom found out somehow.

7    Q.    Did your mom find out?

8    A.    After the fact.

9    Q.    Okay.  Now, let's go to the summer of 2006.  How are

10   things going?  Let's start the beginning of the summer of

11   2006.  How are things going between you and Megan?

12   A.    I felt they were going pretty good, but I did not see

13   Megan most of the summer.

14   Q.    Do you know why that is?

15   A.    I have no idea.

16   Q.    Let's move to kind of the end of the summer in 2006.

17   Anything happen?

18   A.    I had no contact from her.

19   Q.    Okay.  Did you start to hear rumors?

20   A.    Yes, I did.

21   Q.    And what sort of things did you hear?

22   A.    That I was a lesbian.  My clothes are dirty.  My mom

23   never washes my clothes.  I'm fat and ugly.

24   Q.    And where were these rumors supposed to be coming from?

25   A.    They came from MySpace.

1  Q.    And who was spreading the rumors?

2  A.    Megan.

3  Q.    How do you know that?

4  A.    Because she sent me some messages and I heard from

5  friends.

6  Q.    Did that concern you?

7  A.    Yes.

8  Q.    Make you sad?

9  A.    Yes.

10  Q.    Now, at some point Megan switched schools, right?

11  A.    Yes, she did.

12  Q.    Did you have any reaction to that?

13  A.    I was upset because I wanted to go to school with her

14  but it didn't bother me that much.

15  Q.    Did your mom know that Megan switched schools?

16  A.    Yes, she did.

17  Q.    Did your mom have any reaction?

18  A.    I'm not sure.

19  Q.    Now, at the start of the -- well, let's do this.

20        How did the Josh Evans profile get started?

21  A.    Ashley started it.

22  Q.    And how did it come about that it got started?

23  A.    Ashley was mad because she found out Megan was saying

24  bad things about me.

25  Q.    Okay.  So Ashley heard bad things about you?

1    A.    Yes.

2    Q.    Okay.  Did she tell you about that?

3    A.    Yes.

4    Q.    And what sort of things did Ashley tell you about?

5    A.    That I was a lesbian.  I'm fat and ugly.

6    Q.    Did she tell you how she had heard these things?

7    A.    Yes.  From friends.

8    Q.    Did she say anything about getting an e-mail?

9    A.    No.

10          MR. O'BRIEN:  Object, Your Honor.  It's hearsay.

11          THE COURT:  I'll sustain the objection.

12   BY MR. STEWARD:

13   Q.    Who actually set up the profile for Josh Evans?

14   A.    Ashley did.

15   Q.    And where did that happen?

16   A.    At our house.

17   Q.    Okay.  And tell us how that happened.  How did it come

18   about?

19   A.    She was mad that Megan was saying bad things about me.

20   Q.    And so whose idea was it to create the MySpace account?

21   A.    Ashley's.

22   Q.    And who actually filled out the profile?

23   A.    Ashley did.

24   Q.    Okay.  Did your mom know that was being done?

25   A.    No, she did not.

```
 1                MR. O'BRIEN:  Objection.  Calls for speculation,
 2   Your Honor.  Foundation.  Move to strike the answer.
 3                THE COURT:  Unless you can lay the foundation,
 4   I'll strike the answer.
 5                MR. STEWARD:  Withdrawn.  That's fine, Your Honor.
 6   Q.   Now, did your mom play any role in the creation of the
 7   profile?
 8   A.   No, she did not.  She knew about it, but that was it.
 9   Q.   Okay.  And when did she learn about it?
10   A.   After, a few days after she started; she created it.
11   Q.   And what was the purpose of the Josh Evans profile?
12   A.   To find out what Megan was saying bad about me.
13   Q.   Okay.  How long was the profile open, if you know?
14   A.   Four -- I think four weeks.
15   Q.   Now, in that four-week period, did the purpose or the
16   goal of the profile, did it change?
17   A.   No.
18   Q.   Now, how long did you know Ashley Grills?
19   A.   Since I was three years old.
20   Q.   And did she spend a lot of time at your house?
21   A.   Yes.  She spent like every day with us.
22   Q.   Okay.  And why was that?
23   A.   She loves spending time with us.  She loves to babysit
24   me and she felt like she's part of our family.
25   Q.   Did she eat over at your house?
```

1    A.    Yes, she did.

2    Q.    Often?

3    A.    Yes.

4    Q.    In the summer of 2006, did Ashley come to work at your

5    house?

6    A.    Yes, she did.

7    Q.    Okay.  And what did she do?

8    A.    She filed for my mom and did work in her office.

9    Q.    Okay.  And what kind of business did your mom have in

10   the summer of 2006?

11   A.    Advertising.

12   Q.    Now, while the Josh Evans profile was open, was there a

13   time when Megan really got interested in the Josh Evans?

14   A.    Yes, there was.

15   Q.    And about when was that?

16   A.    Two weeks into it.

17   Q.    Okay.  And what happened then?

18   A.    My mom had asked her that it's not a good idea and that

19   she should close it down so Ashley decided to say there was

20   a funeral.

21   Q.    And your mom had told Ashley to shut down the MySpace?

22            MR. O'BRIEN:  I'm going to object, Your Honor.

23   This is hearsay.

24            THE COURT:  I'll sustain the objection unless you

25   can lay a foundation.

```
 1   BY MR. STEWARD:
 2   Q.   Did you specifically speak to your mom about the
 3   MySpace in the middle of the summer -- of the middle of the
 4   four-week period that it was open?
 5   A.   Yes.
 6   Q.   Okay.  And did your mom share with you any concerns
 7   about MySpace?
 8   A.   Yes, she did.
 9   Q.   Okay.  And did she instruct Ashley Grills to shut it
10   down?
11   A.   Yes, she did.
12            MR. WOLFE:  Objection, Your Honor.  It's hearsay.
13            THE COURT:  Sustained.
14            MR. O'BRIEN:  Motion to strike.
15            THE COURT:  I'll strike the answer.
16   BY MR. STEWARD:
17   Q.   Do you know if the Josh Evans account was shut down in
18   the middle of that four-week period?
19   A.   Yes, it was.
20   Q.   And when you say it was shut down, what do you mean?
21   A.   Ashley closed it down the day after -- the day that
22   Megan killed herself.
23   Q.   Okay.  What I'm asking about is before that, like the
24   middle of the four-week period, did Ashley or anybody else
25   shut down that account?
```

1  A.   No.

2  Q.   Okay.  Now, the typing on the account, did your mom

3  ever type on it?

4  A.   No, she did not.

5  Q.   Okay.  Did you ever type on it?

6  A.   Once.

7  Q.   And how did that happen?

8  A.   I was seeing how Megan was doing because I hadn't heard

9  from her in a long time.

10  Q.   But you were appearing to be the Josh Evans character,

11  right?

12  A.   Yes.

13  Q.   So did you send Megan an e-mail?

14  A.   Yes.

15  Q.   And what did he say?

16  A.   I was asking her how she was doing, and she told me

17  that she got a detention for chewing gum.

18  Q.   Now, you know Jessica Mulford, right?

19  A.   Yes, I do.

20  Q.   In the fall of 2006, did you or Ashley give Jessica the

21  password to the Josh Evans account?

22  A.   I did.

23  Q.   Sorry?

24  A.   I did.

25  Q.   Okay.  Why?

1    A.   I didn't know what she was going to say and I just -- I

2    wasn't thinking clearly.

3    Q.   Okay.  But why did you give the password to Jessica?

4    A.   Jessica heard that Megan was saying bad things about

5    her.

6    Q.   Did she ask you for the password?

7    A.   Yes, she did.

8    Q.   And did you give it to her?

9    A.   Yes.

10   Q.   And why did you give it to her?

11   A.   I wanted to see what she was going to say.

12   Q.   About who?

13   A.   About Megan.

14   Q.   Okay.  And would that have been around Sunday,

15   October 15th?

16   A.   Yes, it would.

17   Q.   Okay.  Was Jessica at your house?

18   A.   No.  She was at her house.  She sent me an AIM message.

19   Q.   Were you able to read what Jessica sent to Megan?

20   A.   After the fact.

21   Q.   Now, what kinds of -- well, let me ask it this way.

22        During September and October of 2006, did you have

23   an AIM account, AOL Instant Messenger?

24   A.   Yes, I did.

25   Q.   Okay.  And did you use that a lot?

1    A.    Yes.

2    Q.    How about Yahoo Instant Messenger?  Did you have one of

3    those accounts?

4    A.    Yes, I did.

5    Q.    Okay.  And Xenga, did you have a Xenga account?

6    A.    Yes, I did.

7    Q.    Okay.  Do you know if Megan had those accounts as well?

8    A.    I know she had an AIM and Yahoo.

9    Q.    Okay.  How did you know that?

10   A.    Because I used to talked to her on it.

11   Q.    Would this have been in September and October of '06 or

12   before that?

13   A.    Before that.

14   Q.    Now, let me take you to October 16th of 2006.  Did

15   you go to school that day?

16   A.    Yes, I did.

17   Q.    What about time did you get home?

18   A.    Around 3:00.

19   Q.    Okay.  And what did you do when you got home?

20   A.    Homework.

21   Q.    And how long did that take?

22   A.    It took me about 45 minutes.

23   Q.    And was Ashley at your house?

24   A.    Yes, she was.

25   Q.    Was this like a workday for her?

1    A.    Yes.

2    Q.    Okay.  And was she on the computer?

3    A.    Yes, she was.

4    Q.    Now, did you find out anything about like an electronic

5    argument that was going on?

6    A.    Yes, I did.

7    Q.    What did you find out?

8    A.    That Megan and Josh and Shawna and some other people

9    were fighting back and forth.

10   Q.    Okay.  Who's Shawna?

11   A.    Shawna is a person who used to live here that moved to

12   Ohio.  She's my age.

13   Q.    Okay.  And who else was part of the electronic

14   argument?

15   A.    Her friend, or cousin or something, and Josh, Megan,

16   and Shawna.

17   Q.    Was there another boy in the argument as well?

18   A.    I think so.

19   Q.    And did you actually read the messages that were going

20   around?

21   A.    Yes.  I stood behind her just a little bit after I

22   finished my homework.

23   Q.    I'm sorry.  Stood behind who?

24   A.    Ashley.

25   Q.    Okay.  And so you were able to read these messages?

1    A.    Yes.

2    Q.    Okay.  Pretty bad things being said?

3    A.    Yes.

4    Q.    By everybody?

5    A.    Yes.

6    Q.    Did you actually see

7    the-world-would-be-a-better-place-without-you message?

8    A.    Yes, I did.  And I told Ashley not to send it.

9    Q.    Okay.  Let's back up just a little bit.  Were you

10   behind Ashley at the computer when Ashley typed it?

11   A.    Yes, I was.

12   Q.    Okay.  Did you read it?

13   A.    Yes.  I told her before she sent it not to send it.

14   Q.    What did you say to her?

15   A.    I was like:  No, Ashley, you cannot send it.

16   Q.    What did Ashley do?

17   A.    She said -- she sent it and laughed about it.

18   Q.    Was there any response to that message from Megan?

19   A.    Huh-uh.

20   Q.    I'm sorry?

21   A.    I don't believe so.

22   Q.    You didn't see any?

23   A.    No.

24   Q.    Now, at the time that last message was sent, was your

25   mom home?

1    A.    No.   She came home after the fact.

2    Q.    Okay.   How much later?

3    A.    Like an hour to 45 minutes.

4    Q.    And when she came home, what happened?

5    A.    She had filing papers in her hand.   She was on the

6    phone.   She had to go to the bathroom.   And we were like:

7    We need to talk to you.

8              And she was like:   Let me do a couple of things

9    and then I'll talk to you about it.

10   Q.    And so you didn't talk to her about this right when she

11   got home, correct?

12   A.    Correct.

13   Q.    Okay.   And at some point, a little bit later, did you

14   and Ashley talk to her?

15   A.    Yes, we did.

16   Q.    Okay.   And did you tell her what had happened?

17   A.    Yes.

18   Q.    What was your mom's reaction?   What did she say?

19   A.    She was mad about it.

20   Q.    What happened next?

21   A.    We heard -- Shaun came in -- that was Kukla's

22   husband -- came in and said there was an ambulance about

23   four houses down so --

24   Q.    Let me stop you right there.   Shaun is Kukla Finnegan's

25   husband?

1    A.    Yes.

2    Q.    And Kukla Finnegan is Eugenia Finnegan, right?

3    A.    Yes.

4    Q.    Okay.  And what was her husband Shaun doing in the

5    house?

6    A.    Plumbing in the basement.

7    Q.    Is he a plumber?

8    A.    Yes, he is.

9    Q.    So he came in and said something happened?

10   A.    Yeah.  He saw an ambulance about four houses down.

11   Q.    Okay.  And what happened next?

12   A.    I ran down the street and I -- Ashley followed me and a

13   couple of other people; and I met with this girl; and she

14   was like Megan was out of breath.

15            And I stayed there for a few minutes and then I

16   started going back and my mom came; and I left and she asked

17   what was happening.

18   Q.    Okay.  And did you tell her what was happening?

19   A.    Yes.

20   Q.    What happened next?

21   A.    We went back to our house.  I was in tears.  I could

22   not believe it.  And we drove Ashley home.  Ashley deleted

23   the MySpace; and we drove Ashley home; and we didn't really

24   talk to her about much after.

25   Q.    Why did Ashley delete the MySpace?

1    A.    Because she thought that it would be off of our

2    computer.

3    Q.    Okay.  Did somebody tell her to do that?

4    A.    Yes.

5    Q.    Who was that?

6    A.    My dad.

7    Q.    Did your mom tell her to do it?

8    A.    My mom was like:  If you delete it, it's still going to

9    be on the hard drive.

10   Q.    Okay.  Did she tell Ashley to delete it?

11   A.    No.

12   Q.    At some point in September or October of 2006, did you

13   print out some of the things that Megan had been writing?

14   A.    Yes, we did.

15   Q.    And what did you do with that material?

16   A.    We saved it in our file.

17   Q.    In the days that followed October 16th, 2006, you

18   just went back to school?

19   A.    Yes.

20   Q.    Did you also change schools?

21   A.    I changed schools last year.

22   Q.    Why did you change schools?

23   A.    Because my school cannot control the bullying so they

24   pretty much kicked me out.

25   Q.    Who was being bullied?

1    A.    I would probably be bullied if I went back there.

2    Q.    Let me ask you about Megan and medications.  Did you

3    know that she took some kind of medication?

4    A.    Yes, I did.

5    Q.    Okay.  Did you know what for?

6    A.    I knew it was something like my brother, what he took.

7    Q.    And did your brother have some kind of a condition?

8    A.    Yes.

9    Q.    What does he have?

10   A.    ADHD.

11   Q.    Did you ever see your mom give Megan medication?

12   A.    No, I did not.

13   Q.    Okay.  Did you spend time on like vacations and your

14   family took Megan with you?

15   A.    Yes, we did.

16   Q.    Okay.  And did she have medications with her then?

17   A.    Yes.

18   Q.    Okay.  And how did she take that medication?  Who would

19   give it to her?

20   A.    She would give it to herself.

21   Q.    Okay.  And how many times you think that she went with

22   your family?

23   A.    On vacation?

24   Q.    Right.

25   A.    She went on one big -- she went to Illinois with us a

1    couple of times and Kansas City.  And then she went on one

2    big vacation with us.

3    Q.    Okay.  After Megan's death, how did you feel?

4    A.    I was devastated.

5    Q.    Why?

6    A.    Because she was my best friend.

7    Q.    Even through all of the things that happened in

8    September?

9    A.    Yes.  She was still my best friend.

10   Q.    How do you feel today?

11   A.    Devastated.

12          MR. STEWARD:  Nothing further, Your Honor.

13          THE COURT:  All right.  Cross?

14                    **CROSS-EXAMINATION**

15   BY MR. O'BRIEN:

16   Q.    Sarah, my name is Tom O'Brien.  You feel devastated

17   because you lost your best friend; is that right?

18   A.    Yes, I do.

19   Q.    Do you feel you had any role in the fact that she's no

20   longer here?

21   A.    No.

22   Q.    Nothing to do with it?

23   A.    No.

24   Q.    You have a good relationship with your mother, correct?

25   A.    Yes, I do.

1    Q.   Do you live with your mom?

2    A.   Yes, I do.

3    Q.   You talk to her every day?

4    A.   Yes.

5    Q.   She your best friend?

6    A.   Yes.

7    Q.   You talk to her about school?

8    A.   Yes, I do.

9    Q.   Friends?  Yes?

10   A.   Yes.

11   Q.   Boys?

12   A.   No.

13   Q.   You don't talk to your mom about boys?

14   A.   No.

15   Q.   You talk about everything except boys?

16   A.   Yes.

17   Q.   You used to talk about Megan?

18   A.   Yes.

19   Q.   Talked about your friendship with Megan?

20   A.   Yes.

21   Q.   Your problems with Megan?

22   A.   Yes.

23   Q.   So you talked about everything except for boys; is that

24   right?

25   A.   Yes.

1   Q.   Did you talk to her about what you're going to testify
2   about today?
3   A.   No, we did not.
4   Q.   You have never talked to your mother about what you're
5   going to testify about today?
6   A.   We did talk but not -- she did not tell me what to say.
7   Q.   Did you ever talk to your mom about what you were going
8   to say today?
9   A.   No, I did not.
10  Q.   Did you ever talk to her attorney?
11  A.   No.  We went over it but I'm telling you the truth.
12  Q.   That's not my question, Sarah.  How many times did you
13  going over your testimony with the attorney?
14  A.   A couple.
15  Q.   How long?
16  A.   Not that long.
17  Q.   How long is not that long?
18  A.   Like twenty minutes.
19  Q.   Total?
20  A.   Yes.  No, not total.  Like together.  Twenty minutes at
21  a time.
22  Q.   Twenty minutes twice?
23  A.   Yes.
24  Q.   When was the last time you went over your testimony?
25  A.   Yesterday.

1    Q.    And before that?

2    A.    A couple of weeks ago.

3    Q.    And that was it?

4    A.    Yes.

5    Q.    How old is your mom?

6    A.    49.

7    Q.    She was 47 back when this occurred?

8    A.    Yes.

9    Q.    The Josh Evans account?

10   A.    *(No response.)*

11   Q.    Is that right?

12   A.    Yes.

13   Q.    And you were thirteen years old; is that right?

14   A.    Yes.

15   Q.    And Ashley was eighteen?

16   A.    Yes.

17   Q.    You called Megan your best friend?

18   A.    Yes, she was.

19   Q.    And you found out she was saying some bad things about

20   you, correct?

21   A.    Yes.

22   Q.    Did you ever say bad things about her?

23   A.    No, not really.  Sometimes but not that much.

24   Q.    So when she would call you fat and ugly, did you ever

25   say bad things to her?

1   A.   No.

2   Q.   Never?

3   A.   No.

4   Q.   She called you a lesbian.  Did you ever say bad things

5   about her?

6   A.   No.

7   Q.   Even though she would say these bad things about you --

8   A.   I'm a good person, though.

9   Q.   I'm sure you are, Sarah.  She would say bad things

10  about you and you would just ignore it?

11  A.   Yes.

12  Q.   Would it make you mad?

13  A.   Yeah.

14  Q.   It would make you mad, wouldn't it?

15  A.   Yes.

16  Q.   Your best friend calls you names makes you mad, right?

17  A.   Yes.

18  Q.   Did you tell your mom about what Megan said about you?

19  A.   No.  She found out after the fact.

20  Q.   I don't know what "after the fact" means.  But when

21  Megan would say bad things about you and you were mad,

22  wouldn't you tell your mother?

23  A.   Yes.

24  Q.   So you did talk to your mother about the things Megan

25  was saying; is that right?

1    A.    Yes.

2    Q.    Did your mother get mad, too?

3    A.    Yes.

4    Q.    Because she loves you, doesn't she?

5    A.    Yes, she does.

6    Q.    And even after Megan would say bad things about you,

7    you'd get mad, you'd tell your mom, she'd get mad, but then

8    you'd make up with Megan, right?

9    A.    Yes, I would.

10   Q.    And how many years did this take place where Megan

11   would say bad things about you, you'd get in a fight and

12   then get back together?

13   A.    From like sixth grade.

14   Q.    And Megan died at the beginning of her eighth grade,

15   right?

16   A.    Yes.

17   Q.    So about two or three years?

18   A.    Yes.

19   Q.    Safe to say Megan was boy crazy?

20   A.    Yes, she was.

21   Q.    You think she was more boy crazy than other

22   13-year-olds?

23   A.    No.

24   Q.    She liked boys, correct?

25   A.    Yes.

1   Q.   Did Megan have a problem with her self-esteem?  Do you

2   know what that means?

3   A.   Yes.

4   Q.   Did she --

5   A.   Yes.

6   Q.   Sorry.  What was her problem with her self-esteem?

7   A.   She would think that she didn't fit in places.

8   Q.   Why?

9   A.   Because people called her fat and ugly.

10  Q.   I'm sorry?

11  A.   People would say that she was fat.

12  Q.   Fat and ugly?

13  A.   Yeah.

14  Q.   Did she ever tell you that?

15  A.   Yes.

16  Q.   Sometimes you'd tell her she was fat and ugly, right?

17  A.   No.

18  Q.   You never told her that?

19  A.   No.

20  Q.   Was she sad when people told her she was fat and ugly?

21  A.   Yes.

22  Q.   Now, Megan used to share her secrets with you; isn't

23  that correct?

24  A.   Yes.

25  Q.   You guys were best friends?

1    A.    Yes.

2    Q.    Megan used to tell you sometimes she didn't want to

3    live any more; isn't that right?

4    A.    Yes.

5    Q.    She wanted to kill herself?

6    A.    Yes.

7    Q.    How many times did Megan tell you that?

8    A.    Once.

9    Q.    When did she tell you that?

10   A.    In -- I don't remember what year or when that was.

11   Q.    Do you remember how she told you?

12   A.    She goes:  I don't know if I can live any longer.

13   Q.    Is that over an e-mail or message or was it in person?

14   A.    In person.

15   Q.    Do you remember where you were when she told you that?

16   A.    Megan's house.

17   Q.    How did you feel when Megan said --

18   A.    I told her -- I told her not to do it and I thought she

19   was listening to me.

20   Q.    Not to do what?

21   A.    Not to kill herself and that she was a good person.

22   Q.    Did that scare you?

23   A.    Yes.

24   Q.    Traumatize you?

25   A.    Yes.

1    Q.   Did you tell your mom?

2    A.   No.

3    Q.   Why didn't you tell your mom?

4    A.   I didn't think that I should.

5    Q.   You didn't think you should tell your mom your best

6    friend might want to kill herself?

7    A.   Yes.

8    Q.   You did tell your mom, didn't you?

9    A.   No, I didn't.

10   Q.   Did you tell your dad?

11   A.   No, I did not.

12   Q.   Who did you tell?

13   A.   Nobody.

14   Q.   Did you tell Mr. and Mrs. Meier?

15   A.   No, I didn't.

16   Q.   So your best friend said she might want to kill herself

17   and you just decided not to tell anyone?

18   A.   Yes.

19          MR. STEWARD:  Objection; asked and answered.

20   Counsel is close to badgering the witness, Your Honor.

21          THE COURT:  Overruled.

22   BY MR. O'BRIEN:

23   Q.   Did you tell anybody at all?

24   A.   No.

25   Q.   So you knew that Megan had some mental issues, right?

1    A.    Yes.

2    Q.    I'm sorry?

3    A.    Yes.

4    Q.    And you knew she was seeing a doctor, right?

5    A.    *(No audible response.)*

6    Q.    We need a "yes" or "no," not a head nod.

7    A.    Yes.

8            MR. STEWARD:  Objection.  The poor girl is crying.

9    Yes or no, not a head nod; come on.  Be professional.

10           THE COURT:  Counsel, don't get on your high horse.

11           Let me ask the witness.  Do you need a break?  You

12   feel you can answer the questions without a break?

13           THE WITNESS:  Yes.

14           THE COURT:  All right.

15   BY MR. O'BRIEN:

16   Q.    You knew Megan was seeing a psychiatrist, right?

17   A.    I knew she was seeing something but I didn't know

18   exactly what it was.

19   Q.    You knew she was seeing someone about her depression,

20   right?

21   A.    Yes.

22   Q.    And she told you about the visits to the doctor?

23   A.    I went with one.  I went to one with her.

24   Q.    You went to the doctors with Megan?

25   A.    Yeah.

1   Q.   And you knew Megan was taking medicine for her
2   depression; isn't that right?
3   A.   Yes.
4   Q.   And did you talk to your mom about this?
5   A.   No.
6   Q.   You never told your mom that Megan was seeing a doctor
7   about depression?
8   A.   No.
9   Q.   You never told your mother that Megan was taking
10  medicine for depression?
11  A.   No.
12  Q.   But you shared everything with your mother; isn't that
13  correct?
14  A.   Not everything, but most of the stuff.
15  Q.   You said earlier you didn't talk about boys with your
16  mother.
17  A.   Yes.
18  Q.   Didn't you talk to your mother about Megan?
19  A.   No.   Sometimes in different situations.
20  Q.   When Megan said bad things about you, you said you got
21  mad, right?
22  A.   Yes.
23  Q.   And you told your mom that, right?
24  A.   Yes.
25  Q.   And your mom got mad?

1    A.    Yes.

2    Q.    You told your mom when Megan would say bad things about

3    you, right?

4    A.    Yes.

5    Q.    But you didn't tell your mom that Megan had talked

6    about killing herself?

7    A.    No.

8          MR. STEWARD:   Objection; asked and answered.

9          THE COURT:   I'll sustain the objection.

10   BY MR. O'BRIEN:

11   Q.    Now, these vacations you went on, you know Megan had to

12   take medication, correct?

13   A.    Yes.

14   Q.    And she took medication?

15   A.    Yes.

16   Q.    Antidepressant medication?

17   A.    I didn't know what it was.   I thought it was like my

18   brother's ADD.

19   Q.    But, again, you knew she was taking antidepression

20   medication?

21   A.    Yes.

22   Q.    Did your mother give her that medication?

23   A.    No, she did not.

24   Q.    How old was Megan on these vacation trips?

25   A.    The last one -- like I'm not sure of the exact, what

1    dates, because she went different times with us.

2    Q.    The first trip that she went on vacation and she took

3    medication, do you remember what grade you were in?

4    A.    I think sixth.

5    Q.    So you would have been eleven years old or so?

6    A.    Yes.

7    Q.    And Megan would have been eleven years old?

8    A.    Yes.

9    Q.    And you're saying that on these trips Megan took

10   medication on her own?

11   A.    Yes.

12   Q.    Did you see her take the medication?

13   A.    Yes, I saw her.

14   Q.    Did your mother see her take it?

15   A.    Yes.

16   Q.    Your mother saw Megan taking medication?

17   A.    Yes.

18   Q.    Now, there was a time that Megan's parents had to

19   switch -- switch the locks on Megan's bedroom door, right?

20   A.    Yes.

21   Q.    You knew about that?

22   A.    No, I did not know that she had switched her locks.

23   Q.    How did you know about the fact that the locks were

24   switched?

25   A.    After her death.

1    Q.    You found about it afterwards?

2    A.    Yes.

3    Q.    Did Megan ever tell you that; that the parents had

4    switched her locks?

5    A.    No.

6    Q.    Did Megan ever tell you that her parents were watching

7    her because they were afraid she might commit suicide?

8    A.    No.

9    Q.    You were watching her carefully; you were afraid she

10   might commit suicide?

11   A.    Yes.

12   Q.    So you watched her carefully, wouldn't you?

13   A.    Yes.

14   Q.    Because you knew she was kind of fragile, right?

15   A.    Yes.

16   Q.    You knew she cut her wrists at one time?

17   A.    I knew that she talked about it but I wasn't sure if

18   she did it.

19   Q.    How many times she talk about cutting her wrists?

20   A.    Once.

21   Q.    And when was that?

22   A.    I'm not sure.

23   Q.    Do you know what grade you were in?

24   A.    I think it was sixth or seventh.  I'm not sure.

25   Q.    Did you see the scratch marks on her wrist?

```
 1    A.    No.
 2    Q.    Did she say that she was going to cut her wrists or she
 3    had cut her wrists?
 4    A.    She was going to.
 5    Q.    Was this the second time then she talked about killing
 6    herself?
 7    A.    Yes.
 8    Q.    So there were two times?
 9    A.    Yes.
10    Q.    So the first time I think you said it was over Megan's
11    house; is that right?
12    A.    Yes.
13    Q.    What was the second time when Megan said she was
14    thinking about cutting her wrists?
15    A.    I don't remember.
16    Q.    But it was a different time, right?
17    A.    Yes, it was a different time.
18    Q.    How did you feel about that?
19    A.    I was hurt.  I don't know.
20    Q.    You scared?
21    A.    Yes.
22    Q.    Were you scared for Megan's life?
23    A.    Yes.
24    Q.    Did you tell your mom?
25    A.    No.
```

```
1    Q.    Why not?
2    A.    I don't remember.  I don't know why I didn't tell her.
3    Q.    Did Megan ever send you messages or e-mails about not
4    wanting to live any more?
5    A.    Yes.
6    Q.    How many times?
7    A.    Once.
8    Q.    When was that?
9    A.    The day that she told me at her house.
10   Q.    Was that the first time?
11   A.    Yeah.  The first time.
12   Q.    So she sent you a message and then you went and saw her
13   face to face?
14   A.    Yes.
15   Q.    And what did the message say?
16   A.    I don't remember exactly what it said.
17   Q.    But, in essence, it was a message from Megan to you
18   saying that Megan didn't want to live any more?
19   A.    Yes.
20   Q.    And then you went to her house and she told you in
21   person?
22   A.    Yes.
23   Q.    Where were you when you received that message?
24   A.    In my living room.  No, my dining room area.
25   Q.    How did you receive that message?
```

1    A.    Computer.

2    Q.    Whose computer?

3    A.    My mom's.

4    Q.    Was your mom home at the time?

5    A.    No, she was not.

6    Q.    Were you on the Internet by yourself?

7    A.    Yes.

8    Q.    Did you show your mother that message?

9    A.    I don't remember.

10   Q.    You don't remember if you showed her the message?

11   A.    She knows about it now but I don't remember if I showed

12   her then.

13   Q.    Did you ever discuss receiving that message with your

14   mom?

15   A.    I don't remember.

16   Q.    Ashley Grills, is she like a sister to you?

17   A.    Yes, she was.

18   Q.    She was?

19   A.    Yes, she was.

20   Q.    And she treated your mother like her own mother, didn't

21   she?

22   A.    Yes.

23   Q.    Your mother took care of her?

24   A.    Yes.

25   Q.    Did she obey your mother?

1    A.    Yes, she did.

2    Q.    Besides Ashley being like a daughter to your mother,

3    your mother also paid her as an employee?

4    A.    Yes.

5    Q.    Is that right?  And she would work in your mother's

6    home office, correct?

7    A.    Yes.

8    Q.    And I'm talking about the summer and the fall of 2006.

9    A.    Yes.

10   Q.    And did your mother have another office or was it just

11   the home office?

12   A.    Just the home office.

13   Q.    Is that right off the kitchen?

14   A.    Yes.

15   Q.    And inside there's a computer, correct?

16   A.    Yes.

17   Q.    In the office?

18   A.    Yes.

19   Q.    Whose computer was that?

20   A.    My mom's.

21   Q.    Did you have other computers in the house?

22   A.    We have one other one.

23   Q.    Where is that?

24   A.    It was in my room but we moved it to the basement.

25   Q.    Which computer would Ashley use?

```
 1   A.   My mom's computer.

 2   Q.   Your mom's computer?

 3            And you had high speed Internet; is that right?

 4   A.   Yes.

 5   Q.   I'm sorry?

 6   A.   Yes, we did.

 7   Q.   And was that from Charter Communications; do you know?

 8   A.   Yes.

 9   Q.   And who paid the bill for that?

10   A.   My mom.

11   Q.   And that gave you access to the Internet; is that

12   right?

13   A.   Yes.

14   Q.   Now, that summer Megan's parents moved her to a private

15   school; is that correct?

16   A.   Yes.

17   Q.   How did you feel about that?

18   A.   I -- at first I was upset that she was moving to

19   another school but then I got over it.

20   Q.   Why were you upset?

21   A.   Because I wanted to be at school with Megan.

22   Q.   How did your mom take it when she found out that Megan

23   went to a private school?

24   A.   She didn't really care.

25   Q.   She didn't care at all?
```

1    A.    No.

2    Q.    But she cared that you were upset?

3    A.    Yeah.  But she didn't care.

4    Q.    And sometime during that summer I think you said on

5    direct you heard rumors that Megan was saying bad things

6    about you again?

7    A.    Yes, I did.

8    Q.    Seemed like for years she had been saying bad things

9    about you; is that right?

10   A.    Yes.

11   Q.    And you'd get mad?

12   A.    Yeah, but I would always accept Megan back.

13   Q.    Okay.  So what was different this time?

14   A.    I didn't know that we were in a fight.  I didn't know

15   that we had a falling out or anything.  I just thought that

16   it was a little longer than two weeks that she didn't come

17   back.

18   Q.    So for two weeks you had heard was it from different

19   friends --

20   A.    Yes.

21   Q.    -- they were saying that Megan is saying bad things

22   about you --

23   A.    Yes.

24   Q.    -- is that right?

25         And so this time you decided to do something

1   different about it?

2   A.   I didn't do anything about it.

3   Q.   You didn't do anything, did you?

4   A.   No.

5   Q.   You and your mom and Ashley were in -- at your home one

6   day talking about this, right?

7   A.   No.  Ashley, she got mad one day.  I came home and she

8   was saying that Megan was saying bad things about me again

9   after she moved.

10  Q.   So you came home and told Ashley --

11  A.   Yeah.  And she got mad.  She's like:  I have a way that

12  we can maybe figure out what she was saying about me.

13  Q.   Where was your mother when you were talking with

14  Ashley?

15  A.   She was not home at that time.

16  Q.   It was a workday?

17  A.   Yes.

18  Q.   And so what were your ideas to get back?

19  A.   It was not my idea.  It was Ashley's.

20  Q.   Did you discuss different ideas?

21  A.   No, we didn't discuss anything.  She was like:  I have

22  an idea what we can do; and she typed it in and did it.

23  Q.   Now, did you know whether or not Megan had a MySpace

24  account?

25  A.   Yes, because she sent me a couple weeks prior that I'm

```
 1    a lesbian and that no one likes me; I'm a bad person.

 2    Q.    She said that to you?

 3    A.    Yes.

 4    Q.    Megan sent that to you?

 5    A.    Yes.

 6    Q.    On your MySpace account?

 7    A.    She sent me a message.

 8    Q.    How do you know she had a MySpace account?

 9    A.    Because she -- I got a message from her one day.

10    Q.    And from the message you could tell it came from a

11    MySpace account?

12    A.    Yes, it was MySpace.

13    Q.    Did you have a MySpace account?

14    A.    Yes, I did.

15    Q.    Your own MySpace account?

16    A.    Yes.

17    Q.    Not the Kelly one, your own one?

18    A.    Yes, I did.

19    Q.    Okay.  And did you set it up yourself?

20    A.    Yes, I did.

21    Q.    How old were you when you set that up?

22    A.    Eleven, twelve.

23    Q.    Under what name?

24    A.    Sarah.

25    Q.    Who helped you set it up when you were eleven or twelve
```

1    years old?

2    A.    I set it up myself.

3    Q.    And where did you access that Sarah account?

4    A.    My mom's computer.

5    Q.    In the office?

6    A.    In the dining room.

7    Q.    And how often did you do that?

8    A.    I was on it like every day.

9    Q.    How long every day?

10   A.    Probably an hour or two.

11   Q.    Where was your mom when you were on the account every

12   day?

13   A.    She was doing her work and paperwork and she was gone.

14   She wasn't there with me.

15   Q.    So from the time you were eleven to the time you were

16   on thirteen, you were on your own MySpace account every day

17   for about an hour and your mother was never there?

18   A.    No.

19   Q.    Not once?

20   A.    No.  She was there but she didn't see what I was typing

21   but she was there a couple of times.

22   Q.    So you were typing on the computer in your mom's office

23   every day for an hour --

24   A.    Yes.

25   Q.    -- on your MySpace account and your mother never knew?

1    A.    Yes.

2    Q.    Did your dad ever know?

3    A.    No.

4    Q.    Did you think you had to hide it from her?

5    A.    I didn't hide it from her.

6    Q.    She just never looked at what you were doing?

7    A.    She did a couple of times but not really, no.

8    Q.    So she did look?

9    A.    A couple of times.

10   Q.    Did she talk to you about your MySpace account?

11   A.    No.

12   Q.    She didn't ask you what you were doing?

13   A.    No.

14   Q.    She just saw you on your MySpace account and never

15   asked you a question about what you were doing?

16   A.    She asked me to stop sometimes but not really.

17   Q.    Okay.   The sometimes she asked you, what did she ask

18   you?

19   A.    Who I'm talking to.

20   Q.    On your MySpace account?

21   A.    Yes.

22   Q.    So your mom knew you did have a MySpace account?

23   A.    Yes.

24   Q.    And she knew you were talking to people on the MySpace

25   account?

1   A.    Yes.

2   Q.    Did she ask you how you got on MySpace account?

3   A.    No.

4   Q.    Did she ever ask you how old you had to be to be on

5   MySpace?

6   A.    No.

7   Q.    You knew you couldn't be on at age eleven?

8   A.    I didn't know the age limit.

9   Q.    You didn't?

10  A.    No.

11  Q.    Did you put your real date of birth when you opened

12  your account?

13  A.    No.

14  Q.    Why not?

15  A.    Because they wouldn't let me.

16  Q.    They wouldn't let you if you used your real date of

17  birth, right?

18  A.    Yes.

19  Q.    Because you were too young to be on; isn't that right?

20  A.    Yes.

21  Q.    So you did know you couldn't be on at that kind of an

22  age; is that correct?

23  A.    Yes.

24  Q.    Now, you say that Ashley came up with this idea all by

25  herself to do the Josh account?

1    A.    Yes, she did.

2    Q.    Okay.  Did you talk to her about it?

3    A.    No.  After -- after she created it, I did.

4    Q.    Well, when you told her that Megan is saying bad things

5    about me and Ashley said:  I've got a great idea, something

6    like that, right?

7    A.    Yes.

8    Q.    Did you say:  What's your idea?

9    A.    No.

10   Q.    When she said:  I've got a great idea, what did you

11   say?

12   A.    I don't remember what I said.

13   Q.    Did you say anything to her?

14   A.    I don't remember.

15   Q.    Did you discuss the idea?

16   A.    No.

17              MR. STEWARD:  Objection; asked and answered.

18              THE COURT:  Sustain the objection.

19   BY MR. O'BRIEN:

20   Q.    Did you have any discussion with Ashley at all about

21   what she was going to do?

22              MR. STEWARD:  Objection; asked and answered.

23              THE COURT:  Overruled.  Set the timeframe.

24   BY MR. O'BRIEN:

25   Q.    When you went home and told Ashley that Megan was

```
 1   saying bad things and Ashley said:  I have an idea, did you
 2   have any discussion with Ashley about what Ashley was going
 3   to do?
 4   A.   No.
 5   Q.   You didn't ask her?
 6   A.   No.
 7   Q.   You didn't ask to hear what the idea was?
 8   A.   No.
 9           MR. STEWARD:  Objection; asked and answered.
10           THE COURT:  I'll sustain the objection.
11   BY MR. O'BRIEN:
12   Q.   Did you say:  I have an idea, too?
13   A.   No.
14           MR. STEWARD:  Objection; asked and answered.
15           THE COURT:  Overruled.
16   BY MR. O'BRIEN:
17   Q.   What did you do next?
18   A.   I don't remember exactly what I did.
19   Q.   Did you stay -- by the way, this conversation was in
20   your mom's home office?
21   A.   Yes.
22   Q.   Did Ashley log on to MySpace?
23   A.   Yes.
24   Q.   So you did see her do that?
25   A.   Yes.
```

1  Q.   And where were you when she did that?

2  A.   I was -- no.   I was at PSR that night that she

3  created --

4  Q.   I'm sorry.

5  A.   I was at PSR that night that she created it.

6  Q.   I'm sorry.   What's PSR?

7  A.   Religion school.

8  Q.   Okay.   So after she said she had an idea, you don't

9  know what she did?

10 A.   I don't remember what she did, but I know I had PSR

11 that night.

12 Q.   So she didn't do anything in front of you?

13 A.   No.   Or in front of my mom.

14 Q.   Or in front of your mom?

15 A.   Yes.

16 Q.   When is the first time you found out?

17 A.   After she created it.

18 Q.   After Ashley created the MySpace account?

19 A.   Yes.

20 Q.   And how did you find out about that?

21 A.   After she created it.

22 Q.   How did you find out about it?

23 A.   From Ashley.

24 Q.   Did Ashley tell you:   Look what I've done?

25 A.   Yes.

```
1   Q.   When did she do that?

2   A.   When I came home from PSR.

3   Q.   And was your mother with you?

4   A.   Yes.

5   Q.   Did Ashley say:  Look what I've done after you came

6   home from PSR with your mom?

7   A.   Yes.

8   Q.   And did she show you and your mom what she had done?

9   A.   Yes.

10  Q.   What did she show you and your mother?

11  A.   Just the front layout of it.

12  Q.   Of what?

13  A.   Of the MySpace.

14  Q.   Can you describe what that was?

15  A.   It was a nice-looking guy and -- with no shirt on and

16  it said -- I don't remember exactly.  I just remember that

17  guy's face.

18  Q.   Good-looking boy?

19  A.   Yes.

20  Q.   Did Ashley tell you where she got the picture of that

21  good-looking boy?

22  A.   She got it from the Internet --

23  Q.   How do you know that?

24  A.   -- from Google.

25  Q.   From Google?
```

1    A.    Yes.  She told me that.

2    Q.    Your mom was there, too?

3    A.    No, she was not.

4    Q.    I thought you said your mom was there?

5    A.    She was at our house but she wasn't in the room with us

6    at the time.

7    Q.    So you came back from PSR and went into your mom's

8    office?

9    A.    Yes.

10   Q.    And Ashley started to show you this Josh Evans account?

11   A.    Yes.

12   Q.    And where was your mom?

13   A.    My mom was in the house but she was not with us.

14   Q.    So your mom didn't see any of that either?

15   A.    She did.  Yes, she did later on that night.

16   Q.    Later on that night.  Tell me how your mother saw the

17   Josh Evans account?

18   A.    Ashley showed it to her.

19   Q.    Were you present when she did that?

20   A.    Yes.

21   Q.    What did Ashley say about the Josh Evans account?

22   A.    She said that this is the way that we can find out what

23   Megan was saying bad about Sarah.

24   Q.    Did she explain how that would work?

25   A.    Yes.

1    Q.    What did Ashley say?

2    A.    She didn't explain it that night but she told me

3    eventually what we're going to do.  We're going to add me to

4    my MySpace to see what Megan would say about that but we did

5    not do it.

6    Q.    But the plan was to find out what Megan was saying

7    about you, right?

8    A.    Yes.

9    Q.    And she explained it to your mother?

10   A.    Yes.

11   Q.    And what did your mother say?

12   A.    I don't remember what she said.

13   Q.    You were there, though; is that right?

14   A.    Yeah, but I don't remember two years ago that much.

15   Q.    You do remember your mother later that evening coming

16   into her own office and having Ashley explain the MySpace

17   account?

18   A.    I don't remember the exact words.

19   Q.    Do you remember anything your mother said?

20   A.    No.

21   Q.    Did you remember your mother saying:  No, shut this

22   down?

23            MR. STEWARD:  Objection; asked and answered.

24            THE COURT:  Sustained.

25

```
1    BY MR. O'BRIEN:

2    Q.   Did your mother indicate that this was a good idea?

3    A.   She thought it was but then eventually two weeks on she

4    thought it was not going to be a good idea so she had asked

5    Ashley to close it down and Ashley do the funeral.

6    Q.   I'll get to that.  When did your mother first say it

7    was a good idea?

8    A.   She thought it was but the next day or a couple days

9    after.

10   Q.   Did you talk to your mother about the account?

11   A.   No.

12   Q.   How do you know your mother said this is a good idea?

13   A.   Because she -- she told us.

14   Q.   Your mother told you and Ashley?

15   A.   Yes.

16   Q.   That this was a good idea, right?

17   A.   Yes.

18   Q.   It was a good idea to use the Josh Evans account to try

19   to get information from Megan, right?

20   A.   Yes.

21   Q.   And your mother said that she thought that was a good

22   idea?

23   A.   Yes.

24   Q.   And the plan then was to use this good-looking boy to

25   approach Megan Meier?
```

1   A.    Yes.

2   Q.    And your mother encouraged that idea?

3   A.    She did not encourage it.

4   Q.    But she thought it was a good idea?

5   A.    Yes.

6            MR. STEWARD:  Objection; asked and answered.

7            THE COURT:  I'll sustain the objection.

8   BY MR. O'BRIEN:

9   Q.    And she allowed Ashley to use her computer, right?

10  A.    Yes.  She was doing it for work purposes.

11  Q.    Oh, the Josh Evans account was for work purposes?

12  A.    No, no.  She was doing the computer to use for work

13  purposes.  So my mom did not know exactly when she was on

14  the MySpace account.  She thought that she -- whenever she

15  was on it, she thought she was doing her work for her.

16           MR. O'BRIEN:  I'll move to strike that as

17  speculation, Your Honor.

18           THE COURT:  I'll sustain the objection.

19           Let me ask.  How much longer have you got?

20           MR. O'BRIEN:  A while.

21           THE COURT:  All right.  Why don't we stop at this

22  point in time, ladies and gentlemen.

23           Remember when you're on the break, especially

24  since it's going to be on the weekend, please do not discuss

25  this case with anyone.  Do not -- I don't want to say don't

1    watch TV or listen to radio.  But don't watch TV or radio

2    where you would have a chance to be hearing any reports

3    about this case.

4           Otherwise, have a very pleasant weekend and see

5    you all on Monday at 10:30 on Monday.  10:30.

6                *(The jurors exited the courtroom.)*

7           THE COURT:  Let me indicate, the witness, you are

8    excused for tonight.

9           Let me indicate to counsel that I want to see

10   counsel at 10 o'clock on Monday morning.  Also, let me ask

11   the defense.  How many more witnesses do you have?

12          MR. STEWARD:  One perhaps two.

13          THE COURT:  All right.

14          Anything else we need to discuss?

15          MR. STEWARD:  No, Your Honor.

16          MR. O'BRIEN:  No, Your Honor.

17          MR. KRAUSE:  Just to clarify.  I owe you a disk, a

18   hard copy and e-mail copy --

19          THE COURT:  Yes.

20          MR. KRAUSE:  -- to you and counsel.

21          THE COURT:  Yes.

22          Also, I indicated parties if either of you want to

23   throw anything else in with regards to the motion, give me

24   that sometime before tomorrow.  I need it this weekend.

25          MR. KRAUSE:  Would e-mail be okay?

```
 1              THE COURT:  E-mail will be fine.

 2              Defense counsel, do you have a copy of the e-mail

 3    address?

 4              MR. STEWARD:  I think it's on our PACER web

 5    chambers?

 6              MR. KRAUSE:  Can we approach after?

 7              MR. STEWARD:  We'll get it Your Honor.

 8              THE COURT:  Get it from my clerk.

 9              MR. KRAUSE:  Javier.

10                 (Court and the clerk conferred.)

11              MR. KRAUSE:  May we approach?

12              THE COURT:  One other thing.  Here are copies of

13    Ms. Meier's testimony and also Ms. Grills.

14              MR. KRAUSE:  Thank you.

15             (At 5:05 p.m. proceedings were concluded.)

16

17                            -oOo-

18

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2

3          I hereby certify that pursuant to Section 753,

4    Title 28, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9
     Date:  June 17, 2009
10

11

12                              _____

13                              PAT CUNEO, OFFICIAL REPORTER
                                CSR NO. 1600
14

15

16

17

18

19

20

21

22

23

24

25